BROOKS ELLISON
State Bar No. 122705
PATRICK J. WHALEN
State Bar No. 173489
THE LAW OFFICES OF BROOKS ELLISON
1725 Capitol Ave.
Sacramento, CA 95811
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
California Dump Truck Owners Association

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION<br><br>          Plaintiff,<br>  vs.<br><br>MARY D. NICHOLS, Chairperson of the California Air Resources Board; JAMES GOLDSTENE, Executive Officer of the California Air Resources Board; and DOES 1-50<br><br>          Defendants,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>          Defendant-Intervenor | Case No.  2:11-CV-00384-MCE-GGH<br><br>**MOTION FOR SUMMARY JUDGMENT**<br><br>(Fed.R.Civ.P. 56(c))<br><br>Date:      January  26, 2012<br>Time:      2:00 p.m.<br>Courtroom.:  7 |

- 1 -

# TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL HISTORY ................................................. 1

II. STATEMENT OF FACTS ................................................................... 1

III. ARGUMENT ......................................................................... 10

  A.  Standard for Summary Judgment ..................................................... 10

  B.  The "Truck and Bus Regulation" is Preempted by Federal Law ......................... 10

    1. Principles of Preemption ........................................................ 10

    2. The safety exception ........................................................... 12

    3. The "Truck and Bus Regulation" will impact the price, routes, and service of motor carriers ........................................................................ 13

  C.  Declaratory and Injunctive Relief is Required ...................................... 18

CONCLUSION ............................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ........... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)................................................ 10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ................................................................ 10

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 517 (1992) ............................................ 10

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429 (2002)........... 11, 12

*CPF Agency Corp. v. Sevel's 24 Hour Towing Service*, 132 Cal.App.4th 1034, 1044 (2005)..... 11

*Data Manufacturing v. United Parcel Service, Inc.*, 557 F.3d 849 ............................................ 16

*Dilts v. Penske*, case # 08-CIV-318 JLS (BLM), ___ F.Supp.2d ___, 2011 WL 4975520 (S.D.
   Cal. 2011)...................................................................................................................... 17

*Employers Association, Inc. v. United Steelworkers of America*, 803 F.Supp. 1558 .................. 19

*Fusco v. Rome Cable Corp.*, 859 F.Supp. 624.................................................................... 19

*Holup v. Gates*, 544 F.2d 82 ................................................................................................ 18

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 ................................................................ 19

*Independent Towers of Washington v. Washington,* 350 F.3d 925, 930 (9th Cir.2003)............... 11

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 ........................................................ 11, 12

*N.L.R.B. v. North Dakota,* 504 F.Supp.2d 750 .................................................................... 19

*Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 ........................... 11, 13, 16

*Sherwood Medical Industries, Inc. v. Deknatel, Inc.*, 512 F.2d 724............................................ 18

*Stanley v. University of Southern California*, 13 F.3d 1313 ...................................................... 20

*Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635 ........................................ 19

**Statutes**

28 U.S.C. § 2201 ................................................................................................................ 18

28 U.S.C. § 2202 ................................................................................................................ 19

49 U.S.C. § 13102 .............................................................................................................. 2, 7

49 U.S.C. §14501 .......................................................................................................... 2, 11, 12

Motion for Summary Judgment

**Rules**

Fed.R.Civ.P. 56(c). ................................................................................................ 10

**Regulations**

13 CCR § 2025 ............................................................................ 1, 2, 7, 13

Motion for Summary Judgment

## I. INTRODUCTION AND PROCEDURAL HISTORY

Defendants Mary Nichols and James Goldstene, in their capacities as Chairperson and Executive Officer, respectively, of the California Air Resources Board ("CARB"), have promulgated a regulation known as the "Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles." 13 CCR § 2025. Within the industry, the rule is known as the "Truck and Bus Regulation." The regulation requires that diesel trucks be replaced, repowered and/or retrofitted with diesel particulate filters (DPFs) beginning on January 1, 2012.

Plaintiff California Dump Truck Owners Association ("CDTOA") is a trade association that represents nearly 1,000 construction industry related trucking companies ranging in size from 1 truck to over 350 trucks whose business constitutes over 75% of the hauling of dirt, rock, sand, and gravel operations in California. CDTOA members will be forced to spend tens of thousands or hundreds of thousands of dollars retrofitting or replacing their trucks starting on January 1, 2012 in order to comply with the regulation.

CDTOA filed a first amended complaint on April 6, 2011, seeking declaratory and injunctive relief. Dkt. # 12. On May 23, 2011, this Court granted the motion by the Natural Resources Defense Council, Inc. ("NRDC") to intervene in this case. Dkt. # 18. On September 20, 2011, this Court issued an order setting a hearing on the motion for summary judgment for January 26, 2012, and directed plaintiff to file such motion no earlier than November 17, 2011. Dkt. # 29. Pursuant to that order, plaintiff now files this motion for summary judgment.

