BROOKS ELLISON
State Bar No. 122705
PATRICK J. WHALEN
State Bar No. 173489
THE LAW OFFICES OF BROOKS ELLISON
1725 Capitol Ave.
Sacramento, CA 95811
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
California Dump Truck Owners Association

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION | Case No.  2:11-CV-00384-MCE-GGH |
| Plaintiff, | **DECLARATION OF FRED RECUPIDO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| MARY D. NICHOLS, Chairperson of the California Air Resources Board; JAMES GOLDSTENE, Executive Officer of the California Air Resources Board; and DOES 1-50 | |
| Defendants. | |

I, Fred ReCupido, declare as follows:

1.      I am the owner and operator of Terra Trucking, Inc., based in Banning California. Terra Trucking is a motor carrier business with both state and federal operating authority.  My valid California motor carrier permit is CA# 33765, USDOT# 936273 and Federal Motor Carrier ID# 510728.  I'm also a 34-year member of and the Transportation Affairs Advisor to the California Dump Truck Owners Association ("CDTOA"), the plaintiff in the above-entitled case. I have owned and operated my construction trucking business for 40 years.  My business

Declaration of Fred ReCupido

involves the transportation of construction materials from material plants to construction sites throughout the state of California and Arizona. I regularly quote and haul most common construction materials or commodities such as asphalt, dirt, sand, rock, and gravel.

2.     From about 1970 to 1995, I had owned and operated only one truck and contracted out to other owner-operators for additional trucking capacity, as is typically done within the construction trucking industry here. In 1996, I decided to expand my truck fleet due to the shortage of owner-operators in the Coachella and Imperial Valleys, where I had relocated my business. Over the next five years I purchased about three trucks per year, and by 2000 I had expanded my truck fleet to 16 trucks and about 40 sets of double bottom dump trailers.

3.     Over the next fifteen years (1996 – 2010), I operated my business based on this model. In 2006, I decided to upgrade some of my older trucks and purchased 8 newer (2001 model year) used Freightliner tractors that were converted on-highway freight trucks to day cab, two axle tractors. Typical of our industry, we recycled perfectly sound and clean operating heavy trucks and converted them to operate in a secondary life as a lower annual mileage (50,000/year) construction related commercial vehicle.

4.     I am aware of the On-road Truck and Bus Regulation promulgated by the Air Resources Board, codified at 13 CCR §2025. I attended numerous public meetings during which the rule was debated, modified, and ultimately enacted. The rule requires trucks to be replaced or retrofitted beginning on January 1, 2012, on a schedule based on the truck type and model year of the truck engine and the size of the fleet. The rule prohibits older trucks that have not been replaced or retrofitted from operating on the public roadways, and imposes steep fines and penalties on anyone who operates their trucks in violation of the rule.

5.     On or around July 31 of 2010, analyzing the costs associated with my options for compliance with the CARB's final On-road Truck and Bus Regulations; I made a business decision to sell all but one truck. As I ran and re-ran the options and costs of the most reasonable choices: retrofitting with DPF's (Diesel Particulate Filters) or replacement (with new trucks), neither were reasonable nor affordable options especially under the present business climate in this state.

Declaration of Fred ReCupido

6.      As part of the analysis of the feasibilities of retrofitting or new replacement, I discovered many problems with each option. First, due arguably to the CARB rules, the values of my trucks were artificially cut in half because they would have to be retrofitted at a unit cost of about $16,700 each sometime in the near future. Second, because the trucks were no longer marketable in California, the values of the trucks had dropped by more than half of what they otherwise would be, or to about $8,000 versus a historical valuation of about $17,000. I have undoubtedly personally suffered financially from this and the entire truck value and investment paradigm has changed for me. Third, I would have been forced to install an $18,074 device on an $8,000 truck and financing such a proposition was very difficult in this lending market. What makes it even worse was that by adding these DPF devices to my trucks, I discovered that the value of the truck only went up by a few thousand dollars, so clearly it would have been a very bad investment for both the bank and me.

