BROOKS ELLISON
State Bar No. 122705
PATRICK J. WHALEN
State Bar No. 173489
THE LAW OFFICES OF BROOKS ELLISON
1725 Capitol Ave.
Sacramento, CA 95811
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
California Dump Truck Owners Association

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION<br><br>            Plaintiff,<br>    vs.<br><br>MARY D. NICHOLS, Chairperson of the California Air Resources Board; JAMES GOLDSTENE, Executive Officer of the California Air Resources Board; and DOES 1-50<br><br>            Defendants,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>            Defendant-Intervenor | Case No.  2:11-CV-00384-MCE-GGH<br><br>**STATEMENT OF UNDISPUTED FACTS**<br><br>(Fed.R.Civ.P. 56(c); L.R. 260(a))<br><br>Date:        January  26, 2012<br>Time:       2:00 p.m.<br>Courtroom.:   7 |

In support of the motion for summary judgment already on file, plaintiff hereby submits the following statement of undisputed facts as required by Local Rule 260(a).

1. Plaintiff California Dump Truck Owners Association ("CDTOA") is a nonprofit corporation organized and existing under the laws of the state of California. The mission of CDTOA is to advance the professional interests of construction trucking companies in California. Declaration of Lee Brown (hereafter "Brown Dec.") ¶ 1.

2. CDTOA has approximately 1,000 members, and the membership varies from small owner-operators who own and operate only one truck, to large companies that own fleets of trucks between 400 to 500 power units and trailers. Collectively CDTOA's membership owns or leases at least 5,000 power units, most primarily based in California. The vast majority of members are motor carriers as that term is defined in 49 U.S.C. §13102. Materials hauled by members include dirt, sand, rock, gravel, asphalt and heavy equipment. CDTOA members typically transport construction material from aggregate plants, asphalt and cement plants to construction sites. Dirt is primarily hauled from a barrow or construction site to another construction site. Brown Dec. ¶ 2.

3. Virtually all of the trucks owned and operated by CDTOA members are subject to the Truck and Bus Regulation promulgated by the Air Resources Board, codified at 13 CCR § 2025. Brown Dec. ¶ 4.

4. The regulation is formally known as the Truck and Bus Regulation; On-Road Heavy-Duty Diesel Vehicles (In-Use) Regulation, and is available online at http://www.arb.ca.gov/msprog/onrdiesel/onrdiesel.htm. It is a "regulation . . . having the force and effect of law" as that term is used in 49 U.S.C. §14501(c)(1). Brown Dec. ¶ 6.

5. The regulation requires trucks to be replaced, repowered and/or retrofitted with diesel particulate filters (DPFs) beginning on January 1, 2012, on a schedule based on the truck type and model year of the truck engine. Low mileage dump trucks (under 20,000 miles/year) may be given two year extensions to comply but this will only benefit about 5-10 percent of the trucks owned by CDTOA members. The regulation prohibits older trucks that have not been replaced or retrofitted from operating on the public roadways, and imposes steep fines and penalties on anyone who operates their trucks in violation of the regulation. Brown Dec. ¶ 5.

6. The primary source of livelihood for CDTOA members is their diesel powered tractor and truck body or trailer. Most members purchase trucks to be used for decades, and most are purchased utilizing lengthy conditional sales contracts lasting for 5 to 6 years. Today financing charges are now running 15-20 percent. The trucks typically cost at least $130,000 to purchase. With new truck bodies and trailers the cost can easily exceed $210,000. Due to the low mile nature of the local haul construction industry, trucks operate about 50,000 miles a year so they have a useful life of several decades if maintained properly. Brown Dec. ¶ 7.

7. Available retrofit technology utilizing DPFs enable trucks to comply with the rule but they cost approximately eighteen thousand dollars ($18,000) or more to purchase and install for each truck. Most CDTOA members at this time do not have the financial resources to purchase and install retrofit technology for their trucks, and will likely lose their business. Virtually no trucking company now makes enough profit to afford to purchase these retrofit devices nor can they pay to buy a new $150,000 truck even with heavy subsidies or grants. Brown Dec. ¶ 8.

8. CDTOA members have based their business models on the ability to use their trucks for at least two decades (or more). Due to the lower mileage nature of construction material hauling (50,000 miles per year) a typical dump truck can travel less than 1 million miles in a twenty year period. A million miles is a milestone that diesel engines may reach or exceed prior to major overhaul requirements. Because the rule requires retrofit or replacement of otherwise perfectly useful and clean trucks (which had to meet state or federal emissions standards when manufactured) much earlier than would otherwise be required, most CDTOA members will be unable to continue their business without substantial capital investment if that is available to them. This is not an option to many and will disproportionally harm smaller business owners in virtually every segment of the commercial transportation or trucking industry in California, not just construction trucking. Brown Dec. ¶ 11.

