KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
SARA J. RUSSELL, State Bar No. 84704
Supervising Deputy Attorney General
NICHOLAS STERN, State Bar No. 148308
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 323-3840
 Fax:  (916) 327-2319
 E-mail:  Nicholas.Stern@doj.ca.gov
*Attorneys for Defendant
Mary D. Nichols, Chairperson of the California Air
Resources Board, and James Goldstene, Executive
Officer of the California Air Resources Board*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION,**<br><br>Plaintiff,<br><br>v.<br><br>**MARY D. NICHOLS, Chairperson of the California Air Resources Board, and JAMES GOLDSTENE, Executive Officer of the California Air Resources Board,**<br><br>Defendants.<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, INC.,**<br><br>Defendant-Intervenor. | 2:11-CV-00384-MCE-GGH<br><br>**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:	December 15, 2011<br>Time:	2:00 p.m.<br>Dept:	7<br>Judge	The Honorable Morrison C. England, Jr.<br>Trial Date	June 3, 2013<br>Action Filed:  February 11, 2011 |

**TABLE OF CONTENTS**

**Page**

Introduction ................................................................................................................... 1

Statement of the Case .................................................................................................... 2

Standard of Review ....................................................................................................... 4

Argument ....................................................................................................................... 5

    I.    The Association is Unlikely to Succeed on the Merits of its FAAAA preemption claim. ................................................................................... 5

        A.    The Presumption Against Preemption Applies to the aAssociation's Claim. ............................................................................................... 6

        B.    The Truck and Bus Regulation Does Not Directly or Indirectly Relate to Motor Carrier Prices, Routes, or Services. ................... 6

        C.    The Truck and Bus Regulation Falls Within the Faaaa's Safety Exception, Which Preserves States' Traditional Authority Over Safety. ........................................................................................... 9

    II.    The Association Exaggerates The Irreparable Harm Its Members Will Suffer in the Absence Of Preliminary Relief. .......................................... 13

    III.    The Purported Need For a Preliminary Injunction is of the Association's Own Making, So Granting the Motion Would be Inequitable. ............... 15

    IV.    The Public Has an Interest in Cleaner Air as Soon as Possible. ............. 15

Conclusion ................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Air Transp. Ass'n of Am. v. City & County of S.F.*
   266 F.3d 1064 (9th Cir. 2001) ........................................................................................ 7

*Am. Trucking Assoc., Inc. v. City of Los Angeles*
   No. 10–56465, 2011 WL 4436256 (9th Cir. Oct. 31, 2011) ......................................... 7

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc.*
   519 U.S. 316, 117 S.Ct. 832 (1997) .............................................................................. 7

*Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*
   152 F.3d 1184 (9th Cir. 1998) ................................................................................... 7, 9

*Cardenas v. McLane FoodServices, Inc.*
   No. SACV 10–473 DOC, 2011 WL 2714430 (C.D. Cal. Jul 08, 2011) ....................... 7

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*
   536 U.S. 424, 122 S.Ct. 2226 (2002) ......................................................................... 5, 9

*Dilts v Penske Logistics, LLC*
   No. 08–CV–318, 2011 WL 4975520 (S.D. Cal. Oct. 19, 2011) ............................ 12, 13

*Ginsburg v. Northwest, Inc.*
   653 F.3d 1033 (9th Cir. 2011) ...................................................................................... 6

*Huron Portland Cement Co. v. City of Detroit*
   362 U.S. 440 80 S.Ct. 813 (1960) ............................................................................... 11

*Mazurek v. Armstrong*
   520 U.S. 968, 117 S.Ct. 1865 (1997) ............................................................................ 4

*Pacific Merchant Shipping Ass'n v. Goldstene*
   639 F.3d 1154 (9th Cir. 2011) .................................................................................. 6, 11

*Rice v. Santa Fe Elevator Corp.*
   331 U.S. 218, 67 S.Ct. 1146 (1947) .............................................................................. 6

*Rowe v. New Hampshire*
   552 U.S. 364, 128 S.Ct. 989 (2008) ................................................................. 5, 6, 9, 12

*Tillison v. City of San Diego*
   406 F.3d 1126 (9th Cir. 2005) .................................................................................. 9, 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7, 129 S.Ct. 365 (2008) .................................................................................... 4

**STATUTES**

42 U.S.C. §§ 7407, 7410 ............................................................................................................ 2

49 U.S.C. §7409(b)(1) .............................................................................................................. 11

