KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
SARA J. RUSSELL, State Bar No. 84704
Supervising Deputy Attorney General
NICHOLAS STERN, State Bar No. 148308
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 323-3840
 Fax: (916) 327-2319
 E-mail: Nicholas.Stern@doj.ca.gov
*Attorneys for Defendant
Mary D. Nichols, Chairperson of the California Air
Resources Board, and James Goldstene, Executive
Officer of the California Air Resources Board*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION,**<br><br>Plaintiff,<br><br>v.<br><br>**MARY D. NICHOLS, Chairperson of the California Air Resources Board, and JAMES GOLDSTENE, Executive Officer of the California Air Resources Board,**<br><br>Defendants.<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, INC.,**<br><br>Defendant-Intervenor. | 2:11-CV-00384-MCE-GGH<br><br>**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 26, 2012<br>Time: 2:00 p.m.<br>Dept: 7<br>Judge Honorable Morrison C. England, Jr.<br>Trial Date June 3, 2013<br>Action Filed: February 11, 2011 |

1

**TABLE OF CONTENTS**

2

          **Page**

3   INTRODUCTION .................................................................................................................... 1

4   STATEMENT OF THE CASE ................................................................................................. 2

      STANDARD OF REVIEW ...................................................................................................... 4

5   ARGUMENT ............................................................................................................................ 4

6           I.     The Presumption Against Preemption Applies to the Association's Claim. .......... 4

7          II.    The Truck and Bus Regulation Does not Directly or Indirectly Relate to Motor Carrier Prices, Routes or Services. ................................................................ 5

8               A.    The Regulation Does Not Reference Or Otherwise Directly Relate To Motor Carrier Prices, Routes, Or Services. ............................................ 5

9

10             B.    The Regulation Does Not Bind Motor Carriers to a Particular Price, Route or Service or Interfere with Competitive Market Forces.................. 6

                    1.     Prices ................................................................................................ 7

11                    2.     Services ............................................................................................ 9

12                    3.     Routes .............................................................................................. 9

13          III.   The Truck and Bus Regulation Falls Within the FAAAA's Safety Exception, Which Preserves States' Traditional Authority Over Safety. .............. 11

14   CONCLUSION ....................................................................................................................... 16

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Air Transp. Ass'n of Am. v. City & County of S.F.*
266 F.3d 1064 (9th Cir. 2001) .................................................................................................. 6

*Am. Farm Bureau Fed'n v. Envtl. Prot. Agency*
559 F.3d 512 (D.C. Cir. 2009) ................................................................................................ 15

*Am. Trucking Assoc., Inc. v. City of Los Angeles*
577 F.Supp.2d 1110 (C.D. Cal. 2008) ..................................................................................... 9

*Am. Trucking Assoc., Inc. v. City of Los Angeles*
660 F.3d 384 (9th Cir. 2011) ............................................................................................... 6, 7

*Am. Trucking Assoc., Inc. v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009) ............................................................................................. 8, 9

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc.*
519 U.S. 316, 117 S.Ct. 832 (1997) .................................................................................... 6, 7

*Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*
152 F.3d 1184 (9th Cir. 1998) ....................................................................................... 7, 8, 11

*Cardenas v. McLane FoodServices, Inc.*
No. SACV 10–473 DOC, 2011 WL 2714430 (C.D. Cal. Jul 08, 2011) ................................... 7

*Celotex Corp. v. Catrett*
477 U.S. 317, 106 S.Ct. 2548 (1986) ....................................................................................... 4

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*
536 U.S. 424, 122 S.Ct. 2226 (2002) ..................................................................................... 12

*Dilts v Penske Logistics, LLC*
No. 08–CV–318, 2011 WL 4975520 (S.D. Cal. Oct. 19, 2011) .............................................. 9

*Exxon Mobil Corp. v. U.S. EPA*
217 F.3d 1246 (9th Cir.2000) ................................................................................................. 14

*Ginsburg v. Northwest, Inc.*
653 F.3d 1033 (9th Cir. 2011) .................................................................................................. 4

*Huron Portland Cement Co. v. City of Detroit*
362 U.S. 440 80 S.Ct. 813 (1960) .......................................................................................... 14

# TABLE OF AUTHORITIES
### (continued)

**Page**

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*
   514 U.S. 645, 115 S.Ct. 1671 (1995) .................................................................. 5, 7, 8

*NYS Health Maintenance Org. Conference v. Curiale*
   64 F.3d 794 (2d Cir.1995) ................................................................................... 7

