1  KAMALA D. HARRIS
   Attorney General of California
2  SARA J. RUSSELL, State Bar No. 84704
   Supervising Deputy Attorney General
3  NICHOLAS STERN, State Bar No. 148308
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 323-3840
6    Fax:  (916) 327-2319
     E-mail:  Nicholas.Stern@doj.ca.gov
7  *Attorneys for Defendants*
   *Mary D. Nichols, Chairperson of the California Air*
8  *Resources Board, and James Goldstene,, Executive*
   *Officer of the California Air Resources Board*
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14

| 15 | **CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION,** | 2:11-CV-00384-MCE-GGH |
|---|---|---|
| 16 | | **DECLARATION OF TONY BRASIL IN SUPPORT OF DEFENDANTS MARY NICHOLS AND JAMES GOLDSTENE'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| 17 | Plaintiff, | |
| | v. | |
| 18 | | |
| 19 | **MARY D. NICHOLS, Chairperson of the California Air Resources Board, and** | Date:        January 26, 2012 |
| 20 | **JAMES GOLDSTENE, Executive Officer of the California Air Resources Board,** | Time:        2:00 p.m. |
| | | Courtroom: 7 |
| 21 | Defendant, | Judge        The Honorable Morrison C. England, Jr. |
| 22 | | Trial Date   June 3, 2013 |
| | | Action Filed:  February 11, 2011 |
| 23 | **NATURAL RESOURCES DEFENSE COUNCIL, INC.,** | |
| 24 | | |
| 25 | Defendant-Intervenor. | |

26

27

28

1

I, Tony Brasil, declare:

1.    The facts stated in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify competently thereto.

2.    The opinions stated in this declaration are based on my education, experience, and knowledge of the trucking industry, including specific knowledge of construction companies, dump truck operators, and emission controls for heavy duty engines used on trucks operated in the construction industry.

3.    I received my Bachelor of Arts degree in mechanical engineering at the University of California in Davis in 1990.

4.    I am the Chief of the Heavy-Duty Diesel Implementation Branch, Mobile Source Control Division of the California Air Resources Board (the Board).  I have held this position since May of 2009.  Overall, I have worked in the field of air pollution for more than 15 years.  I initially began working at the Board in 1993.  Other positions I have held with the Board include: Air Resources Engineer from 1993 to 2000 in the Fuels Section of the Stationary Source Division and from 2005 to 2006 in the Zero Emission Vehicle Infrastructure Section in the Sustainable Transportation Technology Branch of the Mobile Source Division.  From 2006 to April 2009, I was the manager of the In-Use Control Measures Section of the Heavy-Duty Diesel In-Use Strategies Branch before being promoted to my current position.

5.    In my present capacity as Chief of the Heavy-Duty Diesel Strategies Branch, I oversaw the staff's development and was a principal author of the 2010 amendments to the "Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants from In-Use Heavy-Duty Diesel-Fueled Vehicles" (Truck and Bus Regulation).

6.    I also oversaw the work on and was a principal author of the Board's 2010 Staff Report:  Initial Statement of Reasons for Proposed Rulemaking for adoption of Proposed Amendments to the Truck and Bus Regulation, the Drayage Truck Regulation, and the Tractor-Trailer Greenhouse Gas Regulation (2010 Staff Report) and the 2008 Staff Report:  Initial Statement of Reasons for Proposed Regulation for In-Use On-Road Diesel Vehicles.  I was also a

2

1  principal author of the 2008 Technical Support Document for the original 2008 Truck and Bus

2  Regulation.

3      7.    My experience in working on the Truck and Bus Regulation has given me significant

4  knowledge about truck owners in a wide variety of industries, including dump truck owners in the

5  construction industry.  For the past four years, I have participated in or led more than seventy

6  workshops throughout the state, met individually with dozens of truck owners about their

7  businesses, and had meetings with hundreds of truck owners at various venues, including local

8  association meetings and events.

9                  *National Ambient Air Quality Standards*

10     8.    As part of my duties, I am aware and knowledgeable of national ambient air quality

11  standards (NAAQS) and the state implementation plan (SIP) adopted by California pursuant to

12  section 110 of the federal Clean Air Act (CAA) for the purpose of achieving attainment with the

13  NAAQS.  The SIP must include enforceable emission limitations and other control measures,

14  means, or techniques, as well as schedules and timetables for compliance, as may be necessary or

15  appropriate to, among other things, achieve attainment and maintenance of the NAAQS.

16     9.    The California Legislature has designated the Board as the air pollution control

17  agency for all purposes under federal law.  California Health and Safety Code section 39003

18  assigns the Board the primary responsibility to ensure California's compliance with the federal

19  Clean Air Act.

20     10.    Two air basins in California – the South Coast Air Basin and the San Joaquin Valley

21  Air Basin – are in nonattainment for both PM2.5 and the 8-hour ozone standard.  Under the CAA,

22  the two air basins must come into compliance with the PM2.5 and 8-hour ozone standards by

23  2014 and 2023 respectively.

24              *Adoption and Purpose of the Truck and Bus Regulation*

25     11.    I and my staff designed the Truck and Bus Regulation to protect public health and

26  safety.  It accomplishes this by reducing emissions of diesel particulate matter (PM), a toxic air

27  contaminant, and oxides of nitrogen (NOx) from trucks and buses.  NOx is a precursor to both

28  ozone and PM composed of particles 2.5 microns or less in diameter (PM2.5).  I also designed the

3

1    Regulation to help California meet the NAAQS for criteria pollutants that the United States

2    Environmental Protection Agency (EPA) has established pursuant to the CAA to protect public

3    health and safety.  The Regulation will help California attain NAAQS for PM2.5 and 8-hour

4    ozone.

5         12.    The Board adopted the original Truck and Bus Regulation in 2008, through

6    Resolution 08-43.  A true and correct copy of Resolution 08-43 (with Attachments A-D omitted)

7    is attached to this declaration as Exhibit 1.

8         13.    The Truck and Bus Regulation will reduce emissions of diesel PM and NOx from

9    nearly one million heavy-duty trucks and buses that operate in California.  It is one of the most

10   important regulations ever adopted by the Board to address pollution from diesel vehicles and

11   engines.

12                    *Amending the Truck and Bus Regulation*

13        14.    The recession that began in 2007 resulted in lower emissions from heavy-duty on-

14   road vehicles than was anticipated when the Truck and Bus Regulation was initially approved by

15   the Board in 2008.  As a result of the recession and reduced actual emissions from decreased

16   economic activity, most notably in the goods movement sector, California moved closer to the

17   emissions levels needed for attainment of the PM2.5 and 8-hour ozone NAAQS.  Overall,

18   business revenues and employment were down, and I realized that this impacted the ability of

19   many fleets to make the investments needed to comply with the Truck and Bus Regulation.

20        15.    In consideration of the impacts of the recession, the Board directed me and my staff

21   to propose amendments to the Truck and Bus Regulation that would provide relief to the

22   regulated stakeholders by reducing the Regulation's compliance costs while still achieving

23   sufficient emissions reductions to protect public health and safety and to attain NAAQS by the

24   applicable federal compliance dates.

25        16.    The amendments that I recommended to the Board and which the Board adopted

26   reduce the compliance costs of the existing Regulation for all fleets subject to it.  The

27   amendments do this by, among other things, reducing the number of required PM filters and

28   providing a longer period of time for retrofitted trucks to operate before having to upgrade to

                                                    4

2010 model year engines.  Changes to the provisions for accruing compliance credits and other special provisions provide further flexibility and reduce annual compliance costs.  Further compliance delays could not be provided without impairing the State's ability to meet the NAAQS and diesel PM health-risk reduction goals, which the Board adopted in 2000 to reduce health risks imposed by diesel PM.  (*See* Declaration of Linda Smith.)

17.    Overall, the amendments have substantially reduced the estimated compliance costs of the Truck and Bus Regulation.  The net investments for affected fleets in the first five years of compliance have been reduced from $3.3 billion to about $1.5 billion, a reduction of more than 50%.  For the life of the amended Regulation, the overall cost has been reduced by about 60% – from $5.5 billion to about $2.2 billion.  The average cost for businesses, such as local contractors, retailers, and local moving companies, has been reduced by approximately 70%, with nearly all of the costs eliminated for thousands of small businesses with lighter trucks (trucks having a gross vehicle weight rating (GVWR) greater than 14,000 pounds but less than or equal to 26,000 pounds).

18.    The Board adopted the amended Truck and Bus Regulation on September 19, 2011. I submitted the Regulation to the Office of Administrative Law, which approved the Regulation on December 14, 2011. The Regulation became operative under California law on that date. Exhibit 2 is a true and correct copy of the Final Regulation Order for the amended Truck and Bus Regulation.  Below, when I refer to the Truck and Bus Regulation, I am referring to the amended version, unless noted otherwise.

*Compliance with the Amended Truck and Bus Regulation*

19.    The Regulation has two essential components.  First, it requires vehicles to have PM filters to reduce emissions of diesel PM.  Model year 2007 and newer diesel trucks have PM filters as part of their standard equipment.  Older diesel trucks need to be either retrofitted with PM filters or replaced with a model year 2007 (or newer) engine by the applicable deadline. Second, the Regulation requires vehicles to be upgraded to model year 2010 engines (or newer) to reduce emissions of NOx by the applicable deadline.  (Engines older than 2010 are acceptable if their emissions are as low as the standard for model year 2010 engines.)

5

20.    To meet the NAAQS for PM2.5, the Truck and Bus Regulation requires most heavy-duty trucks operated in California to have PM filters by 2014.

21.    To reduce NOx emissions in order to meet the NAAQS for 8-hour ozone, the Truck and Bus Regulation requires nearly all heavy-duty truck engines operated in California to be replaced with 2010 model year engines by 2023.

22.    For heavier heavy-duty trucks (i.e., dump trucks and other heavy duty trucks with a GVWR of greater than 26,000 pounds), the basic compliance schedule for retrofitting trucks with PM filters and replacing their engines with 2010 model year engines is as follows:

| Engine Model Year | Compliance Date: Retrofit with PM Filter by | Compliance Date: 2010 Engine by |
|---|---|---|
| 1993 or older | Not required | January 1, 2015 |
| 1994 - 1995 | Not required | January 1, 2016 |
| 1996 - 1999 | January 1, 2012 | January 1, 2020 |
| 2000 - 2004 | January 1, 2013 | January 1, 2021 |
| 2005 - 2006 | January 1, 2014 | January 1, 2022 |
| 2007 - 2009 | Most of these vehicles have PM filters as standard equipment, so they do not need retrofits.  Those that do not have filters need to be retrofitted by January 1, 2014. | January 1, 2023 |
| 2010 or newer | These vehicles already meet all requirements. ||

However, the Regulation contains alternative compliance schedules and exceptions that provide fleets with flexibility to determine which vehicles to retrofit or replace and, in many cases, enables them to postpone compliance with the basic schedule.

