EXHIBIT 2

## FINAL REGULATION ORDER

## AMENDMENTS TO THE REGULATION TO REDUCE EMISSIONS OF DIESEL PARTICULATE MATTER, OXIDES OF NITROGEN AND OTHER CRITERIA POLLUTANTS FROM IN-USE ON-ROAD DIESEL-FUELED VEHICLES

### Division 3: Air Resources Board
### Chapter 1: Motor Vehicle Pollution Control Devices

**Section 2025. Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles.**

*(a)   Purpose*

The purpose of this regulation is to reduce emissions of diesel particulate matter (PM), oxides of nitrogen (NOx) and other criteria pollutants from in-use diesel-fueled vehicles.

*(b)   Scope and Applicability*

Except as provided in subsection (c), this regulation applies to any person, business, federal government agency, school district or school transportation provider that owns or operates, leases, or rents, affected vehicles that operate in California.  The regulation also applies to persons that sell affected vehicles in California.  Affected vehicles are those that operate on diesel-fuel, dual-fuel, or alternative diesel-fuel that are registered to be driven on public highways, were originally designed to be driven on public highways whether or not they are registered, yard trucks with on-road engines or yard trucks with off-road engines used for agricultural operations, both engines of two-engine sweepers, schoolbuses, and have a manufacturer's gross vehicle weight rating (GVWR) greater than 14,000 pounds (lbs).

*(c)   Exemptions*

This regulation does not apply to:

(1)   Vehicles subject to the solid waste collection vehicle rule commencing with title 13, CCR, section 2021;

(2)   Vehicles  owned or operated by a municipality, as defined in title 13, section 2020(b), that comply with the Best Available Control Technology (BACT) requirements of title 13, CCR, section 2022.1(a)(1);

(3)   Vehicles subject to the fleet rule for public transit agencies commencing with title 13, CCR, section 2023;

(4)   Vehicles subject to the rule for mobile cargo handling equipment at ports and intermodal rail yards commencing with title 13, CCR, section 2479;

(5)   Military tactical support vehicles, as described in title 13, CCR, section 1905;

(6)     Authorized emergency vehicles as described in California Vehicle Code (Veh. Code), section 165;

(7)     Off-road vehicles equipped with engines subject to title 13, CCR, sections 2401, 2411, 2421, 2432, and 2449;

(8)     Dedicated snow-removal vehicles as defined in section 2025(d)(15);

(9)     Historic vehicles as defined in section 2025(d)(36);

(10)   Motor homes for non-commercial private use;

(11)   Except as specified in section 2025(l) vehicles subject to the regulation for drayage trucks commencing with title 13, CCR, section 2027 until January 1, 2023;

(12)   Trucks with a GVWR of 19,500 lbs or less with a pick-up bed used exclusively for personal, non-commercial, or non-governmental use; and

(13)   Except for two-engine sweepers, other two-engine on-road vehicles that are subject to title 13, CCR, section 2449, including but not limited to, water well drilling rigs, workover rigs, and cranes, in which one engine provides the motive power for the vehicle and a second engine is an auxiliary engine 50 horsepower or greater that is integrated into the design of the vehicle and provides power for the vehicle to perform a specialized function.

*(d)  Definitions*

For purposes of this regulation, the following definitions apply:

(1)     "2006 *Baseline Fleet*" means diesel-fueled heavy-duty vehicles with a GVWR greater than 26,000 lbs included in the scope of section 2025(b) that were owned by a fleet and registered to operate in California on October 1, 2006 with the California Department of Motor Vehicles, or were owned by a fleet, registered to operate on October 1, 2006 in a jurisdiction that is an International Registration Plan member, and were driven at least 1,000 miles in California in the calendar year 2006. A fleet owner must include all vehicles that fall within the scope and applicability of section 2025(b) and must exclude all vehicles that are exempt from the regulation in the exemptions section 2025(c).

(2)     "*2007 Model Year Emissions Equivalent*" means emissions from:

(A)     An engine certified to the 2004 through 2006 model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx emissions by at least 40 percent; or

(B)     An engine that was built to the 2004 engine emission standard and was not used in any manufacturer's averaging, banking, or trading program that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 40 percent; or

(C)     An engine certified to the 2003 or prior model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 70 percent; or

2

(D)  An engine certified to the 2007-2009 model year heavy-duty engine emissions standard and meets PM BACT.

(3)  "*2010* Model *Year Emissions Equivalent Engine*" means emissions from:

(A)  An engine certified to the 2004 through 2006 model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx emissions by at least 85 percent; or

(B)  An engine that was built to the 2004 engine emission standard and was not used in any manufacturer's averaging, banking, or trading program that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 85 percent; or

(C)  An engine certified to the 2007 model year heavy-duty diesel engine emissions standard that meets PM BACT and reduces NOx exhaust emissions by more than 70 percent; or

(D)  An engine certified to the 2010 model year or newer heavy-duty diesel engine emissions standard that meets PM BACT; or

(E)  A heavy-duty engine certified to 0.2 g/bhp-hr or less NOx emissions level and 0.01 g/bhp-hr or less PM emissions level; or

(F)  An off-road engine certified to the Tier 4 Final engine emissions standard.

(4)  "*Agricultural Operations*" means:

(A)  The activity of growing or harvesting crops for the primary purpose of making a profit or providing a livelihood including any horticultural, viticultural, aquacultural, forestry, dairy, livestock, poultry, bee or farm product. Raising plants at nurseries that sell exclusively retail are not included, or

(B)  The cutting or removing of timber, other solid wood products, including Christmas trees, and biomass from forestlands for commercial purposes. The services also include all the work incidental thereto, including but not limited to, construction and maintenance of roads, fuel breaks, firebreaks, stream crossings, landings, skid trails, beds for falling trees, fire hazard abatement, and site preparation that involves disturbance of soil or burning of vegetation following forest removal activities. Forest operations include the cutting or removal of trees, tops, limbs and or brush which is processed into lumber and other wood products, and or for landscaping materials, or biomass for electrical power generation. Forest operations do not include conversion of forestlands to other land uses such as residential or commercial developments.

(5)  "*Agricultural Vehicle*" means a vehicle that is eligible to utilize the requirements for agricultural vehicles in section 2025(m) and meets one of the definitions of (A) through (E) below.

(A)  A vehicle, or truck-tractor and trailer combination, owned by a farming business and used exclusively in one or more of the following ways:

1.    in agricultural operations;

2.    to transport harvested farm products to the first point of processing;

3.    to directly support farming or forestry operations, which may include supply trucks, cattle trucks, and other vehicles but does not include vehicles that do not directly support farming operations such as personal use vehicles, vehicles rented or leased to others for non-agricultural uses that do not qualify, or vehicles used in a transportation business other than to transport harvested farm products to the first point of processing.

(B)    A vehicle, or truck-tractor and trailer combination, owned by a bee keeping business and used exclusively to transport their own bees or honey to the first point of processing.

(C)    A truck, or a truck-tractor and trailer combination, that is required to display a hazardous material placard during delivery and exclusively delivers fertilizer or crop protection chemicals that require placard identification for use in agricultural operations from a distribution center to a farm and back, and is owned by a business holding a valid fertilizer or pest control license.

1.    Owners of such vehicles must hold:

a.    a valid pest control dealer license issued by the California Department of Pesticide Regulation as required under Food & Agricultural Code, Division 6, Chapter 7, Article 6, Section 12101; or

b.    a valid fertilizing materials license issued by the California Department of Food and Agriculture as required under Food & Agricultural Code, Division 7, Chapter 5, Article 4, Section 14591(a).

2.    Such vehicles must exclusively carry products defined under one of the following, and be required to display an appropriate placard, as required by the United States Department of Transportation:

a.    49 CFR, CHAPTER 1, PART 173.127 (Division 5.1); or

b.    49 CFR, CHAPTER 1, PART 173.132 (Division 6.1); or

c.    49 CFR, CHAPTER 1, PART 173.115 Class 2, (Division 2.1, 2.2, and 2.3); or

d.    49 CFR, CHAPTER 1, PART 173.136 Class 8; or

e.    49 CFR, CHAPTER 1, PART 173.140 Class 9.

(D)    A truck, or truck-tractor and trailer combination, designed for in-field operations, that is exclusively engaged in agricultural operations on the farm. Examples include truck configurations designed to spread manure, dispense hay, and dispense freestall bedding. It also includes water trucks and trucks designed or modified to be used exclusively for the dusting, spraying, fertilizing, or seeding of crops. Except as allowed in (A) above, trucks, or

4

truck-tractor and trailer combinations that transport any products, materials, personnel, or equipment are excluded.

(E)   A truck, or truck-tractor and trailer combination, including yard trucks, that exclusively transports any unprocessed horticultural, viticultural, aquacultural, forestry, dairy, livestock, poultry, bee or farm products such as raw, unprocessed crops, livestock, fish, or fowl between the farm and where the first point of processing occurs after harvest. Also included are trucks that are used to harvest crops for silage, and trucks that transport unprocessed agricultural materials from forest or farm to a biomass facility.

(6)   *"Alternative Diesel Fuel"* means any fuel used in diesel engines that is not a reformulated diesel fuel as defined in sections 2281 and 2282 of title 13, CCR, and does not require engine or fuel system modifications for the engine to operate, other than minor modifications (e.g., recalibration of the engine fuel control) that may enhance performance. Examples of alternative diesel fuels include, but are not limited to, biodiesel, Fischer-Tropsch fuels, and emulsions of water in diesel fuel. Natural gas is not an alternative diesel fuel. An emission control strategy using a fuel additive will be treated as an alternative diesel fuel based strategy unless:

(A)   the additive is supplied to the engine fuel by an on-board dosing mechanism; or

(B)   the additive is directly mixed into the base fuel inside the fuel tank of the engine; or

(C)   the additive and base fuel are not mixed until engine fueling commences, and no more additive plus base fuel combination is mixed than required for a single fueling of a single engine or vehicle.

(7)   *"Alternative Fuel"* means natural gas, propane, ethanol, methanol, hydrogen, electricity, fuel cells, or advanced technologies that do not rely on diesel fuel. "Alternative fuel" also means any of these fuels used in combination with each other or in combination with other non-diesel fuels.

(8)   *"Alternative-Fueled Engine"* means an engine that is exclusively fueled with a fuel meeting the definition of alternative fuel.

(9)   *"Authorized Emergency Vehicle"* has the same meaning as California Vehicle Code section 165.

(10)   *"California Based Broker"* means a person, with operations based in California, who, for compensation, arranges or offers to arrange the transportation of property by an authorized motor carrier. A motor carrier, or person who is an employee or bona fide agent of a carrier, is not a broker when it arranges or offers to arrange the transportation of shipments which it is authorized to transport and which it has accepted and legally bound itself to transport.

(11)   *"Commercial Vehicle"* means a motor vehicle or combination of motor vehicles as defined in California Veh. Code, section 260.

(12) "*Common Ownership or Control*" means being owned or managed day to day by the same person, corporation, partnership, or association. Vehicles managed by the same directors, officers, or managers, or by corporations controlled by the same majority stockholders are considered to be under common ownership or control even if their title is held by different business entities. Common ownership or control of a federal government vehicle shall be the primary responsibility of the unit that is directly responsible for its day to day operational control.

(13) "*Compliance Year*" means January 1 through December 31 of a calendar year.

(14) "*Compression Ignition Engine*" means an internal combustion engine with operating characteristics significantly similar to the theoretical diesel combustion cycle. The regulation of power by controlling fuel supply in lieu of a throttle is indicative of a compression ignition engine.

(15) "*Dedicated Snow Removal Vehicle*" means a vehicle that has permanently affixed snow removal equipment such as a snow blower or auger, and is operated exclusively to remove snow from public roads, private roads, or other paths to allow on-road vehicle access.

(16) "*Diesel Fuel*" has the same meaning as defined in title 13, CCR, sections 2281 and 2282.

(17) "*Diesel Particulate Filter*" means an emission control technology that reduces diesel particulate matter emissions by directing the exhaust through a filter that physically captures particles but permits gases to flow through. Periodically, the collected particles are either physically removed or oxidized (burned off) in a process called regeneration.

(18) "*Diesel Particulate Matter (PM)*" means the particles found in the exhaust of diesel-fueled compression ignition engines. Diesel PM may agglomerate and adsorb other species to form structures of complex physical and chemical properties.

(19) "*Drayage Truck*" is the same as defined in title 13, CCR, section 2027.

(20) "*Dual-Fuel Engine*" means any compression ignition engine that is engineered and designed to operate on a combination of alternative fuels, such as compressed natural gas (CNG) or liquefied petroleum gas (LPG) and diesel fuel or an alternative diesel fuel. These engines have two separate fuel systems, which inject both fuels simultaneously into the engine combustion chamber. A dual-fuel engine is not an alternative-fuel engine.

(21) "*Electronic Tracking System*"

(A) The tracking device must acquire date, time, and engine-on data at a minimum of 15 minute intervals, with no more than 30 minute data gaps. The tracking device must also acquire location data for vehicles claiming to operate exclusively in NOx-exempt areas and for vehicles that must document low use in California when their total miles of operation exceed 1,000 miles and total hours of operation exceed 100 hours.

6

(B)    The tracking records must be collected by an independent entity with no business relationship to the owners of the vehicles being tracked, other than to provide the tracking service.

(22) "*Emergency Operation*" means operation of an authorized emergency vehicle or emergency support vehicle to help alleviate an immediate threat to public health or safety. Examples of emergency operation include vehicle used at an emergency event to repair or prevent damage to roads, buildings, terrain, and infrastructure as a result of an earthquake, flood, storm, fire, terrorism, or other infrequent acts of nature. Emergency operation includes authorized emergency vehicle and emergency support vehicle travel to and from an emergency event when dispatched by a local, state, or federal agency. Routine operation to prevent public health risks does not constitute emergency operation.

(23) "*Emergency Support Vehicle*" means a vehicle, other than an authorized emergency vehicle that has been dispatched by a local, state, or federal agency that is used to provide transport services or supplies in connection with an emergency operation.

(24) "*Executive Officer*" means the Executive Officer of the ARB or his or her authorized representative.

(25) "*Farm*" means a physical location for which the primary purpose is making a profit or providing a livelihood from:

(A)    horticultural, viticultural, aquacultural, forestry or crops or plants that are grown and harvested at the location, (nurseries that sell exclusively retail are not farms); or

(B)    raising, breeding, grazing, feeding, or milking animals, fish, fowl, or bees.

(26) "*Farming Business*" means a business involved exclusively in the cultivating, operating, or managing a farm for profit, or a business contracted to harvest trees in a forest for profit. A farming business does not include businesses that derive their principal source of income from providing agricultural services such as, landscape services, veterinary, farm labor, or management for a fee or on a contract basis, or are engaged in the business of artificial insemination, raising, and caring for dogs, cats, or other pet animals.

(27) "*First Point of Processing*" means the location where harvested crops, bees, fowl, fish, livestock, animals, or their products, such as wool, milk, or eggs, are first altered from their original state, or the first location where unaltered products are packaged and prepared for transportation. First point of processing is not a location of the product's final use and for some crops the location may be in the field, such as chipping wood. First point of processing also includes biomass facilities that receive agricultural waste in the form of unprocessed agricultural materials. A first point of processing may include, but is not limited to, packinghouses, slaughterhouses, cotton gins, nut hullers/shellers and processors, dehydrators, lumber mills, feed and grain mills, and biomass facilities. First point of processing does not include distribution centers, wholesale retail sales locations where the first processing of product does not occur, livestock auction houses, and

7

subsequent locations where processing, canning, or similar activities occur after departing a first point of processing location.

(28) *"Fleet"* means one or more vehicles, owned by a person, business, or government agency, traveling in California and subject to this regulation. A fleet may fall into one of the following subclassifications:

    (A)    *"Federal Fleet"* means a fleet of vehicles owned by a department, agency, or instrumentality of the federal government of the United States of America and its departments, divisions, public corporations, or public agencies including the United States Postal Service. With respect to the Department of Defense and its service branches, federal fleets may be managed regionally, locally, or a combination of regional and local management. There may be multiple federal fleets within a military service or an installation; or

    (B)    *"Rental or Leased Fleet"* means a fleet of vehicles owned by a person (rental or leasing entity) for the purpose of renting or leasing, as defined in California Uniform Commercial Code, section 10103(a)(10) such vehicles to other persons (renters or lessees) for use or operation.

(29) *"Fleet Owner"* means, except as modified below in paragraphs (A) and (B), either the person registered as the owner or lessee of a vehicle by the California Department of Motor Vehicles (DMV), or its equivalent in another state, province, or country; as evidenced on the vehicle registration document carried in the vehicle.