## II. STATEMENT OF FACTS

Plaintiff CDTOA is a nonprofit corporation organized and existing under the laws of the state of California. The mission of CDTOA is to advance the professional interests of construction trucking companies in California. Declaration of Lee Brown (hereafter "Brown Dec.") ¶ 1. CDTOA has approximately 1,000 members, and the membership varies from small owner-operators who own and operate only one truck, to large companies that own fleets of trucks between 400 to 500 power units and trailers. Collectively CDTOA's membership owns or

Motion for Summary Judgment

leases at least 5,000 power units, most primarily based in California. The vast majority of members are motor carriers as that term is defined in 49 U.S.C. §13102.  Materials hauled by members include dirt, sand, rock, gravel, asphalt and heavy equipment. CDTOA members typically transport construction material from aggregate plants, asphalt and cement plants to construction sites. Dirt is primarily hauled from a barrow or construction site to another construction site.  Brown Dec. ¶ 2.   Virtually all of the trucks owned and operated by CDTOA members are subject to the Truck and Bus Regulation promulgated by the Air Resources Board, codified at 13 CCR § 2025.  Brown Dec. ¶ 4.   The regulation is formally known as the Truck and Bus Regulation; On-Road Heavy-Duty Diesel Vehicles (In-Use) Regulation, and is available online at http://www.arb.ca.gov/msprog/onrdiesel/onrdiesel.htm.  It is a "regulation . . . having the force and effect of law" as that term is used in 49 U.S.C. §14501(c)(1).  Brown Dec. ¶ 6.

The regulation requires trucks to be replaced, repowered and/or retrofitted with diesel particulate filters (DPFs) beginning on January 1, 2012, on a schedule based on the truck type and model year of the truck engine. Low mileage dump trucks (under 20,000 miles/year) may be given two year extensions to comply but this will only benefit about 5-10 percent of the trucks owned by CDTOA members. The regulation prohibits older trucks that have not been replaced or retrofitted from operating on the public roadways, and imposes steep fines and penalties on anyone who operates their trucks in violation of the regulation.  Brown Dec. ¶ 5.

The primary source of livelihood for CDTOA members is their diesel powered tractor and truck body or trailer.  Most members purchase trucks to be used for decades, and most are purchased utilizing lengthy conditional sales contracts lasting for 5 to 6 years.  Today financing charges are now running 15-20 percent. The trucks typically cost at least $130,000 to purchase. With new truck bodies and trailers the cost can easily exceed $210,000. Due to the low mile nature of the local haul construction industry, trucks operate about 50,000 miles a year so they have a useful life of several decades if maintained properly.  Brown Dec. ¶ 7.

Available retrofit technology utilizing DPFs enable trucks to comply with the rule but they cost approximately eighteen thousand dollars ($18,000) or more to purchase and install for each truck.  Most CDTOA members at this time do not have the financial resources to purchase

Motion for Summary Judgment

and install retrofit technology for their trucks, and will likely lose their business. The last four years have been especially difficult on the construction trucking industry as home building has dropped by 80%, commercial property development by a similar amount, and even public works investments have dropped. As all three major segment contractors compete for what little work there is today, the lowest winning bid price has little profit margin for the contractor, and even less for the subcontractors and suppliers, which happens to be the category under which the construction trucking falls. In addition, the industry is struggling with diesel fuel price increases that have doubled since 2009.  Likewise, tire costs have increased by at least 30% during this same period. Tires and fuel are the two major components of the operating costs for most trucking businesses. Due to this economic dilemma, virtually no trucking company now makes enough profit to afford to purchase these retrofit devices nor can they pay to buy a new $150,000 truck even with heavy subsidies or grants.  Brown Dec. ¶ 8.

CDTOA members have based their business models on the ability to use their trucks for at least two decades (or more).  Due to the lower mileage nature of construction material hauling (50,000 miles per year) a typical dump truck can travel less than 1 million miles in a twenty year period. A million miles is a milestone that diesel engines may reach or exceed prior to major overhaul requirements. Because the rule requires retrofit or replacement of otherwise perfectly useful and clean trucks (which had to meet state or federal emissions standards when manufactured) much earlier than would otherwise be required, most CDTOA members will be unable to continue their business without substantial capital investment if that is available to them.  This is not an option to many and will disproportionally harm smaller business owners in virtually every segment of the commercial transportation or trucking industry in California, not just construction trucking.  Brown Dec. ¶ 11.

For example, Fred Recupido is a CDTOA member and has been in the construction trucking industry for 40 years. Declaration of Fred Recupido (hereafter "Recupido Dec.") ¶ 1. He started his business with a single truck but over the years expanded to a fleet of 16 trucks and 40 trailers.  Recupido Dec. ¶ 2.  The trucks were periodically upgraded, as Recupido purchased used on-highway trucks and converted them to his industry.  Recupido Dec. ¶ 3.  Recupido built

Motion for Summary Judgment

his business and made capital investments on the assumption that he would be able to continue to use the trucks he purchased for at least 15 years, through 2016. Because of the high initial cost of the trucks, there is little potential profit unless the trucks can be depreciated out and used for many additional years. Recupido Dec. ¶ 8.

Similarly, Robert McClernon is a CDTOA member and has owned his construction trucking business for 34 years. His business mainly involves the transportation of construction material to and from construction sites. He regularly hauls dirt, sand, rock, gravel, and asphalt, among other things in dump trucks and water for on-site compaction and dust control in water trucks. Declaration of Robert McClernon (hereafter "McClernon Dec.) ¶ 1. McClernon currently owns five trucks, all of which will be subject to the regulation. He purchased most of his trucks one at a time over his thirty-four years in the business. When maintained properly, construction trucks, (including both those purchased new and those that are purchased used) have a useful life of several decades if maintained properly. McClernon performed a higher level of maintenance on all his vehicles to ensure they would have a long and useful life. McClernon Dec. ¶ 2.