7.      Moreover, as I ran the numbers associated with buying new, it was even worse because the cost to purchase and finance such trucks could not be justified based on our current work load. New trucks typically cost in excess of $123,000, and financing charges run 15%-20% depending on credit worthiness. I would be competing primarily against owner-operators with older paid-for vehicles and under the regulation; they would not have to make the financial investment necessary to comply with the regulation for at least two additional years. As a result, I would be at a competitive disadvantage.

8.      I built my business and made capital investments on the assumption that I would be able to continue to use the trucks I purchased for at least 15 years, through 2016. Because of the high initial cost of the trucks, there is little potential profit unless the trucks can be depreciated out and used for many additional years.

9.      My business model of purchasing late model used on-highway trucks is typical of how the California dump truck industry has operated for at least the last 50 years. Competition within the state dump truck market has become ruthless today as many companies are competing for far less work than just three or four years ago. Presently, there is virtually no flexibility to

Declaration of Fred ReCupido

1  raise trucking rates to cover any additional operating costs especially with fuel prices now above

2  $4.50/gallon and tire prices up by 30% in the last three years.

3      10.    I previously owned and operated (7) 1998 Freightliner truck tractors or power

4  units with Cummins M11 (370 hp) and (8) 2001 Freightliner truck tractors with Detroit Diesel

5  Series 60 (370 hp). I had obtained an estimate of the cost to retrofit my fleet in order to comply

6  with the rule from a reputable truck dealer/DPF service provider with whom I have previously

7  purchased trucks in the past. As shown in greater detail in Exhibit A to this declaration, for these

8  trucks alone, it would have cost $18,074/truck to retrofit in order to keep them legally operating

9  on California roadways after January 1, 2011 through 2020.

10      11.    Based on my familiarity with the rule and its impending effective date, I had

11  researched the costs of bringing my trucks into compliance with the rule. Based on the size of

12  my fleet, and the model year of my truck engines, I would have had to spend approximately

13  $18,074 per truck to purchase or install the retrofit technology (DPF's). The costs to comply with

14  CARB's regulations under the retrofit option would have been over $90,000 per year over a three

15  year period or over $270,000 plus debt financing.

16      12.    If I were to instead replace my trucks with new trucks (which was the option I

17  initially preferred) to comply with the CARB rule, it would have cost approximately $123,000

18  per truck. See quote from LA Freightliner Exhibit B. The three year phase in cost would have

19  been about $615,000/year times three years or $1,845,000, plus debt financing costs.

20      13.    Whether I decided to retrofit or replace my trucks with new vehicles, I would

21  have had to make substantial capital investments in my company, on the order of hundreds of

22  thousands or millions of dollars. As part of analyzing the CARB compliance options, I have

23  determined that the only way for me to afford to make the necessary investments would have

24  been to raise the prices that I charged for my trucking services by between 8 and 25 percent,

25  depending on the compliance path. If in fact I was forced to raise my rates by any percentage, I

26  believe that I would not have been able to obtain any work at all and would likely face

27  bankruptcy. For the work I perform, the decision as to whom to award a job is almost always

28

- 4 -

Declaration of Fred ReCupido

1  based primarily on the lowest public works or agency bid.   Quality of service is at best a

2  secondary consideration.

3      14.    From approximately September 2010 to the present, I have frequently been in the

4  position of having too few trucks to service the needs of my customers, which negatively affect

5  the jobs I have been able to bid for, and therefore the level of service I was able to guarantee as

6  part of my previous business model.

7      15.    While my decision ten months ago to reduce my fleet had little effect on my

8  trucking prices today, the level of services that I can guarantee has significantly declined. The

9  same is true for the entire industry; the level of service has drastically diminished as fewer

10  trucking companies can even operate profitably under today's trucking rate schemes.  Had I

11  chosen to retrofit or replace my trucks early under the options CARB provided, I can honestly

12  say that I would be out of business within the first compliance year (2012).  The CARB

13  regulation would have forced me to raise the prices I charge for dump truck services in order to

14  break even on my investments.  I would not have been able to competitively bid for jobs against

15  smaller owner-operators who are not required to bring their trucks into compliance as quickly as

16  I would have been required to do for my fleet.  Since I would inevitably have won fewer jobs, I

17  would not be able to service the debt on my trucks.  The higher prices would have led to the

18  demise of my business as there is no way today to operate profitably under any additional cost

19  burdens. Due to this "catch 22" scenario, I had no choice other than to change my business

20  model.