9. Fred Recupido is a CDTOA member and has been in the construction trucking industry for 40 years. Declaration of Fred Recupido (hereafter "Recupido Dec.") ¶ 1.

10. He started his business with a single truck but over the years expanded to a fleet of 16 trucks and 40 trailers. Recupido Dec. ¶ 2.

11. The trucks were periodically upgraded, as Recupido purchased used on-highway trucks and converted them to his industry. Recupido Dec. ¶ 3.

12. Recupido built his business and made capital investments on the assumption that he would be able to continue to use the trucks he purchased for at least 15 years, through 2016. Because of the high initial cost of the trucks, there is little potential profit unless the trucks can be depreciated out and used for many additional years. Recupido Dec. ¶ 8.

13. Similarly, Robert McClernon is a CDTOA member and has owned his construction trucking business for 34 years. His business mainly involves the transportation of construction material to and from construction sites. He regularly hauls dirt, sand, rock, gravel, and asphalt, among other things in dump trucks and water for on-site compaction and dust control in water trucks. Declaration of Robert McClernon (hereafter "McClernon Dec.) ¶ 1.

14. McClernon currently owns five trucks, all of which will be subject to the regulation. He purchased most of his trucks one at a time over his thirty-four years in the business. When maintained properly, construction trucks, (including both those purchased new and those that are purchased used) have a useful life of several decades if maintained properly. McClernon performed a higher level of maintenance on all his vehicles to ensure they would have a long and useful life. McClernon Dec. ¶ 2.

15. McClernon had always believed that the equity or value of his equipment would be enhanced with the level of maintenance efforts he committed to his fleet. He built his business and made capital investments on the assumption that he would be able to continue to use the trucks he purchased for many years. At least 20 years of use is normal in his industry, as owners typically reuse on-road freight trucks with some modifications to operate as dump trucks for another 15 or more years. McClernon believed that recycling large trucks was a responsible and "green"/environmentally-friendly statement. He hoped that the hard work and dedication to his business would provide for some of his retirement needs with retained equity in his equipment. Because of the high initial cost of the trucks, the seasonality of his work in

3

Statement of Undisputed Facts

northern California, and in many cases, low mileage nature of his work, there is little or no profit unless these trucks can be used for many years. McClernon Dec. ¶ 3.

16. McClernon maintained his trucks at a high standard because he depended on their longevity to be successful with the lowest possible competitive operating costs. In fact, he recently smoke tested all three of his on-road vehicles which has been required by CARB's Periodic Smoke Inspection Program since 1988, and they all tested far below the allowable maximum emissions levels. His oldest and dirtiest truck tested at an average of 8.2% opacity with the allowable level set at 55%, which is 670% below this allowable level. McClernon Dec. ¶ 4.

17. After analyzing the impact of the regulation and the cost of compliance, Recupido made a business decision to sell all but one of his trucks. He determined that neither retrofitting with DPFs (Diesel Particulate Filters) nor replacement (with new trucks) were reasonable or affordable options. Recupido Dec. ¶ 5.

18. Recupido determined that the resale value of his trucks had been cut in half from about $17,000 to about $8,000. Recupido Dec. ¶ 6.

19. He then determined that the cost of a retrofit would be $18,074 per truck. Recupido Dec. ¶¶ 6, 10.

20. He could not justify spending that much money on a truck whose value had declined so precipitously. Recupido Dec. ¶ 6.

21. To retrofit his entire fleet, he would have had to spend approximately $18,074 per truck to purchase or install the retrofit technology (DPFs). The costs to comply with CARB's regulations under the retrofit option would have been over $90,000 per year over a three year period or over $270,000 plus debt financing. Recupido Dec. ¶ 11.

22. Recupido also determined that the cost of purchasing new trucks could not be justified. New trucks typically cost in excess of $123,000, and financing charges run 15%-20% depending on credit worthiness. Recupido Dec. ¶ 7.

4

Statement of Undisputed Facts

23. If he were to gradually replace his trucks with new trucks to comply with the CARB rule, the three year phase in cost would have been about $615,000/year times three years or $1,845,000, plus debt financing costs. Recupido Dec. ¶ 12.

24. If he purchased new trucks, Recupido would be competing primarily against owner-operators with older paid-for vehicles and under the regulation, they would not have to make the financial investment necessary to comply with the regulation for at least two additional years. As a result, he would be at a competitive disadvantage. Recupido Dec. ¶ 7.