49 U.S.C §14501(c)(1) ....................................................................................................... 1, 5, 9

49 U.S.C §14501(c)(2)(A) ................................................................................................. 1, 5, 9

# INTRODUCTION

Plaintiff California Dump Truck Owners Association ("Association") has moved to preliminarily enjoin the defendants Mary D. Nichols, Chairperson of the California Air Resources Board, and James Goldstene, Executive Officer of the California Air Resources Board, (collectively, the "Board") from implementing the Truck and Bus Regulation until the Association's motion for summary judgment can be heard on January 26, 2012. The Regulation is set to begin reducing large amounts of diesel particulate matter emissions from trucks and buses on January 1, 2012. The motion for preliminary injunction should be denied.[1]

The Association's single claim is that the Truck and Bus Regulation is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which preempts state laws that are "related to" a price, route, or service of any motor carrier. 49 U.S.C. § 14501(c)(1). The purpose of the Truck and Bus Regulation is to reduce air pollution, not to regulate prices, routes, or services of trucks. While the Regulation will increase some motor carriers' costs of operation, and those costs may be passed on to consumers of motor carrier services, this is not a sufficient relationship to prices to result in preemption. The purpose of the FAAAA was to prevent states from interfering with Congress's decision to deregulate the competitive market for motor carrier services, not to prevent states from exercising their traditional authority to protect the health and safety of their citizens. Besides, even if it were "related to" prices, routes, or services, the FAAAA has a safety exception that would save the Truck and Bus Regulation from preemption. 49 U.S.C. § 14501(c)(2)(A). Thus, the Association is not likely to succeed on the merits.

The Association also fails to establish that it is likely to suffer irreparable harm if its motion for a preliminary injunction is denied. Most of the Association's members will not have any mandatory compliance costs before 2013 (other than the insignificant cost of reporting information about their fleets to the Board).[2] However, each day that implementation of the

---

[1] Pursuant to Local Rule 231(d)(3), the Board does not desire to present oral testimony at the hearing.
[2] (Declaration of Tony Brasil in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction ("Brasil Decl."), at 9:4-9.)

Regulation is delayed beyond January 1, 2012, California will lose the air quality benefits of the Regulation, estimated to be a reduction of one-half ton per day of diesel particulate matter emissions.[3]

## STATEMENT OF THE CASE

There are nearly one million heavy-duty vehicles (vehicles with a gross vehicle weight greater than 14,000 pounds) that travel California's highways each year, over eighty percent of which are diesel fueled. (Sax Decl., at 4:20-22.) These vehicles are the largest sources of emissions from all mobile sources of diesel particulate matter ("PM") and oxides of nitrogen ("NOx") in California. (*Id.* at 4:23-28.)

Diesel PM is a toxic air contaminant. (Declaration of Linda Smith in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction ("Smith Decl."), at 4:24-26.) In addition, diesel PM and NOx contribute to ambient levels of PM composed of particles 2.5 microns or less in diameter ("PM2.5"). (Sax Decl., at 4:26-27.) PM2.5 causes premature death, as well as increased hospitalizations and emergency room visits for heart and lung diseases. (Smith Decl., at 3:10-13, 4:6-8.) In California, 9,200 people die prematurely because of exposure to PM2.5 each year. (*Id.* at 4:1-4.)

NOx is a precursor to ozone. (Sax Decl., at 4:26-27.) Exposure to ozone causes breathing problems, lung tissue damage, and premature mortality in people with lung and heart disease. (Smith Decl., at 4:9-19.) It also causes increased asthma rates for children and adolescents. (*Id.*)

The federal Clean Air Act has national ambient air quality standards for PM2.5 and ozone, which states are required to attain through the development of state implementation plans. 42 U.S.C. §§ 7407, 7410; (Sax Decl., at 3:15-19). The Board estimates that attaining the PM2.5 standard in California will reduce the number of annual premature deaths caused by exposure to PM2.5 by 2,700. (Smith Decl., at 4:2-5.) Two areas in California, the South Coast Air Basin and the San Joaquin Valley Air Basin, are not in attainment for both PM2.5 and ozone. (Sax Decl., at

---

[3] (Declaration of Todd Sax in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction ("Sax Decl."), at 5:18-25.)

3:19-21.) The Clean Air Act requires California to attain these standards by 2014 for PM2.5 and 2023 for ozone. (*Id.* at 3:21-22.)