*Pacific Merchant Shipping Ass'n v. Goldstene*
   639 F.3d 1154 (9th Cir. 2011) ............................................................................. 4, 14

*Rice v. Santa Fe Elevator Corp.*
   331 U.S. 218, 67 S.Ct. 1146 (1947) .................................................................... 4

*Rowe v. New Hampshire*
   552 U.S. 364, 128 S.Ct. 989 (2008) .................................................................... passim

*Tillison v. City of San Diego*
   406 F.3d 1126 (9th Cir. 2005) ............................................................................. 12

**STATUTES**

42 U.S.C.
   § 7409 .................................................................................................................. 2
   § 7409(b)(1) ........................................................................................................ 15
   § 7410 .................................................................................................................. 2

49 U.S.C.
   § 14501(c)(1) ....................................................................................................... 1, 5, 11
   § 14501(c)(2)(A) ................................................................................................. 1, 11

**COURT RULES**

Federal Rule of Civil Procedure 56(a) ..................................................................... 4

**OTHER AUTHORITIES**

76 Federal Register
   40652 .................................................................................................................. 14

California Code of Regulations tit. 13, § 2025 ........................................................ 3

## INTRODUCTION

Plaintiff California Dump Truck Owners Association ("Association") has moved for summary judgment against defendants Mary D. Nichols, Chairperson of the California Air Resources Board, and James Goldstene, Executive Officer of the California Air Resources Board, (collectively, the "Board") in this suit challenging the validity of the Board's Truck and Bus Regulation. Beginning in 2012, the Truck and Bus Regulation will result in substantial reductions in air pollution emitted from trucks and buses operating in California. The Association's motion should be denied, both because its claim fails as a matter of law and because genuine disputes exist regarding facts that it has identified as material to its claim.

The Association's single claim is that the Truck and Bus Regulation is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which preempts state laws that are "related to" a price, route, or service of any motor carrier. 49 U.S.C. § 14501(c)(1). But the Truck and Bus Regulation reduces air pollution emitted from trucks and buses; it does not regulate prices, routes, or services. While the Regulation will increase some motor carriers' costs of operation, and those costs may be passed on to consumers of motor carrier services, it will not bind carriers to particular prices, routes, or services, so its effect is too tenuous, remote, and peripheral to justify preemption.

Besides, the purpose of the FAAAA was to prevent states from interfering with Congress's decision to deregulate the competitive market for motor carrier services, not to prevent states from exercising their traditional authority to protect the health and safety of their citizens. As a result, the FAAAA has a safety exception that saves from preemption state laws adopted for the purpose of motor vehicle safety. 49 U.S.C. § 14501(c)(2)(A). The purpose of the Truck and Bus Regulation is to reduce dangerous air pollution emissions from motor vehicles. Controlling air pollution to protect the health and safety of citizens is a traditional area over which states exercise their police power. So, even if the Regulation were "related to" prices, routes, or services, it would be saved from preemption by the FAAAA's safety exception.

## STATEMENT OF THE CASE

There are nearly one million heavy-duty vehicles (vehicles with a gross vehicle weight rating greater than 14,000 pounds) that travel California's highways each year, over eighty percent of which are diesel fueled. (Declaration of Todd Sax in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Summary Judgment ["Sax Decl."], at 4:11-13.) These vehicles are the largest sources of emissions from all mobile sources of diesel particulate matter ("PM") and oxides of nitrogen ("NOx") in California. (*Id.* at 4:14-20.)

Diesel PM is a toxic air contaminant. (Declaration of Linda Smith in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Summary Judgment ["Smith Decl."], at 5:1-3.) In addition, diesel PM and NOx contribute to ambient levels of PM composed of particles 2.5 microns or less in diameter ("PM2.5"). (Sax Decl., at 3:24-26.) PM2.5 causes premature death, as well as increased hospitalizations and emergency room visits for heart and lung diseases. (Smith Decl., at 3:3-17.) The Board estimates that, in California, 9,200 people die prematurely every year because of exposure to PM2.5. (*Id.* at 4:5-8.)