23.    For example, the Regulation includes a phase-in option, which is an alternative compliance schedule that allows fleets to decide which vehicles to retrofit regardless of engine model year.  This option allows fleets to delay replacement of vehicles with 2010 model year engines until 2020 or later.  Fleet owners can take advantage of this option by installing PM filters on a specified percentage of their fleets for each year, starting in 2012:  30% by January 1, 2012; 60% by 2013; 90% by 2014; and 100% by 2016.  This option counts 2007 model year and

6

1    newer engines originally equipped with PM filters toward compliance, reducing the overall

2    number of retrofit filters needed.

3        24.    Small fleets with one to three diesel trucks can either comply with the same model

4    year schedules as larger fleets or may choose to take advantage of optional small fleet provisions

5    that delay the initial filter requirements for heavier trucks until January 1, 2014.  If they choose

6    this option they may delay engine replacements until January 1, 2020 or later.

7        25.    The Regulation provides for temporary reduced fleet size credits to ease the burden

8    of compliance on fleets that have had to downsize because of the recession.  Fleets qualify for the

9    credits if they either have removed vehicles from the fleet or have decided not to operate vehicles

10    and requested non-operational status from the Department of Motor Vehicles.  A fleet could use

11    the downsize credits to reduce their retrofit obligations under the regulation through 2015.  For

12    example, if a fleet has 20% fewer trucks operating in a particular compliance year than it did in

13    2006, a fleet can accrue a 20% credit, which can be applied to 20% of the remaining trucks in the

14    fleet.  This portion of the fleet will be treated as if they were equipped with PM filters until 2016.

15    Similarly, a fleet that has 40% fewer trucks than it had in 2006 would not have to retrofit 40% of

16    its remaining trucks until 2016.

17        26.    The Regulation provides incentives for adding cleaner trucks to the fleet or for the

18    early retrofitting of existing trucks.  These actions can delay compliance costs for a portion of the

19    fleet until 2017.

20        27.    Owners of dump trucks that operate less than 20,000 miles per year and owners of

21    other construction trucks that operate less than 15,000 miles per year can take advantage of an

22    extension that delays installation of PM filters until 2016 for a limited number of low-mileage

23    construction trucks in the fleet.  Up to ten trucks per fleet that meet the "low-mileage construction

24    truck" definition are initially eligible; more can be approved for the extension, starting January 1,

25    2013, if fewer than 9,000 trucks statewide are initially eligible for the extension.  Compliance for

26    low-mileage construction trucks can be delayed until January 1, 2016, as long as 33% of the

27    entire fleet has PM filters by 2014, 66% by 2015, and 100% by 2016.  Single dump truck owners

28    that qualify for the extension have until January 1, 2016 to equip their engines with filters.

1    Starting January 1, 2020, fleets with low-mileage construction trucks must comply with the model

2    year replacement schedule for heavier trucks, like other fleets.  Fleets can take advantage of this

3    provision whether other trucks in the fleet comply with the model year schedule or use the filter

4    phase-in option.

5         28.    Vehicles that are operated exclusively in areas that have relatively low levels of

6    ambient NOx (defined in the Regulation as NOx Exempt Areas, which are typically in rural

7    areas) can also reduce costs by delaying compliance with the filter requirements for heavier

8    trucks until January 1, 2014.  Vehicles in these areas that do have PM filters are exempt from the

9    requirements to upgrade to 2010 model year engines.

10         29.    The Truck and Bus Regulation also includes a low-use exemption that exempts any

11    truck that operates less than 1,000 miles per year in California from having to comply with the

12    Regulation's emissions reduction requirements.  Trucks that are designed to perform work while

13    stationary, like drill rigs, digger derricks, or cranes will also need to operate less than 100 hours

14    per year to qualify.  Fleets may also exclude low-use trucks when determining the percentage of

15    PM filters needed for fleet compliance.

16    *Compliance Costs*

17         30.    With respect to PM filter costs, for the 2010 Staff Report, my staff and I updated

18    our estimates on PM filter costs, using internal data from the Board's incentive funding programs

19    and information received from retrofit installers on the cost to install PM filter retrofits on heavy-

20    duty trucks in mid-2010.  We looked at a mix of active and passive PM filters, the two basic types

21    of PM filters that the Board has verified for use at this time.  Our findings were that retrofit PM

22    filters can, in general, be purchased and installed for approximately $15,000.

23         31.    The costs attributable to the Truck and Bus Regulation will vary by fleet, depending

24    in part on the fleet's normal vehicle replacement practices.  This, in turn, depends in part on the

25    useful life of trucks.  To estimate the useful life of trucks, my staff and I used the Board's

26    emissions inventory for heavy-duty diesel trucks, which lists populations of trucks by model year

27    and category for each calendar year.  We considered two truck categories that are representative

28    for dump trucks: in-state tractors and construction tractors.  In-state tractors represent a wide

8

1  range of on-highway tractors that are registered to operate in California.  These tractors

2  commonly pull a variety of trailers in a range of short and longer hauls within the State.  These

3  tractors can be converted to pull dump truck trailers, such as bottom dumps, or equipped with an

4  attached tilt bed on the frame of the tractor, such as an end dump or transfer dump truck.  In 2010,

5  there were 42,244 in-state tractors, 9% of which were older than twenty years and 3% of which

6  were older than twenty-five years.  Construction tractors represent a narrower range of tractors

7  used by construction related companies that include tractors that are designed to be used to tow

8  dump truck trailers and for other construction purposes.  In 2010, there were 6,485 construction

9  tractors, 9% of which were more than twenty years old and 4% were more than twenty-five years

10  old.  Thus, in both categories, it is uncommon for trucks to operate more than twenty years and is

11  rare to operate trucks more than twenty-five years.

12       32.   We also considered the fact that when dump truck owners replace vehicles in their

13  fleets, they often purchase used long-haul tractors that are operated within and outside of

14  California.  Because of high annual mileage, well below 1% of all long haul fleets have trucks

15  that are twenty years old or older.  Long-haul businesses commonly replace their long-haul

16  tractors with new tractors in a three- to seven-year replacement cycle because it is more cost

17  effective for long-haul fleets to operate newer trucks with higher reliability and lower operating

18  costs.  When these long-haul tractors are five years old, they typically have been driven 400,000

19  to 600,000 miles.  These five-year-old long-haul tractors are commonly sold on the secondary

20  (used truck) market and used in short-haul applications.  Many dump truck fleets are part of this

21  secondary market and, as described above, convert used long-haul tractors to dump truck

22  applications.  Dump truck fleets are generally operated locally on daily routes where the annual

23  miles travelled is lower and reliability is not as critical.  Repairs can be made during the evenings

24  and weekends, and major work can be done in the off-season.  A dump truck conversion with a

25  five-year-old truck will commonly occur when the truck has 500,000 miles.  After an additional

26  ten years of use as a dump truck (i.e., when the truck is about fifteen years old), with an average

27  annual use of 50,000 miles per year, the truck will likely reach the 1,000,000 mile mark.  At that

28  time, it is likely that the truck will need a major overhaul, and its transmission, suspension,

9

1    braking system, and other components will be more prone to failure.  These older dump trucks are

2    typically replaced with newer trucks or are used less often as backup vehicles.

3         33.    In many instances, the Truck and Bus Regulation does not require replacement of

4    dump trucks any earlier than fleet owners would otherwise replace them as part of their normal

5    course of business because of the age and condition of the vehicles.  For example, the Regulation

6    does not require a model year 2000 dump truck to be replaced until 2021, when it would be

7    twenty-one years old.  At that age, the truck would probably have well over 1,000,000 miles, and

8    the owner would probably have replaced this dump truck by then, pursuant to his normal course

9    of business, even absent the Regulation.

10        34.    The Regulation never requires fleets to purchase new vehicles.  In fact, the

11   Regulation never requires fleets to purchase vehicles that are newer than five years old.  For

12   instance, using the example from the previous paragraph, the fleet that had to replace its twenty-

13   one-year-old dump truck in 2021 could buy any truck up to eleven years old (i.e., a model year

14   2010 or newer).

15        35.    The cost of compliance with the Regulation also depends on whether the fleet is able

16   to take advantage of any of the many provisions in the Regulation that delays compliance for

17   some or all vehicles in the fleet, as described above.

18        36.    In 2007/2008, my staff and I conducted an online survey of fleets that would become

19   subject to the Truck and Bus Regulation.  We gathered truck fleet information, including specific

20   information about vehicles and engines in fleets, the industry sectors in which the fleets operate,

21   and annual per truck revenues.  We received ninety-seven survey responses from truck owners

22   that classified their primary business as "Haul - Dirt/Aggregate."  These respondents provided the

23   number of trucks owned and annual revenue.  The number of trucks owned ranged from a single

24   truck to 109 trucks, with the median fleet size being one truck.  The median response for annual

25   revenue per truck was $87,500.

26        37.    To put the costs of the Regulation into context, it is useful to consider these costs

27   relative to the gross domestic product by industry. The gross domestic product is a measure of the

28   revenue each industry generates, and was used by me and my staff to evaluate the economic

                                                    10

1    impacts of the originally adopted Truck and Bus Regulation by industry type.  At that time, we

2    estimated the costs attributable to the original Truck and Bus Regulation from 2010 to 2025 as a

3    percentage of each business sector's gross domestic product.  We estimated both the annual

4    average percentage and the peak percentage.  For construction, the average annual cost as a

5    percentage of the sector's gross domestic product from 2010 to 2025 was 0.056% and the peak

6    was 0.116%.  The costs for the amended Truck and Bus Regulation are less than 50% of these

7    estimates for the original Truck and Bus Regulation.

8         38.    The annual costs for construction fleets, as described above, are in line with the costs

9    my staff and I estimated for trucking fleets in the 2010 Staff Report.  Our estimates found that a

10   moving company fleet would have compliance costs under the amended Truck and Bus

11   Regulation of about 0.15% of annual revenues, and a fleet  in the transportation sector would

12   have costs of approximately 0.3% of annual revenues.

13        39.    The Regulation does not impose direct or indirect compliance costs on fleets by

14   lowering the residual value of used trucks that must be replaced.  I do not believe the Regulation

15   has had a noticeable impact on truck prices.  In late 2011, I had my staff download the asking sale

16   price from www.truckpaper.com for about 4,000 new to twenty-five year-old truck tractors.

17   Truckpaper.com is a used truck website listing of trucks for sale in the United States by individual

18   truck owners, companies, and dealers.  It regularly has about 50,000 listings for larger heavy duty

19   trucks at any given time.  We observed that about 900 of the prices were for trucks for sale in

20   California, and the remaining prices were for trucks for sale elsewhere in the United States.  I

21   compared the asking prices for the trucks that were for sale in California to the asking prices for

22   the same truck type in all other states outside California.  The prices in California were identical

23   to those in the rest of the country for trucks that are older than two years.  California prices were

24   slightly lower for newer trucks (model years 2010 through 2012) than elsewhere, but I believe

25   this difference was due to limited data for newer trucks and was not truly representative of the

26   relative prices of these trucks.  Since these newer trucks are already equipped with PM filters,

27   they should be in higher demand in California, not lower.  Because the resale value of trucks that

28

1    are three to twenty-five years old are the same in California as in all other states, the Regulation

2    has not adversely affected resale values.