    (A)    For vehicles that are owned by the federal government and not registered in any state or local jurisdiction, the owner shall be the department, agency, branch, or other entity of the United States, including the United States Postal Service, to which the vehicles in the fleet are assigned or which have responsibility for maintenance of the vehicles.

    (B)    For vehicles that are rented or leased:

        1.    The owner shall be presumed to be the rental or leasing entity for purposes of compliance with section 2025(e), if:

            a.    The rental or lease agreement for the vehicle is for a period of less than one year; or

            b.    The rental or lease agreement for the vehicle is for a period of one year or longer, unless the terms of the rental or lease agreement or other equally reliable evidence identifies the party responsible for compliance with state laws for the vehicle to be the renting operator or lessee of the vehicle.

        2.    For purpose of enforcement, if the vehicle is inspected and cited for noncompliance with this regulation and neither the operator of the vehicle nor the rental or leasing entity can produce evidence of the party responsible for compliance with state laws, the owner shall be presumed to be both the rental or leasing entity and the renting operator or lessee of the vehicle.

(30) *"Fleet Size"* means the total number of diesel vehicles with a GVWR greater than 14,000 lbs in a fleet, regardless of whether the vehicles operate in California, that are under common ownership or control even if they are part of different subsidiaries, divisions, or other organizational structures of a company or agency.

(31) *"Fuel Efficient Hybrid Vehicle"* means a vehicle with an onboard energy storage system that improves the average fuel economy of the vehicle by at least 20 percent compared to a conventional diesel vehicle of the same model year and configuration. The vehicle must have a combination of an engine and onboard energy storage system that provides motive power for accelerating the vehicle, regenerative braking, or operates auxiliary equipment while stationary, such as a boom, auger, or drill rig. The energy storage system can be electric, hydraulic, pneumatic or of any other type that recovers its energy directly or indirectly from the engine. In addition, the onboard energy storage system of the hybrid vehicle can have the capability to supplement its energy from an external power source.

(32) *"Governmental Agency"* means any federal, state, or local governmental agency, including, public schools, water districts, or any other public entity with taxing authority.

(33) "Gross Vehicle Weight Rating (GVWR)" is as defined in Vehicle Code Section 350.

(34) *"Heavy-Duty Pilot Ignition Engine"* means an engine designed to operate using an alternative fuel, except that diesel fuel is used for pilot ignition at an average ratio of no more than one part diesel fuel to ten parts total fuel on an energy equivalent basis. An engine that can operate or idle solely on diesel fuel at any time does not meet this definition.

(35) *"Highest Level VDECS"* means the highest level VDECS verified by ARB under its Verification Procedure, Warranty and In-Use Compliance Requirements for In-Use Strategies to Control Emissions from Diesel Engines (Verification Procedure), title 13, CCR, sections 2700-2710, for a specific engine as of 10 months prior to the compliance date, which the diesel emission control strategy manufacturer and authorized diesel emission-control strategy dealer agree can be used on a specific engine and vehicle combination without jeopardizing the original engine warranty in effect at the time of application.

    (A)    The highest level VDECS is determined solely on verified diesel PM reductions. Plus designations do not affect the diesel PM level assigned to a VDECS; that is, a Level 3 Plus is the same diesel PM level as Level 3.

    (B)    A Level 2 VDECS shall not be considered the highest level VDECS as long as a Level 3 VDECS can be retrofitted on a vehicle in the fleet.

    (C)    Level 1 devices are never considered highest level VDECS for the purpose of this regulation.

(36) *"Historic Vehicle"* means a vehicle that meets the qualifications for a historical vehicle and has been issued a historical vehicle license plate pursuant to the California Veh. Code, section 5004, and is operated or moved over the highway primarily for the purpose of historical exhibition or other historic vehicle club activities.

(37) *"Hubodometer"* means a non-resettable device mounted on the axle of a vehicle that measures distance traveled that has a serial number and a lock-out feature that permanently prevents tampering.

(38) "*International Registration Plan (IRP)*" is a registration reciprocity agreement among states of the United States and provinces of Canada providing for payment of license fees on the basis of total distance operated in all jurisdictions.

(39) "*Log Truck*" means a heavy-duty vehicle with a manufacturer's GVWR greater than 33,000 lbs and has log bunks permanently attached that exclusively transports logs.

(40) "*Low-Mileage Construction Truck*" means a vehicle that meets the definition in (A) or (B) as follows:

    (A) A dump truck with a GVWR greater than 26,000 lbs that operates less than 20,000 miles per calendar year and is designed to transport construction materials such as dirt, asphalt, rock or construction debris including a transfer truck, or a tractor trailer combination used exclusively to pull bottom dump, end dump or side dump trailers, or

    (B) A truck with a GVWR greater than 26,000 lbs that travels less than 15,000 miles per calendar year and is a concrete mixer truck, truck with a concrete placing boom, a water tank truck, a single engine crane with a load rating of 35 tons or more, a tractor that exclusively pulls a low-boy trailer, or a truck owned by a company that holds a valid license issued by the California Contractors State License Board.

(41) "*Low-use Vehicle*" means a vehicle that will be operated fewer than 1,000 miles in California in any compliance year. If that vehicle has an engine that powers other equipment that can only be used while stationary, the engine or power take off (PTO) must also operate less than 100 hours in any compliance year. The hour limitation does not apply for vehicles where the engine is used to power an auxiliary mechanism that strictly loads and unloads cargo from the vehicle (examples include, but are not limited to, dump trucks, cement powder trucks, or trucks with attached lift devices).

(42) "*Motor Carrier*" is the same as defined in California Veh. Code section 408 for fleets other than those that are comprised entirely of school buses, which for the purposes of this regulation, means the registered owner, lessee, licensee, school district superintendent, or bailee of any school bus, who operates or directs the operation of any such bus on either a for-hire or not-for-hire basis.

(43) "*Motor Home*" means a single vehicular unit designed for human habitation for recreational or emergency occupancy and built on, or permanently attached to, a self-propelled motor vehicle chassis, chassis cab, or van, which becomes an integral part of the complete vehicle or a vehicle that exclusively tows a trailer that was originally designed for human habitation for recreational or emergency occupancy.

(44) "*New Fleet*" means a fleet that is acquired or that enters California after January 1, 2012. Such fleets may include new businesses or out-of-state businesses that bring vehicles into California for the first time after January 1, 2012.

(45) "*Non-Commercial Use*" means any use or activity where a fee is not charged and the purpose is not the sale of a good or service, and the use or activity is not intended to produce a profit.

(46) "*NOx Exempt Areas*" are the following counties – Alpine, Colusa, Del Norte, Glenn, Humboldt, Lake, Lassen, Mendocino, Modoc, Monterey, Northern Sonoma (as defined in title 17, CCR section 60100(e), Plumas, San Benito, San Luis Obispo, Santa Barbara, Santa Cruz, Shasta, Sierra, Siskiyou, Trinity, Tehama, and Yuba.

(47) "*Person*" means an individual, corporation, business trust, estate, trust, partnership, Limited Liability Company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity.

(48) "*PM BACT*" means the technology employed on the highest level VDECS for PM or an engine that is equipped with an original equipment manufacturer (OEM) diesel particulate filter and certified to meet the 0.01 g/bhp-hr certification standard.

(49) "*Registered and Driven Safely On-Road*" means a vehicle that meets the requirements to be registered for on-road operation in California Veh. Code division 3, chap. 1, article 1, section 4000 et seq. (i.e., required to be registered or could be registered), and the requirements to be driven safely on-road in "Equipment of Vehicles" requirements in Veh. Code division 12, chap. 1, sections 24000 et seq. and "Size, Weight, and Load" requirements in Veh. Code division 15, sections 35000 et seq, or a vehicle defined as an implement of husbandry as defined in California Veh. Code division 16, chap. 1, section 36000 et seq.

(50) "*Repower*" means to replace the engine in a vehicle with a newer engine certified to lower emission standards for PM or NOx or both as applicable.

(51) "*Responsible Official*" means one of the following:

　　(A)　For a corporation: A president, secretary, treasurer, or vice president of the corporation in charge of a principal business function, their delegate, designee, or any other person who performs similar policy or decision-making functions for the corporation;

　　(B)　For a partnership or sole proprietorship: a general partner or the proprietor, respectively;

　　(C)　For a municipality, state, federal, or other governmental agency: either a principal executive officer or ranking elected official. For the purposes of this part, a principal executive officer of a federal agency includes the chief executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., a Regional Administrator of the

11

U.S. EPA). For the purposes of the Department of Defense Military Services, a commanding officer of an installation, base or tenant organization.

(52) "*San Joaquin Valley Air Basin*" includes the entire counties of San Joaquin, Stanislaus, Merced, Madera, Fresno, Tulare, and Kings and western part of Kern County as described starting page 23888 of the Federal Register Vol. 69, No. 84.

(53) "*School Bus*" is a motor vehicle as defined in California Veh. Code, section 545.

(54) "*Specialty Agricultural Vehicle*" means an agricultural vehicle having one of the following body types and has been approved for the exemption in section 2025(m)(11) by the Executive Officer:

    (A) A truck, or a truck-tractor and trailer combination, designed or modified to be used exclusively for the fueling, repairing, or loading of an airplane or helicopter used for the dusting, spraying, fertilizing, or seeding of crops; or

    (B) A truck, or a truck tractor and trailer combination, that is equipped with a self-loading bed and is designed and used exclusively to transport field manufactured cotton modules to a cotton gin; or

    (C) A truck equipped with a water tank owned by a farmer, not operated for compensation, and used exclusively in agricultural operations to provide dust suppression on dirt roads providing access to agricultural fields and for the transportation of water for crop or tree irrigation or for livestock; or

    (D) A feed truck or mixer-feed truck specially designed for dispensing feed to livestock. It does not include trucks designed to supply storage silos with feed; or

    (E) A truck with a self-loading bed designed to be used in the process of harvesting lettuce. This type of vehicle is commonly referred to as a Fabco truck.

(55) "*Three Day Pass*" means a once-a-year temporary permit to operate a vehicle in California for three consecutive days without meeting the requirements of section 2025(e).

(56) "*Tier 0 Engine*" means an engine not subject to the requirements in title 13, CCR, section 2423; Title 40, Code of Federal Regulations (CFR), Part 89; or Title 40, CFR, Part 1039.

(57) "*Tier 4 Final Engine*" means an engine subject to the final after-treatment-based Tier 4 emission standards in title 13, CCR, section 2423(b)(1)(B) and/or Title 40, CFR, Part 1039.101. This also includes engines certified under the averaging, banking, and trading program with respect to the Tier 4 FEL listed in title 13, CCR, section 2423(b)(2)(B) and/or Title 40, CFR, Part 1039.101

(58) "*Two*-Engine Sweeper" means an on-road heavy-duty vehicle with a manufacturer's GVWR greater than 14,000 lbs, used for the express purpose of removing material from road or other surfaces, by mechanical means through the action of one or more brooms, or by suction through a vacuum or regenerative air system or any combination of the above. A two-engine street sweeper has an

engine to propel the vehicle and an auxiliary engine to power the broom or vacuum.

(59) "*Private Utility Vehicle*" means a vehicle owned by a privately-owned or publicly held company or corporation that provides the same or similar services for water, natural gas, and electricity as a public utility operated by a municipality.

(60) "*Verified Diesel Emission Control Strategy*" (VDECS) means an emissions control strategy, designed primarily for the reduction of diesel PM emissions, which has been verified pursuant to the Verification Procedures. VDECS can be verified to achieve Level 1 diesel PM reductions (25 percent), Level 2 diesel PM reductions (50 percent), or Level 3 diesel PM reductions (85 percent). VDECS may also be verified to achieve NOx reductions. See also definition of highest level VDECS.

(61) "*VDECS Failure*" means the condition of not achieving the emissions reductions to which the VDECS is verified. Such condition could be due to inappropriate installation, damage, or deterioration during use. If a Level 3 VDECS is emitting visible smoke, it is assumed to have failed.

(62) "*Yard Truck*" means a vehicle, with an on-road or off-road engine and a hydraulically elevated fifth wheel, that is used in moving and spotting trailers and containers at locations or facilities. Yard trucks are also known as yard goats, hostlers, yard dogs, trailer spotters, or jockeys.

(e)    *General Requirements*

Beginning with the applicable effective dates, a fleet owner must comply with the following requirements of this regulation:

(1)    Except as otherwise provided below for specific classifications in sections 2025(e)(2) through 2025(e)(5), fleets must meet the following compliance schedule:

    (A)    Starting January 1, 2015, fleets must meet the requirements of section 2025(f) for all vehicles with a GVWR 26,000 lbs or less except for school buses.

    (B)    Starting January 1, 2012, for all vehicles with a GVWR greater than 26,000 lbs, excluding school buses, fleets must meet the requirements of section 2025(g) or fleets that report may instead comply with the phase-in option of section 2025(i).

    (C)    Fleets with one to three vehicles with a GVWR greater than 14,000 lbs may utilize the small fleet compliance option of section 2025(h) for vehicles with a GVWR greater than 26,000 lbs.

(2)    Beginning January 1, 2012, fleets with school buses must comply with the requirements of section 2025(k) for all school buses in the fleet.

(3)    Beginning January 1, 2021, all private utility vehicle owners must comply with the requirements of section 2025(l)(4).

13

(4)    Beginning January 1, 2023 drayage trucks must comply with the requirements of section 2025(l)(1) through (3).

(5)    All fleets may utilize the credit provisions of section 2025(j), the provisions of agricultural vehicles and log trucks of section 2025(m), the provisions for construction trucks, vehicles operating exclusively in the NOx exempt areas, or any of the other extensions, delays, and exemptions of section 2025(p).

(6)    Although the total number of vehicles under common ownership or control is determinative of fleet size, if some of the vehicles within the fleet are under the control of different responsible officials because they are part of different subsidiaries, divisions, or other organizational structures of a company or agency, the fleet owner of a "common ownership of control fleet" may elect to have the vehicles under the control of different responsible officials report compliance independently of other vehicles in the general fleet if choosing to comply with the requirements of section 2025(g) or the phase-in option of section 2025(i) for the segment of the fleet under the control of the different responsible officials. However, all vehicles under common ownership and control must be reported for the fleet to use the credits for fleets that have downsized in section 2025(j)(1), the credits for the early addition of newer vehicles in section 2025(j)(3), or the extension for low-mileage construction trucks of section 2025(p)(2).

(7)    Except personal, non-commercial, unregistered motor vehicles, or vehicles otherwise not required to obtain authority to operate, the following is required for all fleet owners who elect to utilize the phase-in option of section 2025(i) and the small fleet option of section 2025(h), the credit provisions of section 2025(j) for early PM retrofits, early addition of newer vehicles, hybrid vehicles, alternative fueled vehicles, and vehicles with heavy-duty pilot ignition engines, the agricultural vehicle provisions of section 2025(m), or the exemptions, delay, and extensions of section 2025(p):

(A)    A valid California motor carrier of property number; or

(B)    A valid identification number assigned by the United States Secretary of the Department of Transportation; or

(C)    A valid operating authority number issued by the Public Utilities Commission; or

(D)    Other applicable valid operating authority number approved by the Executive Officer.

(8)    All information specified in section 2025(r) must be reported to the Executive Officer.

(9)    Records must be kept as specified in section 2025(s).

(10)   Once a vehicle is required to be in compliance with this regulation, it must remain in compliance at all times that it is operating in California.

(f)   *Requirements for Vehicles with a GVWR 26,000 lbs or less*

Fleets owners must comply with the schedule in Table 1 for all the vehicles in the fleet with a GVWR 26,000 lbs or less and meet the record keeping requirements of section 2025(s). Fleets do not need to meet the reporting requirements of section 2025(r). School buses are not subject to the requirements of this subsection and must meet the requirements of section 2025(k).

(1)   Except as provided in (3) below, all vehicles with a GVWR 26,000 lbs or less must be equipped with a 2010 model year emission equivalent engine pursuant to the following schedule in Table 1:

Table 1:  Compliance Schedule by Engine Model Year<br>for Vehicles with a GVWR 26,000 lbs or less

| Compliance Date as of January 1 | Existing Engine Model Year | Requirements |
|---|---|---|
| 2015 | 1995 & older | |
| 2016 | 1996 | |
| 2017 | 1997 | |
| 2018 | 1998 | 2010 model year emission equivalent |
| 2019 | 1999 | |
| 2020 | 2003 & older | |
| 2021 | 2004-2006 | |
| 2022 | N/A | |
| 2023 | All engines | |

(2)   Any engine that meets PM BACT prior to January 1, 2014, does not have to be upgraded to a 2010 model year emissions equivalent engine until January 1, 2020, but the fleet owner must meet the reporting and record keeping requirements of sections 2025(r) and (s) for the vehicle.