McClernon had always believed that the equity or value of his equipment would be enhanced with the level of maintenance efforts he committed to his fleet. He built his business and made capital investments on the assumption that he would be able to continue to use the trucks he purchased for many years. At least 20 years of use is normal in his industry, as owners typically reuse on-road freight trucks with some modifications to operate as dump trucks for another 15 or more years. McClernon believed that recycling large trucks was a responsible and "green"/environmentally-friendly statement. He hoped that the hard work and dedication to his business would provide for some of his retirement needs with retained equity in his equipment. Because of the high initial cost of the trucks, the seasonality of his work in northern California, and in many cases, low mileage nature of his work, there is little or no profit unless these trucks can be used for many years. McClernon Dec. ¶ 3.

McClernon maintained his trucks at a high standard because he depended on their longevity to be successful with the lowest possible competitive operating costs. In fact, he

Motion for Summary Judgment

recently smoke tested all three of his on-road vehicles which has been required by CARB's

Periodic Smoke Inspection Program since 1988, and they all tested far below the allowable

maximum emissions levels. His oldest and dirtiest truck tested at an average of 8.2% opacity

with the allowable level set at 55%, which is 670% below this allowable level.  McClernon Dec.

¶ 4.

        After analyzing the impact of the regulation and the cost of compliance, Recupido made a

business decision to sell all but one of his trucks.  He determined that neither retrofitting with

DPFs (Diesel Particulate Filters) nor replacement (with new trucks) were reasonable or

affordable options.  Recupido Dec. ¶ 5.

        Recupido determined that the resale value of his trucks had been cut in half from about

$17,000 to about $8,000.  Recupido Dec. ¶ 6.  He then determined that the cost of a retrofit

would be $18,074 per truck.  Recupido Dec. ¶¶ 6, 10.  He could not justify spending that much

money on a truck whose value had declined so precipitously.  Recupido Dec. ¶ 6.  To retrofit his

entire fleet, he would have had to spend approximately $18,074 per truck to purchase or install

the retrofit technology (DPFs). The costs to comply with CARB's regulations under the retrofit

option would have been over $90,000 per year over a three year period or over $270,000 plus

debt financing.  Recupido Dec. ¶ 11.

        Recupido also determined that the cost of purchasing new trucks could not be justified.

New trucks typically cost in excess of $123,000, and financing charges run 15%-20% depending

on credit worthiness.  Recupido Dec. ¶ 7.  If he were to gradually replace his trucks with new

trucks to comply with the CARB rule, the three year phase in cost would have been about

$615,000/year times three years or $1,845,000, plus debt financing costs.  Recupido Dec. ¶ 12.

        If he purchased new trucks, Recupido would be competing primarily against owner-

operators with older paid-for vehicles and under the regulation, they would not have to make the

financial investment necessary to comply with the regulation for at least two additional years.

As a result, he would be at a competitive disadvantage.   Recupido Dec. ¶ 7.  Presently, there is

virtually no flexibility to raise trucking rates to cover any additional operating costs especially

with fuel prices now above $4.50/gallon and tire prices up by 30% in the last three years. Recupido Dec. ¶ 9.

Similarly, McClernon determined that to replace the types of working trucks he owns today would typically cost in excess of $125,000 each. Because of the very high cost of new trucks, McClernon must obtain long-term (4 to 6 years) financing in order to purchase even used trucks. This method of purchase is common within the construction trucking industry. McClernon Dec. ¶ 2.  McClernon was a motor carrier until November 1, 2010 with a valid motor carrier permit, permit #224233. He has since put his business on hold, has no more employees, and has sold one of his trucks at a substantial loss while he considers his options, and evaluates the uncertainties created by the regulation.  McClernon Dec. ¶ 5.

Based on his familiarity with the rule and its impending effective date, McClernon researched the cost of bringing his trucks into compliance with the rule.  In order to retrofit his trucks with a DPF or diesel particulate filter, he would have to spend approximately $44,372 per truck to purchase and install the retrofit technology due to their ages.  Because of these rules his trucks, although well maintained and very clean are only worth about $6,000 to $9,000 each. This is approximately less than 25% of what their values would have been without these CARB regulations. These prices or value estimates are based on what he has recently seen at equipment and truck auctions such as those sponsored at Richie Bros. Auctioneers in the Sacramento area. It is not practical nor would he likely find financing to put a $45,000 DPF on an $8,000 truck that in most cases would only give him 3 or 4 additional years of compliance and operation before he would have to upgrade again with newer or new trucks.  Furthermore, a DPF is truck-specific by CARB rules, and cannot be re-used on any other trucks in the future.  McClernon Dec. ¶ 5.

McClernon determined that if he were to instead replace his trucks with new trucks to comply with the rule, it would cost approximately $125,000.00 per truck. His current trucks have a very low resale value because potential buyers would be unwilling to pay much for a truck that could not legally be driven in California and only have a value after being shipped out of state or country.  McClernon Dec. ¶ 10.

Motion for Summary Judgment

The replacement costs calculated by Recupido and McClernon are corroborated by Jay Pocock, the Sales Executive for Superior Trailer Works. Pocock's business primarily involves the sale of trucks and trailers. He has been involved in such sales for 25 years. Most of his customers are motor carriers as that term is defined in 49 U.S.C. § 13102. Declaration of Jay Pocock (hereafter "Pocock Dec.") ¶ 1.