21

22  I declare under penalty of perjury under the laws of the State of California that the foregoing is

23  true and correct and based on my personal knowledge, and if called to testify to these facts, I

24  would do so competently and truthfully.

25

26  Executed this 24 day of MAY, 2011, in BANNING, California.

27

28  Fred ReCupido

- 5 -

# EXHIBIT A

# Los Angeles Freightliner

*A Division of Velocity Vehicle Group*
2429 S. Peck Rd.  Whittier, CA  90601-1605
(562) 447-1200 - Tel.    (562) 447-1271 - Fax



# Quote

| | | |
|---|---|---|
| Company | **Terra Trucking Co** | |
| Address | **1350 East Barbor Street** | |
| City/State | **Banning, Ca** | |
| Zip | **92220** | |

| | |
|---|---|
| Date | **January 15, 2011** |
| Contact | **Fred Recupido** |
| Phone | **951-849-1002** |
| Email | |

| Line | Qty | Description | Notes | Unit Price | Parts | Shop Supplies | Labor Rate | Labor Hrs. | Extended |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Cleaire Longmile- Vertical- | 1DDXH12.7EGL | $ 14,900 | $ 500.00 | $ 300.00 | $ 100.00 | 10 | $ 16,700.00 |
| 2 | | 430Hp | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |

All quotes for emission control devices are based upon a number of criteria including, but not limited to: engine family code, horsepower, engine condition, availability of technology and other factors.  If it is determined by any party that the engine(s) or devices identified in this quotation do not meet the criteria set forth in the Executive Order for the emission control device(s), none of the devices will be installed and this quote will be considered null and void.

| | |
|---|---|
| Parts Total | $ 15,700.00 |
| Sales Tax | $ 1,373.75 |
| Parts Subtotal | $ 17,073.75 |
| Labor Subtotal | $ 1,000.00 |
| **GRAND TOTAL** | **$ 18,073.75** |








# EXHIBIT B



# LOS ANGELES
# FREIGHTLINER
## FONTANA
IS A DIVISION OF VELOCITY VEHICLE GROUP

 

| | | |
|---|---|---|
| SALES | PARTS | (877) Parts-LA |
| Toll Free (800) 673-0500 | SERVICE | (866) FTL-TRKS |
| Reception (909) 510-4000 | COLLISION CENTER | (909) 510-4100 |

13800 Valley Blvd, Fontana CA 92335   www.LAFreightliner.com

Mark Sturdevant   Ph#: 909-510-4263   Cell: 951-764-5424   Email: msturdevant@lafreightliner.com

| | | |
|---|---|---|
| **Purchaser's Name(s)** TERRA TRUCKING | Stock # | DE-11588/2011-9683 |
| Address 1350 E BARBOUR ST | Date | 05/16/2011 |
| City BANNING    State CA | Bus Phone | (951)849-1002 |
| County San Bernardino    Zip 92220 | Cell Phone | |
| | Fax Phone | |

| New/Used | Make | Model | Year | Color | To Be Delivered On Or About |
|---|---|---|---|---|---|
| New | FREIGHTLINER | CASCADIA 113DC | 2012 | White | 1/25/2012 |

| Type of Vehicle | Serial Number | Mileage | | Price Per Unit | Quantity |
|---|---|---|---|---|---|
| Tractor | | | | | 10 |

| | | | Price Per Unit | Quantity |
|---|---|---|---|---|
| **Cash Price Of Base Vehicle** | | | $99,668.00 | $996,680.00 |
| Additional Options: | | | | |
| | Extended Towing Warranty | | $0.00 | $0.00 |

| | | Price Per Unit | Quantity |
|---|---|---|---|
| Doc Fee / Prep Fee | | $55.00 | $550.00 |
| Total | | $99,723.00 | $997,230.00 |
| California Tire Recycle Fee | | $10.50 | $105.00 |
| FET | | $11,808.36 | $118,083.60 |
| Sales Tax | 8.750000 | $8,725.76 | $87,257.60 |
| License/Registration Fee | | $2,884.00 | $28,840.00 |
| O/S Delivery Fee | | | |
| Total Cash Delivered Price | | $123,151.62 | $1,231,516.20 |