25. Presently, there is virtually no flexibility to raise trucking rates to cover any additional operating costs especially with fuel prices now above $4.50/gallon and tire prices up by 30% in the last three years. Recupido Dec. ¶ 9.

26. Similarly, McClernon determined that to replace the types of working trucks he owns today would typically cost in excess of $125,000 each. Because of the very high cost of new trucks, McClernon must obtain long-term (4 to 6 years) financing in order to purchase even used trucks. This method of purchase is common within the construction trucking industry. McClernon Dec. ¶ 2.

27. McClernon was a motor carrier until November 1, 2010 with a valid motor carrier permit, permit #224233. He has since put his business on hold, has no more employees, and has sold one of his trucks at a substantial loss while he considers his options, and evaluates the uncertainties created by the regulation. McClernon Dec. ¶ 5.

28. Based on his familiarity with the rule and its impending effective date, McClernon researched the cost of bringing his trucks into compliance with the rule. In order to retrofit his trucks with a DPF or diesel particulate filter, he would have to spend approximately $44,372 per truck to purchase and install the retrofit technology due to their ages. Because of these rules his trucks, although well maintained and very clean are only worth about $6,000 to $9,000 each. This is approximately less than 25% of what their values would have been without these CARB regulations. These prices or value estimates are based on what he has recently seen at equipment and truck auctions such as those sponsored at Richie Bros. Auctioneers in the Sacramento area. It is not practical nor would he likely find financing to put

5

Statement of Undisputed Facts

a $45,000 DPF on an $8,000 truck that in most cases would only give him 3 or 4 additional years of compliance and operation before he would have to upgrade again with newer or new trucks.  Furthermore, a DPF is truck-specific by CARB rules, and cannot be re-used on any other trucks in the future.  McClernon Dec. ¶ 5.

29. McClernon determined that if he were to instead replace his trucks with new trucks to comply with the rule, it would cost approximately $125,000.00 per truck. His current trucks have a very low resale value because potential buyers would be unwilling to pay much for a truck that could not legally be driven in California and only have a value after being shipped out of state or country.  McClernon Dec. ¶ 10.

30. The replacement costs calculated by Recupido and McClernon are corroborated by Jay Pocock, the Sales Executive for Superior Trailer Works.  Pocock's business primarily involves the sale of trucks and trailers.  He has been involved in such sales for 25 years. Most of his customers are motor carriers as that term is defined in 49 U.S.C. § 13102.  Declaration of Jay Pocock (hereafter "Pocock Dec.") ¶ 1.

31. Pocock has sold hundreds of trucks and trailers throughout his career, including many to dump truck operators that engage in the transportation of construction material to and from construction sites, including dirt, sand, rock, gravel, and aggregate.  Pocock Dec. ¶ 2.

32. As part of his business, Pocock is aware of the costs of purchasing trucks in California.  He is also aware of the Truck and Bus Regulation promulgated by the Air Resources Board, codified at 13 CCR § 2025.  To comply with the rule, Pocock knows that many of his customers and industry associates will have to either replace their current trucks with new trucks, or retrofit their old trucks with a diesel particulate filter.  Pocock Dec. ¶ 3.

33. According to Pocock, the price for the most basic 2010 model year truck that would comply with the rule would be approximately $120,000, including federal excise tax and sales tax.  In order to purchase a truck with more features, it would cost approximately an additional $20,000.  To purchase new dump truck equipment for such a truck, it would cost between $30,000 and $80.000.  To transfer older dump truck equipment to the new truck would cost approximately $5,000.  Pocock Dec. ¶ 4.

6

Statement of Undisputed Facts

34.     Retrofitting or replacing trucks and engines to comply with the rule will directly impact the price that motor carriers of property must charge for their services for several reasons. First, motor carriers of property will be forced to raise their prices because they will need to defray the costs including financing of retrofitting or replacing their trucks. Also, because many members will be unable to afford to bring their trucks into compliance, there will be fewer motor carriers to meet the transportation needs of the construction industry. As a result, as the construction industry recovers from the recession, the increase in demand for construction trucking services combined with fewer suppliers of those services will result in substantially higher prices for those services. Brown Dec. ¶ 12.

35.     For example, Recupido determined that whether he decided to retrofit or replace his trucks with new vehicles, he would have had to make substantial capital investments in his company, on the order of hundreds of thousands or millions of dollars. As part of analyzing the CARB compliance options, he determined that the only way for him to afford to make the necessary investments would have been to raise the prices that he charged for his trucking services by between 8 and 25 percent, depending on the compliance path. If in fact he was forced to raise his rates by any percentage, he would not have been able to obtain any work at all and would likely face bankruptcy. For the work he performs, the decision as to whom to award a job is almost always based primarily on the lowest public works or agency bid. Quality of service is at best a secondary consideration. Recupido Dec. ¶ 13.