In 2008, the Board adopted the Truck and Bus Regulation, section 2025, title 13, of the California Code of Regulations, to reduce emissions of diesel PM and NOx from trucks and buses operating in California. (Brasil Decl., 3:24-25, Exh. 1.) On September 16, 2011, as a result of the national recession that began in 2007, the Board amended the Truck and Bus Regulation to reduce the costs of complying with the Regulation. (*Id.* at 4:22 – 5:23.) The amended Regulation does not become law until approved by the California Office of Administrative Law; the Board expects to receive approval by December 14, 2011. (*Id.* at 5:24-26, Exh. 2.) Although the amendments are not yet law, the Association's suit challenges the amended version of the Truck and Bus Regulation.[4] This brief's discussion of the Regulation's compliance deadlines will all refer to the amended version.

The Truck and Bus Regulation has two essential components. First, it requires vehicles to have diesel particulate filters to reduce emissions of diesel PM. Model year 2007 and newer diesel trucks have filters as part of their standard equipment. Older diesel trucks need to be either retrofitted with filters or replaced with a model year 2007 (or newer) engine by the applicable deadline. Second, the Regulation requires vehicles to be upgraded to model year 2010 engines (or engines with equal or lower emissions) to reduce emissions of NOx by the applicable deadline. (*Id.* at 6:5-10.)

To meet the federal Clean Air Act deadline for attaining the PM2.5 standard, the Truck and Bus Regulation requires most heavy-duty trucks operated in California to have filters by 2014. To reduce NOx emissions in order to meet the ozone standard, the Regulation requires all heavy-duty truck engines operated in California to be replaced with 2010 model year engines by 2023. (*Id.* at 6:12-16.) The Regulation also contains numerous provisions designed to reduce the cost of compliance. (*Id.* at 6:23 – 8:20.)

---

[4] The Association's Motion for Preliminary Injunction ("Mot. P. Inj."), at 1:8-9, states that the Regulation requires diesel trucks to be retrofitted with filters beginning January 1, 2012, which is generally consistent with the amended Regulation. The original Regulation required retrofits beginning January 1, 2011. Cal. Code Regs., tit. 13, § 2025(f).

The Association's motion seeks an injunction until the hearing on its pending motion for summary judgment, calendared for January 26, 2012. (Mot. P. Inj., at 1:17-22.) The Truck and Bus Regulation's only requirement in 2012 is that fleets install filters on trucks with 1996 to 1999 model-year engines. (Brasil Decl., 9:5-7.) Moreover, most of the Association's members will be able to take advantage of various provisions in the Regulation to delay compliance until after 2012. (*Id.* at 9:8-11.) For instance, small fleets with fewer than four vehicles having 1996 to 1999 model-year engines can delay initial compliance until 2014. (*Id.*) Additional methods that the Association's members can use to delay compliance until after the hearing on the Association's motion for summary judgment are described below and in declarations. (*See id.* at 9:13 – 10:2.)

Furthermore, substantial grants and loan assistance are available to help motor carriers, especially those with small fleets, finance compliance with the Truck and Bus Regulation. (*See* Declaration of Lucina Negrete in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction ("Negrete Decl."); Declaration of Gary Scott Rowland in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction ("Rowland Decl.").) The Board's Providing Loan Assistance for California Equipment Program has helped leverage $57 million in loans to purchase over 900 cleaner trucks and nearly 350 filter retrofits, and the Board expects to leverage $98 million more over the next two years. (Negrete Decl., at 8:14-17, 9:4-5.) The Board's Carl Moyer program has spent $15.5 million on heavy-duty truck replacements and $9 million on retrofits. (Rowland Decl., at 6:15-18, 7:1-4.)

**STANDARD OF REVIEW**

Because a preliminary injunction is an extraordinary remedy, courts require the movant to carry its burden of persuasion by a clear showing. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 1867 (1997). The movant must establish that it is likely to succeed on the merits; that it is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in its favor; and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 374 (2008).

# ARGUMENT

## I. THE ASSOCIATION IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS FAAAA PREEMPTION CLAIM.

The Association claims that the FAAAA preempts the Truck and Bus Regulation because the Regulation is purportedly "related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1).[5] The FAAAA preempts state laws that reference or have a connection with motor carrier prices, routes, or services. *Rowe v. New Hampshire*, 552 U.S. 364, 370, 128 S.Ct. 989, 995 (2008). Since the Truck and Bus Regulation neither references nor has a connection with prices, routes, or services, it is not preempted, and the Association is unlikely to succeed on the merits.

Furthermore, state laws that do reference or have a connection with motor carrier prices, routes, or services are saved from preemption if they fall within the safety exception.[6] The purpose of this exception is "to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over safety." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 439, 122 S.Ct. 2226, 2236 (2002). The Truck and Bus Regulation is an exercise of California's preexisting and traditional state police power to protect the health and safety of its citizens by reducing the toxic air pollution emitted from trucks and buses. Therefore, even if it did reference or have a connection with motor carrier prices, routes, or services, the Regulation is within the scope of the FAAAA's safety exception.

---

[5] Section 14501(c)(1) states in full: "General rule.--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."

[6] The relevant portion of the safety exception states: "Paragraph (1) – (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization; . . . ." 49 U.S.C. § 14501(c)(2)(A).

Before addressing these two issues in detail, the starting point for the Court's analysis must be determined.

### A.     The Presumption Against Preemption Applies to The Association's Claim.

The starting point for preemption analysis is the presumption that state laws dealing with matters traditionally within a state's police powers are not to be preempted unless Congress's intent to do so is clear and manifest. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947); *Ginsburg v. Northwest, Inc.*, 653 F.3d 1033, 1036 (9th Cir. 2011). Given the historic presence of state law in the area addressed by the Truck and Bus Regulation – air pollution – the presumption applies here. *See Pacific Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011).

### B.     The Truck and Bus Regulation Does Not Directly or Indirectly Relate to Motor Carrier Prices, Routes, or Services.

The FAAAA preempts state laws that directly or indirectly refer to or have a connection with motor carrier prices, routes, or services. *Rowe*, 552 U.S. at 370, 128 S.Ct. at 995. Unlike the state law in *Rowe*, which the United States Supreme Court found directly affected motor carrier prices, routes, or services, *id.* at 373, 128 S.Ct. at 996, the Truck and Bus Regulation's effect on prices, routes, or services is not only indirect, it is also remote, tenuous, and peripheral.

In *Rowe*, Maine's law mandated that tobacco retailers only use delivery services that would provide "a special kind of *recipient-verification* service," which required motor carriers to verify the age and identity of the retailers' customers. *Id.* at 368, 128 S.Ct. at 993-94. This was not a service that, absent the state law, motor carriers would choose to provide for retailers. *Id.* at 372, 128 S.Ct. at 995. The state law "thereby directly regulates a significant aspect of the motor carrier's package pickup and delivery service." *Id.* at 373, 128 S.Ct. at 996 (citation omitted).

The Truck and Bus Regulation, by contrast, requires motor carriers to add diesel particulate filters to their trucks and to eventually replace their trucks with cleaner trucks. (Brasil Decl., at 6:5-10.) This is not an added service for entities that hire motor carriers; in fact, when entities engage motor carriers, they will likely be ignorant of the age of the particular trucks that the motor carrier will use and whether or not those trucks will have diesel particulate filters.

And, just as the Truck and Bus Regulation does not specify the services that motor carriers must provide, it does not specify either the prices or routes. Nowhere does the Association identify where in the Regulation prices, routes, or services are directly regulated. Thus, the Regulation's effect on prices, routes, or services, if any, is indirect.

In cases such as this, where the effect on prices, routes, or services is indirect, the state law is preempted if it *binds* the motor carrier to a particular price, route or service and thereby interferes with competitive market forces within the motor carrier industry. *Am. Trucking Assoc., Inc. v. City of Los Angeles*, No. 10–56465, 2011 WL 4436256, at *7 (9th Cir. Oct. 31, 2011); *see also Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc.*, 519 U.S. 316, 329, 117 S.Ct. 832, 840 (1997) (ERISA); *Air Transp. Ass'n of Am. v. City & County of S.F.*, 266 F.3d 1064, 1072 (9th Cir. 2001) (Airline Deregulation Act). The crux of the Association's argument is that compliance with the Truck and Bus Regulation will cost its members a substantial amount of money, forcing them either to raise prices or go out of business. (Mot. P. Inj., at 13:9-10.) However, these effects do not bind the Association's members to charging a particular price, nor do they interfere with competitive market forces.

The motor carriers in *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), made the same argument as the Association does now. There, the motor carriers contended that California's prevailing wage law was preempted because it would cause them to increase their prices by twenty-five percent. *Id.* at 1189. While the court agreed that the state law was "'not entirely unrelated to'" motor carrier prices, routes or services, it held the effect was indirect, remote, and tenuous, so it upheld the prevailing wage law. *Id.* at 1185; *see also Dillingham* 519 U.S. at 329, 117 S.Ct. at 840 (if ERISA were concerned with any state action that increased costs of providing benefits, and thereby potentially affected the choices made by ERISA plans, we could scarcely see the end of ERISA's pre-emptive reach, and the words "relate to" would limit nothing); *Cardenas v. McLane FoodServices, Inc.*, No. SACV 10–473 DOC, 2011 WL 2714430, at *8 (C.D. Cal. Jul 08, 2011) (to comply with California's rest and meal break laws, motor carrier may choose to modify its routes or services, but this does not necessarily mean that the laws have more than an indirect, remote, or tenuous effect).

Similarly, the Association's members will incur costs when they comply with the Truck and Bus Regulation, but the extent to which they pass these costs on to their customers will still be determined by competitive market forces within the motor carrier industry. Each motor carrier will still offer its services for whatever price it chooses. Therefore, the Truck and Bus Regulation is not "related to" prices, as that term is used in the FAAAA.

The Regulation is likewise not related to services. The Association claims that the cost of compliance will cause its members to reduce the number of their trucks, lay off employees, or go bankrupt. First, these claims are speculative. The Association itself makes clear that it is the nationwide recession, along with higher prices for fuel and tires, that has devastated its industry. (*E.g.*, Declaration of Lee Brown in Support of Motion for Summary Judgment (Doc. 31-4) ("Brown Decl."), at 2:10-12, 3:11-22.) Second, while the Regulation increases costs, it does not bind motor carriers to providing certain services. Competitive market forces will still determine the level and types of services provided by motor carriers. So, when the economy improves, demand for dump truck and other motor carrier services will rise, prices will likely rise, and, in turn, motor carrier businesses and the services that they provide will likely expand.

The Regulation is also not related to the routes that motor carriers drive. The Association asserts that retrofitting trucks with particulate filters limits the length of time that they can run, particularly concrete mixers. (Mot. P. Inj., at 5:1-6, 14:15-19.) This assertion is based upon hearsay and speculation that the filters are unreliable and cause breakdowns. (Brown Decl., at 3:23 – 4:3.) However, the Board's evidence shows that the retrofit filters are robust and working properly in the field. (Declaration of Sharon Lemieux in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction, at 6:14-15.) Further, so long as the appropriate type of filter is used, they function properly on concrete mixers. (*Id.* at 4:24 – 5:4.) Filters installed on new vehicles also are relatively problem free and rarely fail. (Declaration of John Urkov in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction, at 3:1-18.)

Therefore, the FAAAA does not preempt the Truck and Bus Regulation because the Regulation does not bind motor carriers to a particular price, route or service and it does not interfere with competitive market forces.

### C. The Truck and Bus Regulation Falls Within the FAAAA's Safety Exception, Which Preserves States' Traditional Authority Over Safety.

The Association is also unlikely to succeed on the merits because the FAAAA does not preempt states from exercising their traditional police power over safety. Since the purpose of the Truck and Bus Regulation is safety, it falls within the safety exception of the Act's preemption provision. *See* 49 U.S.C. § 14501(c)(2)(A). This interpretation of the safety exception is in harmony with the federal Clean Air Act, which requires states to develop implementation plans to meet national ambient air quality standards. In fact, the U.S. Environmental Protection Agency ("EPA") has already proposed approving the Truck and Bus Regulation as a critical component of California's implementation plan. If the Regulation were preempted by the FAAAA, then California could not meet its obligations under the Clean Air Act.

The purpose of the FAAAA was to deregulate motor carriers and to even the playing field with the airline carriers, which had already been deregulated. *Californians for Safe and Competitive Dump Trucks*, 152 F.3d at 1187. The purpose of the preemption provision, 49 U.S.C. § 14501(c)(1), was to prevent states from defeating this deregulatory purpose by adopting their own economic regulations that would interfere with competition among the motor carriers. *Ours Garage*, 536 U.S. at 440-41, 122 S.Ct. at 2236. But Congress did not intend to "'restrict' the preexisting and traditional state police power over safety." *Id.* at 439, 122 S.Ct. at 2236; *see also Rowe*, 552 U.S. at 375, 128 S.Ct. at 997.

The Ninth Circuit applied the safety exception to a statute that provided that before a towing company may tow a vehicle from private property without the vehicle owner's permission, the company must obtain written authorization from the property owner. *Tillison v. City of San Diego*, 406 F.3d 1126 (9th Cir. 2005). To determine whether the statute fit within the safety exception, the court examined whether the legislature had adopted the statute for the purpose of motor vehicle safety. *Id.* at 1129. It found that the statute's purpose was motor

9

vehicle safety: to protect the vehicle owner and the public from towing mistakes, which may lead to dangerous confrontations; to protect the owner's family from being stranded at a dangerous location; to protect against false vehicle theft reports, which waste law enforcement's limited resources; and to protect against unnecessary hazardous tows. *Id.* at 1130-31. Thus, in upholding the statute, the court refused to apply the narrowest possible construction of the scope of the safety exception – even preventing fights between tow truck operators and vehicle owners was found to be a safety concern within the scope of the exception. *Id.* at 1129.

The Board's purpose in adopting the Truck and Bus Regulation was to reduce the amount of air pollution emitted from trucks and buses in order to protect the health of Californians. This purpose is demonstrated by the following excerpts from the Board's findings in its resolution adopting the Regulation:

> In-use on-road diesel vehicles that operate in the State – whether based in California or not – are significant contributors of diesel PM and NOx emissions, which California must reduce to attain the ozone and PM2.5 [National Ambient Air Quality Standards or NAAQS] and to reduce the health risks associated with such pollutants;
>
> The regulation approved herein would achieve the necessary emission reductions to achieve the NAAQS for ozone and PM2.5 ….
>
> The regulation approved herein would significantly reduce diesel PM and NOx emissions and associated cancer, premature mortality, and other adverse health effects statewide;….

(Brasil Decl., Exh. 1, at 11;[7] *see also* Brasil Decl., at 3:23 – 4:2.)  Controlling air pollution is one of the traditional areas over which states exercise their police power to protect the health and

---

[7] In addition to these findings, the resolution included the following recitals:

> [T]he Board identified particulate matter (PM) emissions from diesel fueled engines (diesel PM) as a toxic air contaminant ….

\*\*\*

> [T]he Legislature found, among other things, that a number of areas within the state have not attained NAAQS for ozone and PM2.5; that serious public health impacts, including thousands of premature deaths per year, occur in the state as a result of ozone and PM2.5 levels exceeding the NAAQS ….

\*\*\*

(continued…)

1 safety of their citizens.  *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 80

2 S.Ct. 813, 815 (1960); *Pacific Merchant Shipping Ass'n*, 639 F.3d at 1167.  Therefore, the

3 Regulation is genuinely responsive to the Board's motor vehicle safety concern – the harm caused

4 by truck and bus emissions – so the Regulation falls within the scope of the FAAAA's safety

5 exception.

6 The EPA confirmed that safety is the purpose of the Truck and Bus Regulation when it

7 recently proposed approving the Regulation as part of California's state implementation plan for

8 achieving national ambient air quality standards under the federal Clean Air Act.  Approval and

9 Promulgation of Implementation Plans, 76 Fed. Reg. 40652, 40654 (proposed July 11, 2011) (to

10 be codified at 40 C.F.R. pt. 52).  EPA stated that the Truck and Bus Regulation, along with two

11 other regulations for reducing diesel particulate matter, plays "a critical role" in California's

12 efforts to meet national standards for ozone and PM2.5.  *Id.*; *see also* 49 U.S.C. § 7409(b)(1)

13 ("National primary ambient air quality standards … shall be ambient air quality standards the

14 attainment and maintenance of which in the judgment of the Administrator … are requisite to

15 protect the public health").  If the FAAAA's safety exception were construed narrowly, so as to

16 exclude the Truck and Bus Regulation, then California would be unable to comply with the

17 federal Clean Air Act's mandate to attain these national ambient air quality standards.  Since

18 nothing in the FAAAA expressly demands such a narrow construction of the safety exception,

19 there is no reason to invent such disharmony between the two federal acts.  Instead, the safety

20 exception should be construed to include state laws intended to protect the public from the

21 harmful air pollution effects of motor carriers.

---

25 (…continued)

26 WHEREAS, in-use on-road heavy-duty diesel vehicles operating in the state are among the largest contributors to PM2.5 and ozone forming emissions ….

27

(Brasil Decl., Exh. 1, at 1, 3-4, 5.)

28

11

The Association cites three cases that rejected the application of the safety exception in other circumstances.  By distinguishing these cases, we confirm that the safety exception does cover the Truck and Bus Regulation.

In *Rowe*, the Supreme Court stated that the FAAAA does not contain a public health exception. 552 U.S. at 374, 128 S.Ct. at 997.  But the safety concern in *Rowe* arose from the tobacco transported by the trucks, not the trucks themselves.  Here, by contrast, the safety issue arises from air pollution emitted from the trucks themselves.  And here, unlike in *Rowe*, the Regulation plays a critical role in the state's efforts to comply with another federal law, the Clean Air Act, as discussed above.  Furthermore, in *Rowe*, the statute directly bound motor carriers to providing a specified service (recipient verification).  As discussed above, the Truck and Bus Regulation does not directly or indirectly bind carriers to a specified price, route, or service.  Therefore, *Rowe* is not controlling here.

The Association also relies on the first of three Ninth Circuit opinions in the *American Trucking Association v. City of Los Angeles* litigation, in which the court reviewed the cities' mandatory concession agreements for drayage trucking services at the ports of Los Angeles and Long Beach. 559 F.3d 1046 (9th Cir. 2009).  The district court had denied the motor carriers' motion for preliminary injunction based upon the safety exception.  Examining the purpose of the agreements, the Ninth Circuit found that, rather than safety, they were an "extensive attempt to reshape and control the *economics* of the drayage industry." *Id.* at 1055 (italics added).  While another purpose was environmental, the court rejected the cities' means for achieving it: "We see little safety-related merit in those threadpaper arguments, which denigrate small businesses and insist that individuals should work for large employers or not at all." *Id.* at 1056.  The purpose of the Truck and Bus Regulation, by contrast, is entirely safety, not economic, and it does not seek to reshape the industry to achieve this purpose.

The Association also cites *Dilts v Penske Logistics, LLC*, No. 08–CV–318, 2011 WL 4975520 (S.D. Cal. Oct. 19, 2011), in which the district court held that meal and rest break laws applicable to truck drivers were preempted.  The drivers argued that the safety exception applied because they, like all workers, perform their jobs more safely after they have had breaks.  The

12

1  court rejected this argument because it was too general – the drivers provided no evidence that the
2  laws were intended to be specifically responsive to motor vehicle safety. *Id.* at 12.  Here, by
3  contrast, the evidence unambiguously demonstrates that the Board adopted the Truck and Bus
4  Regulation specifically to address the unsafe air pollution emitted by trucks and buses.
5  Therefore, the cases cited by the Association in which the courts rejected the application of
6  the safety exception are each distinguishable from the case at bar, so it is quite unlikely that the
7  Association will succeed on the merits.

**II.  THE ASSOCIATION EXAGGERATES THE IRREPARABLE HARM ITS MEMBERS WILL SUFFER IN THE ABSENCE OF PRELIMINARY RELIEF.**

There is no doubt that the construction industry has been hit hard by the 2008 recession.  As a result, many of the Association's members are in a terribly weak financial condition.  For instance, one of the Association's declarants states that the "nationwide recession has devastated the construction trucking industry and over the past four years, CDTOA membership has declined from 1,600 in 2007 to 1,000 today as many members have been forced to declare bankruptcy or just give up their businesses." (Brown Decl., at 2:10-12; *see also id.* at 12-17; Recupido Decl., at 3:26-27 ("companies are competing for far less work than just three or four years ago").)  On top of this, motor carriers are struggling with higher fuel and tire costs, two of the major components of their total operating costs.  (Brown Decl., at 3:17-20; Recupido Decl., at 3:27 – 4:2.)  While very real, these circumstances are not caused by the Truck and Bus Regulation; even if the Regulation were preliminarily enjoined, as the Association requests, these dire circumstances would still exist.

In addition, the Association exaggerates the cost to comply with the Truck and Bus Regulation, especially in the short term.  (Brasil Decl., at 10:4-7.)  Under the amended Regulation, the earliest that any motor carrier would have to replace its truck is 2015.  This deadline applies to carriers with truck engines that are model year 1993 or older.  Thus, by 2015, these engines would already be at least twenty-two years old, about the time that they would likely be replaced as a matter of course, disregarding the Regulation.  (*See* Mot. P. Inj., at 3:27-29; Declaration of

Robert McClernon in Support of Motion for Summary Judgment (Doc. 31-7) ("McClernon Decl."), at 2:19.)

Moreover, when the Regulation requires engines to be replaced, it does not require them to be replaced with new engines, contrary to the repeated references in the Association's brief and declarations to the high cost of new engines. (*See, e.g.*, Mot. P. Inj., at 5:7-11.) Instead, the Regulation requires replacement with engines that are no newer than model year 2010, meaning that carriers can replace their engines with used engines that are no less than five years old. (Brasil Decl., at 10:7-11.) Purchasing five-year-old engines has been the normal business strategy for the Association's members. (*See* McClernon Decl., at 2:19-21; Recupido Decl., at 2:11-12.) These used engines are considerably cheaper than new engines. In addition, the Board has both grant and loan programs available to motor carriers, which at least one of the Association's declarants have been able to take advantage of in order to comply with the Regulation. (Declaration of Tom Santoro (Doc. 31-8), at 1:26-28; Negrete Decl., at 2:15-20; Rowland Decl., at 2:22-23.)

Motor carriers' only obligation during 2012 is that those with model year 1996 to 1999 engines are required to retrofit these engines with filters by January 1. (Brasil Decl., 9:5-12.) Even this requirement has numerous exceptions. For instance, carriers who have reduced their fleet size due to the recession receive compliance credits, so that a percentage of their trucks would be exempt for some years. (*Id.* at 7:13-19.) Also, dump trucks driven fewer than 20,000 miles annually can delay retrofits until at least 2014. (*Id.* at 7:23 – 8:9.) As a result of these and other compliance options, most construction fleets will be able to delay compliance until after 2012. (*Id.* at 9:8-9.) This likely includes most of the dump truck operators who make up the Association's membership.

The Board's staff analyzed the declarations filed by the Association regarding their compliance options based on the limited information provided there and in the Association's discovery responses to date. Only three of the six declarants provided sufficient information to determine their compliance costs for 2012. (*Id.* at 10:19-20.) For these three, staff found that

their costs would likely be *zero* or could easily be zero if they undertook certain actions, excluding the costs of reporting fleet information to the Board. (*Id.* at 10:19 – 11:22.)

Thus, the Association has not met its burden to show that it or its members will suffer irreparable harm if its motion for preliminary injunction is denied. Its only evidence that any of its members will incur costs before this Court rules on the Association's motion for summary judgment is at the very least called into doubt by the evidence offered by the Board, and much of the Association's evidence is speculative or otherwise inadmissible. Moreover, the real irreparable harm to all motor carriers is due not to the Regulation, but to the nationwide recession. Therefore, preliminarily enjoining the Regulation is unwarranted.

### III. THE PURPORTED NEED FOR A PRELIMINARY INJUNCTION IS OF THE ASSOCIATION'S OWN MAKING, SO GRANTING THE MOTION WOULD BE INEQUITABLE.

This action was filed on February 11, 2011. The Association was aware at that time that some of its members might have to retrofit their trucks by January 1, 2012. (Complaint, 3:4.) It could have had its motion for summary judgment heard before that date. The Association's unjustified delay makes this motion to enjoin the Truck and Bus Regulation inequitable.

Moreover, an injunction would be unfair to those motor carriers who have already taken steps to comply with the Regulation by January 1, 2012. (Brasil Decl., at 12:7-9, 12:17-27, Exh. 3; Santoro Decl., at 1:26-28.) It could also cause significant hardship to retrofit manufacturers who have made significant investments in research, design, and production of products in expectation of the Regulation's implementation dates. (Brasil Decl., at 12:7-11, 12:21-27, Exh. 3.)

### IV. THE PUBLIC HAS AN INTEREST IN CLEANER AIR AS SOON AS POSSIBLE.

Any delay in implementation of the Truck and Bus Regulation will lead to a delay in emission reductions from trucks. The retrofitting of most model year 1996 to 1999 trucks and buses, as required by the Regulation by January 1, 2012, is anticipated to reduce statewide emissions of diesel PM by one-half ton per day. (Sax Decl., at 5:21-25.) The public has a strong interest in reaping the benefits of this Regulation as soon as possible, so the Court should not delay the Regulation's implementation.

15

# CONCLUSION

The Association has failed to demonstrate that it is likely to succeed on the merits of its case. The Truck and Bus Regulation does not fall within the FAAAA's preemption provision and, even if it did, it would still not be preempted because it does fit within the Act's safety exception. The Association has also failed to demonstrate that it or its members will suffer irreparable harm if the motion is denied. And, finally, both the equities and the public interest favor denying the Association's motion for preliminary injunction.

Dated: December 1, 2011               Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
SARA J. RUSSELL
Supervising Deputy Attorney General


*/s/ Nicholas Stern*
NICHOLAS STERN
Deputy Attorney General
*Attorneys for Defendant*

SA2011300613
31391489.doc