NOx is also a precursor to ozone. (Sax Decl., at 4: 25-26.) Exposure to ozone causes breathing problems, lung tissue damage, and premature mortality in people with lung and heart disease. (Smith Decl., at 4:11-23.) It also causes increased asthma rates for children and adolescents. (*Id.*)

Pursuant to the federal Clean Air Act, the United States Environmental Protection Agency ("EPA") established national ambient air quality standards for PM2.5 and ozone, which states are required to attain through the development of state implementation plans. 42 U.S.C. §§ 7409, 7410; (Sax Decl., at 3:15-19). Two areas in California, the South Coast Air Basin and the San Joaquin Valley Air Basin, are not in attainment for both PM2.5 and ozone. (*Id.* at 3:20-21.) The Clean Air Act requires California to attain these standards by 2014 for PM2.5 and 2023 for ozone.[1] (*Id.* at 3:21-23.) Significant reductions in emissions of diesel PM and NOx from heavy-duty vehicles are necessary for the South Coast and San Joaquin Valley Air Basins to attain the

---

[1] The particular ozone standard that must be attained by 2023 is the eight-hour ozone standard – that is, ozone measured over an eight-hour period. (Smith Decl., 2:25-27.)

national ambient air quality standards for PM2.5 and ozone.  (*Id.* at 4:22 – 5:4.)  The Board estimates that attaining the PM2.5 standard in California will reduce the number of premature deaths caused by exposure to PM2.5 by 2,700 every year.  (Smith Decl., at 4:7-10.)

In 2008, the Board adopted the Truck and Bus Regulation, section 2025, title 13, of the California Code of Regulations, to reduce emissions of diesel PM and NOx from trucks and buses operating in California.  (Declaration of Tony Brasil in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Summary Judgment ["Brasil Decl."], at 3:23-25, Exh. 1, at 11.)  On September 19, 2011, as a result of the national recession that began in 2007, the Board amended the Truck and Bus Regulation to reduce the costs of complying with the Regulation.  (*Id.* at 4:25 – 5:15.)  The amended Regulation was approved by the California Office of Administrative Law and become law on December 14, 2011.  (*Id.* at 5:16-17, Exh. 2.)  This brief's discussion of the Regulation's compliance deadlines refers to the amended version of the Regulation.

The Truck and Bus Regulation has two essential components.  First, it requires vehicles to have diesel particulate filters ("PM filters") to reduce emissions of diesel PM.  Model year 2007 and newer diesel trucks have PM filters as part of their standard equipment.  Older diesel trucks need to be either retrofitted with PM filters or replaced with a model year 2007 (or newer) engine by the applicable deadline.  Second, the Regulation requires vehicles to be upgraded to model year 2010 engines (or engines with equal or lower emissions) to reduce emissions of NOx by the applicable deadline.  (*Id.* at 5:22-28.)

To meet the federal Clean Air Act deadline for attaining the PM2.5 standard, the Truck and Bus Regulation requires most heavy-duty trucks operated in California to have PM filters by 2014.  To reduce NOx emissions in order to meet the ozone standard, the Regulation requires nearly all heavy-duty truck engines operated in California to be replaced with 2010 model year engines by 2023.  (*Id.* at 6:1-5.)  The Regulation also contains numerous provisions designed to reduce the cost of compliance.  (*Id.* at 6:6 – 8:15.)

The cost for fleets of trucks to comply with the Truck and Bus Regulation will vary, depending in part on the fleet's normal vehicle replacement practices.  (*Id.* at 8:23-24.)  Over the

life of the Regulation, from 2012 to 2023, the Board estimates that costs as a percentage of annual revenue for a moving company fleet will be about 0.15%, and for a fleet in the transportation sector about 0.3%. (*Id.* at 11:8-12.) Fleets of dump trucks may have higher costs as a percentage of revenue, but the Board estimates that they would still be less than 2%. (*Id.* at 14:7-9, 17:1-2.)

The Truck and Bus Regulation is expected to reduce total emissions of diesel PM in California by forty-five percent in 2014, as compared to the anticipated level of emissions in 2014 absent the Regulation. (Sax Decl., at 5:8-10.) This is a reduction of seven tons of diesel PM emissions per day. (*Id.*) It is also expected to reduce total emissions of NOx in California by eighty percent by 2023, as compared to NOx emissions in 2005; a reduction of seven hundred tons of NOx emissions per day. (*Id.*, at 5:18-20.)

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).

## ARGUMENT

### I. THE PRESUMPTION AGAINST PREEMPTION APPLIES TO THE ASSOCIATION'S CLAIM.

The starting point for preemption analysis is the presumption that state laws dealing with matters traditionally within a state's police powers are not to be preempted unless Congress's intent to do so is clear and manifest. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947); *Ginsburg v. Northwest, Inc.*, 653 F.3d 1033, 1036 (9th Cir. 2011). Given the historic presence of state law in the area addressed by the Truck and Bus Regulation – air pollution – the presumption applies here. *See Pacific Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011).

Previously, the Association argued that the presumption does not apply here because the FAAAA contains an express preemption provision. (Reply to Opp. to Mot. for Preliminary Injunction [Doc. 39], at 1:18-23.) But the FAAAA's preemption provision does not expressly apply to the Truck and Bus Regulation: its preemption provision does not mention state pollution regulations, and the Truck and Bus Regulation does not mention any of the areas expressly preempted by the FAAAA: prices, routes, or services. The Association is asking the Court to interpret the scope of the preemption provision and find that the Regulation is within that scope. In doing so, the Court must assume that the FAAAA does not preempt the Regulation unless the Association can show that preemption of the Regulation was Congress's clear and manifest intent. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 1676 (1995) (interpreting scope of preemption provision in ERISA).

## II. THE TRUCK AND BUS REGULATION DOES NOT DIRECTLY OR INDIRECTLY RELATE TO MOTOR CARRIER PRICES, ROUTES OR SERVICES.

The Association originally claimed that the Truck and Bus Regulation directly related to motor carrier prices, routes, or services. (*See, e.g.*, Motion for Summary Judgment ["MSJ"; Doc. 34], at 9:4.) More recently, the Association may have changed its claim to be based on an indirect relationship. (*See* Reply to Opp. to Mot. for Preliminary Injunction [Doc. 39], at 3:4.) Either way, the Association's claim lacks merit, and the Regulation is not within the scope of the FAAAA's preemption provision.

### A. The Regulation does not reference or otherwise directly relate to motor carrier prices, routes, or services.

The FAAAA preempts state laws that directly or indirectly "relate to" motor carrier prices, routes, or services. 49 U.S.C. § 14501(c)(1);[2] *Rowe v. New Hampshire*, 552 U.S. 364, 370, 128

---

[2] Section 14501(c)(1) states in full: "General rule.--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."

S.Ct. 989, 995 (2008). In *Rowe*, the United States Supreme Court found that the state law directly affected motor carrier prices, routes, or services, so the state law was preempted. *Id.* at 373, 128 S.Ct. at 996. Here, the Truck and Bus Regulation's effect on prices, routes, or services is not only indirect, it is also remote, tenuous, and peripheral.

In *Rowe*, Maine's law mandated that tobacco retailers only use delivery services that would provide "a special kind of *recipient-verification* service," which required motor carriers to verify the age and identity of the retailers' customers. *Id.* at 368, 128 S.Ct. at 993-94. This was not a service that, absent the state law, motor carriers would choose to provide for retailers. *Id.* at 372, 128 S.Ct. at 995. The state law "thereby directly regulates a significant aspect of the motor carrier's package pickup and delivery service." *Id.* at 373, 128 S.Ct. at 996 (citation omitted).

The Truck and Bus Regulation, by contrast, requires motor carriers to add PM filters to their trucks and to eventually replace their trucks with cleaner trucks. (Brasil Decl., at 5:22-27.) This is not an added service for entities that hire motor carriers; in fact, when entities engage motor carriers, they will likely be ignorant of the age of the particular trucks that the motor carrier will use and whether or not those trucks will have PM filters.

And, just as the Truck and Bus Regulation does not specify the services that motor carriers must provide, it does not specify either the prices or routes that motor carriers must charge or use. Nowhere does the Association identify where in the Regulation prices, routes, or services are directly regulated. Thus, the Regulation's effect on prices, routes, or services, if any, is indirect.

**B.   The Regulation does not bind motor carriers to a particular price, route or service or interfere with competitive market forces.**

In cases such as this, where the effect on prices, routes, or services is indirect, the state law is preempted if it *binds* the motor carrier to a particular price, route, or service and thereby interferes with competitive market forces within the motor carrier industry. *Am. Trucking Assoc., Inc. v. City of Los Angeles*, 660 F.3d 384, 396-97 (9th Cir. 2011); *see also Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc.*, 519 U.S. 316, 329, 117 S.Ct. 832, 840 (1997) (ERISA); *Air Transp. Ass'n of Am. v. City & County of S.F.*, 266 F.3d 1064, 1072 (9th Cir. 2001) (Airline Deregulation Act). The crux of the Association's argument is that compliance

with the Truck and Bus Regulation will cost its members a substantial amount of money, forcing them either to raise prices or go out of business. (*E.g.*, MSJ [Doc. 34], at 16:3-13.) However, these effects do not bind the Association's members to charge a particular price, nor do they interfere with competitive market forces.

### 1. Prices

The motor carriers in *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), made the same argument as the Association does now. There, the motor carriers contended that California's prevailing wage law was preempted because it would cause them to increase their prices by twenty-five percent. *Id.* at 1189. While the court agreed that the state law was "'not entirely unrelated to'" motor carrier prices, routes or services, it held the effect was indirect and too remote and tenuous, so it upheld the prevailing wage law. *Id.* at 1185; *see also Dillingham* 519 U.S. at 329, 117 S.Ct. at 840 (if ERISA were concerned with any state action that increased costs of providing benefits, and thereby potentially affected the choices made by ERISA plans, we could scarcely see the end of ERISA's pre-emptive reach, and the words "relate to" would limit nothing); *Cardenas v. McLane FoodServices, Inc.*, No. SACV 10–473 DOC, 2011 WL 2714430, at *8 (C.D. Cal. Jul 08, 2011) (to comply with California's rest and meal break laws, motor carrier may choose to modify its routes or services, but this does not necessarily mean that the laws have more than an indirect, remote, or tenuous effect). Thus, state laws that increase motor carrier costs generally do not bind carriers to particular prices, routes, or services, so their effect is too "tenuous, remote or peripheral" to justify preemption. *See NYS Health Maintenance Org. Conference v. Curiale*, 64 F.3d 794, 803 (2d Cir.1995).

While it is possible for a state law to affect costs so acutely as to effectively bind motor carriers to particular prices, routes, or services, that is not the case here. *See Am. Trucking Ass'n v. City of L.A.* 660 F.3d 384, 397 (9th Cir. 2011). The Supreme Court discussed this possibility in the context of ERISA, which preempts state laws that relate to employee benefit plans. *Travelers*, 514 U.S. at 668, 115 S.Ct. at 1683. The state law being challenged there imposed substantial surcharges on patients' medical costs, including patients covered by employee benefit plans subject to ERISA. However, the Court upheld the state law, stating that the effects on costs and

7

the selection of insurance plans would be just like many other state laws in areas traditionally subject to state regulation, which Congress did not intend to preempt:

> We acknowledge that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted under § 514.  But as we have shown, New York's surcharges do not fall into either category; they affect only indirectly the relative prices of insurance policies, a result no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.

*Id.*  Likewise, the Ninth Circuit held that the FAAAA did not preempt California's prevailing wage law, despite the state law's effect on prices, because the wage law did not "frustrate[] the purpose of deregulation by *acutely* interfering with the forces of competition."  *Californians for Safe and Competitive Dump Truck Transportation*, 152 F.3d at 1189 (citing to *Travelers*).

Here, the Board expects the Truck and Bus Regulation to increase motor carrier capital costs by less than two percent. (Brasil Decl., at 11:9-12, 14:7-9, 17:1-2.)  The extent to which the Association's members pass these costs on to their customers will still be determined by competitive market forces within the motor carrier industry.  Each motor carrier will still offer its services for whatever price it chooses.  The Regulation does not force any motor carrier to charge a particular price for its services.  This is no different than all the other types of traditional state laws that impose costs on motor carriers, which Congress did not intend to preempt.  The Regulation does not frustrate the purpose of deregulation or acutely interfere with the forces of competition.  Builders will still choose to hire the cheapest dump truck operators, and dump truck fleets will grow when the economy recovers.  Therefore, the Truck and Bus Regulation is not "related to" prices, as that term is used in the FAAAA.

The Association argues that this case is analogous to *American Trucking Association, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), wherein the Ninth Circuit found that at least portions of concession agreements between certain California ports and drayage trucks serving those ports were likely preempted by the FAAAA.  (MSJ [Doc. 34], at 16-17.)  But, in *American Trucking*, the issue of whether the concession agreements impacted prices, routes, or services was not disputed on appeal or, for that matter, in the district court because portions of the concession

8

agreements were *directly* related to prices, routes, and services. *Id.* at 1053; *Am. Trucking Assoc., Inc. v. City of Los Angeles*, 577 F.Supp.2d 1110, 1117 (C.D. Cal. 2008). Here, by contrast, and as discussed above, the relationship, if any, is indirect and too tenuous, remote and peripheral to justify preemption.

The Association also cites to *Dilts v Penske Logistics, LLC*, No. 08–CV–318, 2011 WL 4975520 (S.D. Cal. Oct. 19, 2011), in which the court held that meal and rest break laws applicable to truck drivers were preempted by the FAAAA. (MSJ [Doc. 34], at 17-18.) As in *American Trucking*, 559 F.3d 1046, the court found that the state laws directly related to routes and services, because they limited both the number of deliveries that the motor carriers could make in a day and the routes they could drive. *Dilts*, at *9. More relevant to the case at bar was the court's finding that a contention that the meal and rest break laws were preempted due to the "additional imposition of costs upon carriers is 'off the mark.'" *Id.* (quoting *Rowe*, 552 U.S. at 373, 128 S.Ct. at 996). Thus, the court in *Dilts* rejected the very argument made here by the Association.

### 2. Services

The Regulation is likewise not related to services. The Association claims that the cost of compliance will cause its members to reduce the number of their trucks, lay off employees, or go bankrupt. First, these claims are speculative. The Association itself makes clear that it is the nationwide recession, along with higher prices for fuel and tires, that have devastated its industry. (*E.g.*, Declaration of Lee Brown in Support of Motion for Summary Judgment ["Brown Decl.";  Doc. 31-4], at 2:10-12, 3:11-22.) Second, while the Regulation increases costs, it does not bind motor carriers to providing certain services. Competitive market forces will still determine the level and types of services provided by motor carriers. So, when the economy improves, demand for dump truck and other motor carrier services will rise, prices will likely rise, and, in turn, motor carrier businesses and the services that they provide will likely expand.

### 3. Routes

The Regulation is also not related to the routes that motor carriers drive. The Association asserts that PM filters limit the length of time that its members' trucks can run continuously

9

because the filters cause breakdowns and reduce fuel economy. (MSJ [Doc. 34], at 15:8 – 16:2.) First, the Association fails to identify a single actual route that its members will no longer be able to travel as a result of the Regulation. The Association does not even attempt to describe circumstances under which its members' routes would be impacted.

Moreover, all of the Association's evidence in support of its assertions is objectionable – it consists entirely of hearsay, foundationless speculation, and improper lay opinions. (*See* the Board's Objections to Evidence, filed herewith.) The Association's Executive Director, Lee Brown, concludes that the Regulation will "directly impact the routes that motor carriers of property take, because the retrofit technology limits the length of time trucks can run continuously." (Brown Decl. [Doc. 34-3], at 5:23-24.) This conclusion lacks any foundation. The Association's other declarant, Jay Pocock, a truck salesman, does not claim that routes will be affected. Mr. Pocock's assertion that manufacturer installed PM filters cause breakdowns is based on his experience with just a single vehicle. (Pocock Decl. [Doc. 34-4], at 2:25-28.) Therefore, the Association fails to demonstrate that the Regulation relates to its members' routes.

Furthermore, the Board's evidence overwhelmingly rebuts the Association's conclusions. The Board's evidence regarding the reliability of PM filters (both retrofit and manufacturer installed), fuel economy, and routes shows that the Regulation will not affect dump truck routes. According to the Board's staff, retrofit PM filters are robust and working properly in the field. (Declaration of Sharon Lemieux in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction, at 2:12-14, 2:28 – 3:24, 5:5-8, 6:9-15.) Similarly, the Board's staff concludes that PM filters installed on new vehicles are relatively problem free and rarely fail. (Declaration of John Urkov in Support of Defendants Mary Nichols and James Goldstene's Opposition to Motion for Preliminary Injunction, at 2:12-18, 23-27, 3:1-18.)

Regarding fuel economy, the Board's Chief of the Heavy-Duty Diesel Implementation Branch explains that retrofit PM filters cause a two percent decrease in fuel economy. (Brasil Decl., at 12:4-5.) For a typical dump truck, this amounts to about one extra gallon of fuel consumed per day. (*Id.* at 12:7-9.) Given that dump truck fuel tanks hold hundreds of gallons,

10

this minimal loss in fuel economy would not limit routes whatsoever. (*Id.* at 12:9-11.) Instead, the only impact would be to cause a small increase in fuel costs, which, like other cost increases, might be passed through to consumers of dump truck services at the discretion of each fleet owner. (*Id.*) Moreover, when fleets replace their vehicles with model year 2010 trucks or newer, fuel economy will increase. (*Id.* at 12:12-22.) Thus, all the admissible evidence demonstrates that, to the extent that the Regulation has any effect whatsoever on motor carrier routes, the effect will be remote, tenuous, and peripheral.

Therefore, the FAAAA does not preempt the Truck and Bus Regulation because the Regulation does not bind motor carriers to a particular price, route, or service and it does not interfere with competitive market forces.

### III. THE TRUCK AND BUS REGULATION FALLS WITHIN THE FAAAA'S SAFETY EXCEPTION, WHICH PRESERVES STATES' TRADITIONAL AUTHORITY OVER SAFETY.

The FAAAA does not preempt states from exercising their traditional police power over safety. Since the purpose of the Truck and Bus Regulation is safety, it falls within the safety exception of the Act's preemption provision. *See* 49 U.S.C. § 14501(c)(2)(A).[3] This interpretation of the safety exception is in harmony with the federal Clean Air Act, which requires states to develop implementation plans to meet national ambient air quality standards. In fact, EPA has already proposed approving the Truck and Bus Regulation as a critical component of California's implementation plan. If the Regulation was preempted by the FAAAA, then California could not meet its obligations under the Clean Air Act.

The purpose of the FAAAA was to deregulate motor carriers and to even the playing field with the airline carriers, which had already been deregulated. *Californians for Safe and Competitive Dump Trucks*, 152 F.3d at 1187. The preemption provision, 49 U.S.C. § 14501(c)(1), prevents states from defeating this deregulatory purpose by adopting their own economic

---

[3] The relevant portion of the safety exception states: "Paragraph (1) – (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization . . . ."

11

regulations that would interfere with competition among the motor carriers. *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440-41, 122 S.Ct. 2226, 2236 (2002). But Congress did not intend to prevent states from exercising their traditional state police power over safety:

> Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), "not restrict" the preexisting and traditional state police power over safety.

*Id.* at 439, 122 S.Ct. at 2236; *see also Rowe*, 552 U.S. at 375, 128 S.Ct. at 997.

The Ninth Circuit applied the safety exception to a statute which provided that before a towing company may tow a vehicle from private property without the vehicle owner's permission, the company must obtain written authorization from the property owner. *Tillison v. City of San Diego*, 406 F.3d 1126 (9th Cir. 2005). To determine whether the statute fit within the safety exception, the court examined whether the legislature had adopted the statute for the purpose of motor vehicle safety. *Id.* at 1129. It found that the statute's purpose was motor vehicle safety: to protect the vehicle owner and the public from towing mistakes, which may lead to dangerous confrontations; to protect the owner's family from being stranded at a dangerous location; to protect against false vehicle theft reports, which waste law enforcement's limited resources; and to protect against unnecessary hazardous tows. *Id.* at 1130-31. Thus, in upholding the statute, the court refused to apply the narrowest possible construction of the scope of the safety exception – even preventing fights between tow truck operators and vehicle owners was found to be a safety concern within the scope of the exception. *Id.* at 1129. And the court confirmed that the safety exception preserves state power in a field that the states have traditionally occupied. *Id.*

The Board's purpose in adopting the Truck and Bus Regulation was to reduce the amount of air pollution emitted from trucks and buses in order to protect the health of Californians. This purpose is evident in the following excerpts from the Board's findings from its resolution adopting the Regulation:

> In-use on-road diesel vehicles that operate in the State – whether based in California or not – are significant contributors of diesel PM and NOx emissions, which

12

> California must reduce to attain the ozone and PM2.5 [National Ambient Air Quality Standards or NAAQS] and to reduce the health risks associated with such pollutants;
>
> The regulation approved herein would achieve the necessary emission reductions to achieve the NAAQS for ozone and PM2.5 ….
>
> The regulation approved herein would significantly reduce diesel PM and NOx emissions and associated cancer, premature mortality, and other adverse health effects statewide;….

(Brasil Decl., Exh. 1, at 11;[4] *see also* Brasil Decl., at 3:25 – 4:4.) Diesel PM is a toxic air contaminant and causes cancer. The dangers posed by PM2.5 and ozone, including premature deaths, emergency room visits for people suffering from heart and lung diseases, and asthma, are well recognized. (Smith Decl., at 3:3-17.) For instance, PM2.5 is estimated to cause 9,200 premature deaths every year in California. (*Id.* at 4:5-8.) The Truck and Bus Regulation is expected to reduce diesel PM emissions by forty-five percent and NOx emissions by eighty percent. (Sax Decl., at 5:8-10, 18-20.) The Board estimates that attaining the national ambient PM2.5 standard will reduce the number of premature deaths in California by 2,700 per year. (Smith Decl., at 4:7-10.) Therefore, both the intent and the anticipated effect of the Truck and Bus Regulation is genuinely responsive to the Board's motor vehicle safety concern – the danger caused by truck and bus emissions.

---

[4] In addition to these findings, the resolution included the following recitals:

> [T]he Board identified particulate matter (PM) emissions from diesel fueled engines (diesel PM) as a toxic air contaminant ….

\*\*\*

> [T]he Legislature found, among other things, that a number of areas within the state have not attained NAAQS for ozone and PM2.5; that serious public health impacts, including thousands of premature deaths per year, occur in the state as a result of ozone and PM2.5 levels exceeding the NAAQS ….

\*\*\*

> WHEREAS, in-use on-road heavy-duty diesel vehicles operating in the state are among the largest contributors to PM2.5 and ozone forming emissions ….

(Brasil Decl., Exh. 1, at 1, 3-4, 5.)

Controlling air pollution is one of the traditional areas over which states exercise their police power to protect the health and safety of their citizens. As the U.S. Supreme Court stated, "Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 80 S.Ct. 813, 815 (1960); *see also Pacific Merchant Shipping Ass'n*, 639 F.3d at 1167; *Exxon Mobil Corp. v. U.S. EPA*, 217 F.3d 1246, 1255 (9th Cir.2000) ("Air pollution prevention falls under the broad police powers of the states"). Since Congress did not intend to restrict traditional state police power, the Regulation falls within the scope of the FAAAA's safety exception.

The EPA confirmed that safety is the purpose of the Truck and Bus Regulation when it recently proposed approving the Regulation as part of California's state implementation plan for achieving national ambient air quality standards under the federal Clean Air Act. Approval and Promulgation of Implementation Plans, 76 Fed. Reg. 40652, 40654 (proposed July 11, 2011) (to be codified at 40 C.F.R. pt. 52). EPA stated that the Truck and Bus Regulation, along with two other regulations for reducing diesel PM, plays "a critical role" in California's efforts to meet national standards for ozone and PM2.5. *Id.* Therefore, the Truck and Bus Regulation, which was adopted to reduce pollution and help attain these national standards, is genuinely responsive to motor vehicle safety.

If the FAAAA's safety exception were construed narrowly, and the FAAAA were found to preempt the Truck and Bus Regulation, then California would be unable to comply with the federal Clean Air Act's mandate to attain these national ambient air quality standards. Since nothing in the FAAAA expressly demands such a narrow construction of the safety exception, there is no reason to invent such disharmony between the two federal acts. Instead, the safety exception should be construed to include state laws intended to protect the public from the harmful air pollution effects of motor carriers.

The Association argues that the Truck and Bus Regulation concerns public health, which it distinguishes from public safety, and that since the FAAAA does not contain a public health exception, as stated in the Supreme Court's opinion in *Rowe*, the safety exception is inapplicable

14

here. (MSJ [Doc. 34], at 13: 3-5.) First, the holding in *Rowe* was not based on some artificial distinction between public health and public safety. The two terms are intimately connected, since the purpose of public safety is to protect public health. "Safety" is defined as "freedom from exposure to danger : exemption from hurt, injury, or loss." Webster's Third New Int'l Dictionary 1998 (unabridged ed., 2002). Here, the danger is exposure to truck emissions, and the Regulation's purpose is to exempt the public from hurt and injury caused by this exposure. Likewise, the national ambient air quality standards that the Regulation is designed to help attain are required to be based on considerations of safety:

> National primary ambient air quality standards … shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of *safety,* are requisite to protect the public health.

42 U.S.C. § 7409(b)(1) (emphasis added); *see also Am. Farm Bureau Fed'n v. Envtl. Prot. Agency*, 559 F.3d 512, 526 (D.C. Cir. 2009). Thus, whether the Regulation falls within the FAAAA's safety exception does not depend on the Association's distinction between health and safety.

Second, the safety concern here is distinguishable from that in *Rowe*. The safety concern in *Rowe* arose from the tobacco transported by the trucks, not from the trucks themselves. 552 U.S. at 374, 128 S.Ct. at 997. Here, by contrast, the safety issue arises from air pollution emitted from the trucks themselves. And here, unlike in *Rowe*, the Regulation plays a critical role in the state's efforts to comply with another federal law, the Clean Air Act, as discussed above. Furthermore, in *Rowe*, the statute directly bound motor carriers to providing a specified service (recipient verification). As discussed above, the Truck and Bus Regulation does not directly or indirectly bind carriers to a specified price, route, or service. Therefore, *Rowe* is not controlling here, and the Truck and Bus Regulation is within the scope of the safety exception to the FAAAA's preemption provision.

15

**CONCLUSION**

The Truck and Bus Regulation does not fall within the FAAAA's preemption provision and, even if it did, it would still not be preempted because it does fit within the FAAAA's safety exception. Therefore, the Board submits that the Association's motion for summary judgment should be denied.

Dated: December 22, 2011                                    Respectfully Submitted,

                                                            KAMALA D. HARRIS
                                                            Attorney General of California
                                                            SARA J. RUSSELL
                                                            Supervising Deputy Attorney General


                                                            */s/ Nicholas Stern*
                                                            NICHOLAS STERN
                                                            Deputy Attorney General
                                                            *Attorneys for Defendant*

SA2011300613
10799179.doc

16