3                              *The Effect of Retrofits on Fuel Economy*

4           40.    The fuel economy loss typically associated with the use of retrofit PM filters is about

5    2%.  Dump trucks are typically operated locally, within a one hundred mile radius, and

6    commonly travel multiple trips per day from a yard to the job site or from the job site to a

7    dumping area.  If the average distance travelled per day is around 300 miles per day, the fuel

8    economy loss due to a retrofit for a typical day would equate to about six miles per day or about

9    one gallon of fuel.  Heavy duty trucks have fuel tanks that typically have a capacity of hundreds

10   of gallons.  Therefore, this loss in fuel economy would have no impact on truck owners,

11   operators, or their routes, other than an approximately 2% increase in fuel costs.

12          41.    A truck that has a 2010 model year or newer engine will most commonly be

13   equipped with an emissions control system that is known as a selective catalytic reduction system

14   (SCR) in combination with a PM filter.  The SCR system is comprised of a catalytic technology

15   in combination with diesel emissions exhaust fluid that is injected into the exhaust stream.  The

16   SCR system generally reduces oxides of nitrogen emissions on the order of 90% or more.  This

17   technology is necessary to meet national engine emissions standards.  Because SCR systems are

18   so effective at reducing NOx emissions, the engine can be optimized for power and fuel economy.

19   This means the engine can have higher NOx emissions and lower PM emissions.  The engine

20   optimization results in improved fuel economy while the exhaust after treatment system nearly

21   eliminates PM and NOx pollution.  I have read several engine manufacturers' claims that their

22   SCR systems improved the fuel economy of their engines from 3% to 9%.

23                            *Responses to the Association's Declarations*

24          42.    I have read the declarations submitted by CDTOA in support of its motion for

25   summary judgment.  All of the declarants refer to the high cost of purchasing new trucks in order

26   to comply with the Truck and Bus Regulation.  However, as stated above, the Regulation never

27   requires fleets to purchase new vehicles.  The Regulation does not require fleets to begin

28   replacing their vehicles until 2015 at the earliest.  In fact, fleets that use the phase-in option do not

                                              12

1  have to replace their vehicles until at least 2020.  Since the Regulation never requires the

2  purchase of vehicles newer than model year 2010, the replacements can always be at least five

3  years old.  Purchasing five-year-old vehicles is consistent with declarant Fred Recupido's

4  practice:  he states that, in 2006, he purchased eight model year 2001 trucks, which were,

5  therefore, five years old.  It also seems to be consistent with declarant Robert McClernon's

6  practice:  "At least 20 years of use is normal in our industry, as we typically reuse on-road freight

7  trucks with some modifications to operate as dump trucks for another 15 or more years."  A used

8  five-year-old truck might cost about $45,000, plus the cost of converting it to a dump truck, about

9  $5,000.  Thus, the Association's repeated references to the high cost of new trucks are irrelevant.

10  Used trucks are much cheaper than new ones.

11      43.    Declarant Fred Recupido stated that he now has only one truck and that he sold

12  fifteen trucks that were previously in his fleet.  Because he has downsized his fleet by more than

13  90%, he would not be required to take any action to comply with the Regulation until January 1,

14  2016, other than to file a compliance report with the Board.  Thus, his compliance costs (other

15  than reporting costs) for 2012 would be zero.  Had Mr. Recupido downsized his fleet by only

16  30%, he still could have operated eleven trucks in 2012 without incurring any compliance costs

17  other than to report his fleet information.  Therefore, it is questionable as to whether he sold most

18  of his fleet because of the Regulation.  It should be noted that Mr. Recupido made his decision to

19  sell his fifteen trucks in July 2010, but cost estimates that he attributes to his decision were only

20  collected in January and May 2011.  (*See* Recupido Decl., Exhs. A, B.)

21      44.    Based on the information in Mr. Recupido's declaration, it appears that his truck has

22  either a 1998 or 2001 model year engine.  As stated above, according to the phase-in schedule,

23  and using credits from having downsized his fleet, he would not need a PM filter until January 1,

24  2016, to comply with the Truck and Bus Regulation.  For purposes of this analysis, I am

25  assuming that Mr. Recupido replaces his trucks when they are about twenty years old with used

26  trucks that are approximately five years old in his normal course of business.  According to this

27  practice, he would replace his truck in 2018 or 2021 with a used truck that had a 2013 to 2016

28  model year engine in the normal course of his business.  Therefore, Mr. Recupido's only cost

1  attributable to the Truck and Bus Regulation would at most be the cost of the PM filter retrofit, or

2  about $15,000.  Alternatively, if Mr. Recupido elected to purchase a replacement truck in 2016 to

3  avoid the cost of a PM filter retrofit,  he might have been able to further lower his compliance

4  costs.

5       45.    Although revenues vary, the typical revenue for a company with one dump truck,

6  based on the previously described survey results from dump truck operators in 2007, would be

7  about $962,500 from 2012 to 2023 ($87,500 annually times eleven years).  Therefore the costs

8  attributable to the Regulation for a company like Mr. Recupido's would be at most on the order of

9  about 1.6% of revenue in 2011 dollars.

10      46.    It is unclear whether declarant Robert McClernon presently owns four or five trucks.

11  His declaration states that he "currently" owns five trucks and that he recently sold one truck.

12  However, the Association's interrogatory responses indicate that Mr. McClernon currently has

13  four trucks with the following model years:  1990, 1993, 1995, and 1998.  For purposes of

14  estimating his compliance costs, I assume that, until recently, he had five trucks, that he sold one,

15  so that he now has four trucks.  For purposes of analyzing his capital costs absent the Truck and

16  Bus Regulation, I also assume that he will follow his normal truck replacement practice, as

17  described in his declaration, which is to replace trucks when they are about twenty-two years old

18  with used five-year-old trucks.  I chose 22 years because one truck is currently 21 years old and I

19  simply chose to make a more conservative estimate than using 20 years old.  I compare this to his

20  capital costs to comply with the Truck and Bus Regulation.

21      47.    Absent the Truck and Bus Regulation, I would expect Mr. McClernon to replace his

22  1990 model year truck by 2013 with a five-year-old 2007 model year truck.  The 2007 model year

23  truck would come originally equipped with a PM filter.  He would later replace his 1993, 1995,

24  and 1998 model year trucks in 2015, 2017, and 2020, respectively, when these trucks become

25  twenty-two years old.  The replacement trucks would each be used trucks, about five years old.

26  So, each of the replacement trucks would have 2010 model year, or newer, engines.

27      48.    I estimated the cost for Mr. McClernon to purchase these five-year-old trucks and

28  the salvage value of the old trucks that he would replace.  These estimates are based on the data,

14

1    described above, that I directed my staff to download from www.truckpaper.com. I concluded

2    that the average cost to Mr. McClernon for purchasing five-year-old trucks would be about

3    $44,000 each. I also concluded that the salvage value of the older trucks he would replace to be

4    about $10,000 each.

5        49.    I also estimated Mr. McClernon's capital costs from now until 2023 with the Truck

6    and Bus Regulation. Mr. McClernon stated that he had downsized his fleet by one truck. This

7    means he can get credit for his downsized fleet. As stated above, assuming he had five trucks in

8    2006 and that he downsized his fleet by one, he would get a 20% reduced fleet size credit under

9    the Regulation. He can use this credit in meeting the Regulation's phase-in option, which allows

10    a fleet to comply by having 30% of a fleet equipped with PM filters by January 1, 2012. In Mr.

11    McClernon's case, since he is eligible for a 20% credit, he would only need to have 10% of his

12    fleet to have filters by 2012. Because 10% of four vehicles is 0.4, which rounds to zero, he would

13    not need to take any action (other than to report this information to the Board) in order to meet the

14    2012 compliance requirements. Therefore, his compliance costs for 2012 would be almost zero.

15        50.    According to Mr. McClernon's normal truck replacement practice, described above,

16    he would replace his 1990 model year engine with a 2007 model year engine, equipped with a

17    PM filter, in 2012. This would satisfy the PM filter phase-in option requirements of the Truck

18    and Bus Regulation through 2013.

19        51.    By January 1, 2014, the phase in option would require Mr. McClernon to retrofit two

20    additional trucks with PM filters. This would mean that three of his four trucks, 75%, would have

21    to have filters. Although the phase-in option requires that 90% of the fleet have PM filters by

22    2014, with the 20% reduced fleet size credit, Mr. McClernon would only need to reach 70%.

23    Since 75% of his fleet would be equipped with filters, the requirement is met. I assume these two

24    filters would be installed on his 1998 and 1995 model year trucks, and not the older 1993 truck,

25    which would shortly be replaced consistent with his the normal replacement practices.

26    (Alternatively, as with Mr. Recupido, Mr. McClernon could decide that it might be cheaper to

27    replace either the 1995 or both the 1995 and 1998 model year trucks earlier than would otherwise

28    occur to avoid the costs of retrofitting these older vehicles.)

52.    In 2015, Mr. McClernon's fleet would still need to have only 70% of the fleet equipped with PM filters.  Therefore, no additional compliance action would be required.

53.    In 2016, the downsizing credit expires and Mr. McClernon's fleet would be required to have filters on all trucks.  According to Mr. McClernon's normal truck replacement practices, he would already have replaced his 1993 truck with a 2010 model year truck before 2016 and, therefore, all trucks in the fleet would be equipped with PM filters by that date.

54.    Under this scenario, in 2016, Mr. McClernon's fleet would consist of four trucks of the following model years:  1995, 1998, 2007, and 2010.  The 1995 and 1998 model year trucks (which were retrofitted by January 1, 2014) would not have to be replaced with 2010 or newer trucks any earlier than 2020; by then, these trucks would be at least twenty-two years old and would be replaced under Mr. McClernon's normal truck replacement practices.  Therefore, no replacements would occur earlier than normal due to the regulation prior to 2020.

55.    By 2023, the 2007 model year truck would need to be replaced with a truck that has a 2010 model year engine, which in 2023 could be a truck as old as thirteen years old.  In 2023, the 2007 model year truck would be sixteen years old.  A ten-year-old replacement truck currently costs about $22,000 and a sixteen-year-old truck is worth about $15,000.  The net cost of the replacement in today's dollars would therefore be about $7,000.  Modifying a used truck for use as a dump truck or transferring the body of the old truck to the new one might cost an additional $5,000, making the total replacement cost approximately $12,000.

56.    Under this scenario, by 2023, all of Mr. McClernon's trucks would be 2010 or newer, and would fully comply with all the requirements of the Regulation.  His net investments to comply with the Regulation that are above and beyond normal replacement costs would be approximately $30,000 for two PM filters by 2014 and approximately another $12,000 for the early replacement of the 2007 model year truck by 2023, for a total compliance cost of approximately $42,000.

57.    Although revenues vary, the typical revenue for a company with four dump trucks, based on the previously described survey results from dump truck operators in 2007, would be about $3.8 million from 2012 to 2023 ($87,500 per truck annually times 11 years).  Therefore the

16

1    costs attributable to the Regulation for the next 11 years for a company like Mr. McClernon's

2    would be on the order of about 1% of revenue in 2011 dollars.  This is considerably lower than

3    the 100% rate increase claimed to be needed by Mr. McClernon to pay for compliance with the

4    Regulation.  I did not assume that Mr. McClernon was eligible for any other compliance options

5    in the Regulation, which could further reduce his costs.

6        58.    A true and correct copy of portions of Plaintiff's Responses to Defendant Nichol's

7    First Set of Interrogatories is attached as Exhibit 3.

8        59.    A true and correct copy of Plaintiff's Response to Defendant Nichol's First Set of

9    Requests for Admission is attached as Exhibit 4.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1        I declare under penalty of perjury, under the laws of the United States of America, that the

2    foregoing is true and correct and that this Declaration was executed in Sacramento, California on

3    December ⏟20⏟ , 2011.

4

5                                     _____

6                          Tony Brasil

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

EXHIBIT 1

State of California
AIR RESOURCES BOARD

Resolution 08-43

December 12, 2008

Agenda Item No.: 08-11-3

General Findings

WHEREAS, section 39002 of the Health and Safety Code provides that the control of air pollution from vehicular sources, except as otherwise provided in Division 26 of the Health and Safety Code, shall be the responsibility of the Air Resources Board (ARB or Board);

WHEREAS, sections 39600 and 39601 of the Health and Safety Code authorize the Board to adopt standards, rules and regulations and to do such acts as may be necessary for the proper execution of the powers and duties granted to, and imposed upon, the Board by law;

WHEREAS, sections 39515 and 39516 of the Health and Safety Code provide that the Board may delegate any duty to the Executive Officer which the Board deems appropriate and that any power, duty, purpose, function, or jurisdiction which the Board may lawfully delegate shall be conclusively presumed to have been delegated to the Executive Officer unless the Board has expressly reserved such authority onto itself;

WHEREAS, section 41511 of the Health and Safety Code provides that for the purpose of carrying out its duties, ARB may adopt rules and regulations to require the owner or the operator of any pollution emission source to take such action as ARB may determine to be reasonable for the determination of the amount of emissions from such source;

WHEREAS, under section 39650 of the Health and Safety Code, the Legislature finds and declares that it is the public policy of the State that emissions of toxic air contaminants should be controlled to levels that prevent harm to the public health;

WHEREAS, pursuant to section 39662(b) of the Health and Safety Code, on August 27, 1998, the Board identified particulate matter (PM) emissions from diesel fueled engines (diesel PM) as a toxic air contaminant pursuant to article 3 (commencing with section 39650), chapter 3.5, part 2, division 26 of the Health and Safety Code;

WHEREAS, pursuant to section 39669.5(a) of the Health and Safety Code, the Office of Environmental Health Hazard Assessment has listed diesel PM and other compounds

Resolution 08-43                                    2

associated with diesel exhaust as possibly causing infants and children to be especially susceptible to illness;

WHEREAS, in identifying diesel PM matter as a toxic air contaminant, the Board determined, pursuant to section 39662(c) of the Health and Safety Code and Cal. Code Regs., title 17, section 93000, that there is not sufficient scientific evidence to support identification of a threshold level below which no significant adverse health effects are anticipated ;

WHEREAS, pursuant to section 39665 of the Health and Safety Code, ARB staff prepared a comprehensive risk reduction plan (Diesel Risk Reduction Plan) to significantly reduce PM emissions from diesel-fueled engines and vehicles, which the Board approved on September 28, 2000;

WHEREAS, sections 39658, 39665, 39666, and 39667 of the Health and Safety Code authorize the Board to establish airborne toxic control measures (ATCM) for substances identified as toxic air contaminants in accordance with specified criteria;

WHEREAS, in fulfilling the requirements of the aforementioned sections set forth in the paragraph immediately above, and specifically section 39667 of the Health and Safety Code, the Board is required to consider adoption of an ATCM revising emission standards for vehicular sources to achieve the maximum possible reduction in public exposure based on its prior determination not to specify a threshold exposure level for diesel PM under section 39662 of the Health and Safety Code;

WHEREAS, an ATCM for a vehicular source, developed pursuant to section 39667 of the Health and Safety Code, is required to be based on application or utilization of the best available control technologies (BACT) or more effective control methods, unless the Board determines, based on an assessment of risk, that an alternative level of emission reduction is adequate or necessary to prevent an endangerment of public health;

WHEREAS, sections 39674-39675, 42400-42400.2, 42400.3.5, 42402, 42402.2, 42402.4, 42410, 43016, 43017, and 43023 of the Health and Safety Code authorize the Board to request that state and local prosecutors seek criminal prosecution, civil and administrative penalties, and injunctive relief for violations of adopted ARB regulations and ATCMs;

WHEREAS, in section 43000 of the Health and Safety Code, the Legislature has declared that the emissions of air pollutants, including oxides of nitrogen (NOx) and PM, from motor vehicles are the primary cause of air pollution in many parts of the State; also, the State has the responsibility to establish uniform procedures for compliance with standards which control or eliminate those air pollutants, vehicle emission standards apply to new and used motor vehicles equipped with motor vehicle pollution control devices;

WHEREAS, section 43013(a) of the Health and Safety Code authorizes the Board to adopt motor vehicle emission and in-use performance standards, which it finds to be necessary, cost-effective, and technologically feasible;

WHEREAS, section 43013(b) of the Health and Safety Code authorizes ARB, consistent with 43013(a), to adopt emission standards and regulations for light-, medium-, and heavy-duty motor vehicles;

WHEREAS, in section 43013(h) of the Health and Safety Code, the Legislature announced that it is its intent that the Board act as expeditiously as is feasible to reduce NOx emissions from diesel vehicles that significantly contribute to the State's air pollution problems.

WHEREAS, section 43018 of the Health and Safety Code further directs the Board to endeavor to achieve the maximum degree of emission reductions possible from vehicular and other mobile sources to accomplish the attainment of State ambient air quality standards by the earliest practicable date and to adopt standards and regulations that will result in the most cost-effective combination of control measures on all classes of motor vehicles;

WHEREAS, under the federal Clean Air Act (CAA), the United States Environmental Protection Agency (U.S. EPA) has established national ambient air quality standards (NAAQS) for pollutants considered harmful to public health, including fine particulate matter less than 2.5 microns in diameter (PM2.5) and ozone, and states that exceed the NAAQS are required by federal law to develop State Implementation Plans (SIP) describing how they will attain the standards by certain deadlines;

WHEREAS pursuant to the Legislature's directives under Health and Safety Code section 39606, the Board has adopted state ambient air quality standards (state ambient standards) for PM and NOx;

WHEREAS, many areas of California, including the South Coast and San Joaquin Valley air basins, are designated non-attainment for both the state ambient standards and NAAQS for ozone, for which NOx is a precursor, and both the South Coast and San Joaquin Valley Air Basins are designated non-attainment for both the state and NAAQS for PM2.5, to which NOx and diesel PM are significant contributors;

WHEREAS, the federal CAA requires the South Coast and San Joaquin Valley air basins to attain the PM2.5 NAAQS by 2015 and U.S. EPA requires that all necessary emission reductions be achieved by 2014 and the same air basins, having the most severe ozone concentrations are expected to have until 2023 to attain the federal ozone standard;

WHEREAS, on October 13, 2007, the Governor signed Senate Bill (SB) 1028 (Stats. 2007, Ch, sections 1-3) in which the Legislature found, among other things, that a number of areas within the state have not attained NAAQS for ozone and PM2.5; that

serious public health impacts, including thousands of premature deaths per year, occur in the state as a result of ozone and PM2.5 levels exceeding the NAAQS, and that in order to ensure that all areas in the state attain the NAAQS as expeditiously as practicable, it is necessary to require the Board to adopt rules and regulations that are sufficient, in conjunction with other applicable measures, to achieve and maintain the NAAQS by the applicable federal deadlines;

WHEREAS, section 2 of SB 1028, codified at Health and Safety code section 39602.5, directs the Board to adopt rules and regulations pursuant to Health and Safety Code section 43013 that, in conjunction with other measures adopted by the Board, the districts, and the U.S. EPA, will achieve NAAQS in all areas of the state by the applicable attainment date, and to maintain these standards thereafter; that, if necessary to carry out the above directives, the Board shall adopt and enforce rules and regulations that anticipate the development of new technologies or the improvement of existing technologies; and that the rules and regulations shall require standards that the Board finds and determines can likely be achieved by the compliance date set forth in the adopted rules and regulations;

WHEREAS, section 38500 et seq. of the Health and Safety Code enacted by the Global Warming Solutions Act of 2006 (Assembly Bill 32), requires the Board to adopt regulations and other requirements that would reduce by 2020 statewide greenhouse gas emissions to the equivalent of 1990 levels;

WHEREAS, the California Environmental Quality Act (CEQA), section 21080.5 of the Public Resources Code and Cal. Code Regs., title 17, section 60006 require that no project that may have significant adverse environmental impacts be adopted as originally proposed if feasible alternatives or mitigation measures are available to reduce or eliminate such impacts;

Findings Specific to Adoption of Proposed Regulation to Reduce Emissions from In-Use On-Road Diesel Vehicles

WHEREAS, in September 2007, the Board adopted a SIP committing the State to develop measures to achieve emission reductions from sources under State regulatory authority, with the largest share of these emission reductions expected from trucks;

WHEREAS, the Board, pursuant to authority granted under Health and Safety Code sections 43013 and 43101, and U.S. EPA, pursuant to its authority granted under section 202(a), have adopted more stringent emission standards for new diesel engines used in heavy-duty vehicles; these standards were first introduced for sale commencing with the 2007 model-year and will be phased in through the 2010 model-year;

WHEREAS, the Board has established a program to verify diesel emission control strategies (DECS) in Cal. Code Regs., title 13, section 2700 through 2710, and has to date verified strategies that will achieve diesel PM emission reductions of at least 85 percent;

WHEREAS, in-use on-road heavy-duty diesel vehicles operating in the state are among the largest contributors to PM2.5 and ozone forming emissions;

WHEREAS, ARB staff has determined that, under normal replacement cycles, current U.S. EPA and ARB new engine emission standards do not sufficiently reduce emissions of diesel PM and other criteria pollutants and precursors from heavy-duty diesel vehicle engines certified to pre-2007 California and federal emission standards in the time frame required for compliance with NAAQS for ozone and PM2.5;

WHEREAS, Health and Safety Code sections 43600 and 43701(b), when read together with full legislative scheme of Division 26 of the Health and Safety Code, directs ARB to adopt emission standards requiring the use of emission control devices on in-use heavy-duty diesel vehicles;

WHEREAS, ARB staff met and worked with affected private industry, federal agencies, school transportation providers including representatives of school districts, and the public in developing the proposed regulation, held numerous meetings with individual affected stakeholders and industry stakeholder groups, 54 public workshops in 12 different cities across the state, and sent out nearly 300,000 mailings directly to owners of California-registered diesel vehicles, and sent informational flyers to most truck dealers and truck repair facilities in California and to truck stops in the Western United States;

WHEREAS, with the information and comments received from such meetings, ARB staff prepared a report, entitled "Staff Report: Initial Statement of Reasons for Proposed Rulemaking – Proposed Regulation for In-Use On-Road Diesel Vehicles," (ISOR) and an associated technical support document, entitled "Technical Support Document – Proposed Regulation for In-Use On-Road Diesel Vehicles,(TSD)" both released October 24, 2008; these reports along with the report "Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles," adopted by the Board on September 28, 2000, constitute the reports required under Health and Safety Code section 39665;

WHEREAS, the ISOR and TSD identified and explained the need and appropriate degree of regulation of diesel PM and NOx emissions from in-use on-road diesel vehicles and the feasibility of regulating emission from such vehicles;

WHEREAS, the ISOR and TSD discussed, to the extent data could reasonably be made available, the factors specified in Health and Safety Code sections 39665(b), 43013, and 43018, including, but not limited to estimates of emissions, exposure, potential cancer risk and non-cancer health effects associated with the operation of in-use on-road diesel vehicles subject to the proposed regulation, technically feasible control options, potential environmental impacts, cost of compliance for all owners and/or operators of in-use on-road diesel vehicles, and cost impacts for ARB implementation of the proposed regulation;

Resolution 08-43                                                    6

WHEREAS the ISOR and TSD also discussed ARB staff's evaluation of the potential risk of exposure to directly emitted diesel PM in the exhaust of heavy-duty trucks in a localized urban area using U.S.EPA-approved and ARB-recommended air dispersion models, and these evaluations indicate that the overall average potential ambient cancer risk within the localized urban area in the year 2003 is about 375 in a million;

WHEREAS, the ISOR and TSD further discussed the results of ARB staff's evaluations of the non-cancer health effects of exposure to primary and secondary PM emissions from the vehicles subject to the proposed regulation, and these evaluations indicate that in the year 2008, approximately 4,500 premature deaths were associated with the estimated baseline emissions;

WHEREAS, the ISOR and TSD present staff's proposal that the Board adopt the proposed Regulation for In-Use On-Road Diesel Vehicles, Cal. Code Regs., title 13, section 2025, as set forth in Attachment A to both the ISOR and TSD;

WHEREAS, the Legislature has provided funds to ARB and local air pollution control and air quality management districts to provide over one billion dollars in incentive grants and low-interest loans available to fleets, in particular small fleets, to assist with the impacts of the proposed regulation.

WHEREAS, Attachment A hereto contains this proposed Regulation for In-Use On-Road Diesel Vehicles, Cal. Code Regs., title 13, section 2025, and Attachment C contains staff's suggested modifications to the initially proposed regulation, based on staff's evaluations and on comments received since release of the ISOR and TSD;

WHEREAS, the significant elements of the proposed regulation are;

A requirement that owners of in-use on-road diesel vehicles over 14,000 pounds gross vehicle weight rating (GVWR) and shuttle busses of any GVWR that are not personal use motor homes, emergency vehicles, or tactical military vehicles reduce PM and NOx emissions from their fleet by upgrading the vehicles to meet BACT standards for PM and NOx in which:

The BACT standard for PM is an engine equipped with the highest level verified DECS for PM or an engine originally equipped with a diesel particulate filter by the engine manufacturer, and

The BACT standard for NOx is an on-road engine newly manufactured in 2010 or later or a 2010 emissions-equivalent engine as defined in the proposed regulation or a Tier 4 final engine;

Three options for complying with the emissions performance requirements of the proposed regulation are provided:

Resolution 08-43
7

A prescribed BACT schedule that would determine each year the number of verified DECS that a fleet owner must install and the number of vehicles based on the vehicle's engine model-year that a fleet owner must replace;
A BACT percent limit option that would set for each year the minimum number of verified DECS that a fleet owner must install and the minimum number of engines required to meet the 2010 engine requirements that a fleet owner must replace; and

A fleet averaging option whereby a fleet would use PM and NOx emission factors established by the proposed regulation to calculate the average emissions of the fleet and demonstrate, by the applicable compliance date each year, that the fleet met the PM and NOx fleet average emission rate targets set by the proposed regulation, which would decline over time, requiring fleets to reduce their emissions further as time goes on;

The above compliance options require the fleet owner install the highest level PM verified DECS on certain engine model-years during the first two years of the proposed regulation, starting January 1, 2011; then fleet owners must reduce both PM and NOx emissions from their fleet by accelerating engine or vehicle replacement between January 1, 2013 and the end of 2022, so that by January 1, 2023, all engines would be the cleanest available – that is, having a 2010 or later model-year engine or retrofitted to achieve equivalent emission reductions;

An optional requirement for fleets with three or fewer vehicles that would exempt such fleets from all clean-up requirements through 2012, after which they must meet the following requirements:

For a one-vehicle fleet, the vehicle must be equipped by January 1, 2013 with a 2004 model-year or newer engine having the highest level verified PM DECS, and by January 1, 2018, be upgraded to meet the proposed PM and NOx performance requirements of the proposed regulation;

For a fleet consisting of two vehicles, one vehicle must meet the above requirements for a one-vehicle fleet and the second vehicle must be upgraded, starting January 1, 2014, to meet the proposed PM and NOx performance requirements of the proposed regulation;

For a fleet consisting of three vehicles, one vehicle must meet the above requirement for a one-vehicle fleet and then the fleet could elect to either upgrade its two remaining vehicles, starting January 1, 2014, to meet the proposed PM and NOx performance requirements of the proposed regulation, or have one of the remaining vehicles meet the 2010 model year engine emissions requirements by January 1, 2014, and the third vehicle meet the PM and NOx performance requirements by January 1, 2016.

Resolution 08-43                                    8

Requirements for school buses include:

Replacement by January 1, 2012, of school buses manufactured before April 1, 1977;

Retrofit between January 1, 2011, and January 1, 2014, according to the schedule specified for school buses in the proposed regulation, all diesel-fueled school buses with the highest level VDECS to meet the PM BACT standard; if a school bus engine cannot be retrofitted as required, then the engine must be replaced by January 1, 2018, with an engine that can meet the retrofit requirements;

A provision that considers school buses in compliance with the proposed regulation if they were retrofitted on or before December 31, 2005, with a level 2 verified DECS, which was the highest level verified DECS available at the time of installation;

A requirement that drayage trucks be equipped with the highest level verified DECS for PM pursuant to the following schedule:  vehicles with 2004 model-year engines by January 1, 2012, and vehicles with 2005-2006 model-year engines by January 1, 2013;

A requirement that all drayage truck and vehicles owned by utilities comply with the requirements of the proposed BACT schedule for the proposed regulation starting January 1, 2021;

Special provisions for agricultural vehicles that delay compliance with the PM and NOx performance requirements that include:

Specialty agricultural vehicles as defined in the proposed regulation are exempt from the performance requirements of the regulation until January 1, 2023, regardless of annual miles travelled;

Agricultural vehicles that operate less than 10,000 miles annually are exempt from the performance requirements of the regulation until January 1, 2023;

Agricultural vehicles with 1995 and older model-year engines that operate less than 15,000 miles annually, 1996 through 2005 model-year engines that operate less than 20,000 miles annually, and 2006 and newer model-year engines that operate less than 25,000 miles annually are exempt from the performance requirements of the regulation until January 1, 2017;

Agricultural fleets must establish by January 1, 2009, the number of vehicles in each low-mileage category, which cannot thereafter be increased;

Resolution 08-43
9

A limit on the total number of specialty agricultural vehicles that may operate in the San Joaquin Valley Air Basin (1,100), and statewide (2,200);

A requirement that all heavy-duty diesel agricultural vehicles meet the 2010 model-year engine emissions requirements by 2023 regardless of annual mileage driven;

A requirement that auxiliary engines on dual engine sweepers meet the PM performance requirements of the proposed regulation on the same schedule as that of the propulsion engine of the dual-engine sweeper, and that for uncertified Tier 0 off-road auxiliary engines, the maximum allowable hours of operation cannot exceed 250 hours per year from January 1, 2010, through January 1, 2014, and 100 hours per year thereafter;

The following vehicles are exempt from the NOx performance requirements until January 1, 2021:

Vehicles that operate exclusively in counties that the proposed regulation has identified as in attainment with of the NAAQS for ozone and PM2.5 and that do not contribute to downwind exceedances of the state ozone standard;

All vehicles with a GVWR less than 33,000 pounds, other than vehicles using power take-off (PTO) to work while stationary, that are operated fewer than 5,000 miles annually; vehicles using PTO to work while stationary are required to operate fewer than 5000 miles annually and less than 175 hours per year; and

Truck tractors and vehicles with a GVWR greater than 33,000 pounds, other than vehicles using PTO to work while stationary, that are operated fewer than 7,500 miles annually; vehicles using PTO to work while stationary are required to operate fewer than 7500 miles annually and less than 250 hours per year;

Cab-over engine truck tractors that exclusively pull 57 foot trailers are exempt from the NOx performance requirements until January 1, 2018, if the engine of the vehicle is at least a 2004 model-year equivalent engine and meets the PM performance requirements;

Vehicles operated in California for fewer than 1,000 miles and less than 100 hours (low-use vehicles) during the preceding 12-month period from January 1 to the end of December are exempt from both the PM and NOx cleanup requirements;

An early action provision that would exempt any vehicle in a fleet equipped with the highest level verified PM DECS by January 1, 2010, from the NOx performance requirements until January 1, 2014;

Resolution 08-43                                                  10

A provision that would allow a fleet to receive a credit by double counting hybrid vehicles with a fuel economy that is at least 20 percent better than an equivalent diesel vehicle until January 1, 2018, when determining compliance with the BACT percent limits and fleet averaging options of the proposed regulation;

A credit for the use of vehicles equipped with alternative fuel or heavy-duty pilot ignition engines that would allow a fleet to use the NOx emission factor for the certified engine model and zero for the PM emission factor when determining compliance with the BACT percent limits and fleet averaging options of the proposed regulation;

Compliance extensions if the retrofits, repowers, or new engines needed for compliance with the regulation are not available because of manufacturer delays;

WHEREAS, in accordance with the authority set forth above, staff evaluated various control options that do not achieve the same level of PM or NOx reductions, or are less cost-effective than the proposed regulation, including performance requirements that would:

Require fleets to use PM verified DECS on all vehicles under a specified phase-in schedule, until all vehicles in the fleet have been retrofitted;

Require the upgrading of existing engines in two phases according to a schedule that requires the oldest engines to be upgraded first, with engines required in the first phase to meet a 2004 model-year or newer NOx emissions standard and be equipped with the highest level verified DECS by the end of 2013; in the second phase, all engines would have to meet a 2007 model-year emissions standard; in addition, under an alternative compliance option, owners of vehicles registered exclusively in California and not operating outside the state would have the option of meeting increasingly stringent NOx and PM fleet average emission targets;

Require fleet to meet more stringent performance standards by having vehicles upgrade to an engine that is equivalent to a 2007 model-year engine by the end of 2013, and to one equivalent to a 2010 model-year engine by the end of 2021; and require that all vehicles that operate in California meet the fleet averaging option;

Provide more generous mileage exemptions, more liberal early compliance incentives, a specialty vehicles provision beyond that which has been provided for agricultural vehicles, a less aggressive compliance schedule for businesses subject to two or more ARB regulations, and more flexible provisions if diesel emission control technology is not available;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

Resolution 08-43                                11

WHEREAS, based on information in the rulemaking record, including the ISOR and
TSD, written comments, and testimony provided at the public hearing, the Board finds
regarding the proposed adoption of Cal. Code Regs., title 13, section 2025 that:

In-use on-road diesel vehicles that operate in the State – whether based in
California or not – are significant contributors of diesel PM and NOx emissions,
which California must reduce to attain the ozone and PM2.5 NAAQS and to
reduce the health risks associated with such pollutants;

The regulation approved herein would achieve the necessary emission reductions
to achieve the NAAQS for ozone and PM2.5, while providing fleet owners with
reasonable compliance flexibility;

In 2014, the proposed regulation will provide emissions reductions of
approximately 12.8 tons per day of PM and 124 tons per day of NOx, and by 2023,
emission reductions of approximately 3.5 tons per day of PM and 98 tons per day
of NOx;

The proposed regulation would meet or exceed the combined NOx and PM2.5 SIP
fleet rule targets in both the South Coast and San Joaquin Valley air basins for all
years; in 2014, in the South Coast Air Basin, the SIP target for PM2.5 would be
met by achieving slightly more PM2.5 reductions and slightly less NOx than
expected;

The proposed regulation would also help achieve the SIP reduction goals in 2020
for attainment in regions downwind of the South Coast and the San Joaquin Valley
air basins;

The regulation would provide a small climate change benefit primarily due to the
expected improvements in fuel economy associated with the modernization of the
fleet to comply with the regulation that would offset the potential climate change
impacts of the fuel economy penalty of the widespread installation of diesel
particulate filters in the fleet;

In accordance with Health and Safety Code section 39667, and based upon the
Board's determinations under Health and Safety Code section 39662, the
regulation approved herein has been designed to achieve the maximum possible
reduction in public exposure to toxic air contaminants utilizing BACT; by 2020,
diesel PM emissions from existing on road diesel vehicles would be reduced by
80 percent from the 2000 baseline;

The regulation approved herein would significantly reduce diesel PM and NOx
emissions and associated cancer, premature mortality, and other adverse health
effects statewide;

Resolution 08-43                                                    12.

The emission reductions from the regulation are expected to prevent
approximately 9,400 premature deaths over the course of the regulation, and
would result in about 150,000 fewer asthma-related cases and 950,000 fewer lost
work days.

WHEREAS, the Board further finds that:

In accordance with Health and Safety Code section 43013(a) and (b), the in-use
emission standards and other requirements of the proposed regulation approved
herein are necessary, cost-effective, and technologically feasible for in-use
on-road diesel fleets within the time provided for compliance;

The economic impacts of the proposed regulation approved herein have been
analyzed as required by California law, and the conclusions and supporting
documentation for this analysis are set forth in the ISOR and TSD and the benefits
of the regulation to public health and the environment justify the costs of
compliance, and enforcement;

The emission reductions from the proposed regulation would be expected to
provide a benefit of $48 to $68 billion in avoided premature death and health costs
between 2010 and 2025;

The overall cost effectiveness associated with compliance with the proposed
regulation would be approximately $46 per pound of diesel PM reduced and $1.76
per pound of NOx reduced;

The proposed regulation would create costs for school districts, and may impose a
mandate that would not be reimbursable by the state;

Although the Legislature has provided over significant funds for incentive grants
and low-interest loans to be made available for fleets, in particular small fleets, to
assist with the impacts of the proposed regulation, it is not sufficient to cover the
full estimated costs of the proposed regulation;

No alternatives considered or that have otherwise been identified and brought to
the attention of the ARB would be more effective carrying out the purpose for
which the regulation is proposed, or would be as effective and less burdensome to
the affected private businesses and public agencies than the proposed regulation;

WHEREAS, pursuant to Health and Safety Code section 39667, the Board further finds
that the proposed in-use emissions standards approved herein are based on utilization
of BACT identified within the time scheduled for compliance;

WHEREAS, the Board further finds based on its independent judgment and analysis of
the entire record before it that:

Resolution 08-43                                                                13

With respect to the requirements of CEQA, the proposed regulation will not have a significant adverse effect on the environment, but will result in the reduction of diesel PM and NOx; and

Having determined that the proposed regulation will not adversely affect the environment, but rather provide environmental benefits that are achieved both statewide and locally, the proposed regulation should not adversely impact any community in the State, including low-income or minority communities; and

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, section 2020, "Purpose and Definitions of Diesel Particulate Matter Control Measures"

WHEREAS, the Board, pursuant to sections 39002, 39003, 39650-39675, 43000, 43013, 43018, 43101, 43102, 43104, 43105, and 43700 of the Health and Safety Code, adopted Cal. Code Regs., title 13, section 2020 on May 17, 2004, establishing definitions of terminology used in diesel particulate control measures ;

WHEREAS, the staff has proposed an amendment to the definition of "municipality" to exclude federal agencies and tribal reservations and rancherias, and consequently fleets owned by these entities;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, the Board finds regarding the proposed amendment to Cal. Code Regs., title 13, section 2020 that:

The amendment approved herein is necessary since fleets owned by federal agencies and tribal reservations and rancherias are not required to comply with the control measure for public agency or utility on-road heavy-duty diesel-fueled vehicles which applies to municipalities, but would be subject to the proposed regulation approved herein for in-use heavy-duty diesel vehicles;

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, sections 2022-2022.1, "Diesel Particulate Matter Control Measure for Public or Utility On-Road Heavy-Duty Diesel-Fueled Vehicles"

WHEREAS, the Board, pursuant to sections 39002, 39003, 39600, 396001, 39655-39662, 39664, 39665, 39667, 39669, 39674, 39675, 43000, 43013, 43018, 43101, 43102, 43104, 43105, and 43700 of the Health and Safety Code adopted Cal. Code Regs., title 13, sections 2022 and 2022.1, on October 4, 2006, establishing a diesel

Resolution 08-43                                                                14

particulate matter control measure for public or utility on-road heavy-duty diesel-fueled vehicles (control measure for public or utility in-use vehicles);

WHEREAS, the control measure for public or utility in-use vehicles currently is applicable to on-road heavy-duty diesel-fueled vehicles with a 1960 to 2006 model-year medium heavy-duty or heavy heavy-duty engine having a manufacturer's GVWR greater than 14,000 pounds;

WHEREAS, the control measure for public or utility in-use vehicles currently includes the following elements:

A requirement that BACT be applied according to a specified implementation schedule that sets compliance deadlines and the percentage of the fleet that must be equipped with BACT by each deadline;

A provision wherein a public agency or utility can receive credit towards their BACT requirement by retiring a vehicle, and one means of retiring a vehicle is by selling it out-of-state;

WHEREAS, the staff has proposed amendments to the control measure for public or utility in-use vehicles that would:

Expand the scope and applicability of the regulation to include light heavy-duty engines and 2007 model-year and newer engines certified at PM levels greater than the 2007 model-year standard of 0.01 gram per brake horsepower hour (g/bhp-hr) for vehicles with a GVWR greater than 14,000 pounds;

Amend the BACT implementation schedule to add a compliance deadline for 2007 and newer engine model years certified above the 0.01 g/bhp-hr standard; Allow public and utility fleets to apply for a one-year extension of the intermediate 2009 compliance deadline for light heavy-duty engines;

Require that a municipality or utility submit a request for a VIN Stop - a Department of Motor Vehicles registration hold based on a vehicle identification numbers that prevents a vehicle from being re-registered in California after it is retired, and this request must be in place prior to selling the vehicle;

Add language to section 2022.1(h) that would establish contract requirements for out of state sales through a third party vehicle seller;

Modify the definition of "retirement" in section 2022(b)(8) to grant credit for the sale within California of dual-engine street sweepers with 2004 – 2006 model-year propulsion engines, provided that, in the case of private-sector buyers, such buyers comply with the regulation for in-use on-road diesel vehicles proposed in this rulemaking;

Resolution 08-43                                15

Provide an optional extension for privately-owned utilities that would provide a two-year delay of the intermediate and final BACT PM deadlines, accompanied by requirements that, by December 31, 2013, thirty percent of a utility's vehicles must meet the 2010 engine emission standards, and an additional twenty percent meet the 2007 or newer engine emission standards;

Make minor changes to the control measure for public and utility in-use vehicles that add new definitions for "lease," "operate," "sold outside the State of California," "third party," and "VIN Stop," which support the modifications being proposed, and modify the definition of "total fleet" for consistency with the revised scope of the regulation;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments to Cal. Code Regs., title 13, sections 2022 and 2022.1 that:

The expansion of the scope and applicability of the regulation is necessary to include the light heavy duty engines that were inadvertently omitted from the original scope of the regulation;

The expansion of the scope and applicability of the regulation to include 2007 model year and newer engines certified under Averaging Banking and Trading (ABT) provisions at PM levels greater than the 2007 model year standard of 0.01 g/bhp-hr is needed to be consistent with the original intent of the regulation to require upgrades of all engines that did not meet the PM BACT standard of 0.01 g/bhp-hr;

The optional extension for privately-owned utilities would harmonize the requirements for these utilities under the diesel particulate matter control measure for public or utility on-road heavy-duty diesel-fueled vehicles with the requirements that will apply to them under the regulation for in-use on-road diesel vehicles proposed herein, while providing early NOx emissions benefits and meeting the PM emissions reductions targets;

The amendment to establish a "VIN Stop" process to qualify a vehicle for retirement is necessary to ensure that a municipality or utility receives BACT credit for a vehicle sold out of state and that the emissions generated by these vehicles remain outside of California's air basins unless the retired vehicle is retrofit to meet the BACT requirements;

The contract language for out-of-state sales through third parties is needed to ensure that the seller informs buyers of the prohibitions against re-registering or operating retired vehicles in the State;

Resolution 08-43                                                                                              16

The amendment to the definition of retirement is necessary to improve the availability of used lower NOx-emitting dual engine sweepers to owners who would be subject to the regulation for heavy duty diesel vehicles proposed herein;

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, section 2027, "Regulation To Control Emissions From In-Use On-Road Diesel-Fueled Heavy-Duty Drayage Trucks at Ports and Intermodal Rail Yard Facilities"

WHEREAS, the Board, pursuant to sections 39600, 39601, 39650, 39658, 39659, 39666, 39667, 39674, 39675, 42400, 42400.1, 42400.2, 42402.2, 42410, 43013, 43016, 43018, 43023, 43600 of the Health and Safety Code, adopted Cal. Code Regs., title 13, section 2027 on October 12, 2008, establishing a regulation to control emissions from in-use on-road diesel-fueled drayage trucks at ports and intermodal rail yard facilities (drayage truck regulation);

WHEREAS, staff has proposed amendments to the drayage truck regulation that would:

Amend the Phase 1 compliance requirements of section 2027(d)(1) to add the following requirements for drayage trucks with 2004 – 2006 model-year engines:

By January 1, 2012, all drayage trucks with 2004 model-year engines must be equipped with the highest level verified DECS for PM;

By January 1, 2013, all drayage trucks with 2005 - 2006 model-year engines must be equipped with the highest level verified DECS for PM.

Amend section 2027(b) to add diesel-fueled and dual-fueled trucks as being covered by the regulation;

Make minor changes to the definitions of section 2027(c), including the addition of definitions for "Alternative Diesel Fuel", "Compression Ignition Engine", and "Dual-Fueled Engine", and amend the definition of "Diesel-Fueled" to limit the definition to engines fueled by diesel fuel, CARB diesel fuel, and alternative diesel fuel;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments to Cal. Code Regs., title 13, section 2027 that:

The changes to the Phase 1 requirements would align the drayage truck regulation with the regulation for in-use heavy-duty diesel vehicles proposed herein;

This alignment with the proposed regulation for in-use heavy-duty diesel vehicles would help meet the State's PM emission reduction commitments and would ensure that uncontrolled trucks won't cycle into the drayage fleet to avoid compliance with the requirements of the proposed in-use on-road diesel vehicle regulation requirements; and

The proposed changes to the definitions and the applicability of the drayage truck regulation are necessary for clarification of the original intent of the regulation and for consistency with the regulation for in-use heavy-duty diesel vehicles proposed herein;

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, sections 2449, 2449.1, 2449.2, and 2449.3, "In-Use Off-Road Diesel-Fueled Fleets"

WHEREAS, the Board, pursuant to sections 39002, 39515, 39516, 39600, 39601, 39602, 39650, 39656, 39658, 39659, 39665, 39667, 39674, 39675, 40000,41500, 42400,42400.1, 42400.2, 42400.3,5, 42402, 42402.1, 42402.2, 42402.4, 42403, 43000, 43000.5, 43013, 43016, and 43018 of the Health Safety Code, adopted Cal. Code Regs., title 13, sections 2449, 2449.1, 2449.2, and 2449.3 on April 4, 2008, establishing requirements for in-use off-road diesel-fueled fleets (in-use off-road regulation);

WHEREAS, two-engine cranes are currently subject to multiple regulations and requirements with varying compliance dates: the secondary engine of two-engine cranes are subject to the requirements of the portable engine registration program and ATCM for portable engines, the drive engines of two-engine cranes that operate exclusively off-road are subject to the regulation for in-use off-road regulation, the drive engines of two-engine cranes that operate on-road would be potentially subject to the proposed regulation for in-use heavy-duty diesel vehicle regulation, and the drive engine on two-engine cranes that operate at ports or intermodal rail yards are subject to the requirements of the mobile cargo handling equipment at ports and intermodal rail yards regulation (mobile cargo handling regulation);

WHEREAS, the ARB staff has proposed amendments to the general requirements (Cal. Code Regs., title 13, section 2449) of the in-use off-road regulation that would:

Amend the applicability section to include both the secondary engine and the drive engine of all two-engine cranes operating in California, regardless of whether the drive engine is certified as an on-road or off-road engine;

Add new language that requires the replacement engine in a workover rig or other on-road vehicle subject to the in-use off-road diesel vehicle regulation to be an on-road certified engine of the same model year or newer as the engine being replaced if the vehicle will be registered and driven on public roadways;

Resolution 08-43
18

Amend the special provisions for low-use vehicles to clarify that they are required to comply with the regulation's idling limits and the requirements for adding vehicles to the fleet;

Make minor modifications to the regulation, including adding a definition for "two-engine crane", clarifying the rounding provisions for two-engine cranes, and adding requirements for reporting of the vehicle identification number and, if applicable, the license plate number for workover rigs and two-engine cranes;

WHEREAS, the ARB staff has proposed an amendment to the fleet applicability requirements of the Surplus Off-Road Opt-In for NOx (SOON) Program of the in-use off-road regulation (Cal. Code Regs., title 13, section 2449.3) that would exclude the horsepower in two-engine cranes and the horsepower from single engine cranes formerly subject to the Cargo Handling Equipment Regulation when determining a fleet's maximum horsepower;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments to Cal. Code Regs., title 13, sections 2449 and 2449.3 that:

The proposed change to the applicability section of the in-use off-road regulation to include all two-engine cranes is necessary to achieve emissions reductions from both engines in a two-engine crane without creating unnecessary overlapping requirements or adding unnecessary costs for owners of such vehicles;

The clarification of the repower requirements for workover rigs and other on-road vehicles is needed to ensure that vehicles with off-road engines do not drive on public roadways, except as already allowed in the Vehicle Code;

Since it was not the intent to exempt low-use vehicles from the idling requirements, the proposed modification of the provisions for low-use vehicles is necessary to be consistent with the original intent of the provision; and

The other minor amendments to the regulation are necessary to clarify and improve enforcement of the in-use off-road regulation.

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, section 2479, "Regulation for Mobile Cargo Handling Equipment at Ports and Intermodal Rail Yards"

WHEREAS, the Board, pursuant to sections 39600, 39601, 39618, 39658, 39659, 39667, 39674, 39675, 42400, 42400.1, 42400.2, 42400.3, 42400.3.5, 42400.6, 42402, 42402.1, 42402.2, 42402.3, 42402.4, 42410, 43013, and 43018 of the Health and

Safety Code, adopted Cal. Code Regs., title 13, section 2479 on October 17, 2006, establishing the mobile cargo handling regulation;

WHEREAS many owners of sweepers and mobile cranes subject to regulation for mobile cargo handling equipment only provide service to the ports on a limited basis and under the current mobile cargo handling regulation would have to segregate their vehicles into two separate groups – those required to comply with the mobile cargo handling regulation and those that would be required to comply with either the in-use off-road regulation or the in-use on-road regulation proposed herein;

WHEREAS, the ARB staff has proposed amendments to the regulation for mobile cargo handling equipment at ports and intermodal rail yards that include an exemption of sweepers and mobile cranes (both single-engine and two-engine) from the regulation, and modifications of definitions of mobile crane, cargo handling equipment, bulk cargo handling equipment, and sweepers to support these exemptions;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments to Cal. Code Regs., title 13, section 2479 that:

> The proposed amendments to mobile cargo handling regulation would provide consistency for owners and operators providing crane or sweeping service to ports and intermodal rail yards such that they would only be required to comply with one regulation, and this proposed amendment in combination with the changes proposed to the in-use off-road regulation to address cranes would also address other issues such as safety certification, and would provide more compliance flexibility;

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, sections 2450-2465, "Portable Equipment Registration Program"

WHEREAS, the Board, pursuant to sections 39600, 39601, 41752, 41753, 41754, 41755, 43013(b), and 43018 of the Health and Safety Code, initially adopted Cal. Code Regs., title 13, sections 2450-2465 on July 25, 1997, establishing the portable equipment registration program;

WHEREAS, ARB staff has proposed amendments to the portable equipment registration program that would:

> Amend the engine requirements of section 2456 to establish new performance requirements for registered secondary diesel engines on two-engine cranes and

Resolution 08-43

20

dual-engine sweepers not subject to the control measure for public or utility in-use vehicles as follows:

Exempt the registered secondary engines from all of the emission requirements of the portable equipment registration program except the limits on opacity specified in section 2456(f)(5);

Require that the registered secondary engine on a two-engine crane comply with the applicable requirements of Cal. Code Regs., title 13, section 2449, of the in-use off-road regulation;

Require that the registered secondary engine on a dual-engine street sweeper comply with the applicable requirements of Cal. Code Regs., title 13, section 2025, of the in-use on-road diesel vehicles regulation proposed herein;

Modify the recordkeeping and reporting requirements for registered secondary diesel engines on two-engine cranes and dual-engine sweepers not subject to the control measure for public or utility in-use vehicles as follows:

Exempt the registered secondary engine of a crane or street sweeper from the recordkeeping and reporting requirements of the portable equipment registration program; and

Require that the registered secondary engine of a two-engine crane or dual-engine street sweeper comply respectively, with the applicable recordkeeping, reporting and other administrative requirements of the in-use off-road regulation and the in-use on-road diesel vehicle regulation proposed herein;

Add a definition of "street sweeper" that would cross-reference the definition of "dual-engine street sweeper" that would be added to the control measure for public or utility in-use vehicles as proposed herein, and a definition of "crane" that would cross-reference the definition of "two-engine crane" that would be added to the in-use off-road regulation as proposed herein;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments to Cal. Code Regs., title 13, sections 2450-2465, that:

The proposed amendments are necessary to harmonize the requirements to reduce emissions from both engines in two-engine cranes and dual-engine sweepers that would otherwise be subject to multiple regulations with overlapping requirements;

Case 2:11-cv-00384-MCE-AC   Document 43-3   Filed 12/22/11   Page 40 of 46
Case 2:11-cv-00384-MCE -GGH   Document 38-7   Filed 12/01/11   Page 35 of 130
Resolution 08-43                           27

Findings Specific to Proposed Amendments to Cal. Code Regs., title 17, section 93116
et seq., "Airborne Toxic Control Measure for Portable Diesel-Engines Rated at
50 Horsepower and Greater"

WHEREAS, the Board, pursuant to sections 39600, 39601, 39650, 39658, 39659,
39666, 41752, 43013 and 43018 of the Health and Safety Code, adopted Cal. Code
Regs., title 17, section 93116 et seq., on December 23, 2004, establishing an ATCM for
portable diesel-engines rated at 50 horsepower and greater (portable engine ATCM);

WHEREAS, ARB staff has proposed amendments to the ATCM for portable engines
that would:

    Exclude the secondary engines on two-engine cranes and on dual-engine
    sweepers that are not already subject to the control measure for public or utility in-
    use vehicles from the requirements of the portable engine ATCM;

    Require that the secondary engine on a two-engine crane comply with all
    applicable requirements of the in-use off-road regulation;

    Require that the secondary engine on a dual-engine sweeper not subject to the
    control measure for public or utility in-use vehicles comply with all applicable
    requirements of the in-use on-road diesel vehicle regulation proposed herein;

    Delete the diesel PM standards and fleet requirements for lattice boom cranes, so
    that these cranes, which fall within the definition of "two-engine cranes, would be
    subject to the in-use off-road regulation;

    Add a definition for "street sweeper" that would cross-reference the definition of
    "dual-engine street sweeper" that would be added to the control measure for public
    or utility in-use vehicles as proposed herein, and a definition of "crane" that would
    cross-reference the definition of "two-engine crane" that would be added to the
    in-use off-road regulation as proposed herein;

WHEREAS, a public hearing and other administrative proceedings have been held in
accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1,
division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written
comments, and testimony provided at the public hearing, the Board finds regarding the
proposed amendments of Cal. Code Regs., title 17, section 93116 that::

    The proposed amendments are necessary to harmonize the requirements to
    reduce emissions from both engines in two-engine cranes and dual-engine
    sweepers that would otherwise be subject to multiple regulations with overlapping
    requirements;

Findings Specific to Proposed Amendments to Cal. Code Regs., title 13, section 2485, "Airborne Toxic Control Measure to Limit Diesel-Fueled Commercial Motor Vehicle Idling"

WHEREAS, the Board, pursuant to sections 39600, 39601, 39614(b)(6)(A), 39658, 39667, 43000.5(d), 43013(b), 43013(h), 43018(c), Health and Safety Code; and *Western Oil & Gas Assn. v. Orange County air Pollution Control Dist.* (1975) 14 Cal.3d.411, adopted Cal. Code Regs., title 13, section 2485, establishing an ATCM to limit diesel-fueled commercial motor vehicle idling;

WHEREAS ARB staff has proposed amendments to the ATCM for commercial motor vehicle idling that would:

    Exempt armored cars from the idling limits while providing services for which the vehicles were designed;

    Exempt workover rigs from the idling limits while performing the work for which the vehicles were designed;

    Add a definition for "armored car" by reference to the Vehicle Code, and a definition for "workover rig" by reference to the in-use off-road diesel vehicle regulation;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments of Cal. Code Regs., title 13, section that:

    The proposed amendment for armored cars would allow idling of the engine for climate control and is essential to the health and safety of the guard onboard in an enclosed armored car;

    The proposed amendment for workover rigs is necessary to allow a workover rig to carry out its specialized work while stationary;

Findings Specific to Proposed Amendments to Cal. Code Regs. title 13, section 1956.8, "Exhaust Emissions Standards and Test Procedures for 1985 and Subsequent Model Heavy-Duty Engines and Vehicles"

WHEREAS, the Board, pursuant to sections 39500, 39600, 39601, 43013, 43018, 43100, 43101, 43102, 43104, 43105, 43106, 43107, and 43806, Health and Safety Code; and section 28114, Vehicle Code, adopted amendments to Cal. Code Regs.,

Case 2:11-cv-00384-MCE-AC  Document 43-3  Filed 12/22/11  Page 42 of 46
Case 2:11-cv-00384-MCE -GGH  Document 38-7  Filed 12/01/11  Page 37 of 130
Resolution 08-43                                    23

title 13, section 1956.8 on September 1, 2006 that added engine idling requirements to the exhaust emissions standards and test procedures for 1985 and subsequent model heavy-duty engines and vehicles (heavy-duty engine emission standards regulation);

WHEREAS ARB staff has proposed amendments to the heavy-duty engine emissions standards regulation that would add armored cars and workover rigs to the list of vehicles exempt from the engine idling requirements of the regulation;

WHEREAS, a public hearing and other administrative proceedings have been held in accordance with the provisions of chapter 3.5 (commencing with section 11340), part 1, division 3, title 2 of the Government Code;

WHEREAS, based on information in the rulemaking record, including the ISOR, written comments, and testimony provided at the public hearing, the Board finds regarding the proposed amendments of Cal. Code Regs., title 13, section 1956.8 that:

The proposed amendment of the exhaust standards is necessary for consistency with the amendment proposed to the Commercial Vehicle idling limit;

General Findings for Amendments to Above-Referenced Regulations

WHEREAS, the Board finds that the proposed amendments to Cal. Code Regs., title 13, sections 2020, 2022, 2022.1, 2027, 2449, 2449.3, 2451, 2452, 2453, 2455, 2456, 2458, 2461, 2479, 2485, and 1956.8 and Cal. Code Regs., title 17, sections 93116.1, 93116.2, 93116.3, and 93116.5 (proposed amendments) are necessary, cost-effective, and technologically feasible within the time provided for compliance;

WHEREAS, the Board further finds based on its independent judgment and analysis of the entire record before it that:

With respect to the requirements of CEQA, the proposed amendments will not have a significant adverse effect on the environment;

Having determined that the proposed amendments will not adversely affect the environment, they should not adversely impact any community in the State, including low-income or minority communities;

NOW, THEREFORE, BE IT RESOLVED that the Board hereby approves the adoption of Cal. Code Regs., title 13, article 4, chapter 1, division 3, section 2025, as set forth in Attachment A hereto, with the modifications described in Attachment C hereto and the following: provisions for a courtesy inspection program, backdating the start date for the accrual of retirement vehicle credits as provided in section 2025(l)(3) to July 1, 2008, and delaying the compliance dates for the first vehicle of a small fleet by one year.

BE IT FURTHER RESOLVED that the Board hereby approves the adoption of the amendments to Cal. Code Regs., title 13, sections 2020, 2022, 2022.1, 2027, 2449,

Case 2:11-cv-00384-MCE-AC    Document 43-3    Filed 12/22/11    Page 43 of 46
Case 2:11-cv-00384-MCE -GGH    Document 38-7    Filed 12/01/11    Page 38 of 130
Resolution 08-43
24

2449.3, 2451, 2452, 2453, 2455, 2456, 2458, 2461, 2479, 2485, and 1956.8 and title
17, sections 93116.1, 93116.2, 93116.3, and 93116.5, as set forth in Attachment B
hereto, with the modifications in Attachment D hereto and the following: conform the
performance requirements for drayage trucks as set forth in sections 2027(d) and
2025(k) so that the two sections are consistent;

BE IT FURTHER RESOLVED that the Board directs the Executive Officer to incorporate
into the approved regulations the modifications set forth in Attachments C and D hereto,
and such other conforming modifications as may be appropriate, and to make the
modified regulatory language, with the modifications clearly indicated, available for
public comment for a period of at least 15 days, provided that the Executive Officer shall
consider such written comments regarding the modifications as may be submitted
during this period, shall make modifications as may be appropriate in light of the
comments received, and shall present the regulations to the Board for further
consideration if the Executive Officer determines that this is warranted;

BE IT FURTHER RESOLVED that the Board directs the Executive Officer to develop
user-friendly guidelines for implementation of and compliance with Cal. Code Regs.
Section 2025 within six months of adoption of the regulation, to conduct outreach and
education activities with municipalities and owners of public agency-operated and utility-
operated heavy-duty diesel-fueled vehicles, and to make information available, on the
Internet and through other forms of distribution, to affected fleets regarding the
appropriateness of verified retrofit devices, including information on how often a verified
device must undergo regeneration and the potential cost and operational benefits of
electing to upgrade a vehicle to a newer model year engine or vehicle in lieu of
retrofitting an older vehicle engine;

BE IT FURTHER RESOLVED, that the Board directs the Executive Officer to conduct
workshops and report back to the Board by the end of 2009 on the status of
implementation and to specifically monitor, evaluate and, where appropriate to make
recommendations on how to address any adverse impacts regarding the following: the
state of the economy and its impact on affected vehicle emissions, the availability of
funding for affected vehicles and schoolbuses, the impact of the proposed regulation on
the decisions of school districts to reduce or eliminate school transportation services as
a result of the proposed regulation, and the localized impacts from the proposed
agricultural vehicle provisions;

BE IT FURTHER RESOLVED that the Board directs the Executive Officer to report back
in January 2009 and provide an update on the impacts of the PM performance
standards for vehicles driven exclusively within the designated NOx attainment areas
identified in the approved Truck and Bus Regulation;

BE IT FURTHER RESOLVED that the Board finds that because section 209(a) of the
federal CAA does not preempt California from adopting emission standards for non-new
on-road motor vehicles and that California is not required to request a waiver from the
U.S. EPA pursuant to CAA section 209(b).

BE IT FURTHER RESOLVED that the Board finds that the amendments approved herein that affect in-use off-road engines are not preempted under section 209(e)(1) in that they do not apply to new off-road engines under 175 hp used in farm and construction vehicles or to new locomotives and locomotive engines.

BE IT FURTHER RESOLVED that the Board hereby determines that the amendments approved herein to regulations that apply to in-use off-road engines will not cause California's off-road engine emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards, do not undermine any previous protectiveness finding made by the Board, and are not inconsistent with CAA section 209; accordingly, the Board directs the Executive Officer to request that U.S. EPA confirm that the approved amendments fall within the scope of authorization requests presently pending before that agency.

I hereby certify that the above is a true and correct copy of Resolution 08-43, as adopted by the Air Resources Board.

Monica Vejar, Clerk of the Board

Resolution 08-43

ATTACHMENTS

December 11, 2008

<u>Identification of Attachments to the Board Resolution</u>

**Attachment A:**  Proposed Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, and Greenhouse Gases from In-Use Heavy-Duty Diesel-Fueled Vehicles. (Cal. Code Regs., article 4, chapter 3, division 3, title 13, section 2025) as set forth in Appendix A to the Initial Statement of Reasons, released October 21, 2005.

**Attachment B**  Proposed amendments to Cal. Code Regs., title 13, section 2020, "Purpose and Definitions of Diesel Particulate Matter Control Measures;" Proposed amendments to Cal. Code Regs., title 13, sections 2022 and 2022.1, "Diesel Particulate Control Measure for Municipality or Utility On-Road Heavy-Duty Diesel-Fueled Vehicles;" Proposed amendments to Cal. Code Regs., title 13, section 2027, "Regulation to Control Emissions from In-Use On-Road Diesel-Fueled Heavy-Duty Drayage Trucks;" Proposed amendments to Cal. Code Regs., title 13, sections 2449 and 2449.3, "Regulation for In-Use Off-Road Diesel-Fueled Fleets;" Proposed amendments to Cal. Code Regs., title 13, sections 2451, 2452, 2453, 2455, 2456, 2458, 2461, and 2462 of the "Statewide Portable Equipment Registration Program;" Proposed amendments to Cal. Code Regs., title 13, section 2479, "Regulation for Mobile Cargo Handling Equipment at Ports and Intermodal Railyards;" Proposed amendments to Cal. Code Regs., title 13, section 2485, "Airborne Toxic Control Measure to Limit Diesel Fueled Commercial Motor Vehicle Idling;" Proposed amendments to Cal. Code Regs., title 13, section 1956.8, "Exhaust Emissions Standards and Test Procedures – 1985 and Subsequent Model Heavy-Duty Engines and Vehicles;" and Proposed amendment to Cal. Code Regs., title 17, sections 93116.1, 93116.2 and 93116.3 of the "Airborne Toxic Control Measure for Diesel Particulate Matter from Portable Engines Rated at 50 Horsepower and Greater."

**Attachment C:**  Modifications to the Proposed Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, and Greenhouse Gases from In-Use Heavy-Duty Diesel-Fueled Vehicles, as Approved by the Board at the December 11, 2008 Hearing.

Resolution 08-43

27

**Attachment D:**     Modifications to the Proposed Amendments Set Forth in
                      Attachment B, as Approved by the Board at the December 11, 2008
                      Hearing.