(3)   Fleets may use the provisions for agricultural vehicles in section 2025(m) or any of the exemptions, delays, and extensions of section 2025(p), except for the following sections that apply only to heavier trucks: 2025(p)(1)(B), 2025(p)(2), 2025(p)(8), 2025(p)(9), and 2025(p)(10).

(4)   Any fleet where all vehicles with a GVWR 26,000 lbs or less meet PM BACT prior to January 1, 2014, does not have to upgrade those vehicles to 2010 model year emissions equivalent engines until January 1, 2023, but must meet the reporting and record keeping requirements of sections 2025(r) and 2025(s) by January 31, 2014 for all the vehicles in the fleet with a GVWR 26,000 lbs or less.

(g)   *Requirements for Vehicles with a GVWR greater than 26,000 lbs*

Fleets owners must comply with the schedule in Table 2 for all vehicles in the fleet with a GVWR greater than 26,000 lbs and must comply with the record keeping requirements of section 2025(s), and are not required to meet the reporting

requirements of section 2025(r). A fleet may meet PM BACT by installing the highest level VDECS or by having an engine equipped with an OEM diesel particulate filter. A fleet may meet the 2010 model year emissions equivalent engine requirement by replacing the engine or vehicle with one with a 2010 model year engine or later, retrofitting the engine with a VDECS that achieves 2010 model year equivalent emissions, or by replacing a vehicle with one that has a future compliance deadline. Fleets may alternatively choose to comply using the phase-in option of section 2025(i) or as specified in 2025(g)(3) below.

(1)    Starting January 1, 2012, all vehicles in the fleet with a GVWR greater than 26,000 lbs must meet PM BACT and upgrade to a 2010 model year emissions equivalent engine pursuant to the schedule set forth in Table 2 below.

*Table 2: Compliance Schedule by Engine Model Year*
*for Vehicles with GVWR greater than 26,000 lbs*

| Engine Model Year | Compliance Date Install PM Filter by | Compliance Date 2010 Engine by |
|---|---|---|
| 1993 & older | N/A | January 1, 2015 |
| 1994 – 1995 | N/A | January 1, 2016 |
| 1996 – 1999 | January 1, 2012 | January 1, 2020 |
| 2000 – 2004 | January 1, 2013 | January 1, 2021 |
| 2005 – 2006 | January 1, 2014 | January 1, 2022 |
| 2007 or newer | January 1, 2014 if not OEM equipped | January 1, 2023 |

(2)    A 2007 model year emissions equivalent engine complies with the BACT requirements until January 1, 2023.

(3)    From January 1, 2012 until January 1, 2014, any fleet may optionally choose to meet PM BACT according to the following:

   (A)    2003-2004 model year engines and 1993 model year and older engines by January 1, 2012.

   (B)    2005-2006 model year engines and 1994-1999 model year engines by January 1, 2013.

   (C)    All engines by January 1, 2014.

   (D)    After January 1, 2014, this option expires and the fleet must comply with general requirements of section 2025(e).

   (E)    Fleet owners choosing this option must comply with the reporting and record keeping requirements of sections 2025(r) and (s).

(4)    Any engine that meets PM BACT prior to January 1, 2014, does not have to be upgraded to a 2010 model year emissions equivalent engine until January 1, 2020

at which time it must be in compliance with the schedule set forth in Table 2 above. To use the exemption, fleet owners choosing this option must comply with the reporting and record keeping requirements of sections 2025(r) and (s) by January 31, 2014 for the vehicles that meet PM BACT.

(5)     Fleets may utilize the exemptions and extensions of sections 2025(p) and 2025(m).

(6)     Fleets may use the extension based on the unavailability of highest level VDECS of section 2025(p)(9) for 1996 model year or newer engines.

### (h)     Small Fleet Compliance Option

In lieu of initially complying with the schedule set forth in Table 2 of section 2025(g), a fleet with a fleet size of one to three vehicles with a GVWR greater than 14,000 lbs may alternatively comply with the phase-in schedule to meet PM BACT as specified below for the vehicles in the fleet with a GVWR greater than 26,000 lbs from January 1, 2014 to January 1, 2016. Fleets must comply with the record keeping requirements of section 2025(s) starting January 1, 2012 and must meet the reporting requirements as specified below to utilize this option.

(1)     Vehicles within the fleet shall meet PM BACT pursuant to the following schedule:

     (A)     One vehicle by January 1, 2014.

     (B)     Two vehicles by January 1, 2015.

     (C)     Three vehicles by January 1, 2016.

(2)     Vehicles that meet PM BACT are exempt from meeting the 2010 model year emissions equivalent engine requirements until January 1, 2020.

(3)     Fleets with 1996-1999 model year engines must comply with the reporting requirements of section 2025(r) starting January 31, 2012.

(4)     Fleets with 2000-2004 model year engines must comply with the reporting requirements of section 2025(r) starting January 31, 2013.

(5)     All fleet owners must comply with the reporting requirements of sections 2025(r) by January 31, 2014.

(6)     Beginning January 1, 2020, all vehicles in the fleet must comply with the 2010 model year emissions equivalent engine requirements by engine model year as set forth in Table 2 of section 2025(g).

(7)     This option is not available to divisions within a company or subsidiaries under common ownership and control that have a combined fleet size greater than three.

(8)     Fleets using this option may also utilize the exemptions and extensions in section 2025(m) and 2025(p).

(9)     Fleets may use the extension based on the unavailability of highest level VDECS of section 2025(p)(9) for all engine model years in the fleet.

*(i)    Phase-in Option*

In lieu of initially complying with the schedule set forth in Table 2 of section 2025(g), fleets may alternatively comply with the phase-in schedule of this subsection for the vehicles in the fleet with a GVWR greater than 26,000 lbs from January 1, 2012 to January 1, 2016.

(1)    Beginning January 1, 2012, fleets electing this option must meet the PM BACT requirements pursuant to the schedule set forth in Table 3 below and then comply with the requirements of section 2025(g) starting January 1, 2020.

*Table 3: Phase-in Compliance Schedule*
*for Vehicles with GVWR greater than 26,000 lbs*

| Compliance Date as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2012 | 30% |
| 2013 | 60% |
| 2014 | 90% |
| 2015 | 90% |
| 2016 | 100% |
| 2020 | All vehicles must comply with section 2025(g) |

(2)    If the calculated number of engines required to be brought into compliance with the percentage limits is not equal to a whole number, the owner shall round up to a whole number when the fractional part of the required number of engines is equal to or greater than 0.5, and round down if less than 0.5.

(3)    Vehicles in which public funds contributed to the purchase of the vehicle, repower of the engine, or retrofit of the engine must not be included when determining compliance with PM BACT, unless allowed by the funding program guidelines applicable to the particular source of public funds used for the purchase, nor shall the engine be included in the total fleet for purposes of determining the percent complying with PM BACT.

(4)    To utilize this option, fleet owners must comply with the reporting and record keeping requirements of sections 2025(r) and 2025(s) beginning January 31, 2012.

(5)    Fleets complying with this option may also use the credits of section 2025(j), the agricultural provisions of section 2025(m), and the exemptions, delays, and extensions of sections 2025(p).

(6)    Fleets may use the extension based on unavailability of highest level VDECS of section 2025(p)(9) for all engine model years.

18

(j)   *Credits for Fleets that have Downsized, Early PM Retrofits, Hybrid Vehicles, Alternative Fueled Vehicles, Vehicles with Heavy-Duty Pilot Ignition Engines, and Early Addition of Newer Vehicles*

Fleets can take advantage of credits that reduce the number of vehicles with a GVWR greater than 26,000 lbs that must meet the PM BACT requirements in the phase-in option of section 2025(i) as described in subsections (1) to (3) below. These credits do not apply to school buses.

(1)   Credit for Fleets that have Downsized

Until January 1, 2016, a fleet that has fewer vehicles with a GVWR greater than 26,000 lbs operating in the compliance year than in the 2006 baseline fleet may claim a credit towards compliance with the phase-in option of section 2025(i) for that year.

    (A).   The fleet owner may reduce the percent requirement in Table 3 of section 2025(i) by the same percent that the fleet was downsized. For example, a fleet that has 20 percent fewer vehicles operating in 2006 would be able to subtract 20 percent from the annual compliance requirement. That is, if the compliance requirement for the year is 30 percent, the fleet would only need to demonstrate that 10 percent of the existing fleet (30%-20%=10%) met PM BACT.

    (B)   A vehicle that is not operated in the compliance year may be excluded from the existing fleet in determining the credit if:

        1.   The vehicle is not driven for the entire compliance year and

            a.   Either a certificate of non-operation has been issued by the DMV or a request for a non-operation certificate has been filed with DMV prior to the beginning of the compliance year; or

            b.   An equivalent certificate has been issued by another state or a request for such a certificate has been filed with another state prior to the beginning of the compliance year; or

            c.   The vehicle is not operated for any purpose during the compliance year except to demonstrate functionality of the vehicle to potential buyers, to move the vehicle short distances for maintenance, or to a storage facility while awaiting sale.

    (C)   The fleet utilizing this provision must comply with the reporting requirements of section 2025(r)(12) for low-use vehicles and report information for all vehicles in the 2006 baseline fleet pursuant to section 2025(r)(13).

    (D)   For purposes of determining the credit, all vehicles in the scope and applicability of section 2025(b), except school buses, must be included in calculating the number of vehicles in the 2006 baseline fleet and in the fleet during the compliance year and all vehicles exempt from the regulation in section 2025(c) must be excluded. The number of vehicles calculated at the beginning of the compliance year will include vehicles that are partially paid for by state funds, all drayage trucks, and all on-road vehicles that are now subject to the title 13, section 2449.

19

(2)   A fleet shall receive a credit to treat another vehicle with a GVWR greater than 26,000 lbs as meeting the PM BACT requirements of section 2025(i) until January 1, 2017 as described below in 2025(j)(2)(A) to 2025(j)(2)(C).

(A)   Credit for Early PM Retrofit

A credit will be granted for each vehicle, with a GVWR greater than 14,000 lbs, that is equipped with the highest level VDECS for PM by July 1, 2011. The fleet may receive a credit for each vehicle for which the highest level VDECS has been ordered and paid for, or for which at least a 20 percent deposit has been paid, by May 1, 2011 and the VDECS is installed by October 1, 2011. The fleet owner must meet the reporting requirements of section 2025(r)(13) by January 31, 2012 to claim the credit and must meet the record keeping requirements of 2025(s) to document the VDECS purchase and installation.

(B)   Credit for Hybrid Vehicles, Alternative Fueled Vehicles, and Vehicles with Heavy-Duty Pilot Ignition Engines

Credit will be granted for each vehicle with a GVWR greater than 26,000 lbs that is a fuel efficient hybrid vehicle, an alternative fueled vehicle, or a vehicle powered by a heavy-duty pilot ignition engine that is added to the fleet before January 1, 2017. The fleet owner must meet the reporting and record keeping requirements of section 2025(r) and 2025(s) for the vehicle by January 31 of the compliance year to use the credit. Vehicles with a GVWR between 14,000 lbs and 26,000 lbs may also earn a credit if added to the fleet prior to July 1, 2011. Information required by section 2025(r) and the date the vehicle was added to the fleet must be reported by January 31, 2012. Record keeping information must be maintained as required by section 2025(s). Any alternative fueled engine or vehicle powered by a heavy-duty pilot ignition engine must be counted when determining the number of vehicles in the fleet.

(C)   For the same owner, excess PM VDECS credits granted in the Off-road regulation (title 13, CCR, section 2449) may be used in the Truck and Bus regulation and excess PM VDECS credits granted in the Truck and Bus regulation may be used in the Off-road regulation until January 1, 2017. Starting January 1, 2017 no credits may be transferred between the regulations.

1.   Excess PM VDECS credits earned in the Truck and Bus regulation will be determined for each compliance year. The annual excess PM VDECS credits are determined by counting the number of Level 3 PM VDECS filters and 2007 model year and newer engines that meet PM BACT in the fleet that exceed the minimum number required to meet the PM BACT percentage of section 2025(i) without accounting for the credits specified in sections 2025(j)(2)(A), 2025(j)(2)(B), and 2025(j)(3). The number of excess PM VDECS credits cannot exceed the number of Level 3 retrofit VDECS in the fleet. Excess PM VDECS credits can

20

be used in the Off-Road regulation according to section (title 13, CCR, section 2449.1(b)).

    2.    For each compliance year, excess PM VDECS credits earned in the Off-road regulation may be applied as a credit that would treat another vehicle with a GVWR greater than 26,000 lbs in the Truck and Bus regulation section 2025 as compliant in the compliance year when determining compliance with the phase-in option of section 2025(i).

    3.    Fleets must meet the reporting requirements of section 2025(r)(27) to utilize excess PM VDECS credits.

(3)    Credit for Early Addition of Newer Vehicles

The fleet shall receive credit for the addition of a vehicle that has a propulsion engine that is equipped with an OEM diesel particulate filter before January 1, 2012 if the average age of the propulsion engines in the fleet is newer than it was in 2006. Until January 1, 2017, the credit can be applied towards meeting the PM BACT requirements of the phase-in option of section 2025(i).

    (A)    The credit is a percentage that will be calculated as 5 times the difference in the average age of the 2006 baseline fleet and the average age of the fleet in the compliance year, where:

        1.    The average age of the fleet in 2006 is calculated as 2007 minus the average of the engine model years in the 2006 baseline fleet.

        2.    For vehicles that were in the 2006 baseline fleet and are no longer in the fleet as of January 1, 2012, the vehicle model year minus 0.5 will be used in lieu of the engine model year, unless the fleet has documentation demonstrating the engine model year and engine family.

        3.    The fleet owner may retain the credit after 2012 if the fleet average age stays the same or newer than it was on January 1, 2012, otherwise the credit will be recalculated.

        4.    Vehicles that use the exemption for low-use vehicles of 2025(p)(4 ) shall be excluded in determining the credit.

    (B)    The credit cannot exceed the percentage of the fleet that has 2007 model year or newer engines that meet PM BACT.

    (C)    The credit shall reduce the PM BACT requirement of the phase-in option in section 2025(i) for the applicable compliance year.

    (D)    The fleet owner must meet the reporting and record keeping requirements of section 2025(r) and (s) by January 31, 2012.

(4)    Credits specified in sections 2025(j)(1) through 2025(j)(3) will not be given for vehicles that were purchased by the fleet or retrofitted to comply with any other California in-use regulation. Credits will also not be given for partially state funded vehicle replacements or retrofits according to the funding program guidelines applicable to the particular source of public funds used for the purchase. Credits

are only valid for as long as the vehicle for which the compliance action has been taken remains operational in the fleet or if replaced within 30 days with a vehicle equipped with an engine that meets PM BACT and is at least one model year newer.

(5) Credits are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.

## (k) Requirements for School Buses

This subsection applies to diesel-fueled school buses as defined in section 2025(d)(53) with a GVWR greater than 14,000 lbs.

(1) Phase-in Requirements for School Buses

Fleets with school buses manufactured on or after April 1, 1977 must comply with PM BACT as defined in section 2025(d)(48), pursuant to the schedule set forth in Table 5 below.

*Table 5: Compliance Schedule for School Buses*

| Compliance Deadline, as of January 1 | Percent of Fleet Complying with PM BACT |
| --- | --- |
| 2012 | 33% |
| 2013 | 66% |
| 2014 | 100% |

(2) Credit for School Bus Fleets that have Downsized

(A) Until January 1, 2014, a fleet having fewer school buses on January 1 of the compliance year than it had in the 2006 baseline year may reduce the percent requirement in Table 5 by the same percentage that the fleet has downsized.

For example, a fleet that is 20 percent smaller than it was in 2006 would subtract 20 percent from the annual compliance requirement. If the compliance requirement for the year is 33 percent, the fleet would need to demonstrate that it had PM filters on the 13 percent of the existing fleet (33%-20%=13%).

(B) The credits are not transferrable except with appropriate documentation of a change of business form such as sole proprietorship to partnership or partnership to corporation, or for mergers or acquisitions of the entire company and fleet.

(3) Credits for Hybrid School Buses, Alternative Fueled School Buses, Electric School Buses, and School Buses with Pilot Ignition Engines

22

Fleets with fuel efficient hybrid school buses, alternative fueled school buses, electric school buses, or school buses with pilot ignition engines shall receive a credit to treat another school bus in the fleet as compliant until January 1, 2014. A school bus with a dual-fuel engine is not eligible. This credit is not available for school buses that were purchased or retrofitted to comply with any other California in-use regulation. This credit is not available if state funds were used to partially or totally replace or retrofit any school bus unless allowed by the guidelines of the program that funded the bus replacement or retrofit.

(4)    Extension of Deadline for Unavailability of VDECS

If a school bus engine cannot be equipped with the highest level VDECS for PM the school bus owner must:

(A)    Record and submit to the Executive Officer the information listed in section 2025(k)(4)(B) through (E) by January 31 of the applicable compliance year through January 31, 2017. By January 1, 2018, this extension expires and all school buses using this extension must be replaced with vehicles that are equipped with a 2010 model year emissions equivalent engine or with one that complies with the BACT compliance schedule (i.e., a 1998 model year engine or newer school bus equipped with the highest level VDECS for PM).

(B)    Describe the reasons that a compliance extension is needed for each engine or engine-vehicle combination annually.

(C)    If during the warranty period the VDECS would void the engine warranty, provide a statement from the engine manufacturer, authorized engine dealer, or vehicle dealer that explains why the warranty would be voided.

(D)    If no verified VDECS is commercially available, provide a list of VDECS manufacturers that have been contacted and the manufacturers' responses to your requests to purchase a VDECS from them.

(E)    If a verified VDECS is commercially available, but the VDECS manufacturer or an authorized VDECS installer does not deem the VDECS to be technologically feasible for the school bus, provide a statement from the VDECS manufacturer or authorized VDECS installer.

(5)    Low-use School Buses

(A)    School buses operating fewer than 1,000 miles during any compliance year are exempt from the requirements of section 2025(k), but fleet owners must comply with the record keeping requirements of section 2025(s)(3). Such vehicles must have a properly functioning odometer installed at all times.

(B)    A fleet owner of a school bus that exceeds 1,000 miles in any compliance year must immediately count the school bus as part of the fleet, bring the fleet into compliance with the requirements of section 2025(k) in the current compliance year, and notify the Executive Officer of the change in status within 30 days of exceeding the mileage limit.

(6)    Any school bus manufactured before April 1, 1977, must be retired from service no later than January 1, 2012.

23

(7)   Title 13, CCR, section 1272(c) requires that a school bus that has been retrofitted with a VDECS must receive a safety inspection from an authorized employee of the department of the California Highway Patrol, prior to its return to service.

(8)   School buses that were equipped on or before December 31, 2005, with a Level 2 VDECS, which was highest level VDECS at the time of installation, are considered in compliance with PM BACT.

(9)   Section 2025(c)(9) exempts school buses meeting the definition in section 2025(d)(36) of a historic vehicle.

(10)  Owners of school buses are subject to the record keeping requirements in section 2025(s)(3).

(11)  Owners of school buses are subject to the applicable requirements of sections 2025(t) through 2025(z).

(12)  Owners of school buses have the option to delay the requirement to meet PM BACT for 1988-1993 model year engine school buses until January 1, 2014.

(l)   *Requirements for Drayage Trucks and Utility Vehicles*

(1)   Drayage trucks that are subject to the Drayage Truck regulation may be included in the fleet for purposes of determining compliance with the PM BACT requirements of the phase-in option in section 2025(i) only if all drayage trucks in the fleet are included.

(2)   Starting January 1, 2023, all drayage truck owners must comply with the requirements of section 2025(e).

(3)   Drayage trucks may not be used to earn additional credits in section 2025(j) or exemptions and extensions in section 2025(p).

(4)   Starting January 1, 2021, all private utility vehicle owners must comply with the requirements of section 2025(e).

(m)   *Requirements for Agricultural Fleets*

Beginning January 1, 2011, agricultural vehicles shall be exempt from the requirements of sections 2025(f), 2025(g), 2025(h) or 2025(i) if they meet the definition of an agricultural vehicle and remain below the applicable annual mileage limits for the period specified. Vehicles meeting the specialty vehicle definition would have no mileage restrictions. Fleets must comply with the reporting and record keeping requirements of sections 2025(r) and 2025(s).

(1)   Beginning January 1, 2011 through January 1, 2017, any vehicle meeting the definition of an agricultural vehicle, as defined in section 2025(d)(5), that remains below the annual mileage limits in Table 6 below are exempt from the requirements of section 2025(f) and (g).

24

Table 6: Agricultural Vehicle Annual Mileage Limits

| Engine Model Year | Annual Mileage Limits |
|---|---|
| 1995 and earlier | 15,000 miles |
| 1996-2005 | 20,000 miles |
| 2006 or newer | 25,000 miles |

(2)   Agricultural vehicles that have not exceeded 10,000 miles per year in a calendar year between January 1, 2011 and January 1, 2017, shall continue to be exempt from the requirements of 2025(f) and (g) until January 1, 2023, so long as they do not exceed 10,000 miles in a calendar year.

(3)   By January 1, 2017, all agricultural vehicles that have exceeded 10,000 miles in any calendar year since January 1, 2011, must comply with the best available control technology (BACT) requirements of section 2025(f) and (g).

(4)   A qualifying agricultural vehicle must be operational, functional, able to start without assistance, and be able to move under its own power.  Vehicles that are being used for parts do not qualify as an agricultural vehicle subject to section 2025(m).

(5)   Within 30 days of replacing a qualifying agricultural or specialty agricultural vehicle, the agricultural fleet owner must report the required information in section 2025(r)(14)(I).

(6)   The maximum number of qualifying agricultural vehicles in a fleet shall be established by the number of agricultural vehicles in the fleet as of January 1, 2009, as reported in section 2025(r)(14).  This number shall not increase from one year to the next.

(7)   An agricultural vehicle may be replaced by another vehicle so long as the replacement vehicle is equipped with an engine that is at least one model year newer than the engine in the vehicle that it replaced and the original vehicle is scrapped, rendered inoperable, sold out of the agricultural fleet, or no longer meets the definition of an agricultural or specialty agricultural vehicle.  The replacement vehicle must be reported within twelve months of the vehicle being replaced or by January 31 of following compliance year whichever is longer.  This requirement does not apply if just the engine is being replaced and not the entire vehicle.

(8)   When a qualifying agricultural vehicle is replaced, the sum of the miles accrued on the original vehicle in that calendar year, up to the time of replacement, plus the mileage accrued on the replacement vehicle for the remainder of the calendar year (beginning with the date of replacement) must remain below the mileage thresholds based on the model year of the engine in the replacement vehicle.

(9) A merger of two or more agricultural fleets may not result in more agricultural vehicles after the merger occurs than the sum of the agricultural vehicles in the individual agricultural fleets included in the merger.

(10) The agricultural vehicle exemptions are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.

(11) Requirements for specialty agricultural vehicles

    (A) Specialty agricultural vehicles, as defined in section 2025(d)(54), are exempt from the requirements of sections 2025(f), 2025(g), 2025(h) and 2025(i), until January 1, 2023.

    (B) The Executive Officer will approve a vehicle as qualifying as a specialty agricultural vehicle under the following conditions:

        1. The total number of specialty agricultural vehicles operating in the San Joaquin Valley Air Basin does not exceed 1,100, and

        2. The total number of specialty agricultural vehicles in the state does not exceed 2,200.

    (C) If more vehicles are reported than allowed by the limits, the Executive Officer will randomly approve one vehicle per eligible fleet until all fleets have one approved vehicle, then randomly approve another vehicle for the remaining eligible fleets until they all have one more vehicle approved. Vehicles will continue to be approved in this manner until the limits have been met. Vehicles reported by March 31, 2010, will be given priority should the limits identified in section 2025(m)(11)(B) above be exceeded.

    (D) All vehicles with the body types described in section 2025(d)(54) that have not been approved must meet the requirements of section 2025(e) or the agricultural provisions of section 2025(m).

        1. In such an instance, the agricultural fleet operator shall be notified in writing by the Executive Officer that the reported vehicle is not eligible as a specialty agricultural vehicle.

    (E) A fleet that replaces an agricultural specialty vehicle will not affect the number of approved specialty vehicles in the fleet so long as the replacement vehicle meets the specialty vehicle body type and use requirements.

*(12) Optional Phase- in for Log Trucks*

Beginning January 1, 2012, fleets with log trucks as defined in section 2025(d)(39) may opt to have the log trucks in the fleet comply by meeting all of the requirements as set forth below in lieu of meeting the requirements in sections 2025(g) or 2025(i) and may not use a different compliance option for the fleet of log trucks identified as utilizing this option.

(A)   Fleet owners may phase in 2010 model year emission equivalent engines according to the compliance schedule shown in Table 7.

(B)   If the calculated number of engines required to be brought into compliance with the percentage limits is not equal to a whole number, the owner shall round up to a whole number when the fractional part of the required number of engines is equal to or greater than 0.5, and round down if less than 0.5.

(C)   The number of log trucks and qualifying agricultural vehicles cannot exceed the number of vehicles in the fleet as of January 1, 2009.

(D)   The total number of qualifying log trucks cannot increase from one year to the next.

(E)   Fleets utilizing the optional phase-in for log truck provision must comply with the reporting requirements of section 2025(r) for all log trucks.

(F)   Qualifying log trucks may not utilize any of the credits of section 2025(j) or any of the extensions or exemptions of section 2025(p).

(G)   The remaining vehicles in the fleet other than the log trucks using the log truck phase-in option, must comply with the requirements of section 2025(e).

Table 7:  Compliance Schedule for the Log Truck Phase-in Option

| Compliance Deadline as of January 1 | Percent of Total Fleet with 2010 Model Year Emissions Equivalent Engines |
|---|---|
| 2012 | 0% |
| 2013 | 0% |
| 2014 | 10% |
| 2015 | 20% |
| 2016 | 30% |
| 2017 | 40% |
| 2018 | 50% |
| 2019 | 60% |
| 2020 | 70% |
| 2021 | 80% |
| 2022 | 90% |
| 2023 | 100% |

(13)  Labeling Requirements for Agricultural Vehicles and Log Trucks

(A)   Within 30 days of the reporting date, fleet owners must permanently affix or paint an identification label on each vehicle that utilizes the agricultural

27

provision or the log truck phase-in option of section 2025(m) according to the following specification:

    1.    The letters AG shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background,

    2.    The label shall be located on the left and right door of the vehicle and in clear view at all times.

(n)    *Requirements for Single-Engine and Two-Engine Sweepers*

(1)    Two-engine sweepers with auxiliary engines 50 hp or greater must comply with section 2025(e). The propulsion engine is required to meet PM BACT and to upgrade to a 2010 model year emissions equivalent engine like other vehicles, and the auxiliary engines must meet PM BACT as follows:

    (A)    The auxiliary engine is required to meet PM BACT when the propulsion engine is first required to meet PM BACT or to be upgraded to a 2010 model year emissions equivalent. The auxiliary engine is not required to be replaced or upgraded if it meets PM BACT. The reporting requirements of 2025(r)(17) must be met unless the fleet complies with the model year schedules of 2025(f) or 2025(g).

(2)    Regardless of fleet size, two-engine sweepers with Tier 0 auxiliary engines, 50 hp or greater, may not operate more than 450 hours per year starting January 1, 2010 until January 1, 2014 and no more than 100 hours per year thereafter. The fleet owner must meet the reporting requirements in 2025(r)(17) for sweepers with Tier 0 auxiliary engines.

(3)    Labeling Requirements for Two-Engine Sweepers with Tier 0 Auxiliary Engines

    (A)    Within 30 days of the reporting date, fleet owners must permanently affix or paint an SW identification label on each two engine sweeper that has a Tier 0 auxiliary engine according to the following specification:

        1.    The letters SW shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background; and

        2.    The label shall be located on the left and right door of the vehicle and in clear view at all times.

(4)    For purposes of determining the downsizing credit of section 2025(j)(1), fleets with street sweepers may also include all single-engine and two-engine street sweepers with a GVWR from 14,001 lbs to 26,000 lbs in the 2006 baseline fleet and in the fleet for the compliance year. To use this option the fleet must meet the same reporting and record keeping requirements for these lighter street sweepers as is required for heavier vehicles.

(o)    *Requirements for a New Fleet and Changes in an Existing Fleet*

(1)    *New Fleet Requirements.* Owners of new fleets must meet the requirements of section 2025(e) immediately upon purchasing vehicles subject to the regulation or

bringing such vehicles into the State of California for the first time after January 1, 2012. New fleets meeting the requirements of sections 2025(h) or 2025(i) must report vehicles subject to the regulation to ARB within 30 days of purchasing or bringing such vehicles into the State, in accordance with the requirements in section 2025(r).

(2) *Changes in an Existing Fleet*

    (A) *Adding Vehicles to an Existing Fleet.* Unless the vehicle is a 2007 model year or newer engine that meets PM BACT, a fleet may not operate a newly added vehicle or operate a vehicle that was previously reported as non-operational in California, unless the fleet as newly constituted complies with the requirements of section 2025(e) and must within 30 days of adding the vehicle, file a report with the Executive Officer that it has added a new vehicle, and demonstrate that the fleet, as newly constituted, complies with the requirements of section 2025(o)(2)(C) below. If the vehicle added can comply by meeting PM BACT, the vehicle may be operated within 30 days of adding the vehicle to the fleet, solely for the purpose of having the vehicle's exhaust temperature data logged.

    (B) *Removing Vehicles from an Existing Fleet.* If an existing fleet owner meets the requirements of the compliance options other than that of section 2025(f) or 2025(g) when a vehicle is removed from the fleet, it must file a report with the Executive Officer that it has removed a vehicle and demonstrate that the fleet, as newly constituted, will comply with the requirements of section 2025(o)(2)(C) within 30 days of removal of the vehicle.

    (C) *Compliance Requirements for an Existing Fleet that has Changed*

        1. A fleet owner who elects to utilize the phase-in option of section 2025(i) or uses the extensions, delays, and extensions of section 2025(p) may not add or remove vehicles that cause the percentage calculated for the fleet to fall below the percentage required for the previous compliance date.

        2. The addition of vehicles with 2007 or newer model year engines that meet PM BACT need not be reported until the next compliance date unless;

            a. the addition will cause a fleet to increase its size to greater than three vehicles; or

            b. a fleet is utilizing the credit for fleets that have downsized of section 2025(j)(1).

        3. A fleet owner of a vehicle that formerly qualified for any of the compliance extensions or exemptions granted in section 2025(p) but whose status has changed so that it no longer meets the applicable definition, must immediately bring the fleet into compliance with requirements of section 2025(e) for the immediately preceding compliance date, and must notify the Executive Officer of the change in status within 30 days from the date of the change.

(p)   *Exemptions, Delays, and Extensions*

(1)   Vehicles used Exclusively in NOx Exempt Areas

This subsection applies to vehicles that are used exclusively in NOx exempt areas as defined in section 2025(d)(46) when operating in California. The fleet owner must meet the record keeping requirements of section 2025(s) and meet the reporting requirements as specified below.

(A)   Any vehicle with a GVWR greater than 14,000 lbs that is used exclusively in NOx exempt areas shall meet PM BACT but be exempt from meeting the 2010 model year emissions equivalent requirements of section 2025(f) or 2025(g) if the vehicle meets PM BACT by the compliance date that the engine would otherwise be required to be upgraded to a 2010 model year emissions equivalent engine.

   1.   The fleet owner must report information about the vehicle to demonstrate the engine has met PM BACT as specified in section 2025(r) but does not need to report after the initial reporting, as long as the vehicle continues to meet the requirements for the exemption, and;

   2.   The fleet owner must either meet the electronic tracking and reporting requirements or the vehicle labeling requirements as specified in section 2025(p)(1)(C).

(B)   Until January 1, 2014, vehicles with a GVWR greater than 26,000 lbs that are used exclusively in NOx exempt areas shall be exempt from meeting the requirements of section 2025(g), 2025(h) or 2025(i) and must be brought into compliance with PM BACT from 2014 to 2016 as follows:

   1.   The fleet of vehicles with a GVWR greater than 26,000 lbs that operate exclusively in the NOx exempt areas, except for low-use vehicles, must meet the following phase-in schedule set forth in Table 8 below. Rounding will be done by the same method as described for the phase-in option of section 2025(i)(2).

   *Table 8: Compliance Schedule for NOx Exempt Area Fleets*

| Compliance Deadline, as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2014 | 33% |
| 2015 | 66% |
| 2016 | 100% |

   2.   The fleet owner must meet the reporting requirements of section 2025(r) to use this compliance exemption, and must either meet the electronic tracking and reporting requirements or meet the vehicle labeling requirements as specified in section 2025(p)(1)(C) for any vehicle that uses the exemption.

30

3.  The fleet owner must meet the reporting requirements of section 2025(r) for all the vehicles in the fleet.

4.  After the fleet owner reports compliance with PM BACT for every vehicle in the fleet, reporting is no longer required for the NOx exempt area vehicles.

5.  Beginning January 1, 2020, all vehicles must comply with the requirements of section 2025(g) except for vehicles that meet the requirements for an exemption as specified in section 2025(p)(1)(A) above.

6.  Fleet owners may use the extension of section 2025(p)(9) for any vehicle that operates exclusively in the NOx exempt areas if the highest level VDECS is unavailable.

(C)  For each compliance year the exemptions are used, the fleet owner must meet the electronic tracking and reporting requirements of section 2025(r)(16)(A)2., or must label the vehicle by permanently affixing or painting an identification label on the vehicle according to the following specification:

1.  The letters NE shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background.

2.  The label shall be located on the left and right door of the vehicle and in clear view at all times.

(D)  Vehicles that use the NOx exempt areas exemptions may travel outside of the designated NOx exempt areas only for repairs or other services to the vehicle. The vehicle owner must obtain a work order from the facility that describes the service and it must show the date of the service and the location of the facility.

(2)  Extension for Low-Mileage Construction Trucks

Beginning January 1, 2012, fleets with low-mileage construction trucks as defined in section 2025(d)(40) may opt to have a limited number of low-mileage construction trucks in the fleet comply by meeting all of the requirements as set forth below and do not need to include such vehicles in meeting the fleet requirements of sections 2025(g) through (i).

(A)  Beginning, January 1, 2012, up to ten low-mileage construction trucks in the fleet may use the extension. Fleets electing this option must meet the PM BACT requirements for the qualifying low-mileage construction trucks pursuant to the schedule set forth in Table 9, and then comply with the requirements of section 2025(g) starting January 1, 2020. Rounding will be done by the same method as described for the phase-in option of section 2025(i)(2).

(B)  A one truck owner with a low-mileage construction truck must meet PM BACT by January 1, 2016.

31

(C)   If fewer than 9,000 trucks use the extension in 2012, then the Executive Officer will approve additional trucks for the extension by approving one additional extension per fleet owner in a series of rounds until 9,000 trucks have been identified as using the extension. A random selection process will be used to assign extensions that cannot be distributed equally among fleet owners.

*Table 9: Compliance Schedule for Fleets with*
*Low-Mileage Construction Trucks*

| Compliance Deadline, as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2014 | 33% |
| 2015 | 66% |
| 2016 | 100% |

(D)   Fleets that have low-mileage construction trucks and other vehicles with a GVWR greater than 26,000 lbs, except low-use vehicles, must demonstrate that the combined fleet meets the phase-in schedule of Table 9 and, if so, the low-mileage construction vehicles in the fleet qualifying for the extension under sections 2025(p)(2)(A) and (C) above may delay having to comply with PM BACT until as late as 2016.

(E)   Fleets may use the extension based on unavailability of highest level VDECS of section 2025(p)(9) for low-mileage construction trucks.

(F)   Fleet owners using this provision must comply with the reporting and record keeping requirements of sections 2025(r) and (s) beginning January 31, 2012.

(G)   A low-mileage construction truck that has been approved for the extension may be replaced by another truck and continue to qualify for the extension if the replacement truck has a 1996 model year or newer engine, and the miles traveled after it is placed in service combined with the miles traveled by the original vehicle stays below the annual mileage threshold. The replacement vehicle must be placed in service within one year of removing the original vehicle from the fleet or by the next compliance date, whichever is longer.

(H)   Labeling Requirements for Low-Mileage Construction Trucks

   1.   By January 31, 2012, fleet owners must affix or paint an identification label on up to ten low-mileage construction trucks and within thirty days after notification that any additional trucks have been approved as follows:

      a.   The letters CT shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background.

      b.   The label shall be located on the left and right door of the vehicle and be in clear view at all times.

32

(I)    Low-mileage construction truck exemptions are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.

(3)   *Unique Vehicle Extension* – Until January 1, 2017 the fleet owner may apply for, and the Executive Officer will grant, a single one year extension from the requirement to upgrade to a 2010 model year emissions equivalent engine in section 2025(f) and 2025(g) if by January 1, 2014, a VDECS was not available for the engine and a used vehicle or suitable cab and chassis that performs a similar function with a 2010 emissions equivalent engine is not available 6 months prior to the 2010 emissions equivalent engine compliance date. For the extension to be considered the fleet must apply for the extension 4 months prior to the compliance date that the engine is required to upgrade to a 2010 model year emissions equivalent engine.

(4)   *Exemption for Low-Use Vehicles*

(A)   Low-use vehicles as defined in section 2025(d)(41) are exempt from the requirements of section 2025(e) but the owner must meet reporting and record keeping requirements in accordance with sections 2025(r)(12) and 2025(s).

1.    To be considered a low-use vehicle, the fleet owner must submit engine operation data from a properly functioning odometer or hubodometer and non-resettable hour-meter.

2.    A vehicle is also considered to be a low-use vehicle if it is not driven for the entire compliance year and either a planned non-operation certificate or a certificate of non-operation has been filed with the DMV or, an equivalent certificate has been filed with another state prior to the beginning of the compliance year. The vehicle must not be operated for any other purpose during the compliance year except to demonstrate functionality of the vehicle to potential buyers, to move the vehicle short distances for maintenance, or to a storage facility while awaiting sale.

3.    Low-use vehicles need not be included when determining compliance with the small fleet compliance option of section 2025(h) or the phase-in option of section 2025(i).

(B)   Vehicles used both as an emergency support vehicle as defined in section 2025(d)(23), and for other purposes, do not need to consider the hours of operation or mileage the vehicle accrues when used for emergency operations in determining whether the vehicle meets the definition of a low-use vehicle, but the fleet owner must report information about the emergency hours of operation or mileage as specified in section 2025(r)(15).

(C)   Vehicles that formerly met the low-use vehicle definition, but whose use increases above the specified limits, must immediately be brought into compliance as specified in section 2025(o)(2)(C)3.

33

(5)  *Exemption for Vehicles Operating with a Three Day Pass*

   (A)  Until January 1, 2021, a fleet owner that obtains a three-day pass for a vehicle will be allowed to operate one vehicle per calendar year in California without complying with section 2025(e) for the specified three day period per calendar year, provided the information required in section 2025(r)(19) is filed with the Executive Officer at least three days prior to the vehicle's planned use in California.

   (B)  A three-day pass must be obtained from the Executive Officer either online, email, or by fax.  Prior to operating within California, the fleet must obtain written approval from the Executive Officer, which must be carried within the vehicle.  The Executive Officer will make every effort to respond to the request within three business days from the receipt of the request.  The Executive Officer shall grant the request so long as it is the first request made by the fleet in the calendar year.  If the Executive Officer fails to respond to the request by the date of the vehicle's planned entry into the state, the vehicle may operate in California for the requested three-day period, but if the vehicle's operator fails to present documentation to ARB enforcement personnel, upon request, that it has filed a request for a three-day pass and qualifies to operate that specified vehicle in the state, the fleet may be cited and subject to penalties.

(6)  *Exemption for Vehicles Awaiting Sale* – Vehicles in the possession of dealers, financing companies, or other entities that do not intend to operate the vehicle in California or offer the vehicle for operation in California, and that are operated only to demonstrate functionality to potential buyers or to move short distances while awaiting sale for purposes such as maintenance or storage, are exempt from all requirements in section 2025.

(7)  *Exemption for Vehicles Used Solely on San Nicolas or San Clemente Islands* - Vehicles used solely on San Nicolas or San Clemente Islands are exempt from all requirements in section 2025.  If the land use plans for the islands are changed to allow use by the general public of the islands, this exemption shall no longer be applicable.

(8)  *Compliance Extension for Emissions Control Device Manufacturer Delays* - An owner who has purchased, or has entered into contractual agreement with the seller for the purchase, but has not received a VDECS, a replacement engine, or vehicle in order to comply with this regulation will be excused from immediate compliance if the VDECS or vehicles have not been received due to manufacturing delays as long as all the conditions below are met:

   (A)  The fleet owner who has purchased, or has entered into contractual agreement with the seller for the purchase, at least 4 months prior to the required compliance date, except in the case where a VDECS is ordered to replace a failed or damaged VDECS, the fleet owner has purchased, or has entered into contractual agreement with the seller for the purchase of a replacement VDECS within 60 days of the VDECS failure.

(B) The owner has identified the vehicle to be equipped with the VDECS or replaced upon receipt of the replacement VDECS or vehicle.

(C) Proof of purchase, such as a purchase order, down payment, or signed contract for the sale, including specifications for each VDECS, must be maintained by the owner and provided to an agent or employee of ARB upon request.

(D) The new or retrofitted vehicles are immediately placed into operation upon receipt and any replaced vehicles are removed from service within 30 days.

(E) Proof of the date that the new or retrofitted vehicles were placed into service and proof of the date that any replaced vehicles were removed from service must be maintained by the owner and provided to an agent or employee of ARB upon request.

(9) *Extension of the PM BACT Compliance Deadline Based on Unavailability of Highest Level VDECS* - If an engine that is required to meet PM BACT cannot be equipped with the highest level VDECS for PM, the Executive Officer may grant a one-year extension of the compliance deadline, which may be extended annually through January 1, 2017, based on an evaluation of information submitted pursuant to section 2025(r)(11) that the engine cannot be equipped with the highest level VDECS for PM provided that all other engines in the fleet are in compliance with the requirements for the compliance year. The request must be filed 4 months prior to the compliance deadline. By January 1, 2018, any vehicle that is not equipped with the highest level VDECS for PM must be replaced with a vehicle that meets PM BACT. The extension for unavailability of highest level VDECS applies to the auxiliary engines in two engine sweepers if the engine that provides motive power must meet PM BACT. By January 1, 2018, any auxiliary engine in a two engine sweeper with a GVWR greater than 26,000 lbs that is not equipped with the highest level VDECS for PM must be replaced with Tier 4 off-road engine or an engine that is equipped with the highest level VDECS for PM. The extension does not apply for engines that are required to meet the 2010 model year equivalent requirements.

(10) *Extension for Meeting PM BACT by 2014.* By January 1, 2014, if every vehicle in the fleet with a GVWR greater than 26,000 lbs is equipped with either a Level 3 VDECS for PM or a 2007 model year or newer engine that meets PM BACT, the vehicles shall be exempt from meeting the 2010 model year emission equivalent engine requirements until January 1, 2023.

(A) Fleet owners must meet reporting requirements of sections 2025(r) by January 31, 2014. The fleet will not need to report again after the initial reporting to retain the extension unless a vehicle or engine is replaced with one that has a 2006 model year or older engine.

(B) The fleet can retain the exemption if an engine or vehicle is replaced with another one that is equipped with a Level 3 VDECS or has a 2007 model year or newer engine that meets PM BACT. The fleet must report the fleet information in accordance with section 2025(o)(2).

(q)  *Special Provisions for VDECS and Experimental Diesel Emission Control Strategies*

(1)  VDECS *Requirements*

    (A)  *VDECS Installation.*  Before installing a VDECS on a vehicle, the owner must ensure that:

        1.  The VDECS is verified for use on the engine and vehicle, as described in the Executive Order for the VDECS.

        2.  Use of the vehicle is consistent with the conditions of the Executive Order for the VDECS.

        3.  The VDECS is installed in a verified configuration.

        4.  The engine to be retrofitted must be in its original certified configuration, free of excess oil consumption, must not have malfunctioning fuel delivery systems, or any other mechanical condition that may impair the proper functioning of the VDECS.

        5.  The VDECS label will be visible after installation.

    (B)  *VDECS Maintenance.*  If a fleet owner installs a VDECS to meet the requirements of section 2025(e), the VDECS must remain installed until the VDECS fails or is damaged or is replaced with a similar or higher level VDECS. Requirements for VDECS failure or damage are in section 2025(q)(2). The owner of a vehicle retrofitted with a VDECS must ensure that the VDECS and engine are properly maintained as recommended by the respective manufacturers.

(2)  *Failure or Damage of a VDECS.*  In the event of a failure or damage of a diesel emission control strategy, the following conditions apply:

    (A)  Failure or Damage During the Warranty Period.  If a VDECS fails or is damaged within its warranty period, and the VDECS manufacturer or authorized dealer determines that it cannot be repaired, the owner must replace the VDECS with the same level or higher level VDECS for the vehicle within 90 days of the failure.

    (B)  Failure or Damage Outside of Warranty Period.  If a VDECS fails or is damaged outside of its warranty period and cannot be repaired, and if the fleet could not meet an applicable target for the most recent compliance date without the failed VDECS, then within 90 days of the failure, the owner must replace the failed VDECS with the highest level VDECS available for the engine at time of failure.

(3)  *Fuel-Based Strategy VDECS*

    (A)  If a fleet owner determines that the highest level VDECS for a large percentage of the fleet would be a Level 2 fuel verified as a diesel emission control strategy, and implementation of this VDECS would require installation of a dedicated storage tank, then the owner shall request prior approval from

the Executive Officer to allow use of the Level 2 fuel-based strategy across its fleet.

(B)  Waiver for Discontinuation of Fuel Verified as a Diesel Emission Control Strategy. If a fleet owner has relied upon a fuel verified as a diesel emission control strategy to meet an applicable requirement and has to discontinue use of the fuel due to circumstances beyond the fleet owner's control, the fleet owner shall apply to the Executive Officer no later than 30 days after discontinuing use of the fuel for a compliance waiver of up to two years to provide the fleet owner time to return to compliance with the applicable requirements. The Executive Officer shall respond to the request within 30 days and grant the request upon finding that the application is complete, outlines the compliance strategy to be used, and that all reporting requirements have been met.

(4)  *Use of Experimental Diesel Emission Control Strategies*

(A)  If a fleet owner wishes to use an experimental or non-verified diesel emission control strategy to support the verification of a non-verified diesel emission control strategy, the owner must first obtain approval from the Executive Officer for a compliance extension. To obtain approval, the owner must demonstrate either that (1) a VDECS is not available or not feasible for their vehicle or application, or (2) that use of the non-verified strategy is needed to generate data to support verification of the strategy.

1.  The application must include the following: emissions data and a detailed description of the control technology that demonstrates that the experimental control strategy achieves at least a Level 2 diesel PM emission reduction, vehicle and engine data, and odometer or hubodometer readings as described in sections 2025(r)(8), 2025(r)(9), and 2025(r)(12)(B).

2.  The Executive Officer will treat the strategy as a:

a.  Level 2 VDECS if the application demonstrates that the strategy achieves at least 50 percent reduction in diesel PM.

b.  Level 3 VDECS if the application demonstrates that the strategy achieves at least 85 percent reductions in diesel PM.

(B)  Upon approval by the Executive Officer, each vehicle engine retrofitted with the experimental strategy will be allowed to operate for a specified time period necessary to make a determination that the experimental strategy can achieve the projected emissions reductions. The vehicle equipped with the experimental strategy will be considered to be in compliance under section 2025(f), 2025(g), 2025(h), or 2025(i) during the specified time period. The fleet owner shall keep documentation of this use in records as specified by the Executive Officer.

(C)  The fleet owner must bring the fleet into compliance under section 2025(f), 2025(g), 2025(h), or 2025(i) prior to the expiration of the experimental diesel emission control strategy extension.

(5)   *VDECS That Impairs Safe Operation of Vehicle* - A fleet owner may request that the Executive Officer find that a VDECS should not be considered the highest level VDECS available because:

(A)   It cannot be safely installed or operated in a particular vehicle application; or

(B)   Its use would make compliance with occupational safety and health requirements, federal highway safety regulations, or an ongoing local air district permit condition impossible.

If a VDECS manufacturer states that there is no safe or appropriate method of mounting its VDECS on the requesting party's vehicle, then the VDECS will not be considered safe. In the absence of such a declaration by the VDECS manufacturer, the requesting party shall provide other documentation to support its claims.

Documentation may include published reports and other findings of federal, state or local government agencies, independent testing laboratories, engine manufacturers, or other equally reliable sources. The request will only be approved if the requesting party has made a thorough effort to find a safe method for installing and operating the VDECS, including various locations for VDECS mounting, and use of an actively regenerated VDECS. The Executive Officer shall review the documentation submitted and any other reliable information that he or she wishes to consider and shall make his or her determination based upon the totality of the evidence.

Upon finding that a VDECS cannot be installed without violating the safety standards prescribed under title 8, CCR by the California Department of Industrial Relations, Division of Occupational Safety and Health, comparable federal or state health and safety laws where the vehicle operates, or federal highway safety laws, the Executive Officer shall issue a determination that there is no highest level VDECS available. The Executive Officer shall inform the requesting party, in writing, of his or her determination, within 60 days of receipt of the request.

Parties may appeal the Executive Officer's determination as described in (C) and (D) below. During the appeal process described in (C) and (D) below, the requesting party may request the administrative law judge to stay compliance until a final decision is issued. If the stay is granted and the Executive Officer denies the requesting party's request, the requesting party has six months from the date of the Executive Officer's final written decision to bring his or her fleet back into compliance.

(C)   *Appeals – Hearing Procedures*

1.   Any party whose request has been denied may request a hearing for the Executive Officer to reconsider the action taken by sending a request in writing to the Executive Officer. A request for hearing shall include, at a minimum, the following:

a.   name of the requesting party;

b.   copy of the Executive Officer's written notification of denial;

38

<ol type="c" start="3">
<li>a concise statement of the issues to be raised, with supporting facts, setting forth the basis for challenging the denial (conclusory allegations will not suffice);</li>
<li>a brief summary of evidence in support of the statement of facts required in c. above; and</li>
<li>the signature of an authorized person requesting the hearing</li>
</ol>

<ol start="2">
<li>A request for a hearing shall be filed within 30 days from the date of issuance of the notice of the denial.</li>
<li>A hearing requested pursuant to this subsection shall be heard by a qualified and impartial hearing officer appointed by the Executive Officer. The hearing officer may be an employee of the ARB, but may not be any employee who was involved with the denial at issue. In a request for reconsideration, the hearing officer, after reviewing the request for hearing and supporting documentation provided under paragraph 1.d. above, shall grant the request for a hearing if he or she finds that the request raises a genuine and substantial question of law or fact.</li>
<li>If a hearing is granted, the hearing officer shall schedule and hold, as soon as practicable, a hearing at a time and place determined by the hearing officer.</li>
<li>Upon appointment, the hearing officer shall establish a hearing file. The file shall consist of the following:
<ol type="a">
<li>the determination issued by the Executive Officer which is the subject of the request for hearing;</li>
<li>the request for hearing and the supporting documents that are submitted with it;</li>
<li>all documents relating to and relied upon by the Executive Officer in making the initial determination to deny the requesting party's original claim; and</li>
<li>correspondence and other documents material to the hearing.</li>
</ol>
</li>
<li>The hearing file shall be available for inspection by the applicant at the office of the hearing officer.</li>
<li>An applicant may appear in person or be represented by counsel or by any other duly-authorized representative.</li>
<li>The ARB may be represented by staff or counsel familiar with the regulation and may present rebuttal evidence.</li>
<li>Technical rules of evidence shall not apply to the hearing, except that relevant evidence may be admitted and given probative effect only if it is the kind of evidence upon which reasonable persons are accustomed to relying in the conduct of serious affairs. No action shall be overturned based solely on hearsay evidence, unless the hearsay</li>
</ol>

evidence would be admissible in a court of law under a legally recognized exception to the hearsay rule.

10.  Declarations may be used upon stipulation by the parties.

11.  The hearing shall be recorded either electronically or by a certified shorthand reporter.

12.  The hearing officer shall consider the totality of the circumstances of the denial, including but not limited to, credibility of witnesses, authenticity and reliability of documents, and qualifications of experts. The hearing officer may also consider relevant past conduct of the applicant including any prior incidents involving other ARB programs.

13.  The hearing officer's written decision shall set forth findings of fact and conclusions of law as necessary.

14.  Within 30 days of the conclusion of a hearing, the hearing officer shall submit a written proposed decision, including proposed finding as well as a copy of any material submitted by the hearing participants as part of that hearing and relied on by the hearing officer, to the Executive Officer. The hearing officer may recommend to the Executive Officer any of the following:

   a.  uphold the denial as issued;

   b.  modify the denial; or

   c.  overturn the denial in its entirety.

15.  The Executive Officer shall render a final written decision within 60 working days of the last day of hearing. The Executive Officer may do any of the following based on substantial evidence in the record:

   a.  adopt the hearing officer's proposed decision;

   b.  modify the hearing officer's proposed decision; or

   c.  render a decision without regard to the hearing officer's proposed decision.

(D)  *Appeals – Hearing Conducted by Written Submission*

In lieu of the hearing procedure set forth in (C) above, an applicant may request that the hearing be conducted solely by written submission. In such case the requestor must submit a written explanation of the basis for the appeal and provide supporting documents within 20 days of making the request. Subsequent to such a submission the following shall transpire:

1.  ARB staff shall submit a written response to the requestor's submission and documents in support of the Executive Officer's action no later than 10 days after receipt of the requestor's submission;

2.  The applicant may submit one rebuttal statement which may include supporting information, as attachment(s), but limited to the issues previously raised;

3.    If the applicant submits a rebuttal, ARB staff may submit one rebuttal statement which may include supporting information, as attachment(s), but limited to the issues previously raised; and

4.    The hearing officer shall be designated in the same manner as set forth in section 2025(q)(5)(C)(3) above. The hearing officer shall receive all statements and documents and submit a proposed written decision and such other documents as described in section 2025(q)(5)(C) (13) above to the Executive Officer no later than 30 working days after the final deadline for submission of papers. The Executive Officer's final decision shall be mailed to the applicant no later than 60 days after the final deadline for submission of papers.

5.    The Executive Officer shall render a final written decision within 60 working days of the last day of hearing. The Executive Officer may do any of the following:

   a.    adopt the hearing officer's proposed decision;

   b.    modify the hearing officer's proposed decision; or

   c.    render a decision without regard to the hearing officer's proposed decision.

(r)    *Reporting Requirements*

(1)    The owner of a fleet is subject to reporting requirements for the vehicles in the fleet as defined in section 2025(d)(28) if the owner has elected to utilize the compliance options of section 2025(f)(4), 2025(g)(3), 2025(g)(4), 2025(h), 2025(i), the credits of section 2025(j), the agricultural provisions of section 2025(m), the single-engine and two-engine street sweeper provisions of section 2025(n), the extension or exemptions for vehicles used exclusively in NOx exempt areas of section 2025(p)(1), or the extension for low-mileage construction trucks of section 2025(p)(2). Fleet owners that use the credit for fleets that have downsized provided in section 2025(j)(1)and the credit for the early addition of newer vehicles provided in section 2025(j)(3) must report information for all vehicles under common ownership or control with a GVWR greater than 26,000 lbs in the 2006 baseline fleet and in the fleet for each compliance year. Except as required in section 2025(k)(4), school buses are not required to comply with the reporting requirements.

(2)    All fleet owners utilizing any of the credits in section 2025(j) or any of the exemptions, delays, or extensions in section 2025(p) must report according to the requirements of section 2025(r) and maintain records according to section 2025(s) for all of the vehicles in the fleet as defined in section 2025(d)(28).

(3)    The owner of a fleet that complies by using the compliance schedule by engine model year set forth in sections 2025(f) and 2025(g) and also utilizes the low-use vehicle provision of section 2025(p)(4) is only required to  meet the reporting requirements of section 2025(r) for the low-use vehicles meeting the definition in section 2025(d)(41).

(4)  Fleet owners may submit reporting information using forms (paper or electronic) approved by the Executive Officer.

(5)  The fleet owner must notify the Executive Officer in writing by the first applicable reporting date and by January 31 of every subsequent compliance year, if applicable, with the name of the responsible official and the location where the records will be kept, and whether any information has changed since its last reporting. Whether the records will be kept inside or outside California, the owner must also comply with section 2025(t).

(6)  Each year, fleet owners subject to the reporting requirement must report on their fleet as it was on the compliance date of the current compliance year. The fleet owner must submit the applicable information set forth in sections 2025(r)(5) through (10) by January 31 of each compliance year. Owners must report annually until the year after all of the requirements of section 2025(f), 2025(g), 2025(h), and 2025(i), as applicable to the fleet, have been completely met.

(7)  *Owner Contact Information*: Compliance reports must include the following information:

(A)  Fleet owner's name;

(B)  Name of company or agency;

(C)  Motor carrier identification number;

(D)  Corporate parent name (if applicable);

(E)  Corporate parent taxpayer identification number (if applicable);

(F)  Company taxpayer identification number;

(G)  Street address and mailing address;

(H)  Name of responsible person;

(I)  Title of responsible person;

(J)  Contact name;

(K)  Contact telephone number;

(L)  Contact email address (if available); and

(M)  License number issued by the Public Utilities Commission (if applicable).

(8)  *Vehicle Information*

Fleet owners must provide to the Executive Officer a list of all vehicles subject to the reporting requirements along with the information listed in (A) through (S) below for each vehicle:

(A)  Vehicle identification number;

(B)  Vehicle manufacturer;

(C)  Vehicle model;

(D)  Gross vehicle weight rating;

(E)  Vehicle model year;

(F)  License plate number;

(G)  The state, province, or country where the vehicle is or was registered and type of registration plate;

(H)  Vehicle type, including whether the vehicle is a school bus, agricultural vehicle, log truck, truck-tractor, two-engine sweeper, low-mileage construction truck or yard truck;

(I)  If the vehicle was added to the fleet prior to January 1, 2012, the fleet owner may enter "January 1, 2012;

(J)  Date that a vehicle was retired, sold, or scrapped after January 1, 2012;

(K)  Whether the vehicle will be designated as a low-use vehicle as defined in section 2025(d)(41);

(L)  Whether the vehicle has been certified as non-operational with the California Department of Motor Vehicles or equivalent documentation from the state, province, or country where the vehicle is registered and whether the vehicle will not operate in California.

(M)  Whether the vehicle is a fuel efficient hybrid vehicle as defined in section 2025(d)(31);

(N)  Whether the vehicle is propelled by an alternative-fueled engine as defined in section 2025(d)(8);

(O)  Whether the vehicle will use the extension or exemptions for vehicles used exclusively in NOx Exempt Areas in section 2025(p)(1);

(P)  Whether the fleet size is more than three vehicles subject to the regulation with a GVWR greater than 14,000 lbs;

(Q)  Whether the vehicle is a log truck utilizing the optional phase-in for Log Trucks provision in section 2025(m)(12);

(R)  Whether the vehicle is a low-mileage construction truck that will use the extension for low-mileage construction trucks specified in section 2025(p)(2); and

(S)  Whether the vehicle was partially paid for with public funds, and if so, the information about the funding contract specified in section 2025(r)(18).

(9)  *Engine Information Reporting*

Except as provided in section 2025(r)(13)(A) and 2025(r)(19) below, the following information for each engine that propels a vehicle reported per section 2025(r)(8) and for each sweeper engine that operates auxiliary equipment must be reported to the Executive Officer:

(A)  Engine manufacturer;

(B)  Engine model;

(C)  Engine family for all 1974 model year and newer engines;

43

(D)   Fuel type;

(E)   Engine model year;

(F)   Whether the engine meets an on-road or off-road emissions standard;

(G)   Whether the engine is used to propel the vehicle or to operate auxiliary equipment;

(H)   The emissions standard to which the engine was certified if lower than required for the engine model year; and

(I)   Whether the engine was partially paid for with public funds, and if so, the information about the funding contract specified in section 2025(r)(18).

(10)  *Verified Diesel Emission Control Strategies Reporting*

Except as provided in section 2025(r)(13)(A) below, for each VDECS that is installed on an engine listed per section 2025(r)(9), the fleet owner must report the following information to the Executive Officer:

(A)   Description of VDECS installed;

(B)   VDECS family name;

(C)   Serial number, or experimental part number, or aftermarket part number;

(D)   Date installed;

(E)   If claiming early PM retrofit credits of section 2025(j)(2)(A) and the VDECS is installed between July 1, 2011 and October 1, 2011, the fleet owner must attest to having records to document the purchase agreement and down payment for the VDECS by May 1, 2011;

(F)   Whether the VDECS was partially paid for with public funds and the information in 2025(r)(18) if partially paid for with public funds; and

(G)   Whether the VDECS was installed on the engine to comply with another California in-use regulation.

(11)  *Reporting for Extension for Unavailability of Highest Level VDECS*

If appropriate, the following information must be submitted to the Executive Officer with a request for an extension based on the unavailability of highest level VDECS:

(A)   Owner contact information, vehicle, and engine information listed in sections 2025(r)(7), 2025(r)(8), and 2025(r)(9);

(B)   Description of the reason for the compliance extension request for each engine or engine-vehicle combination;

(C)   If the VDECS would void the engine warranty, provide a statement from the engine manufacturer or authorized engine or vehicle dealer;

(D)   If a verified VDECS is commercially available for the engine family, provide a list of manufacturers and installers that have been contacted and the response to a request to purchase; and

44

(E)   Documentation must be submitted with the initial request and must be reported annually on January 31 following the compliance deadline for each year that the owner is claiming non-availability of the highest VDECS.

(12)   *Low-Use Vehicle Reporting*

For vehicles that are designated as low-use, the fleet owner must report the following information to the Executive Officer annually for as long as the fleet owns or operates the vehicle:

(A)   Owner, vehicle, and engine information identified in sections 2025(r)(5) through 2025(r)(9);

(B)   Mileage readings from a properly functioning odometer or hubodometer taken on January 1 and December 31 of the compliance year. A hubodometer may be used in lieu of the odometer;

(C)   If the vehicle uses engine power as specified in 2025(d)(41), hour-meter readings from a properly functioning non-resettable hour-meter taken on January 1 and December 31 of the compliance year;

(D)   The dates and readings of the odometer and non-resettable hour-meter readings. In the event that the odometer is replaced, the original odometer reading and the new odometer reading and the date of replacement must be reported within 30 days the original odometer failed. In the event that the odometer or hubodometer is removed, the reading and date it is removed and the reading of the replacement and the date it is placed in service. If hubodometers are used, the fleet owner must report the serial numbers;

(E)   Upon request of an agent or employee of the ARB, the owner of a vehicle operating both inside and outside of California must provide records from a electronic tracking system as defined in section 2025(d)(21) that can acquire date, time, engine-on, and location data. The owner may use other documentation of vehicle operation and location, such as IRP records;

(F)   Whether the vehicle is used as an emergency support vehicle as defined in section 2025(d)(23); and, if so, the fleet owner must report the information in section 2025(r)(15); and

(G)   Whether a planned non-operation certificate has been filed with the DMV or, an equivalent certificate has been filed with another state prior to the beginning of the compliance year, and whether the vehicle will not be operated in the compliance year.

(13)   *Credit for Fleets that have Downsized or Added Newer Vehicles Early Reporting*

Fleets owners claiming credits under section 2025(j) must report the following:

(A)   Fleet owners claiming credit for downsizing must report the following:

1.    For the vehicles in the 2006 baseline fleet, vehicle information specified in section 2025(r)(8)(A) to 2025(r)(8)(G), and if the vehicle was not registered with the California Department of Motor Vehicles, identify the type of records that are being kept to document proof that the vehicles

45

> drove at least 1,000 miles in California in the year 2006. Fleets that include street sweepers with a GVWR from 14,001 to 26,000 lbs for determining the credit, must identify that the vehicle is a street sweeper.

    2.    For the compliance year, whether the fleet has drayage trucks, on-road vehicles subject to the off-road in-use vehicle regulation, and information about how many are currently in the fleet. Fleets that include street sweepers with a GVWR from 14,001 to 26,000 lbs for determining the credit, must identify that the vehicle is a street sweeper.

(B)    For the 2006 baseline fleet, a fleet owner that claims credits for adding cleaner vehicles as specified in section 2025(j)(3) must report the vehicle information in section 2025(r)(13)(A) above and the engine model year, and engine family for all the vehicles in the fleet as of January 1, 2012. The fleet owner has the option to report the engine information for vehicles that are no longer in the fleet if the fleet owner has records to document the engine model year and engine family.

(14) *Agricultural Fleet Reporting*

Until January 1, 2023, fleet owners that reported as of April 29, 2011, and qualified for the provisions of section 2025(m), must continue to report the following information to the Executive Officer no later than January 31 of every year:

(A)    For vehicles in the existing fleet, the information required in sections 2025(r)(5) through 2025(r)(9); for vehicles that were in the fleet on January 1, 2009, but are no longer part of the existing fleet, only the vehicle information in section 2025(r)(8) (A) to (G) is required;

(B)    Whether the vehicle is a specialty agricultural vehicle or a log truck;

(C)    Whether the vehicle is being added or removed from the fleet and the date that the vehicle is added or removed;

(D)    The vehicle body type if one of the body types described in the definition of specialty agricultural vehicle in section 2025(d)(54);

(E)    If eligible to be considered for the specialty vehicle exemption, the priority status of the vehicle in case not all specialty vehicles in the fleet can be approved;

(F)    Whether the specialty vehicle will operate exclusively outside the San Joaquin Valley Air Basin;

(G)    Whether the vehicle is operated for compensation outside a farming business owner's farm;

(H)    Except for specialty agricultural vehicles, mileage from a properly functioning odometer taken on January 1, 2011 and every January 1 thereafter. In the event that the odometer is replaced, the fleet owner shall report the original odometer reading, the new odometer reading, and the date the original odometer was replaced. If a hubodometer is used in lieu of the odometer, the fleet owner must also report the serial number for each hubodometer used or replaced; and

46

(I)    For an agricultural vehicle being replaced, the owner, vehicle, and engine information set forth in sections 2025(r)(5) through 2025(r)(9), the mileage of both the vehicle being replaced and added, and the date the mileage readings were taken.

(15)  *Vehicles used as emergency support vehicles in emergency operations*

A fleet owner must provide the following information to the Executive Officer to qualify a vehicle's usage as emergency operation:

(A)    Owner, vehicle, and engine information identified in sections 2025(r)(5) through 2025(r)(9);

(B)    Odometer readings from a properly functioning odometer to document use at an emergency event and to document travel to and from the emergency event. In the event that the odometer is replaced, the fleet owner shall report the original odometer reading and the new odometer reading and the date that the original odometer was replaced. If a hubodometer is used in lieu of an odometer, the fleet owner must also report the serial number for each hubodometer used or replaced. Vehicles used exclusively for emergency use that are not authorized emergency vehicles do not need to have an hour meter and do not need to report hours. Authorized emergency vehicles are exempt per section 2025(c); and

(C)    Records to document dispatch by the local, state, or federal agency or other responsible emergency management entity as approved by the Executive Officer.

(16)  *Reporting of Vehicles Utilizing the Exemptions, Delays, and Extensions Provision*

Unless stated otherwise in section 2025(p), fleet owners utilizing the exemptions, delays, and extensions provision of section 2025(p) must provide the following information to the Executive Officer by January 31, 2012:

(A)    *Vehicles Operating Exclusively in NOx-exempt areas*

The owner must provide the following information to the Executive Officer by January 31 of each compliance year to demonstrate compliance with the requirements of section 2025(p)(1):

1.    Owner, vehicle, engine information, and VDECS listed in sections 2025(r)(5) through 2025(r)(10);

2.    For vehicles that are not labeled, records from an electronic tracking system that tracks usage and location in a monthly report format approved by ARB. The system must at a minimum meet the requirements as defined in section 2025(d)(21) and provide the information listed therein; and

3.    Whether the vehicle is labeled as specified in section 2025(p)(1)(C).

(B)    Unique Vehicle Extension.

The owner must provide the following information to the Executive Officer by January 31 of each compliance year to demonstrate compliance with the requirements of section 2025(p)(3):

1. Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(9).

2. Photos and a complete description of the vehicle and its function.

3. A complete explanation of why the vehicle qualifies as a unique vehicle.

4. Names and phone numbers of sources contacted during the search for a replacement vehicle.

5. Letters from contacted VDECS vendors stating that retrofit technology is unavailable for the unique vehicle.

(17) *Two-Engine Sweepers*

The owner must provide the following information for both the propulsion and auxiliary engine to the Executive Officer by March 31, 2010, and January 1 of subsequent compliance years to demonstrate compliance with the requirements of section 2025(n):

(A) Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(10);

(B) Engine tier level of the auxiliary engine, model year, and engine family number; and

(C) For Tier 0 auxiliary engines, the hours of use readings taken January 1 and December 31 of each year starting 2010.

(18) *Vehicles Purchased, Repowered, or Retrofitted Using Public Funds*

For owners of vehicles that were purchased, repowered or retrofitted using public funds and where funding program guidelines include criteria which limit funding projects from receiving regulatory benefit or credit, the fleet owner must provide the following information to the Executive Officer for all vehicles that were purchased or retrofitted using public funds:

(A) Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(10);

(B) Date the public funding contract began;

(C) Date the contract or emissions surplus contract period ends or ended;

(D) Program providing the funding; and

(E) Information about the contract terms to determine eligibility.

(19) Claiming *a Three Day Pass*

Information listed in sections 2025(r)(7) and 2025(r)(8) (A) to (G) must be provided for the vehicle subject to the three-day pass request and the date for which the three-day period would begin.

(20) *Compliance Certification.* All reports submitted to ARB, must be accompanied with a certification signed by a responsible official or a designee thereof that the information reported is accurate and that the fleet is in compliance with the regulation. If a designee signs the compliance certification, a written statement signed by the responsible official designating the designee must be attached to the compliance certification and submitted to the Executive Officer.

(21) *Changes Since Last Reporting* – The fleet owner or responsible person must report to the Executive Officer any additions, removals, or changes to the fleet since the last annual report filed. Such changes shall include, among other things, changes in the fleet's compliance option, vehicles removed from the fleet, vehicles added to the fleet through purchase or by bringing into California, and vehicles newly defined as low-use, or recently repowered or retrofitted. If there are no changes, the fleet owner shall indicate there have been no changes.

(22) *New Fleet Reporting.* New fleets that elect to utilize the phase-in options of section 2025(i) or 2025(h) must submit the information in sections 2025(r)(5) through 2025(r)(9) to the Executive Officer within 30 days of purchasing or bringing such vehicles into the State. Beginning the first January 1 that is more than 30 days after the date of purchase or bringing a vehicle into the State, new fleets must comply with the reporting requirements in section 2025(r).

(23) *Claiming Compliance Extension for Manufacturer Delays*

The fleet owner must report the following information to the Executive Officer by January 31, each year to demonstrate compliance with the requirements of section 2025(p)(8):

(A) The date of purchase or the date the contractual agreement for purchase of VDECS, replacement engine, or vehicle was entered;

(B) The date the VDECS or vehicle was placed into service;

(C) The date the existing vehicle was removed from service; and

(D) Identification of the vehicle that was replaced.

(24) *Reporting for a Compliance Extension for Fleets that Meet PM BACT per section 2025(f) or 2025(g) prior to January 1, 2014*

For fleets complying using the compliance option of section *2025(f) or* 2025(g), the fleet owner must provide the following information about the vehicles that meet PM BACT prior to January 1, 2014:

(A) Owner, vehicle and engine information listed in sections 2025(r)(5) through 2025(r)(9).

(B) Information listed in section 2025(r)(10) for the VDECS.

(25) *Reporting for Small Fleets*

For fleets complying using the phase-in option for small fleets of section 2025(h), the fleet owner must provide the following information about all vehicles in the fleet;

    (A)   Owner information listed in sections 2025(r)(5) through (7); and

    (B)   Until January 31, 2014, the vehicle information listed in sections 2025(r)(8) (A) through (J) and starting January 31, 2014, all the information listed in sections 2025(r)(8) through 2025(r)(10).

(26)   *Reporting for Fleets Using Excess PM VDECS Credits*

    For fleets claiming excess PM VDECS credits of section 2025(j)(2)(C), the fleet owner must provide the following information about the vehicles prior to January 1 of the compliance year in which they want to apply it:

    (A)   Owner, vehicle and engine information listed in sections 2025(r)(5) through 2025(r)(9) for the vehicle that was retrofit;

    (B)   Information listed in section 2025(r)(10) for the VDECS; and

    (C)   The fleet registration identification number for the Off-Road regulation, title 13, CCR, section 2449, known as the diesel off-road online reporting system, or DOORS ID number.

(s)   *Record Keeping*

(1)   The owner of a fleet shall maintain the following records specified in sections 2025(s)(3) through 2025(s)(16)as applicable.  The owner shall provide these records to an agent or employee of the ARB within five business days upon request. If the records will be kept outside California, the owner must also comply with section 2025(t).

(2)   The owner of a fleet subject to the reporting requirements of section 2025(r) shall maintain copies of the information reported under section 2025(r), as well as the records described in sections 2025(s)(3) through 2025(s)(18) below.

(3)   School Buses

    (A)   Fleet owners of school buses shall maintain records of all the information listed in sections 2025(r)(7) through 2025(r)(10).

    (B)   Fleet owners using the downsize credits of section 2025(k)(2) must maintain records of all the information listed in sections 2025(r)(7) through 2025(r)(10) for all school buses in the 2006 baseline fleet and for all school buses in the fleet on January 1 of the compliance year that were registered.  Fleet owners do not have to have to keep engine and VDECS information that is required under sections 2025(r)(9) and 2025(r)(10) for school buses registered on October 1, 2006 that are no longer in the fleet.

    (C)   Fleet owners with low-use buses must maintain records of all the information listed in section 2025(r)(12) for each low-use bus.

    (D)   Fleet owners must comply with record keeping requirements for VDECS failures and maintenance as required in sections 2025(s)(10) and 2025(s)(14).

(4)   *Motor Carrier or Broker*

(A)   Bills of lading and other documentation identifying the motor carrier or broker who hired or dispatched the vehicle and the vehicle dispatched.

(5)   *Agricultural Fleets*

(A)   Fleets utilizing the agricultural fleet provision must keep and make available upon request proof that all agricultural vehicles were used exclusively in agricultural operations.  This may include records used to support proof to other governmental agencies that the primary business function was agricultural.  Such documentation may include IRS or Board of Equalization tax forms or bills of lading.

(B)   Records must be maintained for each agricultural vehicle demonstrating that the vehicle was operational, functional and capable of performing the duty for which it was designed.  This could include maintenance records, mileage records, or licensing records, emissions testing records, or any other source of data approved by the Executive Officer.

(C)   The agricultural fleet owner must keep bills of lading for delivery of fertilizer or crop protection products by an agricultural vehicle to a farm.  Such records must demonstrate that the operation of the vehicle for the preceding calendar year was used exclusively to deliver such products to farms.

(D)   Proof of transference of ownership of any qualifying agricultural vehicle that is added to or removed from the fleet.

(E)   Proof of ownership of the vehicles including title, registration, or bills of sale.

(6)   *Proof of Operation* – Owners of fleets must keep records showing that any vehicle used to demonstrate compliance using the phase-in options of section 2025(h) and section 2025(i) was operated in California for that applicable compliance year.  Records could include IRP records, GPS tracking records, or DMV or law enforcement permits.

(7)   *Fleets that have Downsized or have Added Newer Engines Early* - Fleets utilizing the credit for fleets that have downsized of section 2025(j)(1) or the credit for the early addition of newer engines of section 2025(j)(3) must keep the following records at the business office or terminal location identified in the reports filed with the Executive Officer:

(A)   For all vehicles in the fleet on October 1, 2006; a,

1.   Copy of the vehicle's registration; or

2.   Copy of the vehicle's ownership documentation; and

3.   Copy of documentation of the engine model year and engine family (only if reported for claiming credit for the early addition of newer vehicles); and

4.   If not registered with the California Department of Motor Vehicles, proof that the vehicles in the fleet drove at least 1,000 miles in California in the year 2006.

(B)   For all vehicles in the fleet on January 1 of the compliance year:

1.    A copy of the certificate of non-operation filed with the Department of Motor Vehicles or equivalent documentation from the state, province, or country where the vehicle is registered; and

2.    If scrapped in the previous year, a copy of a non-repairable vehicle certificate issued from the California Department of Motor Vehicles or equivalent documentation from the state, province, or country where the vehicle is registered.

(8)  *Changes Since the Last Reporting Period*

   (A)   For fleets complying using any of the compliance options other than section 2025(f) or 2025(g), must keep documentation of any additions, deletions, or changes to the fleet since the last reporting. Documentation may include bills of sale, purchase orders, maintenance records, registration information, or other documentation.

   (B)   For each vehicle removed from the fleet, a copy of the bill of sale, or other documentation showing transference of ownership from the former owner and the current owner and the date of the transaction or any other form of vehicle transference approved by the Executive Officer.

(9)  *Electronic Tracking* – For fleets using electronic tracking systems as defined in section 2025(d)(21) summary and detailed records must be kept at the business office or terminal location for the fleet. The records must provide;

   (A)   Vehicle identification number of the vehicle being tracked;

   (B)   Monthly and annual mileage accrued in California;

   (C)   Monthly and annual mileage accrued in the NOx Exempt Areas if claiming the vehicle operates exclusively in NOx-exempt areas, and

   (D)   Monthly and annual hours of engine operation accrued in California except for vehicles that do not use PTO to perform work in a stationary mode.

(10)  *VDECS Failure* – Maintain records of any VDECS failure and replacement including:

   (A)   Date of failure;

   (B)   Description of failure;

   (C)   Description of resolution of failure;

   (D)   Date of resolution of failure;

   (E)   Past VDECS maintenance records; and

   (F)   Past engine maintenance records.

(11)  *Fuel-based Strategy* – Documentation of any approval from ARB Executive Officer to use a fuel strategy as in section 2025(q)(3) and the most recent two years' worth of records of purchase that demonstrate usage.

(12)  *Experimental Diesel Emission Control Strategy* – For fleets using an experimental diesel PM control strategy, record of approval from the Executive Officer for use of

the experimental diesel control strategy, the test plan and test data used in the experimental diesel control strategy application, and other records as specified in the approval.

(13) *Manufacturer Delay* – For any vehicle or VDECS for which the fleet owner is utilizing the equipment manufacturer delay provision in section 2025(p)(8), proof of purchase, such as a purchase order or signed contract for the sale, including engine specifications for each applicable piece of equipment or vehicle.

(14) *Maintenance of VDECS Records*

    (A) VDECS Documentation.  For each engine requiring a VDECS to comply with the regulation, the owner shall keep the following documentation in the vehicle and provide it upon request to an agent or employee of the ARB;

        1. A statement signed by the installer at the time of installation of the VDECS affirming that the installation was performed by an installer authorized by the VDECS manufacturer;

        2. The name of the company installing the device;

        3. The date the device was installed;

        4. Description of VDECS installed;

        5. VDECS family name;

        6. Serial number of installed VDECS; and

        7. Verification level and year of verification of the installed VDECS.

(15) *Emergency Support Vehicles* – Fleet owners of emergency support vehicles utilizing the provisions of section 2025(p)(1), 2025(p)(2) or 2025(p)(4) shall keep records to document dispatch by a local, state, or federal agency or other responsible emergency management entity as approved by the Executive Officer.

(16) *Low-use Vehicles* – Fleet owners of low-use vehicles that exceed 1,000 miles per year shall;

    (A) Keep records of electronic tracking pursuant to section 2025(s)(9),

    (B) Keep records of dates and the odometer readings when the vehicle leaves and returns to California to demonstrate that no more than 1,000 miles per year was driven in California.

(17) *Early PM Retrofit Credits* - Fleets that are claiming credit for early PM retrofits shall maintain records with the below information;

    (A) The bill of sale with date of purchase or order.

    (B) The total amount of the purchase and the amount of down payment if not fully paid at the time of purchase.

    (C) Work order or equivalent with the completion date.

(t)    *Audit of Records*

The vehicle owner must make records available to ARB at its request for audit to verify the accuracy of the records. In the event the records are not made available within 30 days of the request, the ARB may assess penalties for non-compliance.

(u)    *Record Retention*

The fleet owner or responsible person shall maintain the records for each vehicle subject to the reporting and record keeping requirements of sections 2025(r) and (s) for 3 years after it is retired, and for the overall fleet, for as long as the owner has a fleet, or January 1, 2025, whichever is earlier. If fleet ownership is transferred, the seller shall transfer the fleet records to the buyer. Dealers must maintain records of the disclosure of regulation applicability required by section 2025(w) for three years after the sale.

(v)    *Right of Entry*

For the purpose of inspecting vehicles subject to this regulation and their records to determine compliance with this regulation, an agent or employee of ARB, upon presentation of proper credentials, has the right to enter any facility (with any necessary safety clearances) where vehicles are located or vehicle records are kept.

(w)    *Disclosure of Regulation Applicability*

Any person residing in California selling a vehicle with an engine subject to this regulation must provide the following disclosure in writing to the buyer on the bill of sale, sales contract addendum, or invoice, "An on-road heavy-duty diesel or alternative-diesel vehicle operated in California may be subject to the California Air Resources Board Regulation to Reduce Particulate Matter and Criteria Pollutant Emissions from In-Use Heavy-Duty Diesel Vehicles. It therefore could be subject to exhaust retrofit or accelerated turnover requirements to reduce emissions of air pollutants. For more information, please visit the California Air Resources Board website at http://www.arb.ca.gov/dieseltruck."

(x)    *Compliance Requirement*

(1)    The vehicle owner shall comply with all applicable requirements and compliance schedules set forth in this regulation.

(2)    Any in-state or out-of-state motor carrier, California broker, or any California resident who operates or directs the operation of any vehicle subject to this regulation shall verify that each hired or dispatched vehicle is in compliance with the regulation and comply with the record keeping requirements of section 2025(s)(4).

(3)    Compliance may be accomplished by keeping at the business location, a copy of the Certificate of Reported Compliance with the In-Use On-Road Diesel Vehicle Regulation for each fleet, or in the vehicle.

(4)    Any contract that a lessor and lessee enter into that has an effective date of January 1, 2010 or later shall clearly specify whether or not the leased vehicle is to

54

be excluded from the lessor's fleet for the duration of the lease, or the responsibility will be that of the lessee.

(y)  *ARB Certificate of Reported Compliance*

After the required reporting and compliance certification are received by ARB staff, ARB will provide the fleet with a Certificate of Reported Compliance with the In-Use On-Road Diesel Vehicle Regulation.  ARB staff will also post on the website for this regulation the name and motor carrier number for fleets that have reported compliance.

(z)  *Non-Compliance*

Any person who fails to comply with the general requirements of this regulation, who fails to submit any information, report, or statement required by this regulation, or who knowingly submits any false statement or representation in any application, report, statement, or other document filed, maintained, or used for the purposes of compliance with this regulation may be subject to civil or criminal penalties under sections 39674, 39675, 42400, 42400.1, 42400.2, 42402.2, and 43016, of the Health and Safety Code. In assessing penalties, the Executive Officer will consider factors, including but not limited to the willfulness of the violation, the length of time of noncompliance, whether the fleet made an attempt to comply, and the magnitude of noncompliance.

(aa) *Severability*

If any subsection, paragraph, subparagraph, sentence, clause, phrase, or portion of this regulation is, for any reason, held invalid, unconstitutional, or unenforceable by any court of competent jurisdiction, such portion shall be deemed as a separate, distinct, and independent provision, and such holding shall not affect the validity of the remaining portions of the regulation.

Note: Authority Cited:  Sections 39600, 39601, 39650, 39658, 39659, 39666, 39667, 39674, 39675, 42400, 42400.1, 42400.2, 42402.2., 42410, 43013, 43016, 43018, 43023, 43600, California Health and Safety Code.  Reference:  Sections 39650, 39658, 39659, 39666, 39667, 39674, 39675, 40717.9, 42400, 42400.1, 42400.2, 42402.2, 42410, 43013, 43016, 43018, 43023, 43600, and 43701(b), California Health and Safety Code.

**EXHIBIT 3**

BROOKS ELLISON
State Bar No. 122705
PATRICK J. WHALEN
State Bar No. 173489
THE LAW OFFICES OF BROOKS ELLISON
1725 Capitol Ave.
Sacramento, CA 95811
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
California Dump Truck Owners Association

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION | Case No. 2:11-CV-00384-MCE-GGH |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANT NICHOL'S FIRST SET OF INTERROGATORIES** |
| vs. | |
| MARY D. NICHOLS, Chairperson of the California Air Resources Board; JAMES GOLDSTENE, Executive Officer of the California Air Resources Board; and DOES 1-50 | |
| Defendants, | |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | |
| Defendant-Intervenor | |

PROPOUNDING PARTY:     Defendant Nichols

RESPONDING PARTY:     Plaintiff California Dump Truck Owners Association

SET NUMBER:     One

1

**Interrogatory No. 5**

Other than trucks and ancillary equipment, describe all capital costs that CDTOA members incur.

**Response to Interrogatory No. 5**

Plaintiff objects to the interrogatory as irrelevant. Plaintiff also objects to the interrogatory because the phrase "ancillary equipment" is vague, ambiguous, and potentially overbroad. The phrase "trucks and ancillary equipment" could include virtually all capital costs incurred by members. Without waiving these objections, plaintiff notes that many members incur costs related to trailers, real estate, maintenance facilities, tools, forklifts, tractors, and loaders, in various amounts and combinations.

**Interrogatory No. 6**

Describe all services that CDTOA members offer.

**Response to Interrogatory No. 6**

CDTOA members perform the following services, although not every member performs every service, and each member may perform he services in varying degrees depending on their business. The services include loading, hauling, and offloading of construction aggregate material including rock fragments, pebbles, sand, dirt, gravel, cobbles, crushed base, asphalt, trash, recyclable material and other similar materials.

**Interrogatory No. 7**

What model years are the trucks that are owned by Robert McClernon?

**Response to Interrogatory No. 7**

Robert McClernon owns the following vehicles: 1990 Keworth, 1993 Kenworth, 1998 Freightliner, 1995 Ford water truck.

///

///

4

1  **Interrogatory No. 11**

2      Between 1990 and the present, what is the average cost of trucks that CDTOA members

3  purchased in the secondary market?

4  **Response to Interrogatory No. 11**

5      Plaintiff objects to the interrogatory as irrelevant, as the cost of trucks has no bearing on

6  the applicability of the FAAAA to the TRUCK AND BUS REGULATION. Plaintiff also

7  objects to the extent it calls for speculation about information that is outside the knowledge that

8  CDTOA has or will have. Moreover, CDTOA objects because the collecting the information

9  called for by the interrogatory would be overly burdensome because it covers equipment

10 purchases over a period spanning more than two decades. Without waiving these objections,

11 plaintiff notes that the cost of trucks has fluctuated immensely over the past two decades, making

12 any "average" impossible to calculate and likely meaningless. It is impossible to tell when

13 members bought their trucks, the model year of the trucks purchased, the market conditions at

14 the time of the purchase, or the type of truck. Plaintiff notes that recently, prices for used have

15 decreased substantially.

16

17 **Interrogatory No. 12**

18     Currently, what is the average cost of a 5-year-old on-road freight truck that could be

19 modified by a CDTOA member to operate as a dump truck for another 15 years or so?

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

Response to Defendant Nichol's First Set of Interrogatories

1    **Response to Interrogatory No. 12**

2        Plaintiff objects to the interrogatory as irrelevant, as the average cost of used trucks has

3    no bearing on the applicability of the FAAAA to the TRUCK AND BUS REGULATION.

4    Without waiving these objections, the cost could vary between approximately $40,000 to

5    approximately $60,000, depending on the type of truck (i.e. 2-axle, 3 axle, end dump, bottom

6    dump, etc.), the amount of conversion already performed by the seller, and the warranty offered

7    by the seller.

8

9                                              THE LAW OFFICES OF BROOKS ELLISON

10   Dated: October 31, 2011

11

12                                             PATRICK J. WHALEN

13                                             Attorneys for Plaintiff
                                          CALIFORNIA DUMP TRUCK OWNERS
                                          ASSOCIATION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Response to Defendant Nichol's First Set of Interrogatories

1

2

## VERIFICATION

3

4      I am the Executive Director of the California Dump Truck Association, and I have read

5  the foregoing Response to Defendant-Intervenor's First Set of Interrogatories and know its

6  contents. The matters stated in the Response to Defendant-Intervenor's First Set of

7  Interrogatories are true based on my own knowledge. I declare under penalty of perjury under

8  the laws of the State of California that the foregoing is true and correct and based on my personal

9  knowledge, and if called to testify to these facts, I would do so competently and truthfully.

10

11  Executed this 1 day of November 2011, in _____Upland_____, California.

12

13  Lee Brown

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Response to Defendant Nichol's First Set of Interrogatories

**EXHIBIT 4**

1  BROOKS ELLISON
   State Bar No. 122705
2  PATRICK J. WHALEN
   State Bar No. 173489
3  THE LAW OFFICES OF BROOKS ELLISON
   1725 Capitol Ave.
4  Sacramento, CA 95811
   Telephone: (916) 448-2187
5  Facsimile: (916) 448-5346
   E-mail: attorneys@ellisonlawoffices.com
6
   Attorneys for Plaintiff
7  California Dump Truck Owners Association

8

9                    UNITED STATED DISTRICT COURT
10
                    EASTERN DISTRICT OF CALIFORNIA
11

12  CALIFORNIA DUMP TRUCK OWNERS          Case No.  2:11-CV-00384-MCE-GGH
    ASSOCIATION
13
                                          **PLAINTIFF'S RESPONSE TO**
14            Plaintiff,                   **DEFENDANT NICHOL'S FIRST SET**
        vs.                               **OF REQUESTS FOR ADMISSION**
15
16  MARY D. NICHOLS, Chairperson of the
    California Air Resources Board; JAMES
17  GOLDSTENE, Executive Officer of the
    California Air Resources Board; and DOES 1-
18  50

19          Defendants,

20
    NATURAL RESOURCES DEFENSE
21  COUNCIL, INC.,

22          Defendant-Intervenor
23

24

25  PROPOUNDING PARTY:    Defendant Nichols

26  RESPONDING PARTY:     Plaintiff California Dump Truck Owners Association

27  SET NUMBER:           One

28

                                       1
    Response to Defendant Nichol's First Set of Requests for Admission

Pursuant to rules 26 and 36 of the federal rules of Civil Procedure, Plaintiff provides the following written responses to the requests for admission served on September 30, 2011.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

The responses which follow are based on plaintiff's present recollection, knowledge, information and belief, and plaintiff specifically reserves the right to amend or withdraw any response to these requests for admission. Plaintiff reserves all objections as to competency, relevancy, materiality, privilege, or admissibility of all information provided. By providing a response to a request for admission, plaintiff does not waive any objection which has been stated generally as to all requests or to that specific request. These introductory comments and general objections shall be incorporated by reference as if fully set forth in all responses herein.

## RESPONSES TO REQUESTS FOR ADMISSION

**Admission Request No. 1**

CDTOA members will not raise rates in response to the TRUCK AND BUS REGULATION because, as CDTOA alleges, prices in this market are currently inflexible.

**Response to Admission Request No. 1**

Plaintiff denies the request in its entirety. Plaintiff admits that prices will inevitably have to be raised to pay for the capital investment necessary for either engine retrofits or truck replacement. CDTOA members will either raise prices or they will go out of business.

**Admission Request No. 2**

Implementation of the TRUCK AND BUS REGULATION will reduce the level of DIESEL PM emitted from many trucks owned by CDTOA members.

**Response to Admission Request No. 2**

Plaintiff objects to the request to the extent it calls for hearsay, expert opinion, and matters beyond the personal knowledge of plaintiff. Plaintiff also objects to the request on the grounds of relevancy, as the FAAAA which preempts the TRUCK AND BUS REGULATION does not depend on whether the effect of the regulation is to reduce emissions.

2

Without waiving these objections, plaintiff admits that it is aware that the author of one or more of the emissions studies relied upon by the Air Resources Board falsified his credentials. Plaintiff admits that the Air Resources Board has revised downward its previous estimates of emissions, thereby undermining the premise of the data that gave rise to the rule in the first place. Plaintiff denies the balance of the request.

**Admission Request No. 3**

Installing a diesel particulate filter on trucks owned by CDTOA members that are model year 2006 or older in accordance with the TRUCK AND BUS REGULATION will reduce the level of DIESEL PM emitted from those trucks.

**Response to Admission Request No. 3**

Plaintiff objects to the request to the extent it calls for hearsay, expert opinion, and matters beyond the personal knowledge of plaintiff. Plaintiff also objects to the request on the grounds of relevancy, as the FAAAA which preempts the TRUCK AND BUS REGULATION does not depend on whether the effect of the regulation is to reduce emissions.

Without waiving these objections, plaintiff admits that it is aware that the retrofit devices can and have caused fires, resulting in the destruction of hundreds of acres of forest land and causing a unknown amount of air pollution. Plaintiff admits that some of the retrofit devices previously approved by the Air Resources Board have now been recalled by the manufacturer because of the dangers they present. Plaintiff denies the balance of the request.

**Admission Request No. 4**

When CDTOA members purchase trucks, they purchase used trucks, not new trucks.

**Response to Admission Request No. 4**

Plaintiff admits that most CDTOA members, especially including owner-operators, have traditionally purchased used trucks. However, CDTOA members that are owners of large fleets will also buy new trucks and use them for decades. Plaintiff also admits that because the TRUCK AND BUS REGULATION establishes the 2010 engine model year as the standard,

3

1  many CDTOA members who might otherwise purchase a used, older truck have elected not to

2  purchase those trucks, knowing that they may not get the years of use out of them that they

3  otherwise would plan for in making their purchase.  Accordingly, the number of used truck

4  purchases may have declined recently as CDTOA members adjust their business practices in

5  light of the TRUCK AND BUS REGULATION.  As a corollary to that, the number of new

6  trucks purchased by members may have increased recently.

7

8  **Admission Request No. 5**

9        CDTOA members typically replace their trucks when the trucks are approximately 20

10  years old.

11  **Response to Admission Request No. 5**

12        Plaintiff admits that 20 years is a good average for the number of years that members

13  tend to use their heavy-duty trucks (which generally have a GVWR greater than 26,000 lbs.),

14  however the actual number varies by member according to his maintenance practices and the

15  particular types of business in which they engage.  Some members convert older trucks to low-

16  mileage 10-wheelers or water trucks and use them in that capacity for many years beyond the 20-

17  year average.

18

19  **Admission Request No. 6**

20        The cost of a retrofit device can be annualized over 6 to 8 years under the TRUCK AND

21  BUS REGULATION.

22  **Response to Admission Request No. 6**

23        Plaintiff denies the request in its entirety.  Financing is available only for 12 months at

24  approximately a 12% interest rate.  Moreover, based on the compliance schedule of the TRUCK

25  AND BUS REGULATION, purchasing a retrofit device only extends the life of the truck for

26  approximately eight years, at which time the truck will have to be replaced.  In other words,

27  making the substantial capital investment necessary to retrofit trucks only delays the much larger

28  capital investment necessary to fully replace trucks.

**Admission Request No. 7**

       The TRUCK AND BUS REGULATION was not the sole reason that Fred Recupido decided to sell all but one of his trucks.

**Response to Admission Request No. 7**

       Plaintiff objects to the request as irrelevant. Without waiving the objection, plaintiff admits that Mr. Recupido's decision was based on a variety of factors.

**Admission Request No. 8**

       Fuel costs are a factor that CDTOA members consider in setting rates.

**Response to Admission Request No. 8**

       Plaintiff admits that fuel costs are one factor – but not the only factor – that CDTOA members consider in setting rates.

**Admission Request No. 9**

       Fuel costs are a factor that CDTOA members consider in establishing routes.

**Response to Admission Request No. 9**

       Plaintiff admits that fuel costs are one factor – but not the only factor – that CDTOA members consider in establishing routes.

**Admission Request No. 10**

       Fuel costs are a factor that CDTOA members consider in establishing services.

**Response to Admission Request No. 10**

       Plaintiff admits that fuel costs are one factor – but not the only factor – that CDTOA members consider in establishing services.

///

///

///

Response to Defendant Nichol's First Set of Requests for Admission

**Admission Request No. 11**

Employee and drivers' salaries, pay, and benefits are a factor CDTOA members consider in setting rates.

**Response to Admission Request No. 11**

Plaintiff admits that, for members that have employees and drivers, salaries, pay, and benefits are factors that CDTOA members consider in setting rates.

**Admission Request No. 12**

Employee and drivers' salaries, pay, and benefits are a factor CDOA members consider in establishing routes.

**Response to Admission Request No. 12**

Plaintiff admits that, for members that have employees and drivers, salaries, pay, and benefits are factors that CDTOA members consider in establishing routes.

**Admission Request No. 13**

Employee and drivers' salaries, pay, and benefits are a factor CDTOA members consider in establishing services.

**Response to Admission Request No. 13**

Plaintiff admits that, for members that have employees and drivers, salaries, pay, and benefits are factors that CDTOA members consider in establishing services.

THE LAW OFFICES OF BROOKS ELLISON

Dated: October 31, 2011

PATRICK J. WHALEN
Attorneys for Plaintiff
CALIFORNIA DUMP TRUCK OWNERS
ASSOCIATION

Response to Defendant Nichol's First Set of Requests for Admission

PATRICK J. WHALEN
Attorneys for Plaintiff
CALIFORNIA DUMP TRUCK OWNERS
ASSOCIATION

## VERIFICATION

I am the Executive Director of the California Dump Truck Association, and I have read the foregoing Response to Defendant-Intervenor's First Set of Requests for Admission and know its contents. The matters stated in the Response to Defendant-Intervenor's First Set of Requests for Admission are true based on my own knowledge. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and based on my personal knowledge, and if called to testify to these facts, I would do so competently and truthfully.

Executed this 1st day of November 2011, in Upland, California.

Lee Brown

Response to Defendant Nichol's First Set of Requests for Admission