Pocock has sold hundreds of trucks and trailers throughout his career, including many to dump truck operators that engage in the transportation of construction material to and from construction sites, including dirt, sand, rock, gravel, and aggregate. Pocock Dec. ¶ 2.

As part of his business, Pocock is aware of the costs of purchasing trucks in California. He is also aware of the Truck and Bus Regulation promulgated by the Air Resources Board, codified at 13 CCR § 2025. To comply with the rule, Pocock knows that many of his customers and industry associates will have to either replace their current trucks with new trucks, or retrofit their old trucks with a diesel particulate filter. Pocock Dec. ¶ 3.

According to Pocock, the price for the most basic 2010 model year truck that would comply with the rule would be approximately $120,000, including federal excise tax and sales tax. In order to purchase a truck with more features, it would cost approximately an additional $20,000. To purchase new dump truck equipment for such a truck, it would cost between $30,000 and $80,000. To transfer older dump truck equipment to the new truck would cost approximately $5,000. Pocock Dec. ¶ 4.

Retrofitting or replacing trucks and engines to comply with the rule will directly impact the price that motor carriers of property must charge for their services for several reasons. First, motor carriers of property will be forced to raise their prices because they will need to defray the costs including financing of retrofitting or replacing their trucks. Also, because many members will be unable to afford to bring their trucks into compliance, there will be fewer motor carriers to meet the transportation needs of the construction industry. As a result, as the construction industry recovers from the recession, the increase in demand for construction trucking services combined with fewer suppliers of those services will result in substantially higher prices for those services. Brown Dec. ¶ 12.

Motion for Summary Judgment

For example, Recupido determined that whether he decided to retrofit or replace his trucks with new vehicles, he would have had to make substantial capital investments in his company, on the order of hundreds of thousands or millions of dollars.  As part of analyzing the CARB compliance options, he determined that the only way for him to afford to make the necessary investments would have been to raise the prices that he charged for his trucking services by between 8 and 25 percent, depending on the compliance path.  If in fact he was forced to raise his rates by any percentage, he would not have been able to obtain any work at all and would likely face bankruptcy. For the work he performs, the decision as to whom to award a job is almost always based primarily on the lowest public works or agency bid.   Quality of service is at best a secondary consideration.  Recupido Dec. ¶ 13.

McClernon is familiar with the impacts of CARB regulations on his business.  He previously voluntarily updated some of his trucks with incentive grant funds from SECAT and his own money and now those trucks will not comply with the new rule without another substantial investment in a DPF. And because it would be unlawful to drive his current trucks at that time (even if they were retrofitted), the trucks would have little or no resale value. McClernon Dec. ¶ 8.  In 2004, CARB adopted a mandatory software update known as a "chip reflash" for affected heavy-duty diesel engines.  McClernon fully complied with this requirement at a substantial cost to his business.  In 2006, a California Superior Court struck down these chip reflash regulations.  McClernon was never re-compensated for the costs of CARB's illegal regulation.  McClernon Dec. ¶ 9.

Whether he decides to retrofit his trucks or replace them, McClernon will have to make substantial capital investments in his company, on the order of hundreds of thousands of dollars.  Such an investment would require him to raise his truck rates by at least 100% as he would have to recoup the costs of equipment purchases within a five year period – the financing period, if finance funding was even available. A 100% rate increase is substantial in the industry today. Also because the competition is so severe, again very little construction is happening because environmental regulations have halted all major growth in the state, there is little to no work. And the work there is, is so competitive that the lowest bids are at a contractor's costs, if not less

Motion for Summary Judgment

than their costs. A 100% rate increase would make McClernon uncompetitive.   He would be out of business and worse yet, more than likely bankrupt. He has been forced into a set of losing options – all will lead to the loss of his business. McClernon Dec. ¶ 11.

The rule will also directly impact the service that motor carriers of property provide, because those CDTOA members with multiple trucks will not be able to replace or retrofit their entire fleets all at once.  Rather, they will have to gradually update their fleets over time.  As a result, they will be unable to provide certain levels of services that they presently provide, because they will not have enough trucks in compliance with the rule.  Brown Dec. ¶ 13.

For example, from approximately September 2010 to the present, Recupido has had too few trucks to service the needs of his customers, which negatively affect the jobs he has been able to bid for, and therefore the level of service he was able to guarantee as part of his previous business model.  Recupido Dec. ¶ 14.  As a result of Recupido's decision to reduce his fleet, the level of services that he can guarantee has significantly declined. The same is true for the entire industry; the level of service has drastically diminished as fewer trucking companies can even operate profitably under today's trucking rate schemes.  Recupido Dec. ¶ 15.

McClernon has determined that the only way for him to afford to make the necessary investments in light of the CARB rule, will be to raise the prices that he charges for his services. However, this is impossible because of his work and the economy. Thus, the only remaining option is to diminish the level of service (go out of business) that he provides for the people of his community that he has served for over thirty years.  McClernon Dec. ¶ 12.

The rule will also directly impact the routes that motor carriers of property take, because the retrofit technology limits the length of time trucks can run continuously.  As a result, those CDTOA members who opt to retrofit their trucks may have to choose different routes in order to accommodate the more limited hours of service of their trucks.  Brown Dec. ¶ 14.

For example, Pocock owns a 2009 truck that has factory-installed diesel particulate filter technology which makes it currently compliant with the Truck and Bus Regulation promulgated by the Air Resources Board.  He also owns an older truck with a larger, less efficient engine than the 2009 truck.  He has driven both trucks under identical circumstances for significant periods

Motion for Summary Judgment

1    of time, and has discovered that the 2009 truck gets less miles per gallon than the older truck

2    with the larger engine.  Normally, all other things being equal, Pocock would expect a new truck

3    with a smaller engine to have better fuel economy than an older truck with a larger engine.  His

4    discovery that the converse is true shows that the filtering technology required to make trucks

5    compliant with the Truck and Bus Regulation results in decreased fuel efficiency.  Pocock Dec. ¶

6    5.

7         Pocock's 2009 truck engine with a diesel particulate filter has also completely shut down

8    while he has been driving it, due to an excess buildup of heat and pressure from the filter unit.

9    This problem has never occurred with any of his trucks that are not equipped with the filtering

10   technology.  Pocock Dec. ¶ 6.

11

12   **III. ARGUMENT**

13        A.  <u>Standard for Summary Judgment</u>

14   Summary judgment is warranted where there is no genuine issue as to any material fact.

15   Fed.R.Civ.P. 56(c).; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The burden

16   initially is on the moving party to show entitlement to summary judgment. *Celotex Corp. v.*

17   *Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate where "the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19   any, show that there is no genuine issue as to any material fact and that the moving party is

20   entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

21

22        B.  <u>The "Truck and Bus Regulation" is Preempted by Federal Law</u>

23   *1.  Principles of Preemption*

24   Article VI of the United States Constitution, known as the Supremacy Clause, provides that

25   "the laws of the United States . . . shall be the supreme Law of the Land; ... anything in the

26   Constitution or Laws of any state to the contrary notwithstanding."  Under the Supremacy

27   Clause, state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Group,*

28   *Inc.*, 505 U.S. 504, 516, 517 (1992).

Motion for Summary Judgment

The United States Supreme Court has recognized that the Federal Aviation Administration Authorization Act of 1994 (the FAAAA) "generally preempts state and local regulation 'related to a price, route, or service of any motor carrier ... with respect to the transportation of property.'" *City of Columbus v. Ours Garage & Wrecker Serv., Inc*., 536 U.S. 424, 429 (2002) ("*Ours Garage*"). Specifically, the FAAAA provides:

> (1) General Rule. Except as provided in paragraphs (2) and (3), a State [or] political subdivision of a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  The phrase "related to" in this general preemption provision is "interpreted quite broadly." *Independent Towers of Washington v. Washington,* 350 F.3d 925, 930 (9th Cir.2003).  Given this mandate of a broad interpretation, courts recognize that a state or local regulation is "related to" the price, route, or service of a motor carrier if the regulation "has more than an indirect, remote, or tenuous effect on the motor carrier's prices, routes, or services." *CPF Agency Corp. v. Sevel's 24 Hour Towing Service,* 132 Cal.App.4th 1034, 1044 (2005).  Congress' purpose in preempting state regulation of the transportation industry was to create "maximum reliance on competitive market forces" to ensure lower prices and better service. *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 378 (1992)  Congress expressly wanted to "ensure that the States would not undo federal deregulation with regulation of their own." *Ibid*.

When Congress expanded the FAAAA to preclude state regulation of trucking in 1994, they used the identical verbiage as had previously been applied to the airline industry.  *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 368-370 (2008).  In so doing, Congress expressly adopted "the broad preemption interpretation adopted by the United States Supreme Court in *Morales*."  *Id*. at 370.  The Court outlined the breadth of federal preemption under the FAAAA:

> (1) state enforcement actions having a connection with, or reference to carrier rates, routes, or services are preempted;

Motion for Summary Judgment

(2) preemption may occur even if a state law's effect on rates, routes or services is

only indirect;

(3) in respect to preemption, it makes no difference whether a state law is

"consistent" or "inconsistent" with federal regulation;

(4) preemption occurs at least where state laws have a significant impact related

to Congress' deregulatory and pre-emption-related objectives.

*Id*. at 370-371, internal quotations and citations omitted.  In *Morales*, the high Court noted that federal law might not preempt state law that only impacted prices in a "tenuous, remote, or peripheral ... manner."  *Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at 390.  In *Morales* the court invalidated a state consumer protection statute that purported to apply to airlines.  *Id*. at 391.

## 2.  *The safety exception*

The FAAAA contains an exception to the foregoing preemption provision.  Specifically, the preemption provision

> shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization

49 U.S.C. § 14501(c)(2).  This "safety" exception permits states to enact laws that are truly aimed at ensuring the safety of motor vehicles.  However, the exception is to be construed narrowly, not broadly.  The United States Supreme Court has declared that "[l]ocal regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule."  *Ours Garage*, *supra*, 536 U.S. 424 at 442.  Accordingly, the only state regulation of motor carriers that is permissible is regulation that is "genuinely responsive to safety concerns."  All CDTOA members who transport construction material are motor carriers of property (see Cal. Rev. & Tax. Code § 7232, subd.

Motion for Summary Judgment

(d)) and therefore any regulations on the construction trucking industry must be limited to the safety exception or they will be deemed invalid under the preemption doctrine.

The Supreme Court has specifically held that public health is *not* an exception to preemption, holding that public health is different than public safety. *Rowe v. New Hampshire Motor Transport Association*, *supra*, 552 U.S. 364 at 374. In *Rowe*, the issue was whether the state could regulate tobacco shipments by requiring shippers to utilize only carriers with a specific recipient-verification service to ensure that only persons with a Maine tobacco license received tobacco, and by imputing upon persons knowledge that a package contains tobacco under specific circumstances. *Id*. at 369. The purpose of the law was to prevent minors from obtaining cigarettes, but the Court determined that notwithstanding that laudable goal, the method chosen by Maine ran afoul of federal law. *Id*. at 373-374.

### 3. The "Truck and Bus Regulation" will impact the price, routes, and service of motor carriers

By its express terms, 13 CCR § 2025 requires truck engines to either be replaced or retrofitted, beginning January 1, 2012. 13 CCR § 2025(g). Retrofit devices, known as diesel particulate filters (DPFs) cost between $18,000 and $44,000 per truck depending on the age and type of truck. Brown Dec. ¶ 8; Recupido Dec. ¶¶ 6, 10; McClernon Dec. ¶ 5. Replacement is even more expensive, and costs at least $120,000 per truck. Recupido Dec. ¶ 7; McClernon Dec. ¶ 2; Pocock Dec. ¶ 4.

CDTOA members engaged in the business of construction trucking have operated for years under a business model that relies on investing in trucks that will run for many years. Brown Dec. ¶ 11; McClernon Dec. ¶ 2. Because of the high initial cost of the trucks, the business model is such that there is little or no profit unless these trucks can be used for many years. McClernon Dec. ¶ 3; Recupido Dec. ¶ 8. Operators who have been in business for several decades have concluded that the cost of compliance with the regulation will put them out of business. Fred Recupido determined that neither retrofitting with DPFs (Diesel Particulate Filters) nor replacement (with new trucks) were reasonable or affordable options, and as a result he sold all but one of his 16 trucks. Recupido Dec. ¶ 5. Because some small-fleet owners have

Motion for Summary Judgment

different compliance deadlines, Recupido realized that bringing his fleet into compliance would put him at a competitive disadvantage as compared to owners who did not have to comply as early. Recupido Dec. ¶ 7. Recupido also determined that the cost of purchasing new trucks could not be justified. He would have to raise his prices and given the already slim margins, he concluded he would lose work and would face bankruptcy. Recupido Dec. ¶¶ 7. Based on his 40 years in the construction trucking industry, Recupido concluded that there is no flexibility to raise trucking rates to cover any additional operating costs. Recupido Dec. ¶¶ 1, 9.

Rob McClernon, who has been in the construction trucking business for 34 years, reached similar conclusions. He has already had experience with complying with regulations promulgated by the Air Resources Board. He previously voluntarily updated some of his trucks with incentive grant funds from SECAT and his own money and now those trucks will not comply with the new rule without another substantial investment in a DPF. And because it would be unlawful to drive his current trucks at that time (even if they were retrofitted), the trucks would have little or no resale value. McClernon Dec. ¶ 8. In 2004, CARB adopted a mandatory software update known as a "chip reflash" for affected heavy-duty diesel engines. McClernon fully complied with this requirement at a substantial cost to his business. In 2006, a California Superior Court struck down these chip reflash regulations. McClernon was never re-compensated for the costs of CARB's illegal regulation. McClernon Dec. ¶ 9.

Armed with that prior experience, McClernon determined that he would have to raise his prices substantially, by as much as 100%, if he were to comply with the regulation. McClernon Dec. ¶¶ 11, 12. Such a rate increase would make McClernon uncompetitive. He would be out of business and most likely bankrupt. McClernon Dec. ¶ 11. He has since put his business on hold, has no more employees, and has sold one of his trucks at a substantial loss while he considers his options, and evaluates the uncertainties created by the regulation. McClernon Dec. ¶ 5.

The impending regulation has already begun affecting the level of service the motor carriers can provide. From approximately September 2010 to the present, Recupido has had too few trucks to service the needs of his customers, which negatively affect the jobs he has been

able to bid for, and therefore the level of service he was able to guarantee as part of his previous business model.  Recupido Dec. ¶ 14.  As a result of Recupido's decision to reduce his fleet, the level of services that he can guarantee has significantly declined. The same is true for the entire industry; the level of service has drastically diminished as fewer trucking companies can even operate profitably under today's trucking rate schemes.  Recupido Dec. ¶ 15.  Similarly, McClernon has put his business on hold and is contemplating reducing the level of service that he provides to nothing, by essentially going out of business. McClernon Dec. ¶ 12.

In addition to impacting prices and service, the regulation will also affect the routes, because the available retrofit technology limits the length of time trucks can run continuously. As a result, those CDTOA members who opt to retrofit their trucks may have to choose different routes in order to accommodate the more limited hours of service of their trucks.  Brown Dec. ¶ 14.

For example, Pocock owns a 2009 truck that has factory-installed diesel particulate filter technology which makes it currently compliant with the Truck and Bus Regulation promulgated by the Air Resources Board.  He also owns an older truck with a larger, less efficient engine than the 2009 truck.  He has driven both trucks under identical circumstances for significant periods of time, and has discovered that the 2009 truck gets less miles per gallon than the older truck with the larger engine.  Normally, all other things being equal, Pocock would expect a new truck with a smaller engine to have better fuel economy than an older truck with a larger engine.  His discovery that the converse is true shows that the filtering technology required to make trucks compliant with the Truck and Bus Regulation results in decreased fuel efficiency.  Pocock Dec. ¶ 5.

Pocock's 2009 truck engine with a diesel particulate filter has also completely shut down while he has been driving it, due to an excess buildup of heat and pressure from the filter unit. This problem has never occurred with any of his trucks that are not equipped with the filtering technology.  Pocock Dec. ¶ 6.  Based on the reduced fuel efficiency, and the limited running time (without shutting down), motor carriers of property will necessarily have to adjust their routes to

Motion for Summary Judgment

accommodate trucks that get lower gas mileage and which cannot run for extended periods of time.

Forcing businesses to invest tens of thousands of dollars to retrofit their trucks, or hundreds of thousands of dollars to replace them, is undoubtedly a significant impact. And it cannot be denied that a regulation which dictates the type of truck equipment or truck engine that a motor carrier must use impacts prices, routes and services in more than "only a "tenuous, remote, or peripheral ... manner." *Rowe v. New Hampshire Motor Transport Association*, *supra*, 552 U.S. 364 at 371. There is simply no way for motor carriers of property to absorb the exorbitant costs of retrofitting or replacing their trucks without impacting the prices they charge. The margins are simply not present to allow them make such huge capital investments without it affecting their prices. The reduced number of motor carriers who can even afford to comply with the rule will necessarily result in a lower level of service to customers of construction trucking services. Whatever merit there might be to the Truck and Bus Regulation generally, states simply "cannot inflict their own public policies or regulations on a carrier's operations." *Data Manufacturing v. United Parcel Service, Inc.*, 557 F.3d 849, 852 (8th Cir. 2009).

Recent court decisions interpreting the FAAAA support the argument that a regulation which imposes significant costs on a motor carrier industry will necessarily impact the prices, routes or services of that industry. In *American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), the Ninth Circuit addressed whether concession agreements for drayage trucking at two California ports were preempted by the FAAAA. Although the district court initially denied a request for a preliminary injunction, the Court of Appeals reversed and directed the district court to issue a preliminary injunction. *Id*. at 1048, 1060-1061. The concession agreements prescribed a ban on pre-1989 trucks and imposed a container fee. *Id*. at 1049. They also imposed a laundry list of requirements relating to trucks and drivers, including special equipment specifications, parking and route requirements, maintenance standards, and various reporting requirements. *Id*. at 1049-1050.

The district court agreed with the plaintiffs that the requirements related to a price, route or service of the impacted motor carriers, but found that the concession agreements were saved

Motion for Summary Judgment

from preemption by the safety exception to preemption. *Id.* at 1051. In reversing the district

court's denial of a preliminary injunction, the court observed that it could hardly be doubted that

the concession agreements had more than an indirect or tenuous effect on motor carriers' prices,

routes and services. *Id.* at 1053. As to the claimed safety exception, the court found that many

of the provisions of the concession agreements were not "genuinely responsive to motor safety."

*Id.* at 1055. In reaching that conclusion, the court noted that one of the primary purposes of the

concession agreements was environmental, in that they were designed to eliminate the use of

older, polluting trucks. *Id.* at 1055. The court noted that it was imperative that the specific

provisions subject to challenge be examined to determine whether they were preempted, and

found that many of the challenged provisions were likely preempted. *Id.* at 1057.

The *American Trucking* case represents a direct application of the FAAAA to specific

requirements promulgated by the boards of the ports of Los Angeles and Long Beach. The

instant case represents an application of the FAAAA to a regulation promulgated by the Air

Resources Board, which has broader impact because it applies throughout the entire state.

Whereas the concessions agreements in *American Trucking* imposed a number of relatively

minor requirements, the Truck and Bus Regulation imposes one huge requirement: trucks must

either be retrofitted or replaced by January 1, 2012 in order to lawfully drive on California

roadways. Truckers who did not wish to comply with the concession agreements at the ports at

least had the option of providing their trucking services elsewhere. However, in this case, the

challenged regulation is all-or-nothing in the sense that trucks (or fleets) which do not comply

with the regulation will be unable to operate anywhere in California.

Another case was recently decided by a sister district court in California holding that the

FAAAA preempted California's meal and rest break laws. In *Dilts v. Penske*, case # 08-CIV-318

JLS (BLM), ___ F.Supp.2d ___, 2011 WL 4975520 (S.D. Cal. 2011), plaintiffs alleged that the

defendants had failed to provide rest breaks, overtime, and other wages to its delivery drivers.

On October 19, 2011, the district court granted the defendant's motion for partial summary

judgment, finding that the California meal and rest break laws codified in California Labor Code

§§ 226.6 and 512 were indeed preempted as to the defendants, because it was a motor carrier

Motion for Summary Judgment

under the FAAAA. *Id*. at *1. The district court agreed that requiring drivers to take specified rest breaks interfered with service "by virtue of simple mathematics" because the defendants would necessarily have to employ more drivers or increase the time necessary to make deliveries. *Id*. at *8. The district court also found that the laws would impact prices, because additional staff and equipment would be needed to cover the mandated rest breaks. *Id*. at *9.

These two decisions indicate that courts can and do invalidate laws and regulations which impact the prices, routes and services of motor carriers. It cannot be denied that the substantial capital investment required by the Truck and Bus Regulation would have a direct impact on prices, routes and services.

Finally, lest there be any doubt that the regulation will impact price, one need only review the Initial Statement of Reasons given for the proposed regulation, published in 2008. In that document, CARB expressly admitted that "Staff expects many, if not most, affected businesses to pass through the proposed regulation's costs to their customers." Req. for Judicial Notice, Exh. A, p. 4. Moreover, even with the most recent amendments to the regulation, CARB admitted that the estimated costs of the regulation to industry would be $2.2 billion over the life of the regulation. Req. for Judicial Notice, Exh. B, p. 160.

C. Declaratory and Injunctive Relief is Required

In this action, Plaintiff CDTOA seeks declaratory and injunctive relief. Specifically, Plaintiff seeks a declaration that the Truck and Bus Regulation is preempted by federal law. In addition, Plaintiff seeks an order enjoining the enforcement of the regulation.

28 U.S.C. § 2201 permits federal courts to "declare the rights and other legal relations of any interested party seeking such declaration." The section is to be liberally construed to accomplish its "purpose of providing a speedy and inexpensive method of adjudicating legal disputes without invoking coercive remedies" and is not to be interpreted in a narrow or technical sense. *Sherwood Medical Industries, Inc. v. Deknatel, Inc*., 512 F.2d 724, 729 (8th Cir. 1975.) The granting of declaratory relief is governed by equitable principles and is within the sound discretion of the court. *Holup v. Gates*, 544 F.2d 82, 85, n. 3 (2nd Cir. 1976).

Motion for Summary Judgment

The requirement in section 2201 of an "actual controversy" is no different that the "case and controversy" requirement of Article III. *Fusco v. Rome Cable Corp.*, 859 F.Supp. 624, 629-630. (N.D.N.Y.1994). Courts have repeatedly determined that questions of federal preemption under the Supremacy Clause are appropriate for declaratory relief. See e.g. *N.L.R.B. v. North Dakota,* 504 F.Supp.2d 750, 753-754 (D.N.D.2007); *Employers Association, Inc. v. United Steelworkers of America*, 803 F.Supp. 1558, 1562-1563 (D.Minn.1992). This case thus satisfies the terms of the statute, and does not fall within any of the prohibited classes of actions. Entry of a declaratory judgment would serve an extremely useful purpose in this case, as it would effectively end the litigation in this Court, and would provide the parties with the information necessary to either adjust their businesses (in the case of the plaintiff's members), or adjust the regulation (in the case of the defendants).

Similarly, this Court has authority to issue injunctive relief pursuant to 28 U.S.C. § 2202. Injunctive relief is appropriate where a plaintiff requests that a "state official [ ] be restrained from enforcing an order in contravention of controlling federal law." *Verizon Maryland, Inc. v. Public Service Commission,* 535 U.S. 635, 645-46 (2002). In making this determination, the court must make a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997).

The standard for obtaining injunctive relief is settled:

In this circuit, a party seeking preliminary injunctive relief must meet one of two tests. Under the first, a court may issue a preliminary injunction if it finds that:

(1) the [moving party] will suffer irreparable injury if injunctive relief is not granted, (2) the [moving party] will probably prevail on the merits, (3) in balancing the equities, the [non-moving party] will not be harmed more than [the moving party] is helped by the injunction, and (4) granting the injunction is in the public interest.

Alternatively, a court may issue a preliminary injunction if the moving party demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

Motion for Summary Judgment

*Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994).

In this case, plaintiff has shown that hundreds of its member motor carriers with thousands of trucks will suffer irreparable injuries including the loss of the businesses they have worked for years to build. In addition, plaintiff has demonstrated probable success on the merits under binding federal law and United States Supreme Court precedent. There will be almost no harm to the defendants, because they can continue to enforce the regulation against operators of trucks that are not motor carriers of property. Finally, the public interest is served by an injunction because it is the only method to prevent the decimation of the construction trucking industry in California.

Even under the alternative test, plaintiff is entitled to an injunction. Not only has plaintiff demonstrated that the regulation is preempted, but, as demonstrated by the various declarations submitted in support of this motion, hundreds of motor carriers of property face the elimination of their business and livelihood. At a minimum, plaintiff has demonstrated that serious questions exist about whether the regulation can withstand federal preemption, and has demonstrated that the balance of harms tips sharply in favor of the CDTOA members who would be impacted if the rule were implemented.

Motion for Summary Judgment

## CONCLUSION

WHEREFORE, Plaintiff CDTOA respectfully prays that:

1.   This Court grant summary judgment in favor of Plaintiff;

2.   This Court issue a declaration that the Truck and Bus Regulation is preempted by federal law;

3.   This Court issue a preliminary and permanent injunction prohibiting Defendants from enforcing the Truck and Bus Regulation;

4.   Plaintiff be awarded attorneys fees and costs of suit incurred in this action.

THE LAW OFFICES OF BROOKS ELLISON

Dated: November 17, 2011

/s/ Patrick J. Whalen

PATRICK J. WHALEN

Attorneys for Plaintiff
CALIFORNIA DUMP TRUCK OWNERS
ASSOCIATION

Motion for Summary Judgment