2 axle tractor spec for double bottom dump asphalt application

FET Tire Credit  $151.80
County San Bernardino
GVWR/GCWR  80000

| | Cash down payment | Check/PO# | Deposit on Order | |
|---|---|---|---|---|
| | | | Deposit Each | $0.00 | $0.00 |
| CASH | | | Cash on Delivery Each | $0.00 | $0.00 |

| Description Of Trade-In | | | | | Appraisal Allow. For Used Vehicle Trade | |
|---|---|---|---|---|---|---|
| Make | Model | Type | Year | Quantity | Less Balance Owning to | |
| | | | | | Trade in Allowance | |
| Eng. No. | VIN No. | | | License No | **Amount Due Upon Delivery** | $1,231,516.20 |

**ONLY THOSE ITEMS AND SERVICES SPECIFICALLY WRITTEN ON THIS ORDER ARE INCLUDED IN THE STATED PRICE. ANY OTHER AGREEMENTS, UNLESS IN WRITING, ARE NOT BINDING ON SELLER.**

The first and second pages of this Order comprise the entire agreement affecting this purchase and no other agreement or understanding of any nature concerning this purchase has been made or entered into, or will be recognized. I hereby certify that no credit has been extended to me for the purchase of this motor vehicle except as appears in writing on the face of this agreement.

I have read and understand the second page of this agreement and agree to it as a part of this order the same as if it were printed above my signature. I certify that I am of legal age, or older, that I have legal capacity and authority to execute this agreement on behalf of my company, and hereby acknowledge receipt of a copy of this order.

| | |
|---|---|
| TERRA TRUCKING | Mark Sturdevant |
| Purchaser's Name | Sales Person |
| | |
| Purchaser's Signature | Approved By: |
| | This order is not valid unless signed and accepted by dealer |

May 16 2011  9:16AM

1.    TRADE-IN(S).    Purchaser shall deliver trade-in(s) in the same condition as at time of inspection and appraisal by Seller reasonable wear and tear excepted, except as disclosed in the Agreement. Purchaser represents that each truck shall be free and clear of all liens and encumbrances and warrants that the trade-in(s) are that type and condition described in this Agreement, including any attachments hereto.

2.    TERMS OF PAYMENT.    Unless otherwise agreed, net payment shall be due on delivery. Late payments shall bear interest at the rate of 18% per annum, or the maximum permitted under law, whichever is less. If acceptance of delivery is delayed by Purchaser, payment shall become due on the date when Seller is prepared to deliver. If the financial condition of Purchaser at any time does not, in the judgment of Seller, justify continuance of the work to be performed by Seller hereunder on the terms of payment as agreed upon, Seller may suspend such work, or postpone delivery, and requi such assurances of Purchaser's performance as Seller deems adequate, including payment in advance, or Seller may cancel this order and shall receive reimbursement for its reasonable and proper cancellation charges. In the event of bankruptcy or insolvency of Purchaser, voluntary or involuntary, Seller shall be entitled to cancel any order then outstanding at any time and seek reimbursement for its reasonable and proper cancellation charges.

3.    CANCELLATION.    Purchaser may cancel this order only if Seller is able to cancel said order with the manufacturer, and only upon written notice. Upon any cancellation or failure to accept delivery, Purchaser shall pay Seller reasonable cancellation charges and expenses, not to be less than Seller's out-of-pocket expenses including carrying costs.

_____ **(Purchaser's Initials)**

4.    SALES AND OTHER TAXES.    Unless otherwise specified herein, Seller's price does not include federal excise, sales, use, or other taxes. Consequently, in addition to the price specified herein, the amount of any other excise, sales, use, or other tax applicable to the sale or use of the truc purchased hereunder shall be paid by Purchaser, or in lieu thereof Purchaser shall provide Seller with a tax exemption certificate acceptable to the taxing authorities. Purchaser agrees that all taxes related to this transaction, whether arising at the time of the transaction or in the future, are Purchasers responsibility and further agrees to promptly pay any such taxes

5.    DELIVERY.    All trucks furnished hereunder shall be delivered to Purchaser at the Seller's dealership location or other location as designated in this Agreement. Unless otherwise provided, delivery will be made via carriers and routes designated by manufacturer with freight charges to be included in the purchase price. Delivery dates are approximate and are based upon receipt of all necessary information from Purchaser. Seller shall not be liable for delays in delivery or manufacturing, or other causes beyond Seller's control.

6.    TECHNICAL CHANGES.    Purchaser acknowledges that the manufacturer and Seller reserve the right to change the specifications of the truck(s) at any time without obligation to make such changes in other trucks previously delivered to Purchaser. In addition, manufacturer and Seller reserve the right to make design changes and substitution of materials subsequent to the receipt of the order which, in manufacturers or Seller's opinion are necessary to improve the truck. Purchaser agrees to accept any such changes as fulfillment of Seller's obligations under this order.

7.    REQUIRED EQUIPMENT.    This order shall be deemed to include, whether or not specified herein, all equipment or accessories required by the National Highway Traffic Safety Act or other regulations in effect at the time of order receipt. It is agreed that any additional or different equipment not specified which is required at the time of delivery to meet the foregoing Act or other regulations will be added and the costs shall be paid by Purchaser.

8.    TITLE AND REMEDIES.    Until full payment by Purchaser of all amounts due hereunder, Seller reserves the title to all equipment furnished hereunder. If Purchaser defaults in payment or performance hereunder or becomes subject to insolvency, receivership, or bankruptcy proceedings, or makes an assignment for the benefit of creditors, or without the consent of Seller voluntarily or involuntarily sells, transfers, leases, or permits any lien or attachment on the equipment delivered hereunder, Seller may treat all amounts then or thereafter owing hereunder by Purchaser as immediately due and payable (subject only to credits required by law) and Seller may repossess said equipment by any means available by law and shall enjoy any and all other remedies of a secured creditor under the Uniform Commercial Code. Purchaser shall execute and deliver to Seller such financing statements and other documents, as Seller may deem appropriate to evidence, perfect, and protect the priority of its security interest in the truck(s) subject to this order.

9.    GENERAL.    Any assignment by Purchaser of this order or any rights hereunder, without written consent of Seller, shall be void. Clerical errors in this order may be automatically corrected by giving written notice thereof to Purchaser by a duly authorized representative of Seller. No waiver, alteration, or modification of any of the provisions hereof shall be binding unless and until in writing and signed by a duly authorized representative of Seller. To the extent not covered by other terms herein, including terms of warranty and limitation of liability, etc., the provisions of the Uniform Commercial Code shall govern this sale.

This Agreement (including by reference the provisions set out in manufacturer's standard warranty or warranties) shall constitute the entire agreement between Purchaser and Seller, and no understandings or obligations not expressly set forth herein or in manufacturer's standard warranty or warranties are binding upon Purchaser or Seller.

ALL WARRANTIES, IF ANY, BY A MANUFACTURER OR SUPPLIER OTHER THAN SELLER ARE THEIRS, NOT SELLER'S, AND ONLY SUCH MANUFACTURER OR OTHER SUPPLIER SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. SELLER HEREBY DISCLAIMS ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERHCANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Accepted and Agreed by:_____    _____
                                             (Company Name)                                     (Date)

Signor's Name and Title:_____    _____
                                     (Please Print Name and Title. Must be an officer              (Signature)
                                      of the company authorized to approve capital purchases.)

May 16 2011 9:16AM