36.     McClernon is familiar with the impacts of CARB regulations on his business. He previously voluntarily updated some of his trucks with incentive grant funds from SECAT and his own money and now those trucks will not comply with the new rule without another substantial investment in a DPF. And because it would be unlawful to drive his current trucks at that time (even if they were retrofitted), the trucks would have little or no resale value. McClernon Dec. ¶ 8.

37.     In 2004, CARB adopted a mandatory software update known as a "chip reflash" for affected heavy-duty diesel engines. McClernon fully complied with this requirement at a substantial cost to his business. In 2006, a California Superior Court struck down these chip

7

Statement of Undisputed Facts

reflash regulations. McClernon was never re-compensated for the costs of CARB's illegal regulation. McClernon Dec. ¶ 9.

38. Whether he decides to retrofit his trucks or replace them, McClernon will have to make substantial capital investments in his company, on the order of hundreds of thousands of dollars. Such an investment would require him to raise his truck rates by at least 100% as he would have to recoup the costs of equipment purchases within a five year period – the financing period, if finance funding was even available. A 100% rate increase is substantial in the industry today. Also because the competition is so severe, again very little construction is happening because environmental regulations have halted all major growth in the state, there is little to no work. And the work there is, is so competitive that the lowest bids are at a contractor's costs, if not less than their costs. A 100% rate increase would make McClernon uncompetitive. He would be out of business and worse yet, more than likely bankrupt. He has been forced into a set of losing options – all will lead to the loss of his business. McClernon Dec. ¶ 11.

39. The rule will also directly impact the service that motor carriers of property provide, because those CDTOA members with multiple trucks will not be able to replace or retrofit their entire fleets all at once. Rather, they will have to gradually update their fleets over time. As a result, they will be unable to provide certain levels of services that they presently provide, because they will not have enough trucks in compliance with the rule. Brown Dec. ¶ 13.

40. For example, from approximately September 2010 to the present, Recupido has had too few trucks to service the needs of his customers, which negatively affect the jobs he has been able to bid for, and therefore the level of service he was able to guarantee as part of his previous business model. Recupido Dec. ¶ 14.

41. As a result of Recupido's decision to reduce his fleet, the level of services that he can guarantee has significantly declined. The same is true for the entire industry; the level of service has drastically diminished as fewer trucking companies can even operate profitably under today's trucking rate schemes. Recupido Dec. ¶ 15.

42.     McClernon has determined that the only way for him to afford to make the necessary investments in light of the CARB rule, will be to raise the prices that he charges for his services.  However, this is impossible because of his work and the economy. Thus, the only remaining option is to diminish the level of service (go out of business) that he provides for the people of his community that he has served for over thirty years.  McClernon Dec. ¶ 12.

43.     The rule will also directly impact the routes that motor carriers of property take, because the retrofit technology limits the length of time trucks can run continuously.  As a result, those CDTOA members who opt to retrofit their trucks may have to choose different routes in order to accommodate the more limited hours of service of their trucks.  Brown Dec. ¶ 14.

44.     For example, Pocock owns a 2009 truck that has factory-installed diesel particulate filter technology which makes it currently compliant with the Truck and Bus Regulation promulgated by the Air Resources Board.  He also owns an older truck with a larger, less efficient engine than the 2009 truck.  He has driven both trucks under identical circumstances for significant periods of time, and has discovered that the 2009 truck gets less miles per gallon than the older truck with the larger engine.  Normally, all other things being equal, Pocock would expect a new truck with a smaller engine to have better fuel economy than an older truck with a larger engine.  His discovery that the converse is true shows that the filtering technology required to make trucks compliant with the Truck and Bus Regulation results in decreased fuel efficiency.  Pocock Dec. ¶ 5.

///
///
///
///
///
///

9

Statement of Undisputed Facts

45. Pocock's 2009 truck engine with a diesel particulate filter has also completely shut down while he has been driving it, due to an excess buildup of heat and pressure from the filter unit. This problem has never occurred with any of his trucks that are not equipped with the filtering technology. Pocock Dec. ¶ 6.

THE LAW OFFICES OF BROOKS ELLISON

Dated: November 17, 2011

/s/ Patrick J. Whalen

PATRICK J. WHALEN

Attorneys for Plaintiff
CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION