DAVID PETTIT (SBN 67128)
dpettit@nrdc.org
MELISSA LIN PERRELLA (SBN 205019)
mlinperrella@nrdc.org
MORGAN WYENN (SBN 270593)
mwyenn@nrdc.org
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, California 90401
Telephone:     (310) 434-2300
Facsimile:     (310) 434-2399

Attorneys for Defendant-Intervenor
Natural Resources Defense Council, Inc.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION,<br><br>              Plaintiff,<br><br>      v.<br><br>MARY D. NICHOLS, Chairperson of the California Air Resources Board; and JAMES GOLDSTENE, Executive Officer of the California Air Resources Board,<br><br>              Defendants,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>              Defendant-Intervenor. | Case No. 2:11-CV-00384-MCE-GGH<br><br>DECLARATION OF MELISSA LIN PERRELLA IN SUPPORT OF DEFENDANT-INTERVENOR NATURAL RESOURCES DEFENSE COUNCIL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF <u>CROSS-MOTION</u> FOR SUMMARY JUDGMENT<br><br>Date:        January 26, 2012<br>Time:        2:00 p.m.<br>Judge:       Hon. Morrison C. England, Jr.<br>Courtroom:   7 |

I, MELISSA LIN PERRELLA, declare as follows:

1.     I am one of the counsel of record for Defendant-Intervenor Natural Resources Defense Council ("NRDC") in this matter.  I make this Declaration of my own personal knowledge and, if called as a witness, could and would testify truthfully to the contents hereof. This declaration is submitted in support of NRDC's Cross-Motion for Summary Judgment against Plaintiff California Dump Truck Owners Association ("CDTOA").

2.     Attached hereto as Exhibit "A" is a true and correct copy of the California Air Resources Board's ("CARB") Final Regulation Order: Amendments to the Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants from In-Use On-Road Diesel-Fueled Vehicles, which is located at http://www.arb.ca.gov/regact/2010/truckbus10/tbfro.pdf (last visited Dec. 21, 2011).

3.     Attached hereto as Exhibit "B" is a true and correct copy of excerpts from CARB's Staff Report: Initial Statement of Reasons for Proposed Rulemaking: Proposed Regulation for In-Use On-Road Diesel Vehicles, dated October 2008, which is located at http://www.arb.ca.gov/regact/2008/truckbus08/tbisor.pdf (last visited Dec. 21, 2011).

4.     Attached hereto as Exhibit "C" is a true and correct copy of excerpts from CARB's Staff Report: Initial Statement of Reasons for Proposed Rulemaking: Proposed Amendments to the Truck and Bus Regulation, the Drayage Truck Regulation and the Tractor-Trailer Greenhouse Gas Regulation, dated October 2010, which is located at http://www.arb.ca.gov/regact/2010/truckbus10/truckbus10isor.pdf (last visited Dec. 21, 2011).

5.     Attached hereto as Exhibit "D" is a true and correct copy of CARB's Fact Sheet: Truck and Bus Regulation Compliance Requirements Summary, dated March 23, 2011, which is located at http://www.arb.ca.gov/msprog/onrdiesel/documents/FSRegSum.pdf (last visited Dec. 21, 2011).

6.     Attached hereto as Exhibit "E" is a true and correct copy of CARB's Executive Order R-11-009: Adoption of Amendments to the Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants from In-Use Heavy-Duty

Diesel-Fueled Vehicles, dated September 19, 2011, which is located at

http://www.arb.ca.gov/regact/2010/truckbus10/tbeo.pdf (last visited Dec. 21, 2011).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 22, 2011 in Santa Monica, California.

/s/ Melissa Lin Perrella

**EXHIBIT A**

**FINAL REGULATION ORDER**

**AMENDMENTS TO THE REGULATION TO REDUCE EMISSIONS OF DIESEL PARTICULATE MATTER, OXIDES OF NITROGEN AND OTHER CRITERIA POLLUTANTS FROM IN-USE ON-ROAD DIESEL-FUELED VEHICLES**

**Division 3: Air Resources Board**
**Chapter 1: Motor Vehicle Pollution Control Devices**

---

Note: This document is printed in a style to indicate changes from the existing provisions in title 13, California Code of Regulations, section 2025. All existing language is indicated by plain type. All additions to the language are indicated by underlined text. All deletions are indicated by strikeout.

**Section 2025.  Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles**

(a)    *Purpose.*

The purpose of this regulation is to reduce emissions of diesel particulate matter (PM), oxides of nitrogen (NOx) and other criteria pollutants, and greenhouse gases from in-use diesel-fueled vehicles.

(b)    *Scope and Applicability.*

(1)

Except as provided in subsection (c), this regulation applies to any person, business, federal government agency, school district or school transportation provider that owns or operates, leases, or rents, affected vehicles that operate in California. The regulation also applies to persons that sell affected vehicles in California. Affected vehicles are those that operate on diesel-fuel, dual-fuel, or alternative diesel-fuel that are registered to be driven on public highways, were originally designed to be driven on public highways whether or not they are registered, yard trucks with on-road engines or yard trucks with off-road engines used for agricultural operations, both engines of two-engine sweepers, schoolbuses, and have a manufacturer's gross vehicle weight rating (GVWR) greater than 14,000 pounds (lbs). Affected vehicles also include shuttle vehicles defined in section 2025(d)(68).

(c)    *Exemptions*

This regulation does not apply to:

(1)    Vehicles subject to the solid waste collection vehicle rule commencing with title 13, CCR, section 2021;

(2)    Vehicles On-road diesel-fueled heavy-duty vehicles over 14,000 pounds owned or operated by a municipality, as defined in title 13, section 2020(b), that comply with

1

the Best Available Control Technology (BACT) requirements of title 13, <u>CCR</u> section 2022.1(a)(1);

(3) Vehicles subject to the fleet rule for <u>public</u> transit agencies commencing with title 13, CCR, section 2023;

(4) Vehicles subject to the rule for mobile cargo handling equipment at ports and intermodal rail yards commencing with title 13, CCR, section 2479;

(5) Military tactical support vehicles, as described in title 13, CCR, section 1905;

(6) Authorized emergency vehicles as described in California Vehicle Code (Veh. Code), section 165;

(7) Off-road vehicles <u>equipped with engines</u> subject to title 13, CCR, sections 2401, 2411, 2421, 2432, and 2449;

(8) Dedicated snow-removal vehicles as defined in section 2025(d)<s>(18)</s><u>(15)</u>;

(9) <s>Two-engine cranes as defined in title 13, CCR, section 2449(c)(56);</s>

<s>(10)</s><u>(9)</u>    Historic vehicles as defined in section 2025(d)<s>(41)</s><u>(36)</u>;

<s>(11)</s><u>(10)</u>    Motor homes for non-commercial private use;

<s>(12)</s><u>(11)</u>    <u>Except as specified in section 2025(l) v</u><s>V</s>ehicles subject to the regulation for drayage trucks commencing with title 13, CCR, section 2027 until January 1, 202<s>1</s><u>23</u>;<s>- and</s>

<s>(13)</s><u>(12)</u>    Trucks with a GVWR of 19,500 <s>pounds</s><u>lbs</u> or less with <u>a</u> <s>originally equipped</s> pick-up bed<s>s</s> used exclusively for personal <s>use</s>, non-commercial, <u>or non-governmental use</u><s>.</s><u>; and</u>

(13) <u>Except for two-engine sweepers, other two-engine on-road vehicles that are subject to title 13, CCR, section 2449, including but not limited to, water well drilling rigs, workover rigs, and cranes, in which one engine provides the motive power for the vehicle and a second engine is an auxiliary engine 50 horsepower or greater that is integrated into the design of the vehicle and provides power for the vehicle to perform a specialized function.</u>

(d) *Definitions*

For purposes of this regulation, the following definitions apply:

(1) <s>"*2004 Model Year NOx Emissions Equivalent*" means emissions from:</s>

    (A) <s>An engine certified to the 2003 or prior model year heavy duty diesel engine emission standard that was built to 2004 engine emission standards and was not used in any manufacturer's averaging, banking and trading program.</s>

    (B) <s>A pre-2004 model year heavy duty diesel engine that is equipped with a verified diesel emissions control strategy (VDECS) that reduces NOx exhaust emissions by at least 55 percent.</s>

(1) <u>"2006 *Baseline Fleet*" means diesel-fueled heavy-duty vehicles with a GVWR greater than 26,000 lbs included in the scope of section 2025(b) that were owned</u>

by a fleet and registered to operate in California on October 1, 2006 with the California Department of Motor Vehicles, or were owned by a fleet, registered to operate on October 1, 2006 in a jurisdiction that is an International Registration Plan member, and were driven at least 1,000 miles in California in the calendar year 2006. A fleet owner must include all vehicles that fall within the scope and applicability of section 2025(b) and must exclude all vehicles that are exempt from the regulation in the exemptions section 2025(c).

(2) "*2007 Model Year ~~NOx~~ Emissions Equivalent*" means emissions from:

(A)  An engine certified to the 2004 through 2006 model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx emissions by at least 40 percent; or

(B)  An engine that was built to the 2004 engine emission standard and was not used in any manufacturer's averaging, banking, or trading program that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 40 percent; or

(C)  An engine certified to the 2003 or prior model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 70 percent; or

~~(A)  An engine certified to the 2003 or prior model year heavy-duty diesel engine emissions standard that is equipped with a VDECS that reduces NOx exhaust emissions by at least 70 percent; or~~

~~(B)  An engine certified to the 2004 through 2006 model year heavy-duty diesel engine emissions standard that is equipped with a VDECS that reduces NOx exhaust emissions by at least 40 percent; or~~

~~(C)  A 2004 model year NOx emissions equivalent heavy-duty diesel engine, as defined in section 2025(d)(1)(A), that is equipped with a VDECS that reduces NOx exhaust emissions by at least 40 percent.~~

(D)  An engine certified to the 2007-2009 model year heavy-duty engine emissions standard and meets PM BACT.

~~(3)  2008 *Baseline Fleet*" means the motor vehicles that were owned by the fleet, registered with California's department of motor vehicles or registered in the home jurisdiction of one of the International Registration Plan member jurisdictions on July 1, 2008, and were driven at least 1,000 miles in the year 2008 in California.~~

(4)(3)  "*2010* Model *Year ~~NOx~~ Emissions Equivalent Engine*" means emissions from:

(A)  An engine certified to the 2004 through 2006 model year heavy-duty diesel engine emissions standard that is equipped with the highest level VDECS and reduces NOx emissions by at least 85 percent; or

(B)  An engine that was built to the 2004 engine emission standard and was not used in any manufacturer's averaging, banking, or trading program that is equipped with the highest level VDECS and reduces NOx exhaust emissions by at least 85 percent; or

(A)   ~~An engine certified to the 2004 model year heavy-duty diesel engine emissions standard that is equipped with a VDECS that reduces NOx exhaust emissions by more than 85 percent; or~~

~~(B)~~(C)   An engine certified to the 2007 model year heavy-duty diesel engine emissions standard that meets PM BACT and ~~that is equipped with a VDECS that~~ reduces NOx exhaust emissions by more than 70 percent; or

~~(C)~~(D)   An engine certified to the 2010 model year or newer heavy-duty diesel engine emissions standard that meets PM BACT; or

~~(D)~~(E)   A heavy-duty engine certified to 0.2 g/bhp-hr or less NOx emissions level and 0.01 g/bhp-hr or less PM emissions level; or

~~(E)~~(F)   An off-road engine certified to the Tier 4 Final engine emissions standard.

~~(5)~~(4)   "*Agricultural Operations*" means:

(A)   The activity of growing or harvesting crops for the primary purpose of making a profit or providing a livelihood including any horticultural, viticultural, aquacultural, forestry, dairy, livestock, poultry, bee or farm product.  Raising plants at nurseries that sell exclusively retail are not included, or

(B)   The cutting or removing of timber, other solid wood products, including Christmas trees, and biomass from forestlands for commercial purposes. The services also include all the work incidental thereto, including but not limited to, construction and maintenance of roads, fuel breaks, firebreaks, stream crossings, landings, skid trails, beds for falling trees, fire hazard abatement, and site preparation that involves disturbance of soil or burning of vegetation following forest removal activities.  Forest operations include the cutting or removal of trees, tops, limbs and or brush which is processed into lumber and other wood products, and or for landscaping materials, or biomass for electrical power generation. Forest operations do not include conversion of forestlands to other land uses such as residential or commercial developments.

~~(6)~~(5)   "*Agricultural Vehicle*" means ~~one of the following types of vehicles;~~ a vehicle that is eligible to utilize the requirements for agricultural vehicles in section 2025(m) and meets one of the definitions of (A) through (E) below.

~~(B)~~(A)   A vehicle, or truck-tractor and trailer combination, owned by a farming business and used exclusively in one or more of the following ways:

1.   in agricultural operations;

2.   to transport harvested farm products to the first point of processing;

3.   to directly support ~~the~~ farming or forestry operations, which may include supply trucks, cattle trucks, and other vehicles but does not include vehicles that do not directly support farming operations such as personal use vehicles, vehicles rented or leased to others for non-agricultural uses that do not qualify, or vehicles used in a transportation

4

business other than to transport harvested farm products to the first point of processing.

(B)   A vehicle, or truck-tractor and trailer combination, owned by a bee keeping business and used exclusively to transport their own bees or honey to the first point of processing.

(B)   ~~A vehicle, or truck-tractor and trailer combination, owned by a farming business and used exclusively in agricultural operations, or owned by a beekeeping business used exclusively to transport their own bees. This includes supply trucks, cattle trucks, and other vehicles, but excludes vehicles that do not directly support farming operations such as personal use vehicles, vehicles rented or leased out, or vehicles used in a transportation business.~~

~~(A)~~(C)   A truck, or a truck-tractor and trailer combination, that is required to display a hazardous material placard during delivery and exclusively delivers fertilizer or crop protection chemicals that require placard identification for use in agricultural operations from a distribution center to a farm and back, and is owned by a business holding a valid fertilizer or pest control license.

    1.   Owners of such vehicles must hold~~;~~:

        a.   a valid pest control dealer license issued by the California Department of Pesticide Regulation as required under Food & Agricultural Code, Division 6, Chapter 7, Article 6, Section 12101: or~~,~~

        b.   a valid fertilizing materials license issued by the California Department of Food and Agriculture as required under Food & Agricultural Code, Division 7, Chapter 5, Article 4, Section 14591(a). ~~and,~~

    2.   Such vehicles must exclusively carry products defined under one of the following, and be required to display an appropriate placard, as required by the United States Department of Transportation:

        a.   49 CFR, CHAPTER 1, PART 173.127 (Division 5.1)~~;~~: or

        b.   49 CFR, CHAPTER 1, PART 173.132 (Division 6.1)~~;~~: or

        c.   49 CFR, CHAPTER 1, PART 173.115 Class 2, (Division 2.1, 2.2, and 2.3)~~;~~: or

        d.   49 CFR, CHAPTER 1, PART 173.136 Class 8~~;~~: or

        e.   49 CFR, CHAPTER 1, PART 173.140 Class 9.

~~(C)~~(D)   A truck, or truck-tractor and trailer combination, designed for in-field operations, that is exclusively engaged in agricultural operations on the farm. Examples include truck configurations designed to spread manure, dispense hay, and dispense freestall bedding. It also includes water trucks and trucks designed or modified to be used exclusively for the dusting, spraying, fertilizing, or seeding of crops. Except as allowed in (A) above, trucks, or

truck-tractor and trailer combinations that transport any products, materials, personnel, or equipment are excluded.

(D)(E)    A truck, or truck-tractor and trailer combination, including yard trucks, that exclusively transports any unprocessed horticultural, viticultural, aquacultural, forestry, dairy, livestock, poultry, bee or farm products such as raw, unprocessed crops, livestock, fish, or fowl from between the farm and to the where the first point of processing occurs after harvest. Also included are trucks that are used to harvest crops for silage, and trucks that transport unprocessed agricultural materials from forest or farm to a biomass facility.

(7)(6)    *"Alternative Diesel Fuel"* means any fuel used in diesel engines that is not a reformulated diesel fuel as defined in sections 2281 and 2282 of title 13, CCR, and does not require engine or fuel system modifications for the engine to operate, other than minor modifications (e.g., recalibration of the engine fuel control) that may enhance performance.  Examples of alternative diesel fuels include, but are not limited to, biodiesel, Fischer-Tropsch fuels, and emulsions of water in diesel fuel.  Natural gas is not an alternative diesel fuel.  An emission control strategy using a fuel additive will be treated as an alternative diesel fuel based strategy unless:

(A)    the additive is supplied to the engine fuel by an on-board dosing mechanism,; or

(B)    the additive is directly mixed into the base fuel inside the fuel tank of the engine,; or

(C)    the additive and base fuel are not mixed until engine fueling commences, and no more additive plus base fuel combination is mixed than required for a single fueling of a single engine or vehicle.

(8)(7)    "*Alternative Fuel*" means natural gas, propane, ethanol, methanol, gasoline (when used in hybrid electric vehicles only), hydrogen, electricity, fuel cells, or advanced technologies that do not rely on diesel fuel.  "Alternative fuel" also means any of these fuels used in combination with each other or in combination with other non-diesel fuels.

(9)(8)    "*Alternative-Fueled Engine*" means an engine that is exclusively fueled with a fuel meeting the definition of alternative fuel.

(10)(9)        *"Authorized Emergency Vehicle"* has the same meaning as California Vehicle Code section 165.

(11)    "*Best Available Control Technology BACT Standard*" (BACT) means the exhaust PM and NOx standards that must be met according to the requirements of section 2025(f) and 2025(g).

(12)(10)        *"California Based Broker"* means a person, with operations based in California, who, for compensation, arranges or offers to arrange the transportation of property by an authorized motor carrier. A motor carrier, or person who is an employee or bona fide agent of a carrier, is not a broker when it arranges or offers

to arrange the transportation of shipments which it is authorized to transport and which it has accepted and legally bound itself to transport.

(13)   ~~"*Cattle or Calf Feedlot*" means a lot or facility where cattle or calves have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period, and where crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.~~

~~(14)~~(11)       "*Commercial Vehicle*" means a motor vehicle or combination of motor vehicles as defined in California Veh. Code, section 260.

~~(15)~~(12)       "*Common Ownership or Control*" means being owned or managed day to day by the same person, corporation, partnership, or association.  Vehicles managed by the same directors, officers, or managers, or by corporations controlled by the same majority stockholders are considered to be under common ownership or control even if their title is held by different business entities.  Common ownership or control of a federal government vehicle shall be the primary responsibility of the unit that is directly responsible for its day to day operational control.

~~(16)~~(13)       "*Compliance Year*" means January 1 through December 31 of a calendar year.

~~(17)~~(14)       "*Compression Ignition Engine*" means an internal combustion engine with operating characteristics significantly similar to the theoretical diesel combustion cycle.  The regulation of power by controlling fuel supply in lieu of a throttle is indicative of a compression ignition engine.

~~(18)~~(15)       "*Dedicated Snow Removal Vehicle*" means a vehicle that has permanently affixed snow removal equipment such as a snow blower or auger, and is operated exclusively to remove snow from public roads, private roads, or other paths to allow on-road vehicle access.

~~(19)~~(16)       "*Diesel Fuel*" has the same meaning as defined in title 13, CCR, sections 2281 and 2282.

~~(20)~~(17)       "*Diesel Particulate Filter*" means an emission control technology that reduces diesel particulate matter emissions by directing the exhaust through a filter that physically captures particles but permits gases to flow through.  Periodically, the collected particles are either physically removed or oxidized (burned off) in a process called regeneration.

~~(21)~~(18)       "*Diesel Particulate Matter (PM)*" means the particles found in the exhaust of diesel-fueled compression ignition engines.  Diesel PM may agglomerate and adsorb other species to form structures of complex physical and chemical properties.

~~(22)   "*Diesel PM Index*" for the purposes of section 2025(h)(3)(B) means an indicator of the overall PM emission rate.~~

7

(23)  "~~*Diesel PM Target Rate*~~" ~~means the diesel PM fleet average that a specific fleet must meet in a compliance year in order to show compliance with the fleet average requirements.~~

~~(24)~~(19)        "*Drayage Truck*" is the same as defined in title 13, CCR~~.~~, ~~S~~section 2027.

~~(25)~~(20)        "*Dual-Fuel Engine*" means any compression ignition engine that is engineered and designed to operate on a combination of alternative fuels, such as compressed natural gas (CNG) or liquefied petroleum gas (LPG) and diesel fuel or an alternative diesel fuel. These engines have two separate fuel systems, which inject both fuels simultaneously into the engine combustion chamber.  A dual-fuel engine is not an alternative-fuel engine.

~~(26)~~(21)        "*Electronic Tracking System*"

(A)    The tracking device must acquire date, time, and engine-on data at a minimum of 15 minute intervals, with no more than 30 minute data gaps. The tracking device must also acquire location data for vehicles claiming to operate exclusively in NOx-exempt areas and for vehicles that must document low use in California when their total miles of operation exceed 1,000 miles and total hours of operation exceed 100 hours.

(B)    The tracking records must be collected by an independent entity with no business relationship to the owners of the vehicles being tracked, other than to provide the tracking service.

~~(27)~~(22)        "*Emergency Operation*" means operation of an authorized emergency vehicle or emergency support vehicle to help alleviate an immediate threat to public health or safety.  Examples of emergency operation include vehicle used at an emergency event to repair or prevent damage to roads, buildings, terrain, and infrastructure as a result of an earthquake, flood, storm, fire, terrorism, or other infrequent acts of nature.  Emergency operation includes authorized emergency vehicle and emergency support vehicle travel to and from an emergency event when dispatched by a local, state, or federal agency.  Routine operation to prevent public health risks does not constitute emergency operation.

~~(28)~~(23)        "*Emergency Support Vehicle*" means a vehicle, other than an authorized emergency vehicle that has been dispatched by a local, state, or federal agency that is used to <u>provide</u> transport services or supplies in connection with an emergency operation.

(29)  "~~*Emission Factor*~~" ~~means diesel PM or oxides of nitrogen (NOx) emission rate in grams per mile (g/mile) as shown in Appendix A.  For engines that have been retrofitted with VDECS, the PM Emission Factor is reduced by 50 percent for a level 2 VDECS, and 85 percent for a level 3 VDECS; the NOx Emission Factor is reduced by the percentage NOx emission reductions that are verified, if any. The PM Emission Factor is not reduced for a level 1 VDECS.~~

~~(30)~~(24)        "*Executive Officer*" means the Executive Officer of the ARB or his or her authorized representative.

~~(31)~~(25)        "*Farm*" means a physical location for which the primary purpose is making a profit or providing a livelihood from~~:~~:

   (A)    horticultural, viticultural, aquacultural, forestry or crops or plants that are grown and harvested at the location, (~~N~~nurseries that sell exclusively retail are not farms)~~;~~; or

   (B)    raising, breeding, grazing, feeding, or milking animals, fish, fowl, or bees.

~~(32)~~(26)        "*Farming Business*" means a business involved exclusively in the cultivating, operating, or managing a farm for profit~~, either as owner or tenant~~ or a business contracted to harvest trees in a forest for profit.  A farming business does not include businesses that derive their principal source of income from providing agricultural services such as, landscape services, veterinary, farm labor, or management for a fee or on a contract basis, or are engaged in the business of artificial insemination, raising, and caring for dogs, cats, or other pet animals.

~~(33)~~(27)        "*First Point of Processing*" means the location where harvested crops, bees, fowl, fish, livestock, animals, or their products, such as wool, milk, or eggs, are first altered from their original state, or the first location where unaltered products are packaged and prepared for transportation.  First point of processing is not a location of the product's final use and for some crops the location may be in the field, such as chipping wood.  First point of processing also includes biomass facilities that receive agricultural waste in the form of unprocessed agricultural materials.  A first point of processing may include, but is not limited to, packinghouses, slaughterhouses, cotton gins, nut hullers/shellers and processors, dehydrators, lumber mills, feed and grain mills, and biomass facilities.  First point of processing does not include distribution centers, wholesale retail sales locations where the first processing of product does not occur, livestock auction houses, and subsequent locations where processing, canning, or similar activities occur after departing a first point of processing location.

~~(34)~~(28)        "*Fleet*" means one or more vehicles, owned by a person, business, or government agency, traveling in California and subject to this regulation.  A fleet may fall into one of the following subclassification~~s~~s:

   ~~(A)    "Agricultural Fleet" means a fleet utilizing the agricultural fleet provision in section 2025(m).  A fleet owner utilizing the agricultural fleet provisions must include all vehicles under common ownership or control in the agricultural fleet including those vehicles that are not agricultural vehicles.  Fleets not utilizing the agricultural fleet provision must comply with section 2025(e).~~

   ~~(B)~~(A)    "*Federal Fleet*~~s~~" means a fleet of vehicles ~~in fleets~~ owned by a department, agency, or instrumentality of the federal government of the United States of America and its departments, divisions, public corporations, or public agencies including the United States Postal Service.  With respect to the Department of Defense and its service branches, federal fleets may be managed regionally, locally, or a combination of regional and local management.  There may be multiple federal fleets within a military service or an installation~~.~~; or

9

(C)(B)    "*Rental or Leased Fleets*" means a fleet of vehicles that are owned by a person (rental or leasing entity) for the purpose of renting or leasing, as defined in California Uniform Commercial Code, section 10103(a)(10) such vehicles to other persons (renters or lessees) for use or operation.

(D)    "*Schoolbus Fleet*" means a fleet comprised only of vehicles that meet the definition of schoolbus given in section 2025(d)(67).

(E)    "*Schoolbus Sub-Fleet*" means the schoolbuses in a fleet comprised of schoolbuses and vehicles other than schoolbuses.

(F)    "*Small Fleet*" means a fleet with a fleet size of three or fewer vehicles. When determining fleet size, all of the vehicles under common ownership and control must be counted.

(35)(29)        *"Fleet Owner"* means, except as modified below in paragraphs (A) and (B), either the person registered as the owner or lessee of a vehicle by the California Department of Motor Vehicles (DMV), or its equivalent in another state, province, or country; as evidenced on the vehicle registration document carried in the vehicle.

(A)    For vehicles that are owned by the federal government and not registered in any state or local jurisdiction, the owner shall be the department, agency, branch, or other entity of the United States, including the United States Postal Service, to which the vehicles in the fleet are assigned or which have responsibility for maintenance of the vehicles.

(B)    For vehicles that are rented or leased:

1.    The owner shall be presumed to be the rental or leasing entity for purposes of compliance with section 2025(e), if:

a.    The rental or lease agreement for the vehicle is for a period of less than one year; or

b.    The rental or lease agreement for the vehicle is for a period of one year or longer, unless the terms of the rental or lease agreement or other equally reliable evidence identifies the party responsible for compliance with state laws for the vehicle to be the renting operator or lessee of the vehicle.

2.    For purpose of enforcement, if at the time that the vehicle is inspected and cited for noncompliance with this regulation and neither the operator of the vehicle nor the rental or leasing entity can produce does not possess evidence of the party responsible for compliance with state laws, the owner shall be presumed to be both the rental or leasing entity and the renting operator or lessees of the vehicle.

(36)(30)        *"Fleet Size"* means the total number of diesel vehicles with a GVWR greater than 14,000 lbs in a fleet, regardless of whether the vehicles operate in California, that are under common ownership or control even if they are part of different subsidiaries, divisions, or other organizational structures of a company or agency.

(31)  "*Fuel Efficient Hybrid Vehicle*" means a vehicle with an onboard energy storage system that improves the average fuel economy of the vehicle by at least 20 percent compared to a conventional diesel vehicle of the same model year and configuration.  The vehicle must have a combination of an engine and onboard energy storage system that provides motive power for accelerating the vehicle, regenerative braking, or operates auxiliary equipment while stationary, such as a boom, auger, or drill rig.  The energy storage system can be electric, hydraulic, pneumatic or of any other type that recovers its energy directly or indirectly from the engine.  In addition, the onboard energy storage systems of the hybrid vehicle can have the capability to supplement its energy from an external power source.

(37)(32)  "*Governmental Agency*" means any federal, state, or local governmental agency, including, public schools, water districts, or any other public entity with taxing authority.

(33)  "Gross Vehicle Weight Rating (GVWR)" is as defined in Vehicle Code Section 350.

(38)(34)  "*Heavy-Duty Pilot Ignition Engine*" means an engine designed to operate using an alternative fuel, except that diesel fuel is used for pilot ignition at an average ratio of no more than one part diesel fuel to ten parts total fuel on an energy equivalent basis.  An engine that can operate or idle solely on diesel fuel at any time does not meet this definition.

(39)  "*Heavy Heavy-Duty Diesel Vehicle (HHD)*" for the purposes of this regulation, means a diesel motor vehicle having a manufacturer's gross vehicle weight rating greater than 33,000 pounds or a truck-tractor regardless of GVWR., or a motorcoach.

(40)(35)  "*Highest Level VDECS*" means the highest level VDECS verified by ARB under its Verification Procedure, Warranty and In-Use Compliance Requirements for In-Use Strategies to Control Emissions from Diesel Engines (Verification Procedure), title 13, CCR, sections 2700-2710, for a specific engine as of 10 months prior to the compliance date, which the diesel emission control strategy manufacturer and authorized diesel emission-control strategy dealer agree can be used on a specific engine and vehicle combination without jeopardizing the original engine warranty in effect at the time of application.

(A)  The highest level VDECS is determined solely on verified diesel PM reductions.  Plus designations do not affect the diesel PM level assigned to a VDECS; that is, a lLevel 3 Plus is the same diesel PM level as lLevel 3.

(B)  A Level 2 VDECS shall not be considered the highest level VDECS as long as a lLevel 3 VDECS can be retrofitted on a vehicle in the fleet.

(C)  Level 1 devices are never considered highest level VDECS for the purpose of this regulation.

(41)(36)  "*Historic Vehicle*" means a vehicle that meets the qualifications qualifies for a historical vehicle and has been issued a historical vehicle license plate pursuant to the California Veh. Code, section 5004, and is operated or moved over the highway primarily for the purpose of historical exhibition or other historic vehicle club activities.

(37)  *"Hubodometer"* means a non-resettable device mounted on the axle of a vehicle that measures distance traveled that has a serial number and a lock-out feature that permanently prevents tampering.

(42)  "~~*Hybrid Vehicle*~~" ~~means a vehicle that has a combination of an engine and onboard energy storage systems that provide for one or more of the following processes: motive power for starting the vehicle from a stop, motive power for accelerating the vehicle, recapture of energy when the vehicle decelerates. The energy storage systems can be electric, hydraulic, pneumatic or of any other type that recovers its energy directly or indirectly from the engine. In addition, the onboard energy storage systems of the hybrid vehicle can have the capability to supplement its energy from an external power source.~~

~~(43)~~(38)    "*International Registration Plan (IRP)*" is a registration reciprocity agreement among states of the United States and provinces of Canada providing for payment of license fees on the basis of total distance operated in all jurisdictions.

(44)  "~~*Limited-Mileage Agricultural Vehicle*~~" ~~means until January 1, 2017, an agricultural vehicle with a properly functioning odometer installed at all times, that operates less than the miles specified below per calendar year, based on the model year of the installed engine or any vehicle that replaces a limited-mileage vehicle pursuant section 2025(m) (6)(B):~~

~~(A)  A pre-1996 model year engine that is operated fewer than 15,000 miles; or~~

~~(B)  A 1996 through 2005 model year engine that is operated fewer than 20,000 miles; or~~

~~(C)  A 2006 or newer model year engine that is operated fewer than 25,000 miles.~~

(39)  "*Log Truck*" means a heavy-duty vehicle with a manufacturer's GVWR greater than 33,000 lbs and has log bunks permanently attached that exclusively transports logs.

(45)  "~~*Low-Mileage Agricultural Vehicle*~~" ~~means until January 1, 2023, an agricultural vehicle with a properly functioning odometer installed at all times, that operates less than 10,000 miles per calendar year each year since January 1, 2010 or a vehicle that replaces a low-mileage vehicle per section 2025(m) (7)(B).~~

(46)  "~~*Low-use Schoolbus*~~" ~~means a schoolbus whose propulsion engine was operated in California for fewer than 1,000 miles during the preceding 12 month period from January 1 to the end of December. Such vehicles must have a properly functioning odometer installed at all times but are not required to have an hour-meter.~~

(40)  "*Low-Mileage Construction Truck*" means a vehicle that meets the definition in (A) or (B) as follows:

(A)  A dump truck with a GVWR greater than 26,000 lbs that operates less than 20,000 miles per calendar year and is designed to transport construction materials such as dirt, asphalt, rock or construction debris including a transfer

truck, or a tractor trailer combination used exclusively to pull bottom dump, end dump or side dump trailers, or

(B)   A truck with a GVWR greater than 26,000 lbs that travels less than 15,000 miles per calendar year and is a concrete mixer truck, truck with a concrete placing boom, a water tank truck, a single engine crane with a load rating of 35 tons or more, a tractor that exclusively pulls a low-boy trailer, or a truck owned by a company that holds a valid license issued by the California Contractors State License Board.

(41)   "*Low-use Vehicle*" means a vehicle that will be operated fewer than 1,000 miles in California in any compliance year. If that vehicle has an engine that powers other equipment that can only be used while stationary, the engine or power take off (PTO) must also operate less than 100 hours in any compliance year. The hour limitation does not apply for vehicles where the engine is used to power an auxiliary mechanism that strictly loads and unloads cargo from the vehicle (examples include, but are not limited to, dump trucks, cement powder trucks, or trucks with attached lift devices).

(47)   "*Low-use Vehicle*" means a vehicle whose propulsion engine was operated in California for fewer than 1,000 miles and less than 100 hours during the preceding 12 month period from January 1 to the end of December.  Such vehicles must have a properly functioning odometer and hour-meter installed at all times.

(48)   "*Medium Heavy-Duty Diesel Vehicle (MHD)"* for the purposes of this regulation, means a diesel motor vehicle having a manufacturer's gross vehicle weight rating less than or equal to 33,000 pounds excluding truck-tractors regardless of GVWR.

(49)   "*Motorcoach*" (MC) is an on-road motor vehicle having an under floor luggage compartment separate from the passenger cabin used for conveying passengers, is at least 35 feet in length, and is designed for and has seating capacity for 40 or more passengers.

(50)(42)      "*Motor Carrier*" is the same as defined in California Veh. Code section 408 for fleets other than those that are comprised entirely of school buses, which for the purposes of this regulation, means the registered owner, lessee, licensee, school district superintendent, or bailee of any school bus, who operates or directs the operation of any such bus on either a for-hire or not-for-hire basis.

(51)(43)      "*Motor Home*" means a single vehicular unit designed for human habitation for recreational or emergency occupancy and built on, or permanently attached to, a self-propelled motor vehicle chassis, chassis cab, or van, which becomes an integral part of the completed vehicle or a vehicle that exclusively tows a trailer that was originally designed for human habitation for recreational or emergency occupancy.

(52)(44)      "*New Fleet*" means a fleet that is acquired or that enters California after January 1, 2011 January 1, 2012.  Such fleets may include new businesses or out-of-state businesses that bring vehicles into California for the first time after January 1, 2011 January 1, 2012.

13

(53)(45)    "*Non-Commercial Use*" means any use or activity where a fee is not charged and the purpose is not the sale of a good or service, and the use or activity is not intended to produce a profit.

(54)    ~~*"NOx BACT"* means an on-road engine newly manufactured in 2010 or later or a 2010 emissions-equivalent engine as defined in section 2025(d)(4).~~

(55)(46)    "*NOx Exempt Areas*" are the following counties – Alpine, Colusa, Del Norte, Glenn, Humboldt, Lake, Lassen, Mendocino, Modoc, Monterey, <u>Northern Sonoma (as defined in title 17, CCR section 60100(e),</u> Plumas, San Benito, San Luis Obispo, Santa Barbara, Santa Cruz, Shasta, Sierra, Siskiyou, Trinity, Tehama, and Yuba.

(56)    ~~"*NOx Exempt Vehicle*" is any vehicle identified in paragraphs 0 through (E) below. These vehicles are exempt from meeting the NOx BACT requirements of sections 2025(f) or (g), or the NOx fleet average requirements of section 2025(h) for the compliance years specified in section 2025(p).~~

~~A NOx exempt vehicle is:~~

~~(A)    A schoolbus as defined in section 2025(d)(67); or~~

~~(B)    A vehicle that operates exclusively in the NOx exempt areas defined in section 2025(d)(55); or~~

~~(C)    A vehicle that is granted a compliance extension under the early action provision of section 2025(p)(8); or~~

~~(D)    A NOx mileage exempt vehicle, as defined in section 2025(d)(56); or~~

~~(E)    A motorcoach as defined in section 2025(d)(47).~~

(57)    ~~"*NOx Index*" for the purposes of section 2025(h)(2)(B) means an indicator of a fleet's overall NOx emission rate.~~

(58)    ~~"*NOx Mileage Exempt Vehicle*" is exempt from meeting NOx BACT in sections 2025(f) or (g), or the NOx fleet average in section 2025(h) during the compliance years specified in section 2025(p)(1), and section 2025(h) regardless of where the vehicle is operated and is limited to:~~

~~(A)    A heavy heavy-duty diesel vehicle that has a power take off system to perform work in a stationary mode, or a diesel yard truck that is operated fewer than 7,500 miles and less than 250 hours per year;~~

~~(B)    A medium heavy-duty diesel vehicle that has a power take off system to perform work in a stationary mode that is operated fewer than 5,000 miles and less than 175 hours per year;~~

~~(C)    A heavy heavy-duty diesel vehicle that does not have a power take off system to perform work in a stationary mode and is operated fewer than 7,500 miles per year, with no hours limitation; or~~

~~(D)    A medium heavy-duty diesel vehicle that does not have a power take off system to perform work in a stationary mode and is operated fewer than 5,000 miles per year, with no hours limitation.~~

(59) ~~*"NOx Target Rate"* means the NOx fleet average that a specific fleet must meet in a compliance year in order to show compliance with the fleet average requirements.~~

(60) ~~*"Oxides of* Nitrogen *(NOx)"* means compounds of nitric oxide, nitrogen dioxide, and other oxides of nitrogen. Nitrogen oxides are typically created during combustion processes and are major contributors to smog formation and acid deposition, and to the formation of particulate matter.~~

~~(61)~~(47)     "*Person*" means an individual, corporation, business trust, estate, trust, partnership, Limited Liability Company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity.

~~(62)~~(48)     *"PM BACT"* means the technology employed on the highest level VDECS for PM or an engine that is equipped with an original equipment manufacturer (OEM) diesel particulate filter and certified to meet the 0.01 g/bhp-hr certification standard.

~~(63)~~(49)     "*Registered and Driven Safely On-Road*" means a vehicle that meets the requirements to be registered for on-road operation in California Veh. Code division 3, chap. 1, article 1, section 4000 et seq. (i.e., required to be registered or could be registered), and the requirements to be driven safely on-road in "Equipment of Vehicles" requirements in Veh. Code division 12, chap. 1, sections 24000 et seq. and "Size, Weight, and Load" requirements in Veh. Code division 15, sections 35000 et seq, or a vehicle defined as an implement of husbandry as defined in California Veh. Code division 16, chap. 1, section 36000 et seq.

~~(64)~~(50)     "*Repower*" means to replace the engine in a vehicle with a newer engine certified to lower emission standards for PM or NOx or both as applicable.

~~(65)~~(51)     "*Responsible Official*" means one of the following:

(A)     For a corporation: A president, secretary, treasurer, or vice president of the corporation in charge of a principal business function, their delegate, designee, or any other person who performs similar policy or decision-making functions for the corporation;

(B)     For a partnership or sole proprietorship: a general partner or the proprietor, respectively;

(C)     For a municipality, state, federal, or other governmental agency: either a principal executive officer or ranking elected official. For the purposes of this part, a principal executive officer of a federal agency includes the chief executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., a Regional Administrator of the U.S. EPA). For the purposes of the Department of Defense Military Services, a commanding officer of an installation, base or tenant organization.

~~(66)~~(52)     "*San Joaquin Valley Air Basin*" includes the entire counties of San Joaquin, Stanislaus, Merced, Madera, Fresno, Tulare, and Kings and western part

of Kern County as described starting page 23888 of the Federal Register Vol. 69, No. 84.

(67)(53)        "~~Schoolbus~~ School Bus" is a motor vehicle as defined in California Veh. Code, section 545.

(68)    ~~"Shuttle vehicle" means a diesel-powered motor vehicle of any gross vehicle weight rating with a capacity of 10 or more passengers, routinely driving an average of 10 trips per day to or from airport terminals, marine terminals, and rail based stations.~~

(69)(54)        "*Specialty Agricultural Vehicle*" means~~, until January 1, 2023,~~ an agricultural vehicle having one of the following body types and has~~that have~~ been approved for the exemption ~~under~~ in section 2025(m)~~(8)~~(11) by the Executive Officer:

(A)    A truck, or a truck-tractor and trailer combination, designed or modified to be used exclusively for the fueling, repairing, or loading of an airplane or helicopter used for the dusting, spraying, fertilizing, or seeding of crops; or

(B)    A truck, or a truck tractor and trailer combination, that is equipped with a self-loading bed and is designed and used exclusively to transport field manufactured cotton modules to a cotton gin; or

(C)    A truck equipped with a water tank owned by a farmer, not operated for compensation, and used exclusively in agricultural operations to provide dust suppression on dirt roads providing access to agricultural fields and for the transportation of water for crop or tree irrigation or for livestock; or

(D)    A feed truck or mixer-feed truck~~,~~ specially designed for dispensing feed to livestock. It does not include trucks designed to supply storage silos with feed; or ~~and is used exclusively at a cattle or calf feedlot. It does not include a feed truck or mixer-feed truck used at dairies or other locations other than cattle and calf feedlots.~~

(E)    A truck with a self-loading bed designed to be used in the process of harvesting lettuce. This type of vehicle is commonly referred to as a Fabco truck.

(70)(55)        "*Three Day Pass*" means a once-a-year temporary permit to operate a vehicle in California for three consecutive days without meeting the requirements of section 2025(e) ~~provided that prior to entering California the vehicle owner has reported the information required in sections 2025(r)(7) and (r)(8) and the date the vehicle will be entering California. No vehicle or fleet will be granted more than one three day pass per year.~~

(71)(56)        "*Tier 0 Engine*" means an engine not subject to the requirements in title 13, CCR, section 2423; Title 40, Code of Federal Regulations (CFR), Part 89; or Title 40, CFR, Part 1039.

(72)(57)        "*Tier 4 Final Engine*" means an engine subject to the final after-treatment-based Tier 4 emission standards in title 13, CCR, section 2423(b)(1)(B) and/or Title 40, CFR, Part 1039.101. This also includes engines certified under the

16

averaging, banking, and trading program with respect to the Tier 4 FEL listed in title 13, CCR, section 2423(b)(2)(B) and/or Title 40, CFR, Part 1039.101

(73)  "~~*Truck-Tractor*~~" ~~means a motor vehicle as defined in section 655 of the California Motor Veh. Code.~~

(58)  "*Two*-Engine Sweeper" means an on-road heavy-duty vehicle with a manufacturers GVWR greater than 14,000 lbs, used for the express purpose of removing material from road or other surfaces, by mechanical means through the action of one or more brooms, or by suction through a vacuum or regenerative air system or any combination of the above.  A two-engine street sweeper has an engine to propel the vehicle and an auxiliary engine to power the broom or vacuum.

(74)  "~~*Unique Vehicle*~~" ~~means a vehicle for which:~~

   (A)  ~~a used vehicle that performs a similar function with a 2007 NOx equivalent emissions engine or cleaner is not available, and~~

   (B)  ~~a used suitable cab and chassis upon which the truck bed could be mounted is not available, and~~

   (C)  ~~a verified NOx emissions control device that could reduce the vehicle's exhaust NOx emissions is either installed or not available, and~~

   (D)  ~~the vehicle's engine is equipped with the highest level VDECS.~~

~~(75)~~(59)      "*Private Utility Vehicle*" means a vehicle owned by a privately-owned or publicly held company or corporation that provides the same or similar services for water, natural gas, and electricity as a public utility operated by a municipality.

~~(76)~~(60)      "*Verified Diesel Emission Control Strategy*" (VDECS) means an emissions control strategy, designed primarily for the reduction of diesel PM emissions, which has been verified pursuant to the Verification Procedures.  VDECS can be verified to achieve ~~l~~Level 1 diesel PM reductions (25 percent), ~~l~~Level 2 diesel PM reductions (50 percent), or ~~l~~Level 3 diesel PM reductions (85 percent).  VDECS may also be verified to achieve NOx reductions.  See also definition of ~~H~~highest ~~l~~Level VDECS.

~~(77)~~(61)      "*VDECS Failure*" means the condition of not achieving the emissions reductions to which the VDECS is verified.  Such condition could be due to inappropriate installation, damage, or deterioration during use.  If a ~~l~~Level 3 VDECS is emitting visible smoke, it is assumed to have failed.

~~(78)~~(62)      "*Yard Truck*" means a vehicle, with an on-road or off-road engine and a hydraulically elevated fifth wheel, that is used in moving and spotting trailers and containers at locations or facilities.  Yard trucks are also known as yard goats, hostlers, yard dogs, trailer spotters, or jockeys.

(e)   *General Requirements*

Beginning with the applicable effective dates, a fleet owner must comply with the following requirements of this regulation:

(1) Except as otherwise provided below for specific classifications in sections 2025(e)(2) through 2025(e)(5), fleets must meet the following compliance schedule:

   (A) Starting January 1, 2015, fleets must meet the requirements of section 2025(f) for all vehicles with a GVWR 26,000 lbs or less except for school buses.

   (B) Starting January 1, 2012, for all vehicles with a GVWR greater than 26,000 lbs, excluding school buses, fleets must meet the requirements of section 2025(g) or fleets that report may instead comply with the phase-in option of section 2025(i).

   (C) Fleets with one to three vehicles with a GVWR greater than 14,000 lbs may utilize the small fleet compliance option of section 2025(h) for vehicles with a GVWR greater than 26,000 lbs.

(2) Beginning January 1, 2012, fleets with school buses must comply with the requirements of section 2025(k) for all school buses in the fleet.

(3) Beginning January 1, 2021, all private utility vehicle owners must comply with the requirements of section 2025(l)(4).

(4) Beginning January 1, 2023 drayage trucks must comply with the requirements of section 2025(l)(1) through (3).

(5) All fleets may utilize the credit provisions of section 2025(j), the provisions of agricultural vehicles and log trucks of section 2025(m), the provisions for construction trucks, vehicles operating exclusively in the NOx exempt areas, or any of the other extensions, delays, and exemptions of section 2025(p).

(1) Except for small fleets electing to comply with section 2025(i), the fleet owner must comply with the best available control technology (BACT) requirements of section 2025(f) or the BACT percentage limits of section 2025(g) or the fleet average requirements of section 2025(h). The compliance option need not be the same for each pollutant. The fleet owner may also opt to comply with the early compliance provision of section 2025(p)(8).

(2) Schoolbus fleets, as defined in section 2025(d)(34)(D), must comply with the requirements of section 2025(j).

(3) Each fleet that includes schoolbuses and other vehicles must meet the following requirements:

   (A) The schoolbus sub-fleet as defined in section 2025(d)(34)(E) must meet the requirements of section 2025(j).

   (B) The remaining non-schoolbus vehicles, excluding the schoolbus sub-fleet, must comply with the requirements of section 2025(e)(1) above; or the owner may include the schoolbus sub-fleet in the determination of compliance for the entire fleet with the requirements of section 2025(e)(1). Schoolbuses used in this determination remain exempt from meeting NOx BACT in sections 2025(f) or (g), or the NOx fleet average in section 2025(h).

~~However, the owner may not use non-schoolbus vehicles to satisfy the schoolbus sub-fleet requirements of section 2025(j).~~

~~(4)    Requirements for Drayage Trucks and Utility Vehicles~~

~~Starting in January 1, 2021, all drayage truck and utility vehicle owners must comply with the BACT requirements of section 2025(f).~~

~~(5)~~(6)  Although the total number of vehicles under common ownership or control is determinative of fleet size, if some of the vehicles within the fleet are under the control of different responsible officials because they are part of different subsidiaries, divisions, or other organizational structures of a company or agency, the fleet owner of a "common ownership of control fleet" may elect to have the vehicles under the control of different responsible officials report compliance independently of other vehicles in the general fleet if choosing to comply with ~~the fleet averaging requirements of~~ the requirements of section 2025(g) or the phase-in option of section 2025~~(h)~~(i) ~~or the BACT percentage limits requirements of section 2025(g)~~ for the segment of the fleet under the control of the different responsible officials. However, all vehicles under common ownership and control must be reported for the fleet to use the credits for fleets that have downsized in section 2025(j)(1), the credits for the early addition of newer vehicles in section 2025(j)(3), or the extension for low-mileage construction trucks of section 2025(p)(2).

~~(6)    A fleet may meet the requirements of section 2025(e)(1), 2025(e)(2), or 2025(i)(2) by applying a VDECS that will achieve PM or NOx reductions or both as required, replacing an engine, or replacing a vehicle.~~

~~(7)    Except as provided below in (B), one of the following is required for all fleet owners who elect to utilize the BACT percent limits option of section 2025(g), the fleet averaging option of section 2025(h), the optional requirements for small fleets of section 2025(i), the agricultural provisions of section 2025(m), the retired vehicle provisions of section 2025(k), or the exemptions or credits of sections 2025(p)(1), (2), (9), and (10):~~

(7)    Except personal, non-commercial, unregistered motor vehicles, or vehicles otherwise not required to obtain authority to operate, the following is required for all fleet owners who elect to utilize the phase-in option of section 2025(i) and the small fleet option of section 2025(h), the credit provisions of section 2025(j) for early PM retrofits, early addition of newer vehicles, hybrid vehicles, alternative fueled vehicles, and vehicles with heavy-duty pilot ignition engines, the agricultural vehicle provisions of section 2025(m), or the exemptions, delay, and extensions of section 2025(p):

~~(A)~~

(A)~~1.~~ A~~a~~ valid California motor carrier of property number~~,~~; or

(B)~~2.~~ A~~a~~ valid identification number assigned by the United States Secretary of the Department of Transportation~~,~~; or

(C)3. A~~a~~ valid operating authority number issued by the Public Utilities Commission~~,~~; or

(D)4. O~~o~~ther applicable valid operating authority number approved by the Executive Officer.

~~(B) this requirement does not apply to personal, non-commercial, unregistered motor vehicles, or vehicles otherwise not required to obtain operating authority numbers as described in section (e)(7)(A) above.~~

~~(8) A vehicle that is exempt from meeting the NOx BACT sections 2025(f) or the percent limits in section 2025(g), or the NOx fleet average in section 2025(h) must comply with the requirements of section 2025(p)~~(o)(1).

~~(9)~~(8)  All information specified in section 2025(r) must be reported to the Executive Officer.

~~(10)~~(9)    Records must be kept as specified in section 2025(s).

~~(11)~~(10)    Once a vehicle is required to be in compliance with this regulation, it must remain in compliance at all times that it is operating in California.

(f)    *Requirements for Vehicles with a GVWR 26,000 lbs or less*

Fleets owners must comply with the schedule in Table 1 for all the vehicles in the fleet with a GVWR 26,000 lbs or less and meet the record keeping requirements of section 2025(s). Fleets do not need to meet the reporting requirements of section 2025(r). School buses are not subject to the requirements of this section and must meet the requirements of section 2025(k).

(1)    Except as provided in (3) below, all vehicles with a GVWR 26,000 lbs or less must be equipped with a 2010 model year emission equivalent engine pursuant to the following schedule in Table 1:

*Table 1:  Compliance Schedule by Engine Model Year for Vehicles with a GVWR 26,000 lbs or less*

| Compliance Date as of January 1 | Existing Engine Model Year | ~~BACT Requirements~~ |
|---|---|---|
| 2015 | 1995 & older | 2010 model year emission equivalent |
| 2016 | 1996 | |
| 2017 | 1997 | |
| 2018 | 1998 | |
| 2019 | 1999 | |
| 2020 | 2003 & older | |
| 2021 | 2004-2006 | |
| 2022 | N/A | |
| 2023 | All engines | |

(2)     Any engine that meets PM BACT prior to January 1, 2014, does not have to be upgraded to a 2010 model year emissions equivalent engine until January 1, 2020, but the fleet owner must meet the reporting and record keeping requirements of sections 2025(r) and (s) for the vehicle.

(3)     Fleets may use the provisions for agricultural vehicles in section 2025(m) or any of the exemptions, delays, and extensions of section 2025(p), except for the following sections that apply only to heavier trucks: 2025(p)(1)(B), 2025(p)(2), 2025(p)(8), 2025(p)(9), and 2025(p)(10).

(4)     Any fleet where all vehicles with a GVWR 26,000 lbs or less meet PM BACT prior to January 1, 2014, does not have to upgrade those vehicles to 2010 model year emissions equivalent engines until January 1, 2023, but must meet the reporting and record keeping requirements of sections 2025(r) and 2025(s) by January 31, 2014 for all the vehicles in the fleet with a GVWR 26,000 lbs or less.

(g)     *Requirements for Vehicles with a GVWR greater than 26,000 lbs*

Fleets owners must comply with the schedule in Table 2 for all vehicles in the fleet with a GVWR greater than 26,000 lbs and must comply with the record keeping requirements of section 2025(s), and are not required to meet the reporting requirements of section 2025(r).   A fleet may meet PM BACT by installing the highest level VDECS or by having an engine equipped with an OEM diesel particulate filter.  A fleet may meet the 2010 model year emissions equivalent engine requirement by replacing the engine or vehicle with one with a 2010 model year engine or later, retrofitting the engine with a VDECS that achieves 2010 model year equivalent emissions, or by replacing a vehicle with one that has a future compliance deadline. Fleets may alternatively choose to comply using the phase-in option of section 2025(i) or as specified in 2025(g)(3) below.

(1)     Starting January 1, 2012, all vehicles in the fleet with a GVWR greater than 26,000 lbs must meet PM BACT and upgrade to a 2010 model year emissions equivalent engine pursuant to the schedule set forth in Table 2 below.

21

*Table 2:* ~~Best Available Control Technology~~ *Compliance Schedule by Engine Model Year for Vehicles with GVWR greater than 26,000 lbs*

| Engine Model Year | Compliance Date Install PM Filter by | Compliance Date 2010 Engine by |
|---|---|---|
| 1993 & older | N/A | January 1, 2015 |
| 1994-1995 | N/A | January 1, 2016 |
| 1996 – 1999 | January 1, 2012 | January 1, 2020 |
| 2000 -2004 | January 1, 2013 | January 1, 2021 |
| 2005-2006 | January 1, 2014 | January 1, 2022 |
| 2007 or newer | January 1, 2014 if not OEM equipped | January 1, 2023 |
|  |  |  |

(2)    A 2007 model year emissions equivalent engine complies with the BACT requirements until January 1, 2023.

(3)    From January 1, 2012 until January 1, 2014, any fleet may optionally choose to meet PM BACT according to the following:

    (A)    2003-2004 model year engines and 1993 model year and older engines by January 1, 2012.

    (B)    2005-2006 model year engines and 1994-1999 model year engines by January 1, 2013.

    (C)    All engines by January 1, 2014.

    (D)    After January 1, 2014, this option expires and the fleet must comply with general requirements of section 2025(e).

    (E)    Fleet owners choosing this option must comply with the reporting and record keeping requirements of sections 2025(r) and (s).

(4)    Any engine  that meets PM BACT prior to January 1, 2014, does not have to be upgraded to a  2010 mode l year emissions equivalent engine until January 1, 2020 at which time it must be in compliance with the schedule set forth in Table 2 above.  To use the exemption, fleet owners choosing this option must comply with the reporting and record keeping requirements of sections 2025(r) and (s) by January 31, 2014 for the vehicles that meet PM BACT.

(5)    Fleets may utilize the exemptions and extensions of sections 2025(p) and 2025(m).

(6)    Fleets may use the extension based on the unavailability of highest level VDECS of section 2025(p)(9) for 1996 model year or newer engines.

(h)    *Small Fleet Compliance Option*

In lieu of initially complying with the schedule set forth in Table 2 of section 2025(g), a fleet with a fleet size of one to three vehicles with a GVWR greater than 14,000 lbs may alternatively comply with the phase-in schedule to meet PM BACT as specified below for the vehicles in the fleet with a GVWR greater than 26,000 lbs from January 1, 2014 to January 1, 2016. Fleets must comply with the record keeping requirements of section 2025(s) starting January 1, 2012 and must meet the reporting requirements as specified below to utilize this option.

(1)    Vehicles within the fleet shall meet PM BACT pursuant to the following schedule:

        (A)    One vehicle by January 1, 2014

        (B)    Two vehicles by January 1, 2015

        (C)    Three vehicles by January 1, 2016

(2)    Vehicles that meet PM BACT are exempt from meeting the 2010 model year emissions equivalent engine requirements until January 1, 2020.

(3)    Fleets with 1996-1999 model year engines must comply with the reporting requirements of section 2025(r) starting January 31, 2012.

(4)    Fleets with 2000-2004 model year engines must comply with the reporting requirements of section 2025(r) starting January 31, 2013.

(5)    All fleet owners must comply with the reporting requirements of sections 2025(r) by January 31, 2014.

(6)    Beginning January 1, 2020, all vehicles in the fleet must comply with the 2010 model year emissions equivalent engine requirements by engine model year as set forth in Table 2 of section 2025(g).

(7)    This option is not available to divisions within a company or subsidiaries under common ownership and control that have a combined fleet size greater than three.

(8)    Fleets using this option may also utilize the exemptions and extensions in section 2025(m) and 2025(p).

(9)    Fleets may use the extension based on the unavailability of highest level VDECS of section 2025(p)(9) for all engine model years in the fleet.

(i)    *Phase-in Option*

In lieu of initially complying with the schedule set forth in Table 2 of section 2025(g), fleets may alternatively comply with the phase-in schedule of this section for the vehicles in the fleet with a GVWR greater than 26,000 lbs from January 1, 2012 to January 1, 2016.

(1)    Beginning January 1, 2012, fleets electing this option must meet the PM BACT requirements pursuant to the schedule set forth in Table 3 below and then comply with the requirements of section 2025(g) starting January 1, 2020.

23

*Table 3: Phase-in Compliance Schedule*
*for Vehicles with GVWR greater than 26,000 lbs*

| Compliance Date as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2012 | 30% |
| 2013 | 60% |
| 2014 | 90% |
| 2015 | 90% |
| 2016 | 100% |
| 2020 | All vehicles must comply with section 2025(g) |

(2)   If the calculated number of engines required to be brought into compliance with the percentage limits is not equal to a whole number, the owner shall round up to a whole number when the fractional part of the required number of engines is equal to or greater than 0.5, and round down if less than 0.5.

(3)   Vehicles in which public funds contributed to the purchase of the vehicle, repower or the engine, or retrofit of the engine must not be included when determining compliance with PM BACT, unless allowed by the funding program guidelines applicable to the particular source of public funds used for the purchase, nor shall the engine be included in the total fleet for purposes of determining the percent complying with PM BACT.

(4)   To utilize this option, fleet owners must comply with the reporting and record keeping requirements of sections 2025(r) and 2025(s) beginning January 31, 2012.

(5)   Fleets complying with this option may also use the credits of section 2025(j), the agricultural provisions of section 2025(m), the exemptions, delays, and extensions of sections 2025(p).

(6)   Fleets may use the extension based on unavailability of highest level VDECS of section 2025(p)(9) for all engine model years.

(i)   Credits for *Fleets that have Downsized, Early PM Retrofits, Hybrid Vehicles, Alternative Fueled Vehicles, Vehicles with Heavy-Duty Pilot Ignition Engines, and Early Addition of Newer Vehicles*

Fleets can take advantage of credits that reduce the number of vehicles with a GVWR greater than 26,000 lbs that must meet the PM BACT requirements in the phase-in option of section 2025(i) as described in items (1) to (3) below, and does not apply to school buses.

(1)   Credit for Fleets that have Downsized

Until January 1, 2016, a fleet that has fewer vehicles with a GVWR greater than 26,000 lbs operating in the compliance year than in the 2006 baseline fleet may claim a credit towards compliance with the phase-in option of section 2025(i) for that year.

(A).   The fleet owner may reduce the percent requirement in Table 3 of section 2025(i) by the same percent that the fleet was downsized. For example, a fleet that has 20 percent fewer vehicles operating in 2006 would be able to subtract 20 percent from the annual compliance requirement. That is, if the compliance requirement for the year is 30 percent, the fleet would only need to demonstrate that 10 percent of the existing fleet (30%-20%=10%) met PM BACT.

(B)   A vehicle that is not operated in the compliance year may be excluded from the existing fleet in determining the credit if:

1.   The vehicle is not driven for the entire compliance year and

a.   Either a certificate of non-operation has been issued by the DMV or a request for a non-operation certificate has been filed with DMV prior to the beginning of the compliance year; or

b.   An equivalent certificate has been issued by another state or a request for such a certificate has been filed with the state prior to the beginning of the compliance year; or

c.   The vehicle is not operated for any purpose during the compliance year except to demonstrate functionality of the vehicle to potential buyers, to move the vehicle short distances for maintenance, or to a storage facility while awaiting sale.

(C)   The fleet utilizing this provision must comply with the reporting requirements of section 2025(r)(12) for low-use vehicles and report information for all vehicles in the 2006 baseline fleet per section 2025(r)(13).

(D)   For purposes of determining the credit, all vehicles in the scope and applicability section 2025(b), except school buses, must be included in calculating the number of vehicles in the 2006 baseline fleet and in the fleet during the compliance year and all vehicles exempt from the regulation in section 2025(c) must be excluded. The number of vehicles calculated at the beginning of the compliance year will include vehicles that are partially paid for by state funds, all drayage trucks, and all on-road vehicles that are now subject to the title 13, section 2449.

(2)   A fleet shall receive a credit to treat another vehicle with a GVWR greater than 26,000 lbs as meeting the PM BACT requirements of section 2025(i) until January 1, 2017 for the following items as described below in 2025(j)(2)(A) to 2025(j)(2)(C).

(A)   Credit for Early PM Retrofit

A credit will be granted for each vehicle, with a GVWR greater than 14,000 lbs, that is equipped with the highest level VDECS for PM by July 1, 2011. The fleet may receive a credit for each vehicle for which the highest level VDECS has been ordered and paid for, or for which at least a 20 percent

deposit has been paid, by May 1, 2011 and the VDECS is installed by October 1, 2011. The fleet owner must meet the reporting requirements of section 2025(r)(13) by January 31, 2012 to claim the credit and must meeting the record keeping requirements of 2025(s) to document the VDECS purchase and installation.

(B)    Credit for Hybrid Vehicles, Alternative Fueled Vehicles, and Vehicles with Heavy-Duty Pilot Ignition Engines

Credit will be granted for each vehicle with a GVWR greater than 26,000 lbs that is a fuel efficient hybrid vehicle, an alternative fueled vehicle, or a vehicle powered by a heavy-duty pilot ignition engine that is added to the fleet before January 1, 2017. The fleet owner must meet the reporting and record keeping requirements of section 2025(r) and 2025(s) for the vehicle by January 31 of the compliance year to use the credit. Vehicles with a GVWR between 14,000 lbs and 26,000 lbs may also earn a credit if added to the fleet prior to July 1, 2011 and information is reported by January 31, 2012. Any alternative fueled engine or vehicle powered by a heavy-duty pilot ignition engine must be counted when determining the number of vehicles in the fleet.

(C)    For the same owner, excess PM VDECS credits granted in the Off-road regulation (title 13, CCR section 2449) may be used in the Truck and Bus regulation and excess PM VDECS credits granted in the Truck and Bus regulation may be used in the Off-road regulation until January 1, 2017. Starting January 1, 2017 no credits may be transferred between the regulations.

1.    Excess PM VDECS credits earned in the Truck and Bus regulation will be determined for each compliance year. The annual excess PM VDECS credits are determined by counting the number of Level 3 PM VDECS filters and 2007 model year and newer engines that meet PM BACT in the fleet that exceed the minimum number required to meet the PM BACT percentage of section 2025(i) without accounting for the credits specified in sections 2025(j)(2)(A) and 2025(j)(2)(B), and 2025(j)(3). The number of Excess PM VDECS credits cannot exceed the number of Level 3 retrofit VDECS in the fleet. Excess PM VDECS credits can be used in the Off-Road regulation according to section (title 13, CCR section 2449.1(b)).

2.    For each compliance year, excess PM VDECS credits earned in the Off-road regulation may be applied as a credit that would treat another vehicle with a GVWR greater than 26,000 lbs in the Truck and Bus regulation section 2025 as compliant in the compliance year when determining compliance with the phase-in option of section 2025(i).

3.    Fleets must meet the reporting requirements of section 2025(r)(27) to utilize excess PM VDECS credits.

(3)   Credit for Early Addition of Newer Vehicles

26

The fleet shall receive credit for the addition of a vehicle that has a propulsion engine that is equipped with an OEM diesel particulate filter before January 1, 2012 if the average age of the propulsion engines in the fleet is newer than it was in 2006.  Until January 1, 2017, the credit can be applied towards meeting the PM BACT requirements of the phase-in option of section 2025(i).

(A)    The credit is a percentage that will be calculated as 5 times the difference in the average age of the 2006 baseline fleet and the average age of the fleet in the compliance year, where:

1.    The average age of the fleet in 2006 is calculated as 2007 minus the average age of the engine model years in the 2006 baseline fleet.

2.    For vehicles that were in the 2006 baseline fleet and are no longer in the fleet as of January 1, 2012, the vehicle model year minus 0.5 will be used in lieu of the engine model year, unless the fleet has documentation demonstrating the engine model year and engine family.

3.    The fleet owner may retain the credit after 2012 if the fleet average age stays the same or newer than it was on January 1, 2012, otherwise the credit will be recalculated.

4.    Vehicles that use the exemption for low-use vehicles of 2025(p)(4 ) may be excluded in determining the credit.

(B)    The credit cannot exceed the percentage of the fleet that has 2007 model year or newer engines that meet PM BACT.

(C)    The credit shall reduce the PM BACT requirement of the phase-in option in section 2025(i) for the applicable compliance year.

(D)    The fleet owner must meet the reporting and record keeping requirements of section 2025(r) and (s) by January 31, 2012.

(4)    Credits specified in sections 2025(j)(1) through 2025(j)(3) will not be given for vehicles that were purchased by the fleet or retrofitted to comply with any other California in-use regulation.  Credits will also not be given for partially state funded vehicle replacements or retrofits according to the funding program guidelines applicable to the particular source of public funds used for the purchase.  Credits are only valid for as long as the vehicle for which the compliance action has been taken remains operational in the fleet or if replaced within 30 days with a vehicle equipped with an engine that meets PM BACT and is at least one model year newer.

(5)    Credits are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.

(f)    Best Available Control Technology (BACT) Requirements

27

Starting and every January 1, 2011 thereafter, vehicles within a fleet in which the fleet owner has elected to utilize the provisions of section 2025(f) must comply with the definitions for PM BACT, and NOx BACT as set forth in the compliance schedule shown in Table 1. Each year the fleet must meet the requirements of all prior years shown in the schedule. If all vehicles in the fleet meet the requirements of this section the fleet is exempt from the reporting requirements of section 2025(e)(9).

*Table 2: Best Available Control Technology Compliance Schedule*

| Compliance Deadline, as of January 1 | Engine Model Years | BACT Requirements |
|---|---|---|
| 2011 | Pre-1994 | PM BACT |
| 2012 | 2003 – 2004 | PM BACT |
| 2013 | 2005 – 2006 | PM BACT |
| | 1994 – 1999 | NOx and PM BACT |
| 2014 | 2000 – 2002 | NOx and PM BACT |
| | 2007 and later that do not meet PM BACT | PM BACT |
| 2015 | Pre-1994 | NOx and PM BACT |
| 2016 | 2003 – 2004 | NOx and PM BACT |
| 2017 | 2005 – 2006 | NOx and PM BACT |
| 2018 | All pre-2007 | NOx and PM BACT |
| 2019 | All pre-2007 | NOx and PM BACT |
| 2020 | All pre-2007 | NOx and PM BACT |
| 2021 | 2007 or equivalent | NOx and PM BACT |
| 2022 | 2008 | NOx and PM BACT |
| 2023 | 2009 | NOx and PM BACT |

(g)    *BACT Percentage Limits.*

A fleet owner who elects to utilize the provisions of this section must comply with the applicable requirements below and the reporting requirements of section 2025(r).

(1)    By January 1 of each compliance year, the fleet must meet PM BACT for the percentage of propulsion engines in the fleet, including engines installed in motorcoaches, as set forth in Table 2.

(2)    By January 1 of each compliance year, the fleet, excluding motorcoaches, must meet NOx BACT for the percentage of non-motorcoach propulsion engines in the fleet as set forth in Table 2. By January 1 of each compliance year, motorcoaches in the fleet must meet MC NOx BACT for the percentage of motorcoach engines in the fleet as set forth in Table 2.

(3)    If the calculated number of engines in each model year group required to be brought into compliance with the BACT percentage limits is not equal to a whole number, the owner shall round up to a whole number when the fractional part of

28

the required number of engines is equal to or greater than 0.5, and round down if less than 0.5.

*Table 2:  Percent of Total Fleet That Must Comply with PM and NOx BACT*

| Compliance Deadline as of January 1 | Percent of Total Fleet Complying with BACT | | Percent of Total Motorcoach Fleet Complying with BACT |
|---|---|---|---|
| | PM BACT | NOx BACT | MC NOx BACT |
| 2011 | 25% | NA | NA |
| 2012 | 50% | NA | NA |
| 2013 | 75% | 25% | NA |
| 2014 | 100% | 50% | NA |
| 2015 | 100% | 50% | NA |
| 2016 | 100% | 60% | NA |
| 2017 | 100% | 80% | 50% |
| 2018 | 100% | 80% | 50% |
| 2019 | 100% | 80% | 50% |
| 2020 | 100% | 90% | 50% |
| 2021 | 100% | 90% | 90% |
| 2022 | 100% | 90% | 90% |
| 2023 | 100% | 100% | 100% |

(h)    *Fleet Averaging Option*

(1)    A fleet owner who elects to be subject to provisions of section 2025(h) for compliance with the fleet average requirement for PM, NOx, or both must comply with the applicable fleet averaging requirements of sections 2025(h)(2) and (3) below and the reporting requirements of section 2025(r).

(2)    *NOx Fleet Average.*

(A)    A fleet owner must demonstrate that on January 1 of each compliance year, starting in 2013 and ending on January 1, 2023, the calculated NOx Index of the applicable portion of the fleet was less than or equal to the calculated NOx Target Rate.

NOx exempt vehicles, as defined in section 2025(d)(56)need not be included in the calculation of the NOx Index or the NOx fleet average for those years that the vehicle is exempt.

(B)    *NOx Index*:    The following equation is to be used to calculate the NOx Index.

$$NOx \; Index \; = \; \frac{Sum \; of \; EF_{(HHD)} \; + \; Sum \; of \; EF_{(MHD)} \; + \; Sum \; of \; EF_{(MC)}}{Total \; number \; of \; vehicles \; subject \; to \; the \; NOx \; requirements}$$

Where:

EF$_{(HHD)}$ =  The NOx emission factor as specified in Appendix A for each heavy heavy-duty (HHD) vehicle subject to the NOx requirements, including motorcoaches, or adjusted as applicable according to paragraphs 1. and 2. below.

EF$_{(MHD)}$ =  The NOx emission factor as defined in Appendix A for each medium heavy-duty (MHD) vehicle subject to the NOx requirements, or adjusted as applicable, according to paragraphs 1. and 2. below.

1. Except for 2010 model year NOx emissions equivalent engines, for propulsion engines that have been retrofitted with VDECS, the NOx emission factor is reduced by the percentage NOx emission reductions that are verified.  2010 model year NOx emissions equivalent engines shall use the emissions factor for 2010 and newer engines in Table A-2 in Appendix A.

2. The fleet owner may exclude 2010 model year engines equipped with a diesel particulate filter (DPF) from the fleet average calculation for any compliance year, and may exclude 2007 model year engines equipped with a DPF from the fleet average calculation until January 1, 2017.

(C) *NOx Target Rate*: The following equation is to be used to calculate the NOx Target Rate.

$$NOx\ Target\ Rate = \frac{Sum\ of\ Target_{(HHD)} + Sum\ of\ Target_{(MHD)} + Sum\ of\ Target_{(MC)}}{Total\ number\ of\ vehicles\ subject\ to\ the\ NOx\ requirements}$$

Where:

Target$_{(HHD)}$ = The NOx target from Table 3 for each HHD vehicle subject to the NOx requirements.

Target$_{(MHD)}$ = The NOx target from Table 3 for each MHD vehicle subject to the NOx requirements.

Target$_{(MC)}$ = The NOx target from Table 3 for each MC vehicle subject to the NOx requirements.

*Table 3: Fleet NOx Targets*
*to be Used to Calculate NOx Target Rates (g/mile)*

| *Compliance Deadline, as of January 1* | *Fleet NOx Targets for each compliance deadline* | | |
|---|---|---|---|
| | **MHD** | **HHD** | **MC** |
| 2013 | 8.5 | 14.4 | N/A |
| 2014 | 5.8 | 9.8 | N/A |
| 2015 | 5.8 | 9.8 | N/A |
| 2016 | 4.6 | 7.8 | N/A |
| 2017 | 4.0 | 6.0 | 9.8 |
| 2018 | 4.0 | 6.0 | 9.8 |
| 2019 | 4.0 | 6.0 | 9.8 |
| 2020 | 3.2 | 4.4 | 9.8 |
| 2021 | 3.2 | 4.4 | 4.4 |
| 2022 | 1.6 | 3.0 | 3.0 |
| 2023 | 0.8 | 1.6 | 1.6 |

(3)  *PM Fleet Average.*

(A)  A fleet owner must demonstrate that on January 1 of each year starting in 2011 and ending on January 1, 2023, the PM Index of the applicable portion of the fleet was less than or equal to the calculated PM Target Rate.

(B)  *PM Index.*  The following equation is to be used to calculate the PM Index:

$$PM\ Index = \frac{Sum\ of\ PMEF_{(HHD)} + Sum\ of\ PMEF_{(MHD)}}{Total\ number\ of\ vehicles\ subject\ to\ the\ PM\ fleet\ averaging\ requirement}$$

Where:

$PMEF_{(HHD)}$  = The PM emission factor (g/mile) as specified in Appendix A for each heavy heavy-duty (HHD) vehicle, including motorcoaches, or adjusted according to paragraph 1. below, as applicable.

$PMEF_{(MHD)}$  = The PM emission factor (g/mile) as specified in Appendix A for each medium heavy-duty (MHD) vehicle or adjusted as applicable according to paragraph 1. below.

1.  For a propulsion engine that has been retrofitted with a VDECS, the PM Emission Factor is reduced 50 percent for a level 2 VDECS, and 85 percent for a level 3 VDECS; the PM Emission Factor is not reduced for a level 1 VDECS

(C)  *PM Target Rate*:        The following equation is to be used to calculate the

PM Target Rate

$$PM\ Target\ Rate = \frac{Sum\ of\ PM\ Target\ _{(HHD)}\ +\ Sum\ of\ PM\ Target\ _{(MHD)}}{Total\ number\ of\ vehicles\ subject\ to\ the\ PM\ fleet\ averaging\ requirement}$$

Where:

$PM Target_{(HHD)}$ = The PM target (g/mile) from Table 4 for each HHD vehicle subject to the PM fleet averaging requirements.

$PM Target_{(MHD)}$ = The PM target (g/mile) from Table 4 for each MHD vehicle subject to the PM fleet averaging requirements.

Table 4:  Fleet PM Targets
to be Used to Calculate PM Target Rates (g/mile)

| Compliance Deadline, as of January 1 | Fleet PM Targets for each compliance deadline | |
|---|---|---|
| | MHD | HHD |
| 2011 | 0.38 | 0.710 |
| 2012 | 0.29 | 0.530 |
| 2013 | 0.17 | 0.320 |
| 2014 | 0.06 | 0.110 |
| 2015 | 0.06 | 0.110 |
| 2016 | 0.06 | 0.110 |
| 2017 | 0.06 | 0.110 |
| 2018 | 0.06 | 0.110 |
| 2019 | 0.06 | 0.110 |
| 2020 | 0.06 | 0.110 |
| 2021 | 0.06 | 0.110 |
| 2022 | 0.06 | 0.110 |
| 2023 | 0.06 | 0.110 |

(i)    Optional Requirements for Small Fleets

(1) For any compliance deadline, small fleet owners may comply with the requirements of section 2025(e)(1) , which includes the requirement to comply with BACT in section 2025(f), the BACT percentage limits of 2025(g), or the fleet averaging option of 2025(h), or by complying with following optional compliance requirements.

(2)  Small fleets must comply with the general requirements of section 2025(e) except that in lieu of the requirements of sections 2025(e)(1), the owner of a small fleet may comply by having the following:

(A)  Fleets with One Vehicle

32

Beginning January 1, 2014, a fleet consisting of one vehicle must have that vehicle equipped with a 2004-2006 model year NOx emissions equivalent or newer engine that has the highest level VDECS for reducing PM emissions installed.  By January 1, 2019, the vehicle must meet the requirements of BACT in section 2025(f).

(B)  Fleets with Two Vehicles

Fleets with two vehicles may meet the requirements of 1. or 2. below.

1.  a.  Beginning January 1, 2014, the fleet must have one vehicle equipped with a 2004-2006 model year NOx emissions equivalent or newer engine that has the highest level VDECS for reducing PM emissions installed and the second vehicle in the fleet must meet the requirements of BACT in section 2025(f); and

b.  By January 1, 2019, the 2004-2006 model year vehicle identified in a. above must meet the requirements of BACT in section 2025(f).

2.  a.  Beginning January 1, 2014 the fleet must have one vehicle equipped with a 2010 NOx emissions equivalent or newer engine and the second vehicle equipped with the highest level VDECS for reducing PM emissions; and

b.  By January 1, 2017, the second vehicle must meet the requirements of BACT in section 2025(f).

(C)  *Fleets with Three Vehicles*

Fleets with three vehicles may meet the requirements of 1., 2., or 3. 2. below.

1.  a.  Beginning January 1, 2014, the fleet must have one vehicle equipped with a 2004-2006 model year NOx emissions equivalent or newer engine that has the highest level VDECS for reducing PM emissions installed and the other two vehicles in the fleet must meet the requirements of BACT in section 2025(f);

b.  Beginning January 1, 2019, all three vehicles in the fleet must be in compliance with the requirements of section 2025(e).

2.  a.  Beginning January 1, 2014, the fleet must have one vehicle equipped with a 2010 model year emissions equivalent or newer engine, and a second vehicle equipped with a 2004-2006 model year NOx emissions equivalent or newer engine that has the highest level VDECS for reducing PM emissions; the third vehicle is exempt the requirements of sections 2025(f), (g), or (h) until January 1, 2016 when it must meet the requirements of BACT in section 2025(f).from the PM and NOx requirements.

33

b.   Beginning January 1, 2019, all three vehicles in the fleet must be in compliance with the requirements of section 2025(e).

(k)(j)   *Requirements for ~~Schoolbuses~~School Buses*

This section applies to diesel-fueled school buses as defined in section 2025(d)(53) with a GVWR greater than 14,000 lbs.

(1)   Phase-in Requirements for School Buses

Fleets with school buses manufactured on or after April 1, 1977 must comply with PM BACT as defined in section 2025(d)(48), pursuant to the schedule set forth in Table 5 below.

*Table 5: Compliance Schedule for School Buses*

| Compliance Deadline, as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2012 | 33% |
| 2013 | 66% |
| 2014 | 100% |

(2)   Credit for School Bus Fleets that have Downsized

(A)   Until January 1, 2014, a fleet having fewer school buses on January 1 of the compliance year than it had in the 2006 baseline year may reduce the percent requirement in Table 5 by the same percentage that the fleet has downsized.

For example, a fleet that is 20 percent smaller than it was in 2006 would subtract 20 percent from the annual compliance requirement.  If the compliance requirement for the year is 33 percent, the fleet would need to demonstrate that it had PM filters on the 13 percent of the existing fleet (33%-20%=13%).

(B)   The credits are not transferrable except with appropriate documentation of a change of business form such as sole proprietorship to partnership or partnership to corporation, or for mergers or acquisitions of the entire company and fleet.

(3)   Credits for Hybrid School Buses, Alternative Fueled School Buses, Electric School Buses, and School Buses with Pilot Ignition Engines

Fleets with fuel efficient hybrid school buses, alternative fueled school buses, electric school buses, or school buses with pilot ignition engines shall receive a credit to treat another school bus in the fleet as compliant until January 1, 2014.  A school bus with a dual-fuel engine is not eligible.  This credit is not available for school buses that were purchased or retrofitted to comply with any other California in-use regulation.  This credit is not available if state funds were used to partially or

34

totally replace or retrofit any school bus unless allowed by the guidelines of the program that funded the bus replacement or retrofit.

(4)   Extension of Deadline for Unavailability of VDECS

If a school bus engine cannot be equipped with the highest level VDECS for PM the school bus owner must:

(A)   Record and submit to the Executive Officer the information listed in section 2025(k)(4)(B) through (E) by January 31 of the applicable compliance year through January 31, 2017.  By January 1, 2018, this extension expires and all school buses using this extension must be replaced with vehicles that are equipped with a 2010 model year emissions equivalent engine or with one that complies with the BACT compliance schedule (i.e., a 1998 model year engine or newer school bus equipped with the highest level VDECS for PM).

(B)   Describe the reasons that a compliance extension is needed for each engine or engine-vehicle combination annually.

(C)   If during the warranty period the VDECS would void the engine warranty, provide a statement from the engine manufacturer, authorized engine dealer, or vehicle dealer that explains why the warranty would be voided.

(D)   If no verified VDECS is commercially available, provide a list of VDECS manufacturers that have been contacted and the manufacturers' responses to your requests to purchase a VDECS from them.

(E)   If a verified VDECS is commercially available, but the VDECS manufacturer or an authorized VDECS installer does not deem the VDECS to be technologically feasible for the school bus, provide a statement from the VDECS manufacturer or authorized VDECS installer.

(5)   Low-use School Buses

(A)   School buses operating fewer than 1,000 miles during any compliance year are exempt from the requirements of section 2025(k), but fleet owners must comply with the record keeping requirements of section 2025(s)(3).  Such vehicles must have a properly functioning odometer installed at all times.

(B)   A fleet owner of a school bus that exceeds 1,000 miles in any compliance year must immediately count the school bus as part of the fleet, bring the fleet into compliance with the requirements of section 2025(k) in the current compliance year, and notify the Executive Officer of the change in status within 30 days of exceeding the mileage limit.

(6)   Any school bus manufactured before April 1, 1977, must be retired from service no later than January 1, 2012.

(7)   Title 13, CCR section 1272(c) requires that a schoolbus that has been retrofitted with a VDECS must receive a safety inspection from an authorized employee of the department of the California Highway Patrol, prior to its return to service.

(8)  School buses that were equipped on or before December 31, 2005, with a Level 2 VDECS, which was highest level VDECS at the time of installation, are considered in compliance with PM BACT.

(9)  Section 2025(c)(9) exempts school buses meeting the definition in section 2025(d)(36) of a historic vehicle.

(10)  Owners of school buses are subject to the record keeping requirements in section 2025(s)(3).

(11)  Owners of school buses are subject to the applicable requirements of sections 2025(t) through 2025(z).

(12)  Owners of school buses have the option to delay the requirement to meet PM BACT for 1988-1993 model year engine school buses until January 1, 2014.

~~Beginning with the applicable effective dates set forth below, a schoolbus fleet, as defined in section 2025(d)(34)(D), and a schoolbus sub-fleet as defined in section 2025(d)(34)(E) must comply with the following requirements of this regulation:. Schoolbuses within a schoolbus fleet or a schoolbus sub-fleet are exempt from meeting NOx BACT in section 2025(f), (g) and NOx fleet averaging in section 2025(h).~~

~~(1)  Any schoolbus manufactured before April 1, 1977, must be retired from service no later than January 1, 2012.~~

~~(2)  Each schoolbus fleet or schoolbus sub-fleet must comply with the best available control technology (BACT) requirements of section 2025(j)(4) or the PM BACT percentage limit requirements of 2025(g) or the PM fleet averaging option of 2025(h)(3).~~

~~(3)  By January 1, 2014, all diesel-fueled schoolbuses shall be retrofitted with the highest level VDECS available. Engines equipped with a diesel particulate filter by the engine manufacturer as original equipment are considered in compliance with this requirement.~~

~~(4)  Each schoolbus fleet or schoolbus sub-fleet owner who chooses the BACT option must meet the PM BACT as defined in section 2025(d)(62) according to the compliance schedule shown in Table 5.~~

~~(5)  If a schoolbus engine cannot be retrofitted with highest level VDECS for PM then the engine shall be replaced with an engine that can be retrofitted with the highest level VDECS by January 1, 2018, subject to meeting the annual extension requirements of section 2025(p)(11). The schoolbus must be included in the compliance method calculation described in section 2025(j)(2) and the reporting and record requirements in section 2025(j)(9).~~

~~(6)  After a schoolbus has been retrofitted with a VDECS, it must receive a safety inspection from an authorized employee of the department of the California Highway Patrol, as required by title 13, California Code of Regulations (CCR) section 1272(c), prior to its return to service.~~

36

*Table 5: Best Available Control Technology Compliance Schedule for Schoolbus Fleets*

| *Compliance Deadline, As of January 1* | *Engine Model Years* |
|---|---|
| 2011 | 2000 and newer |
| 2012 | 1994 – 1999 |
| 2013 | 1987 – 1993 |
| 2014 | Pre-1987 |

(7)    *Special Provisions for Schoolbuses*

(A)  An owner of a schoolbus fleet or schoolbus sub-fleet may be granted credit for hybrid schoolbuses or alternative fuel schoolbuses according to the provisions of sections 2025(p)(8) and (9), respectively.

(B) *Low-use Schoolbuses*

1.   Schoolbuses that meet the definition of a low-use schoolbus are exempt from the requirements of section 2025(j)(2) but the owner must keep records and meet the reporting requirements in accordance with sections 2025(j)(9) and 2025(s)(4).

2.   Low-use schoolbuses need not be included when determining compliance with the BACT percent limits of section 2025(g) or when calculating PM fleet average indices or target rates for the fleet averaging option of section 2025(h)(3).

3.   Schoolbuses that formerly met the low-use schoolbus definition, but for which mileage subsequently increases to 1,000 miles or greater, must immediately meet the requirements of Table 5 above or section 2025(g) or (h) as required for the immediately preceding compliance deadline.

(C)  Schoolbuses that were retrofitted on or before December 31, 2005 with a level 2 VDECS, which was highest level VDECS at the time of installation, are considered in compliance with PM BACT.

(8)   Schoolbuses registered as historic vehicles, as defined in section 2025(d)(41) are not subject to the regulation.

(9)   *Reporting Requirements for Schoolbus Fleets and Schoolbus Sub-Fleets*

The owner of a schoolbus fleet or a schoolbus sub-fleet is subject to the reporting requirements in section 2025(r)(14) if complying with the PM BACT percentage limit requirements of 2025(g) or the PM fleet averaging option of 2025(h)(3) or any of the special provisions in section 2025(p).

(10)  Schoolbus fleets and schoolbus sub-fleets are subject to the applicable requirements of sections 2025(t) through (z).

(l)    Requirements for Drayage Trucks and Utility Vehicles

37

(1)    Drayage trucks that are subject to the Drayage Truck regulation may be included in the fleet for purposes of determining compliance  with the PM BACT requirements of the phase-in option in section 2025(i) only if all drayage trucks in the fleet are included.

(2)    Starting January 1, 2023, all drayage truck owners must comply with the requirements of section 2025(e).

(3)    Drayage trucks may not be used to earn additional credits in section 2025(j) or exemptions and extensions in section 2025(p).

(4)    Starting January 1, 2021, all private utility vehicle owners must comply with the requirements of section 2025(e).

(k)    *Retired Vehicle Credit*

(1)    Until January 1, 2014, a fleet may obtain credit equivalent to one 2010 engine for purposes of determining BACT in section 2025(g) or for calculating the PM and NOx indices and target rates in 2025(h). Any fleet utilizing the retirement credit provision must comply with the reporting requirements of section 2025(r) beginning March 31, 2010,by January 31, 2012, and report information for all vehicles in the 2008 baseline fleet.

(2)    For purposes of calculating the BACT percentage limits in section 2025(g) credit will be given equal to a 2010 model year engine for each vehicle retired, that reduces the number of vehicles in the fleet compared to the baseline fleet as defined in section 2025(d)(3).

(3)    For purposes of calculating the PM and NOx indices and target rates in fleet averaging 2025(h) the fleet shall use the following approach:

(A)    If the number of MHD vehicles in the fleet has declined then the emissions factor used shall be the same as a 2010 model year engine emissions factor for each MHD vehicle retired up to the total number of vehicles reduced from the 2008 baseline fleet.

(B)    If the number of HHD vehicles in the fleet has declined then the emissions factor used shall be the same as a 2010 model year engine emissions factor for each HHD vehicle retired up to the total number of vehicles reduced from the 2008 baseline fleet.

(4)    Retirement credits will be retained upon appropriate documentation of a change of business form such as sole proprietorship to partnership or partnership to corporation, but not for mergers, acquisitions, sales or purchases.

(l)    *Requirements for Motorcoaches*

Motorcoaches are exempt from meeting NOx BACT in sections 2025(f) or (g), or the NOx fleet averaging in section 2025(h) until January 1, 2017.  Beginning January 1, 2017, fleets with motorcoaches complying with the BACT percentage limits of section 2025(g) or the fleet averaging requirements of section 2025(h), would include

38

~~the MC NOx BACT emissions factor from Table 2 and the MC NOx target value from Table 3 when calculating the NOx target rate and fleet average NOx emissions for the fleet.~~

(m)   *Requirements for Agricultural Fleets*

Beginning January 1, 2011, agricultural vehicles shall be exempt from the requirements of sections 2025(f), 2025(g), 2025(h) or 2025(i) if they meet the definition of an agricultural vehicle and remain below the applicable mileage limits for the period specified.  Vehicles meeting the specialty vehicle definition would have no mileage restrictions.  Fleets must comply with the reporting and record keeping requirements of sections 2025(r) and 2025(s).

(1)   Beginning January 1, 2011 through January 1, 2017, any vehicle meeting the definition of an agricultural vehicle, as defined in section 2025(d)(5), that remains below the annual mileage limits in Table 6 below are exempt from the requirements of section 2025(f) and (g).

*Table 6: Agricultural Vehicle Mileage Limits*

| Engine Model Year | Mileage Limits |
|---|---|
| 1995 and earlier | 15,000 miles |
| 1996-2005 | 20,000 miles |
| 2006 or newer | 25,000 miles |

(2)   Agricultural vehicles that have not exceeded 10,000 miles per year in a calendar year between January 1, 2011 and January 1, 2017, shall continue to be exempt from the requirements of 2025(f) and (g) until January 1, 2023, so long as they do not exceed 10,000 miles in a calendar year.

(3)   By January 1, 2017, all agricultural vehicles that have exceeded 10,000 miles in any calendar year since January 1, 2011, must comply with the best available control technology (BACT) requirements of section 2025(f) and (g).

(4)   A qualifying agricultural vehicle must be operational, functional, able to start without assistance, and be able to move under its own power.  Vehicles that are being used for parts do not qualify as an agricultural vehicle subject to section 2025(m).

(5)   Within 30 days of replacing a qualifying agricultural or specialty agricultural vehicle, the agricultural fleet owner must report the required information in section 2025(r)(14)(I).

(6)   The maximum number of qualifying agricultural vehicles in a fleet shall be established by the number of agricultural vehicles in the fleet as of January 1, 2009, as reported in section 2025(r)(14).  This number shall not increase from one year to the next.

(7)    An agricultural vehicle may be replaced by another vehicle so long as the replacement vehicle is equipped with an engine that is at least one model year newer than the engine in the vehicle that it replaced and the original vehicle is scrapped, rendered inoperable, sold out of the agricultural fleet, or no longer meets the definition of an agricultural or specialty agricultural vehicle.  The replacement vehicle must be reported within twelve months of the vehicle being replaced or by January 31 of following compliance year whichever is longer.  This requirement does not apply if just the engine is being replaced and not the entire vehicle.

(8)    When a qualifying agricultural vehicle is replaced, the sum of the miles accrued on the original vehicle in that calendar year, up to the time of replacement, plus the mileage accrued on the replacement vehicle for the remainder of the calendar year (beginning with the date of replacement) must remain below the mileage thresholds based on the model year of the engine in the replacement vehicle.

(9)    A merger of two or more agricultural fleets may not result in more agricultural vehicles after the merger occurs than the sum of the agricultural vehicles in the individual agricultural fleets included in the merger.

(10)   The agricultural vehicle exemptions are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.

(1)    Beginning January 1, 2011, vehicles meeting the definitions of limited-mileage agricultural vehicles, or low-mileage agricultural vehicles, shall be exempt from the requirements of sections 2025(f), (g), and (h) for the periods specified in the definitions, provided that such vehicles meet the conditions set forth below. Provisions for specialty agricultural vehicles, as defined in section 2025(d)(69)(74), are provided below.  To qualify for any of these provisions, such vehicles must be operational and functional, including being able to start without assistance and able to move under its own power.  Vehicles that are being used for parts are not included in these provisions.

(2)    For all other vehicles in the agricultural fleet, beginning January 1, 2011, the fleet owner must comply with the best available control technology (BACT) requirements of section 2025(f), the BACT percentage limits of section 2025(g) or the fleet average requirements of section 2025(h).

(3)    Agricultural fleet owners utilizing the agricultural provisions of section 2025(m) must report and comply with the requirements of section 2025(r) and 2025(s) for all vehicles subject to this regulation for each compliance year, regardless of whether the vehicle is an agricultural vehicle or not.

(4)    Within 30 days of replacing a low-mileage, limited-mileage, or specialty agricultural vehicle, the agricultural fleet owner must report the required information in section 2025(r)(15)(J).

40

(5)    All vehicles must comply with the requirements of section 2025(e) for the next compliance date upon it being discovered that any vehicle in the agricultural fleet does not comply with any of the requirements of this agricultural fleet provision.

(6)    Requirements for limited-mileage agricultural vehicles

   (A)    The maximum number of limited-mileage agricultural vehicles in any agricultural fleet shall be established by the number of limited-mileage vehicles in the agricultural fleet as of January 1, 2009, as reported in section 2025(r)(15).  This number shall not increase.

   (B)    A limited-mileage agricultural vehicle may be replaced by another vehicle so long as the replacement vehicle is equipped with an engine that is at least one model year newer than the engine in the vehicle it replaced, and provided the original vehicle is scrapped, rendered inoperable, replaces a low-mileage agricultural vehicle according to section 2025(m)(7)(C), or is sold out of the agricultural fleet.  This requirement does not apply to engine replacements.

   (C)    When a limited-mileage agricultural vehicle is replaced, the sum of the miles accrued on the original vehicle in that calendar year, up to the time of replacement, plus the mileage accrued on the replacement vehicle for the remainder of the calendar year (beginning with the date of replacement) must remain below the mileage thresholds established in section 2025(d)(44) based on the model year of the engine in the replacement vehicle.

   (D)    Beginning January 1, 2017, all limited-mileage agricultural vehicles that do not meet the definition of a low-mileage agricultural vehicle as defined in section 2025(d)(45) must comply with the best available control technology (BACT) requirements of section 2025(f) or the fleet average requirements of section 2025(h).

   (E)    A vehicle that formerly met the limited-mileage agricultural vehicle definition, but whose use increases above the mileage thresholds established in section 2025(d)(44) based on the model year of the engine, must immediately meet the requirements of section 2025(f) or (h) for the immediately preceding compliance deadline.

      1.    In addition, the vehicle may not be replaced and the number of limited-mileage agricultural vehicles in the agricultural fleet, as established in section 2025(m)(6)(A) above, shall be reduced by one.

   (F)    A merger of two or more agricultural fleets having designated limited mileage vehicles may not result in more designated limited mileage vehicles after the merger occurs than the sum of the total limited mileage vehicles from each individual agricultural fleet included in the merger.

(7)    Requirements for low-mileage agricultural vehicles

   (A)    The maximum number of low-mileage agricultural vehicles in each agricultural fleet shall be established by the number of low-mileage vehicles

41

in the agricultural fleet as of January 1, 2009, as reported in section 2025(r)(15).  This number shall not increase.

(B)    A low-mileage agricultural vehicle may be replaced with another vehicle if the replacement vehicle is equipped with an engine that is at least one model year newer than the engine in the vehicle being replaced, and provided the original vehicle is scrapped, rendered inoperable, or sold out of the agricultural fleet.  This requirement does apply to engine replacements.

(C)    When a low-mileage agricultural vehicle is replaced, the sum of the miles accrued on the original vehicle in that calendar year, up to the time of replacement, plus the mileage accrued on the replacement vehicle for the remainder of the calendar year (beginning with the date of replacement) must remain below the mileage threshold established in section 2025(d)(45).

(D)    Beginning January 1, 2023, all low-mileage agricultural vehicles must comply with the best available control technology (BACT) requirements of section 2025(f).

(E)    Irrespective of section 2025(m)(7)(A) a vehicle that formerly met the low-mileage agricultural vehicle definition, but whose use increases above the mileage thresholds established in section 2025(d)(45), must immediately meet the requirements of section 2025(f) or (h) for the immediately preceding compliance deadline.  The vehicle may not be replaced in the future with a substitute low-mileage agricultural vehicle, and the number of low-mileage agricultural vehicles in the agricultural fleet, as established in section 2025(m)(7)(A) above, shall be reduced by one.

(F)    A merger of two or more agricultural fleets having designated low-mileage vehicles may not result in more designated low-mileage vehicles after the merger occurs than the sum of the total low-mileage vehicles from each individual agricultural fleet included in the merger.

(G)    Until January 1, 2017, an agricultural fleet owner may change the status of a low-mileage vehicle to a limited-mileage vehicle provided the vehicle continues to meet the definition of a limited-mileage vehicle.  The low-mileage vehicle may not be replaced and the number of low-mileage agricultural vehicles in the agricultural fleet, as established in section 2025(m)(7)(A) above, shall be reduced by one

(8) (11)    Requirements for specialty agricultural vehicles

(A)    Specialty agricultural vehicles, as defined in section 2025(d)(69)(54), are exempt from the requirements of sections 2025(f), 2025(g), 2025(h) and 2025(i),, (g), and (h) until January 1, 2023.

(B)    The Executive Officer will approve a vehicle as qualifying as a specialty agricultural vehicle under the following conditions:

1.    The total number of specialty agricultural vehicles operating in the San Joaquin Valley Air Basin does not exceed 1,100, and

42

    2.    The total number of specialty agricultural vehicles in the state does not exceed 2,200.

(C)    If more vehicles are reported than allowed by the limits, the Executive Officer will randomly approve one vehicle per eligible fleet until all fleets have one approved vehicle, then randomly approve another vehicle for the remaining eligible fleets until they all have one more vehicle approved.  Vehicles will continue to be approved in this manner until the limits have been met.  <u>Vehicles reported by March 31, 2010, will be given priority should the limits identified in section 2025(m)(11)(B) above be exceeded.</u>

(D)    All vehicles with the body types described in section 2025(d)<s>(69)</s><u>(54)</u> that have not been approved must meet the requirements of section 2025(e) or the agricultural provisions of section 2025(m).

    1.    In such an instance, the agricultural fleet operator shall be notified in writing by the Executive Officer that the reported vehicle is not eligible as a specialty agricultural vehicle.

(E)    A fleet that replaces an agricultural specialty vehicle will not affect the number of approved specialty vehicles in the fleet so long as the replacement vehicle meets the specialty vehicle body type and use requirements.

<u>(12)   *Optional Phase in for Log Trucks*</u>

<u>Beginning January 1, 2012, fleets with log trucks as defined in section 2025(d)(39) may opt to have the log trucks in the fleet comply by meeting all of the requirements as set forth below in lieu of meeting the requirements in sections 2025(g) or 2025(i) and may not use a different compliance option for the fleet of log trucks identified as utilizing this option.</u>

<u>(A)    Fleet owners may phase in 2010 model year emission equivalent engines according to the compliance schedule shown in Table 7.</u>

<u>(B)    If the calculated number of engines required to be brought into compliance with the percentage limits is not equal to a whole number, the owner shall round up to a whole number when the fractional part of the required number of engines is equal to or greater than 0.5, and round down if less than 0.5.</u>

<u>(C)    The number of log trucks and qualifying agricultural vehicles cannot exceed the number of vehicles in the fleet as of January 1, 2009.</u>

<u>(D)    The total number of qualifying log trucks cannot increase from one year to the next.</u>

<u>(E)    Fleets utilizing the optional phase-in for log truck provision must comply with the reporting requirements of section 2025(r) for all log trucks.</u>

<u>(F)    Qualifying log trucks may not utilize any of the credits of section 2025(j) or any of the extensions or exemptions of section 2025(p).</u>

<u>(G)    The remaining vehicles in the fleet other than log trucks, must comply with the requirements of section 2025(e).</u>

*Table 7:  Compliance Schedule for the Log Truck Phase-in Option*

| Compliance Deadline as of January 1 | Percent of Total Fleet with 2010 Model Year Emissions Equivalent Engines |
|---|---|
| 2012 | 0% |
| 2013 | 0% |
| 2014 | 10% |
| 2015 | 20% |
| 2016 | 30% |
| 2017 | 40% |
| 2018 | 50% |
| 2019 | 60% |
| 2020 | 70% |
| 2021 | 80% |
| 2022 | 90% |
| 2023 | 100% |

(9) (13)    Labeling Requirements for Agricultural Vehicles and Log Trucks

(A)    Within 30 days of the reporting date, fleet owners must permanently affix or paint an AG identification label on each vehicle that utilizes the agricultural provision or the log truck phase-in option of section 2025(m) low-mileage, limited-mileage, and specialty agricultural vehicle in the fleet according to the following specification:

1.    The letters AG shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background,

2.    The label shall be located in clear view on the left and right door of the vehicle and be in clear view at all times.

(n)    *Requirements for Single-Engine and Two-Engine Sweepers*

(1)    Two-engine sweepers with auxiliary engines 50 hp or greater must comply with section 2025(e).  The propulsion engine is required to meet PM BACT and to upgrade to a 2010 model year emissions equivalent engine like other vehicles, and the auxiliary engines must meet PM BACT as follows:

(A)    The auxiliary engine is required to meet PM BACT when the propulsion engine is first required to meet PM BACT or to be upgraded to a 2010 model year emissions equivalent. The auxiliary engine is not required to be replaced or upgraded if it meets PM BACT.  The reporting requirements of

44

2025(r)(17) must be met unless the fleet complies with the model year schedules of 2025(f) or 2025(g).

~~(1) Two-engine sweepers must comply with section 2025(e) and must meet PM BACT on the auxiliary engine, 50 hp or greater, when the propulsion engine is required to meet PM BACT according to the compliance option chosen under section 2025(f), section 2025(g) or 2025(h).~~

(2) Regardless of fleet size, two-engine sweepers ~~may not operate any~~ with Tier 0 auxiliary engine~~s~~, 50 hp or greater, may not operate more than 450 hours per year starting January 1, 2010 until January 1, 2014 and no more than 100 hours per year thereafter.  The fleet owner must meet the reporting requirements in 2025(r)(17) for sweepers with Tier 0 auxiliary engines.

(3) Labeling Requirements for Two-Engine Sweepers with Tier 0 Auxiliary Engines

   (A) Within 30 days of the reporting date, fleet owners must permanently affix or paint an SW identification label on each two engine sweeper that has a Tier 0 auxiliary engine ~~in the fleet if using BACT percentage limits or fleet averaging upon reporting~~ according to the following specification:

      1. The letters SW shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background~~.~~; and

      2. The label shall be located on the left and right door of the vehicle and ~~be~~ in clear view at all times.

(4) For purposes of determining the downsizing credit of section 2025(j)(1), fleets with street sweepers may also include all single-engine and two-engine street sweepers with a GVWR from 14,001 lbs to 26,000 lbs in the 2006 baseline fleet and in the fleet for the compliance year. To use this option the fleet must meet the same reporting and record keeping requirements for these lighter street sweepers as is required for heavier vehicles.

(o) *Requirements for a New Fleet and ~~Adding Vehicles to a Fleet~~Changes in an Existing Fleet.*

(1) *New Fleet Requirements.*  Owners of new fleets must meet the requirements of section 2025(e) immediately upon purchasing vehicles subject to the regulation or bringing such vehicles into the State of California for the first time after ~~January 1, 2011~~January 1, 2012.  New fleets meeting the requirements of sections 2025(h) or 2025(i) ~~2025(g) or (h)~~ must report vehicles subject to the regulation to ARB within 30 days of purchasing or bringing such vehicles into the State, in accordance with the requirements in section 2025(r).

(2) *Changes in an Existing Fleet*

   (A) *Adding Vehicles to an Existing Fleet.*  ~~If a fleet does not meet the BACT requirements of section 2025(f), before the~~ Unless the vehicle is a 2007 model year or newer engine that meets PM BACT, a fleet may not operate a newly added vehicle or operate a vehicle that was previously reported as non-operational in California, ~~it~~ unless the fleet as newly constituted complies

45

with the requirements of section 2025(e) and must within 30 days of adding the vehicle, file a report with the Executive Officer that it has added a new vehicle, and demonstrate that the fleet, as newly constituted, complies with the requirements of sections 2025(o)(2)(A), (B), and (C) below.  If the vehicle added can comply by meeting PM BACT, the vehicle may be operated within 30 days of adding the vehicle to the fleet, solely for the purpose of having the vehicle's exhaust temperature data logged.

(B)   *Removing Vehicles from an Existing Fleet.*  If an existing fleet owner meets the requirements of the compliance options other than that of section 2025(f) or 2025(g) when a vehicle is removed from the fleet, it must file a report with the Executive Officer that it has removed a vehicle and demonstrate that the fleet, as newly constituted, will comply with the requirements of section 2025(o)(2)(C) within 30 days of removal of the vehicle.

(C)   *Compliance Requirements for an Existing Fleet that has Changed*

(A)1. A fleet owner who elects to utilize the phase-in option BACT percentage limits option of section 2025(g)(i) or uses the extensions, delays, and extensions of section 2025(p) may not add or remove vehicles that cause the percentage calculated for the fleet to fall below the percentage required for the previous compliance date.

(B)   A fleet owner who elects to utilize the fleet averaging requirements of section 2025(h) may not add vehicles that cause the fleet to exceed the fleet average target rates for the immediately preceding compliance deadline.

(C)2. Until January 1, 2017, the The addition of vehicles with 2007 or newer through 2009 model year engines that meet PM BACT need not be reported until the next compliance date unless;

1.a. the addition will cause a fleet to increase its size to greater than three vehicles; or a fleet with three or fewer vehicles changes to a fleet with four or more or,

2.b. a fleet is utilizing the credit for fleets that have downsized retired vehicle credit of section 2025(j)(1)(k)

(D)   The addition of vehicles with 2010 model year or newer engines that meet PM BACT need not be reported until the next compliance date;

3.   A fleet owner of a vehicle that formerly qualified for any of the compliance extensions or exemptions granted in section 2025(p) but whose status has changed so that it no longer meets the applicable definition, must immediately bring the fleet into compliance with requirements of section 2025(e) for the immediately preceding compliance date, and must notify the Executive Officer of the change in status within 30 days from the date of the change.

(p)    *Exemptions, Delays, and Extensions* ~~Exemptions, Compliance Extensions, and Credits~~

(1)    Vehicles used Exclusively in NOx Exempt Areas

This section applies to vehicles that are used exclusively in NOx exempt areas as defined in section 2025(d)(46) when operating in California. The fleet owner must meet the record keeping requirements of section 2025(s) and meet the reporting requirements as specified below.

(A)    Any vehicle with a GVWR greater than 14,000 lbs that is used exclusively in NOx exempt areas shall meet PM BACT but may be exempt from meeting the 2010 model year emissions equivalent requirements of section 2025(f) or 2025(g) if the vehicle meets PM BACT by the compliance date that the engine would otherwise be required to be upgraded to a 2010 model year emissions equivalent engine.

1.    The fleet owner must report information about the vehicle to demonstrate the engine has met PM BACT as specified in section 2025(r) but does not need to report after the initial reporting, as long as the vehicle continues to meet the requirements for the exemption, and;

2.    The fleet owner must either meet the electronic tracking and reporting requirements or the vehicle labeling requirements as specified in section 2025(p)(1)(C).

(B)    Until January 1, 2014, vehicles with a GVWR greater than 26,000 lbs that are used exclusively in NOx exempt areas shall be exempt from meeting the requirements of section 2025(g), 2025(h) or 2025(i) and must be brought into compliance with PM BACT from 2014 to 2016 as follows:

1.    The fleet of vehicles with a GVWR greater than 26,000 lbs including vehicles that operate exclusively in the NOx exempt areas, except for low-use vehicles must meet the following phase-in schedule set forth in Table 8 below.  Rounding will be done by the same method as described for the phase-in option of section 2025(i)(2).

*Table 8: Compliance Schedule for NOx Exempt Area Fleets*

| *Compliance Deadline, as of January 1* | *Percent of Fleet Complying with PM BACT* |
| --- | --- |
| 2014 | 33% |
| 2015 | 66% |
| 2016 | 100% |

2.    The fleet owner must meet the reporting requirements of section 2025(r) to use this compliance exemption, and must either meet the electronic tracking and reporting requirements or meet the vehicle labeling requirements as specified in section 2025(p)(1)(C) for any vehicle that uses the exemption.

47

3. The fleet owner must meet the reporting requirements of section 2025(r) for all the vehicles in the fleet.

4. After the fleet owner reports compliance with PM BACT for every vehicle in the fleet, reporting is no longer required for the NOx exempt area vehicles.

5. Beginning January 1, 2020, all vehicles must comply with the requirements of section 2025(g) except for vehicles that meet the requirements for an exemption as specified in section 2025(p)(1)(A) above.

6. Fleet owners may use the extension of section 2025(p)(9) for any vehicle that operates exclusively in the NOx exempt areas if the highest level VDECS is unavailable.

(C) For each compliance year the exemptions are used, the fleet owner must meet the electronic tracking and reporting requirements of section 2025(r)(16)(A)2, or must label the vehicle by permanently affixing or painting an identification label on the vehicle according to the following specification:

1. The letters NE shall be white block lettering on a black background. Both letters shall be at least three inches high on a five by eight inch background.

2. The label shall be located on the left and right door of the vehicle and in clear view at all times.

(D) Vehicles that use the NOx exempt areas exemptions may travel outside of the designated NOx exempt areas only for repairs or other services to the vehicle. The vehicle owner must obtain a work order from the facility that describes the service and it must show the date of the service and the location of the facility.

A fleet owner may be granted an extension to a compliance deadline if:

(1) *Exemption from Meeting NOx BACT.* Upon providing documentation demonstrating compliance with the conditions listed below in paragraphs (A) through (D), the Executive Officer will exempt the vehicles identified in those paragraphs from meeting NOx BACT in sections 2025(f) or (g), or the NOx fleet average in section 2025(h). If an exemption is granted, all such vehicles affected will continue to be subject to meeting PM BACT in sections 2025(f) or (g), or the PM fleet average in section 2025(h) and the record keeping and reporting requirements of this regulation.

(A) *A vehicle that meets the definition of NOx mileage exempt vehicle, as defined in section 2025(d)(58) , prior to January 1, 2021.*

If an emergency support vehicle is used both for emergency operation as defined in section 2025(d)(27), and for other purposes, the owner does not need to consider the hours of operation or the mileage the vehicle accrues when used for emergency operations in a compliance year, in determining

48

~~whether the vehicle meets the definition of a NOx mileage exempt vehicle for that compliance year.~~

(B)     ~~A vehicle that operates solely in the NOx exempt areas defined in section (d)(55) prior to January 1, 2021. A NOx-exempt vehicle is allowed to travel outside of the NOx-exempt area only for repairs or other service to the vehicle. The vehicle owner must obtain a work order from the facility that describes the service and shows the date of the service and location of the facility.~~

(C)     ~~Schoolbuses as defined in section 2025(d)(67).~~

(D)     ~~Motorcoaches as defined in section 2025(d)(49) prior to January 1, 2017.~~

(E)     ~~Early compliance action. If a fleet owner installs the highest level VDECS for PM on one or more vehicles before January 1, 2010, the owner is exempt from the NOx BACT requirements of sections 2025(f), the NOx BACT percent limits of section 2025(g) and the NOx fleet averaging requirements of section 2025(h) until January 1, 2014 for each vehicle that has been retrofitted early.~~

~~(2)~~     ~~*Exemption for Cab-Over-Engine Truck Tractors.* Upon providing documentation demonstrating compliance with the conditions listed below in paragraphs (A) through (E), the Executive Officer will not require the type of vehicle listed in paragraph (A) to be replaced in order to meet the fleet's NOx BACT prior to January 1, 2018, but the fleet owner will still be required to include the vehicle in the fleet if complying using the BACT percentage limits of section 2025(g) or the fleet averaging option of section 2025(h):~~

(A)     ~~The vehicle is a truck-tractor where the cab sits over the engine on the chassis and it is used exclusively to pull 57 foot trailers~~

(B)     ~~The PM performance requirement for the vehicle has been met and,~~

(C)     ~~The engine installed in the vehicle is at least a 2004 model year NOx emissions equivalent and,~~

(D)     ~~On the compliance date, all vehicles in the fleet that do not qualify for the exemption under this section have met the requirements of section 2025(e) and,~~

(E)     ~~The law limiting the total length of a combination vehicle to 65 feet as described in section 35401(a) of the California Vehicle Code has not been amended prior to January 1, 2010 to increase the length restriction.~~

(2)     Extension for Low-Mileage Construction Trucks

Beginning January 1, 2012, fleets with low-mileage construction trucks as defined in section 2025(d)(40) may opt to have a limited number of low-mileage construction trucks in the fleet comply by meeting all of the requirements as set forth below and do not need to include such vehicles in meeting the fleet requirements of sections 2025(g) through (i).

49

(A)  Beginning, January 1, 2012, up to ten low-mileage construction trucks in the fleet may use the extension. Fleets electing this option must meet the PM BACT requirements for the qualifying low-mileage construction trucks pursuant to the schedule set forth in Table 9, and then comply with the requirements of section 2025(g) starting January 1, 2020. Rounding will be done by the same method as described for the phase-in option of section 2025(i)(2).

(B)  A one truck owner with a low-mileage construction truck must meet PM BACT by January 1, 2016.

(C)  If fewer than 9,000 trucks use the extension in 2012, then the Executive Officer will approve additional trucks for the extension by approving one additional extension per fleet owner in a series of rounds until 9,000 trucks have been identified as using the extension.  A random selection process will be used to assign extensions that cannot be distributed equally among fleet owners.

*Table 9: Compliance Schedule for Fleets with Low-Mileage Construction Trucks*

| Compliance Deadline, as of January 1 | Percent of Fleet Complying with PM BACT |
|---|---|
| 2014 | 33% |
| 2015 | 66% |
| 2016 | 100% |

(D)  Fleets that have low-mileage construction trucks and other vehicles with a GVWR greater than 26,000 lbs, except low-use vehicles, must demonstrate that the combined fleet meets the phase-in schedule of Table 9 and, if so, the low-mileage construction vehicles in the fleet qualifying for the extension under sections 2025(p)(2)(A) and (C) above may delay having to comply with PM BACT until as late as 2016.

(E)  Fleets may use the extension based on unavailability of highest level VDECS of section 2025(p)(9) for low-mileage construction trucks.

(F)  Fleet owners using this provision must comply with the reporting and record keeping requirements of sections 2025(r) and (s) beginning January 31, 2012.

(G)  A low-mileage construction truck that has been approved for the extension may be replaced by another truck and continue to qualify for the extension if the replacement truck has a 1996 model year or newer engine, and the miles traveled after it is placed in service combined with the miles traveled by the original vehicle stays below the annual mileage threshold.  The replacement vehicle must be placed in service within one year of removing the original vehicle from the fleet or by the next compliance date, whichever is longer.

50

(H)   Labeling Requirements for Low-Mileage Construction Trucks

    1.   By January 31, 2012, fleet owners must affix or paint an identification label on up to ten low-mileage construction trucks and within thirty days after notification that any additional trucks have been approved as follows:

        a.   The letters CT shall be white block lettering on a black background.  Both letters shall be at least three inches high on a five by eight inch background.

        b.   The label shall be located on the left and right door of the vehicle and be in clear view at all times.

(I)   Low-mileage construction truck exemptions are not transferrable except with appropriate documentation of a change of business form approved by the Executive Officer such as sole proprietorship to partnership, partnership to corporation, mergers or acquisitions of the entire company and fleet of vehicles, or for changes such as from estate tax or inheritance tax planning.


(3)   *Unique Vehicle Extension* – Until January 1, 2017 the fleet owner may apply for, and the Executive Officer will grant, a single one year extension from the requirement to upgrade to a 2010 model year emissions equivalent engine in section 2025(f) and 2025(g) if by January 1, 2014, a VDECS was not available for the engine and a used vehicle or suitable cab and chassis that performs a similar function with a 2010 emissions equivalent engine is not available 6 months prior to the 2010 emissions equivalent engine compliance date. For the extension to be considered the fleet must apply for the extension 4 months prior to the compliance date that the engine is required to upgrade to a 2010 model year emissions equivalent engine.

(3)   ~~*Provisions for Unique Vehicles.*  Upon providing documentation demonstrating that a vehicle meets the definition of a unique vehicle as defined in section 2025(d)(74), the Executive Officer will not require the vehicle to be replaced in order to meet NOx BACT prior to January 1, 2021, but the fleet owner will still be required to include the vehicle in the fleet if complying using the BACT percentage limits of section 2025(g) or the fleet averaging option of section 2025(h).~~

(4)   *Exemption for Low-Use Vehicles*

(A)   Low-use vehicles as defined in section 2025(d)(41) are exempt from the requirements of section 2025(e)~~(1)~~ but the owner must meet reporting and record keeping ~~keep records and meet the reporting~~ requirements in accordance with sections 2025(r)(12) and 2025(s).

    1.   To be considered a low-use vehicle, the fleet owner must submit engine operation data from a properly functioning odometer or hubodometer and non-resettable hour-meter ~~unless they have a three day pass~~.

    2.   A vehicle is also considered to be a low-use vehicle if it is not driven for the entire compliance year and either a planned non-operation

certificate or a certificate of non-operation has been filed with the DMV or, an equivalent certificate has been filed with another state prior to the beginning of the compliance year.  The vehicle must not be operated for any other purpose during the compliance year except to demonstrate functionality of the vehicle to potential buyers, to move the vehicle short distances for maintenance, or to a storage facility while awaiting sale.

    3.    Low-use vehicles need not be included when determining compliance with the small fleet compliance option of section 2025(h) or the phase-in option of section 2025(i). BACT percent limits of section 2025(g) or when calculating fleet average indices and target rates for the fleet averaging option of section 2025(h).

(B)    Vehicles used both as an emergency support vehicle as defined in section 2025(d)(27)(23), and for other purposes, do not need to consider the hours of operation or mileage the vehicle accrues when used for emergency operations in determining whether the vehicle meets the definition of a low-use vehicle., but the fleet owner must report information about the emergency hours of operation or mileage as specified in section 2025(r)(15). If the vehicle meets the low-use definition of section 2025(d)(47), it is exempt from the requirements of section 2025(e)(1), but it is subject to the requirements of section 2025(p)(4) for low-use vehicles.

(C)    Vehicles that formerly met the low-use vehicle definition, but whose use increases above the specified limits, must immediately be brought into compliance as specified in section 2025(o)(3). to 100 hours per year or greater or whose mileage increases to 1,000 miles or greater, must immediately meet the requirements of section 2025(f)(g) or (h) for the immediately preceding compliance deadline unless it takes advantage of one of the exemptions listed in section 2025(p).

(5)    *Exemption for Vehicles Operating with a Three Day Pass*

(A)    Until January 1, 2021, a fleet owner that obtains a three-day pass for a vehicle will be allowed to operate one vehicle per calendar year in California without complying with section 2025(e) for the specified three day period per calendar year, provided the information required in section 2025(r)(7) is filed with the Executive Officer at least three days prior to the vehicle's planned use in California.

(B)    A three-day pass must be obtained from the Executive Officer either online, email, or by fax.  Prior to operating within California, the fleet must obtain written approval from the Executive Officer, which must be carried within the vehicle.  The Executive Officer will make every effort to respond to the request within three business days from the receipt of the request.  The Executive Officer shall grant the request so long as it is the first request made by the fleet in the calendar year.  If the Executive Officer fails to respond to the request by the date of the vehicle's planned entry into the state, the vehicle may operate in California for the requested three-day

period, but if the vehicle's operator fails to present documentation to ARB enforcement personnel, upon request, that it has filed a request for a three-day pass and qualifies for operating in the state, the fleet may be cited and subject to penalties.

(B) To obtain a three-day pass, a request to the Executive Officer, identifying the date that an out-of-state vehicle will be making a one-time annual visit to the state, the vehicle owner, company name, and vehicle identification number. and must obtain written approval, which must be carried within the vehicle., prior to operating in the state.

(C) A three-day pass must be obtained from the Executive Officer either online, email, or by fax. The Executive Officer will have three business days to respond from receipt of the request.

(6) *Exemption for Vehicles Awaiting Sale* – Vehicles in the possession of dealers, financing companies, or other entities that do not intend to operate the vehicle in California or offer the vehicle for hire for operation in California, and that are operated only to demonstrate functionality to potential buyers or to move short distances while awaiting sale for purposes such as maintenance or storage, are exempt from all requirements in section 2025.

(7) *Exemption for Vehicles Used Solely on San Nicolas or San Clemente Islands* - Vehicles used solely on San Nicolas or San Clemente Islands are exempt from all requirements in section 2025. If the land use plans for the islands are changed to allow use by the general public of the islands, this exemption shall no longer be applicable.

(8) *Credit for Hybrid Vehicles*

(A) Prior to January 1, 2018, upon presentation of proper documentation, the Executive Officer shall grant an owner credit, as set forth in (B) below, towards compliance with the fleet average for using hybrid vehicles defined in section 2025(d)(42) if the owner can demonstrate that the manufacturer has improved the fuel economy of the hybrid vehicle by at least 20 percent compared to a diesel vehicle of the same model year that performs a similar function and has a similar configuration to that of the hybrid vehicle.

(B) Upon approval by the Executive Officer, the fleet shall receive for each compliance year prior to 2018, a credit that double counts the number of hybrid vehicles in the fleet that may be used to calculate the PM and NOx indices and target rates for the percent limits requirements of section 2025(g) and for the fleet averaging option of section 2025(h). The emissions factor from Appendix A will be based on the engine model year or standard to which the engine was certified.

(9) *Credit for Alternative Fuel Vehicles* – Upon presentation of proper documentation, the Executive Officer will grant a fleet credit for using vehicles equipped with alternative fuel or heavy-duty pilot ignition engines, in calculating the NOx and PM fleet averages under section 2025(h). Upon approval, the fleet is allowed to use the NOx emission factor for the engine model year to which the alternative or

~~heavy-duty pilot ignition engines have been certified in calculating the NOx index and zero for the PM index.~~

~~(10)~~(8)    *Compliance Extension for Emissions Control Device Manufacturer Delays*~~:~~ - An owner who has purchased, or has entered into contractual agreement with the seller for the purchase, but has not received~~,~~ a VDECS, a replacement engine, or vehicle in order to comply with this regulation will be excused from immediate compliance if the VDECS or vehicles have not been received due to manufacturing delays as long as all the conditions below are met:

(A)    ~~Except for VDECS purchased to replace a failed or damaged VDECS, the~~ The fleet owner who ~~has purchased the VEDCS or vehicle or~~ has purchased, or has entered into contractual agreement with the seller for the purchase, at least 4 months prior to the required compliance date~~;~~, except in the case ~~of~~ where a VDECS is ordered to replace a failed or damaged VDECS, the fleet owner has purchased, or has entered into contractual agreement with the seller for the purchase of a replacement VDECS within 60 days of the VDECS failure.

(B)    The owner has identified the vehicle to be equipped with the VDECS or replaced upon receipt of the replacement VDECS ~~VEDCS~~ or vehicle.

(C)    Proof of purchase, such as a purchase order, down payment, or signed contract for the sale, including specifications for each VDECS, must be maintained by the owner and provided to an agent or employee of ARB upon request.

(D)    The new or retrofitted vehicles are immediately placed into operation upon receipt and any replaced vehicles are removed from service within 30 days.

(E)    Proof of the date that the new or retrofitted vehicles were placed into service and proof of the date that any replaced vehicles were removed from service~~.~~ must be maintained by the owner and provided to an agent or employee of ARB upon request.

~~(11)~~(9)    *Extension of the PM BACT Compliance Deadline Based on Unavailability of Highest Level VDECS* - If an engine that is required to meet PM BACT cannot be equipped with the highest level VDECS for PM, the Executive Officer may grant a one-year extension of the compliance deadline, which may be extended annually through January 1, 2017, based on an evaluation of information submitted pursuant to section 2025(r)(11) that the engine cannot be equipped with the highest level VDECS for PM provided that all other engines in the fleet are in compliance with the ~~PM BACT~~ requirements for the compliance year.  The request must be filed 4 months prior to the compliance deadline. By January 1, 2018, any vehicle that is not equipped with the highest level VDECS for PM must be replaced ~~or have~~ with a vehicle that meets PM BACT. ~~its engine replaced with one that is equipped with the highest level VDECS for PM.  This includes~~The extension for unavailability of highest level VDECS applies to the auxiliary engines in two engine sweepers~~.~~ if the engine that provides motive power must meet PM BACT.  By January 1, 2018, any auxiliary engine in a two engine sweeper with a GVWR

greater than 26,000 lbs that is not equipped with the highest level VDECS for PM must be replaced with Tier 4 off-road engine or an engine that is equipped with the highest level VDECS for PM.  The extension does not apply for engines that are required to meet the 2010 model year equivalent requirements.

(10)    *Extension for Meeting PM BACT by 2014.*  By January 1, 2014, if every vehicle in the fleet with a GVWR greater than 26,000 lbs is equipped with either a Level 3 VDECS for PM or a 2007 model year or newer engine that meets PM BACT, the vehicles shall be exempt from meeting the 2010 model year emission equivalent engine requirements until January 1, 2023.

    (A)    Fleet owners must meet reporting requirements of sections 2025(r) by January 31, 2014.  The fleet will not need to report again after the initial reporting to retain the extension unless a vehicle or engine is replaced with one that has a 2006 model year or older engine.

    (B)    The fleet can retain the exemption if an engine or vehicle is replaced with another one that is equipped with a Level 3 VDECS or has a 2007 model year or newer engine that meets PM BACT.  The fleet must report the according to section 2025(o)(2).

(12)    ~~Change in Exemption Status.  - A fleet owner of a vehicle that formerly qualified for any of the compliance extensions or exemptions granted in section 2025(n) or 2025(p) but whose status has changed so that it no longer meets the applicable definition, must immediately bring the fleet into compliance with requirements of section 2025(f) or 2025(g), (g), or (h) for the immediately preceding compliance deadline, and must notify the Executive Officer of the change in status within 30 days from the date of the change.~~

(q)    *Special Provisions for VDECS and Experimental Diesel Emission Control Strategies*

(1)    VDECS *Requirements*

    (A)    *VDECS Installation.*  Before installing a VDECS on a vehicle, the owner must ensure that:

        1.    The VDECS is verified for use ~~with~~on the engine and vehicle, as described in the Executive Order for the VDECS.

        2.    Use of the vehicle is consistent with the conditions of the Executive Order for the VDECS.

        3.    The VDECS is installed in a verified configuration.

        4.    The engine to be retrofitted must be in its original certified configuration, free of excess oil consumption, must not have malfunctioning fuel delivery systems, or any other mechanical condition that may impair the proper functioning of the VDECS. ~~meets engine manufacturer's specifications for installation of the VDECS.~~

        5.    The VDECS label will be visible after installation.

(B)   *VDECS Maintenance.*  If a fleet owner installs a VDECS to meet the requirements of section 2025(e), the VDECS must remain installed until the VDECS fails or is damaged or is replaced with a similar or higher level VDECS.  Requirements for VDECS failure or damage are in section 2025(q)(2).  The owner of a vehicle retrofitted with a VDECS must ensure that the VDECS and engine are properly maintained as recommended by the respective manufacturers.

(2)   *Failure or Damage of a VDECS.*

In the event of a failure or damage of a diesel emission control strategy, the following conditions apply:

(A)   Failure or Damage During the Warranty Period.  If a VDECS fails or is damaged within its warranty period, and the VDECS manufacturer or authorized dealer determines that it cannot be repaired, the owner must replace the VDECS with the same level or higher level VDECS for the vehicle within 90 days of the failure.

(B)   Failure or Damage Outside of Warranty Period.  If a VDECS fails or is damaged outside of its warranty period and cannot be repaired, and if the fleet could not meet an applicable target for the most recent compliance date without the failed VDECS, then within 90 days of the failure, the owner must replace the failed VDECS with the highest level VDECS available for the engine at time of failure.

(3)   *Fuel-Based Strategy VDECS.*

(A)   If a fleet owner determines that the highest level VDECS for a large percentage of the fleet would be a Level 2 fuel verified as a diesel emission control strategy, and implementation of this VDECS would require installation of a dedicated storage tank, then the owner shall request prior approval from the Executive Officer to allow use of the Level 2 fuel-based strategy across its fleet.

(B)   Waiver for Discontinuation of Fuel Verified as a Diesel Emission Control Strategy.  If a fleet owner has relied upon a fuel verified as a diesel emission control strategy to meet an applicable requirement and has to discontinue use of the fuel due to circumstances beyond the fleet owner's control, the fleet owner shall apply to the Executive Officer no later than 30 days after discontinuing use of the fuel for a compliance waiver of up to two years to provide the fleet owner time to return to compliance with the applicable requirements.  The Executive Officer shall respond to the request within 30 days and grant the request upon finding that the application is complete, outlines the compliance strategy to be used, and that all reporting requirements have been met.

(4)   *Use of Experimental Diesel Emission Control Strategies*

(A)   If a fleet owner wishes to use an experimental or non-verified diesel emission control strategy to support the verification of a non-verified diesel emission control strategy, the owner must first obtain approval from the Executive

56

Officer for a compliance extension. To obtain approval, the owner must demonstrate either that (1) a VDECS is not available or not feasible for their vehicle or application, or (2) that use of the non-verified strategy is needed to generate data to support verification of the strategy.

1.  The application must include the following: emissions data and a detailed description of the control technology that demonstrates that the experimental control strategy achieves at least a ~~l~~Level 2 diesel PM emission reduction, vehicle and engine data, and odometer or hubodometer readings as described in sections 2025(r)(8), 2025(r)(9), and 2025(r)(12)(B).

2.  The Executive Officer will treat the strategy as a:

    a.  Level 2 VDECS if the application demonstrates that the strategy achieves at least 50 percent reduction in diesel PM.

    b.  Level 3 VDECS if the application demonstrates that the strategy achieves at least 85 percent reductions in diesel PM.

    3.  ~~If the application demonstrates that the strategy achieves a NOx reduction of over 15 percent, the NOx reduction will be counted.~~

(B)  Upon approval by the Executive Officer, each vehicle engine retrofitted with the experimental strategy will be allowed to operate for a specified time period necessary to make a determination that the experimental strategy can achieve the projected emissions reductions. The vehicle equipped with the experimental strategy will be considered to be in compliance under section 2025(f), 2025(g), ~~or~~ 2025(h), or 2025(i) during the specified time period. The fleet owner shall keep documentation of this use in records as specified by the Executive Officer.

(C)  The fleet owner must bring the fleet into compliance under section 2025(f), 2025(g), ~~or~~ 2025(h), or 2025(i) prior to the expiration of the experimental diesel emission control strategy extension.

(5)  *VDECS That Impairs Safe Operation of Vehicle* - A fleet owner may request that the Executive Officer find that a VDECS should not be considered the highest level VDECS available because:

(A)  It cannot be safely installed or operated in a particular vehicle application~~,~~; or

(B)  Its use would make compliance with occupational safety and health requirements, federal highway safety regulations, or an ongoing local air district permit condition impossible.

If a VDECS manufacturer states that there is no safe or appropriate method of mounting its VDECS on the requesting party's vehicle, then the VDECS will not be considered safe. In the absence of such a declaration by the VDECS manufacturer, the requesting party shall provide other documentation to support its claims.

Documentation may include published reports and other findings of federal, state or local government agencies, independent testing laboratories, engine

manufacturers, or other equally reliable sources.  The request will only be approved if the requesting party has made a thorough effort to find a safe method for installing and operating the VDECS, including various locations for VDECS mounting, and use of an actively regenerated VDECS.  The Executive Officer shall review the documentation submitted and any other reliable information that he or she wishes to consider and shall make his or her determination based upon the totality of the evidence.

Upon finding that a VDECS cannot be installed without violating the safety standards prescribed under title 8, CCR by the California Department of Industrial Relations, Division of Occupational Safety and Health, ~~or~~ comparable federal or state <u>health and safety</u> laws where the vehicle operates, <u>or federal highway safety laws,</u> the Executive Officer shall issue a determination that there is no highest level VDECS available.  The Executive Officer shall inform the requesting party, in writing, of his or her determination, within 60 days of receipt of the request.

Parties may appeal the Executive Officer's determination as described in ~~(A)~~<u>(C)</u> and ~~(B)~~<u>(D)</u> below.  During the appeal process described in ~~(A)~~<u>(C)</u> and ~~(B)~~<u>(D)</u> below, the requesting party may request the administrative law judge to stay compliance until a final decision is issued.  If the stay is granted and the Executive Officer denies the requesting party's request, the requesting party has six months from the date of the Executive Officer's final written decision to bring his or her fleet back into compliance.

~~(A)~~<u>(C)</u>   *Appeals – Hearing Procedures*

1.   Any party whose request has been denied may request a hearing for the Executive Officer to reconsider the action taken by sending a request in writing to the Executive Officer.  A request for hearing shall include, at a minimum, the following:

   a.   name of the requesting party;

   b.   copy of the Executive Officer's written notification of denial;

   c.   a concise statement of the issues to be raised, with supporting facts, setting forth the basis for challenging the denial (conclusory allegations will not suffice);

   d.   a brief summary of evidence in support of the statement of facts required in c. above; and

   e.   the signature of an authorized person requesting the hearing

2.   A request for a hearing shall be filed within 30 days from the date of issuance of the notice of the denial.

3.   A hearing requested pursuant to this section shall be heard by a qualified and impartial hearing officer appointed by the Executive Officer.  The hearing officer may be an employee of the ARB, but may not be any employee who was involved with the denial at issue.  In a request for reconsideration, the hearing officer, after reviewing the request for hearing and supporting documentation provided under paragraph 1.d. above, shall grant the request for a hearing if he or she

finds that the request raises a genuine and substantial question of law or fact.

4. If a hearing is granted, the hearing officer shall schedule and hold, as soon as practicable, a hearing at a time and place determined by the hearing officer.

5. Upon appointment, the hearing officer shall establish a hearing file. The file shall consist of the following:

    a. the determination issued by the Executive Officer which is the subject of the request for hearing;

    b. the request for hearing and the supporting documents that are submitted with it;

    c. all documents relating to and relied upon by the Executive Officer in making the initial determination to deny the requesting party's original claim; and

    d. correspondence and other documents material to the hearing.

6. The hearing file shall be available for inspection by the applicant at the office of the hearing officer.

7. An applicant may appear in person or be represented by counsel or by any other duly-authorized representative.

8. The ARB may be represented by staff or counsel familiar with the regulation and may present rebuttal evidence.

9. Technical rules of evidence shall not apply to the hearing, except that relevant evidence may be admitted and given probative effect only if it is the kind of evidence upon which reasonable persons are accustomed to relying in the conduct of serious affairs. No action shall be overturned based solely on hearsay evidence, unless the hearsay evidence would be admissible in a court of law under a legally recognized exception to the hearsay rule.

10. Declarations may be used upon stipulation by the parties.

11. The hearing shall be recorded either electronically or by a certified shorthand reporter.

12. The hearing officer shall consider the totality of the circumstances of the denial, including but not limited to, credibility of witnesses, authenticity and reliability of documents, and qualifications of experts. The hearing officer may also consider relevant past conduct of the applicant including any prior incidents involving other ARB programs.

13. The hearing officer's written decision shall set forth findings of fact and conclusions of law as necessary.

14. Within 30 days of the conclusion of a hearing, the hearing officer shall submit a written proposed decision, including proposed finding as well as a copy of any material submitted by the hearing participants as part of that hearing and relied on by the hearing officer, to the Executive

Officer. The hearing officer may recommend to the Executive Officer any of the following:

    a.   uphold the denial as issued;

    b.   modify the denial; or

    c.   overturn the denial in its entirety.

15.   The Executive Officer shall render a final written decision within 60 working days of the last day of hearing. The Executive Officer may do any of the following based on substantial evidence in the record:

    a.   adopt the hearing officer's proposed decision;

    b.   modify the hearing officer's proposed decision; or

    c.   render a decision without regard to the hearing officer's proposed decision.

(B)(D)   *Appeals – Hearing Conducted by Written Submission.*

In lieu of the hearing procedure set forth in A(C)above, an applicant may request that the hearing be conducted solely by written submission. In such case the requestor must submit a written explanation of the basis for the appeal and provide supporting documents within 20 days of making the request.  Subsequent to such a submission the following shall transpire:

1.   ARB staff shall submit a written response to the requestor's submission and documents in support of the Executive Officer's action no later than 10 days after receipt of the requestor's submission.

2.   The applicant may submit one rebuttal statement which may include supporting information, as attachment(s), but limited to the issues previously raised;

3.   If the applicant submits a rebuttal, ARB staff may submit one rebuttal statement which may include supporting information, as attachment(s), but limited to the issues previously raised; and

4.   The hearing officer shall be designated in the same manner as set forth in section 2025(q)(5)(A)(C)(3) above.  The hearing officer shall receive all statements and documents and submit a proposed written decision and such other documents as described in section 2025(q)(5)(A)(C) (13) above to the Executive Officer no later than 30 working days after the final deadline for submission of papers. The Executive Officer's final decision shall be mailed to the applicant no later than 60 days after the final deadline for submission of papers.

5.   The Executive Officer shall render a final written decision within 60 working days of the last day of hearing.  The Executive Officer may do any of the following:

    a.   adopt the hearing officer's proposed decision;

    b.   modify the hearing officer's proposed decision; or

    c.  render a decision without regard to the hearing officer's proposed decision.

(r)   *Reporting <u>Requirements</u>*

<u>(1)   The owner of a fleet is subject to reporting requirements for the vehicles in the fleet as defined in section 2025(d)(28) if the owner has elected to utilize the compliance options of section 2025(f)(4), 2025(g)(3), 2025(g)(4), 2025(h), 2025(i), the credits of section 2025(j), and the agricultural provisions of section 2025(m), single-engine and two-engine street sweeper provisions of section 2025(n), extension or exemptions for vehicles used exclusively in NOx exempt areas of section 2025(p)(1), and the extension for low-mileage construction trucks of section 2025(p)(2).  Fleet owners that use the credit for fleets that have downsized provided in section 2025(j)(1)and the credit for the early addition of newer vehicles provided in section 2025(j)(3) must report information for all vehicles under common ownership or control with a GVWR greater than 26,000 lbs in the 2006 baseline fleet and in the fleet for each compliance year.  Except as required in section 2025(k)(4), school buses are not required to comply with the reporting requirements.</u>

(1)   ~~The owner of a fleet is subject to the reporting requirements of section 2025(r) for the vehicles in the fleet as defined in section 2025(d)(34) if the owner has elected to utilize the BACT percent limits option of section 2025(g), the fleet averaging option of section 2025(h), the optional requirements for small fleets of section 2025(i), the retired vehicle credit provision of section 2025(k), the special provisions and compliance extensions of section 2025(p), or the agricultural provisions of section 2025(m).~~

(2)   All fleet owners utilizing any of the <u>credits in section 2025(j) or any of the exemptions, delays, or extensions in section 2025(p)</u> ~~exemptions, compliance extensions, or credit in section 2025(p)~~ must report <u>according to</u> ~~and comply with~~ the requirements of section 2025(r) and <u>maintain records according to section</u> 2025(s) for all of the<u>ir</u> ~~ir~~ vehicles in the fleet as defined in section 2025(d)(<u>34</u>)<u>(28)</u>.<u>,</u> ~~regardless of whether the vehicle is utilizing of the special provisions or not.~~

(3)   The owner of a fleet that ~~has elected to comply~~ <u>complies by</u> using the ~~BACT~~ compliance schedule <u>by engine model year</u> set forth in sections 2025(f) <u>and 2025(g) and also utilizes</u> the low-use vehicle provision of section 2025(p)(4) is ~~not subject to the~~ <u>only required to</u> ~~reporting~~ <u>meet the reporting</u> requirements of <u>section</u> 2025(r) <u>for the low-use vehicles meeting the definition in section 2025(d)(41)</u>.

(4)   Fleet owners may submit reporting information using forms (paper or electronic) approved by the Executive Officer.

(5)   The fleet owner must notify the Executive Officer in writing by the first applicable reporting date and by January 31 of every subsequent compliance year, if applicable<u>,</u> with the name of the responsible official and the location where the records will be kept<u>.</u> ~~.~~ <u>, and whether any information has changed since its last reporting.</u>  ~~If~~<u>Whether</u> the records will be kept <u>inside or</u> outside California, the

owner must also comply with section 2025(t). ~~If a fleet owner opts to comply with fleet averaging requirements of section 2025(h) separately for different divisions or subsidiaries according to section 2025(e)(5), then the company or agency may report separately for the different portions of the fleet.~~

(6) Each year, fleet owners subject to the reporting requirement must report on their fleet as it was on ~~January 1~~ the compliance date of the current compliance year. ~~They must~~ The fleet owner must submit the applicable information set forth in sections 2025(r)(5) through ~~(14)~~(10) by January 31 ~~following~~ of each compliance ~~date~~year. Owners must report annually until ~~the reporting requirement expires or fleets may stop reporting~~ the year after all of the ~~BACT~~ requirements of section 2025(f) and 2025(g) have been completely met. ~~Fleets may submit information by mail or electronically.~~

(7) *Owner Contact Information*: Compliance reports must include the following information: ~~in (A) through (M) below.~~

(A) Fleet owner's name~~,~~;

(B) Name of company or agency~~,~~;

(C) Motor carrier identification number~~,~~;

(D) Corporate parent name (if applicable)~~,~~;

(E) Corporate parent taxpayer identification number (if applicable)~~,~~;

(F) Company taxpayer identification number~~,~~;

(G) Street address and mailing address~~,~~;

(H) Name of responsible person~~,~~;

(I) Title of responsible person~~,~~;

(J) Contact name~~,~~;

(K) Contact telephone number~~,~~;

(L) Contact email address (if available)~~.,~~; and

(M) License number issued by the Public Utilities Commission (if applicable).

(8) *Vehicle Information*

Fleet owners must provide to the Executive Officer a list of all vehicles subject to the reporting requirements along with the information listed in (A) through (S) ~~(P)~~below for each vehicle:

~~(A)    Vehicle type,;~~

~~(B)    Whether the vehicle is a schoolbus as defined in section 2025(d)(67) that transports pupils, a motorcoach, truck-tractor, shuttle vehicle, two-engine sweeper, or yard truck;~~

~~(C)    Date the vehicle was added first reported,or retired,~~

(A) ~~(D)~~ Vehicle identification number~~,~~;

(B) (E)  Vehicle manufacturer~;~:

(C) (F)  Vehicle model~;~:

(D) (G)  Gross vehicle weight rating:

(E) (H)  Vehicle model year~,~:

(F) (I)  License plate number~;~:

(G) (J)  ~Where t~The state, province, or country where the vehicle is or was registered and type of registration plate;

(H)  Vehicle type, including whether the vehicle is a schoolbus, agricultural vehicle, log truck, truck-tractor, two-engine sweeper, low-mileage construction truck or yard truck;

(I)  If the vehicle was added after January 1, 2012, the date the vehicle was added otherwise the date first reported;

(J)  Date that a vehicle was retired, sold, or scrapped after January 1, 2012;

(K)  Whether the vehicle will be designated as a low-use vehicle as defined in section 2025(d)(41);

~1.    For vehicles designated as low-use, fleet owners must report the information listed in section 2025(r)(12).~

~2.    Report whether the low-use status is based on mileage or hours of operation.~

~3.    Whether the vehicle has PTO for performing work in stationary mode.;~

~(L)    Whether the vehicle is used as an emergency support vehicle;~

~1    For low-use or mileage exempt vehicles used in emergency operations, fleet owners must report the information listed in section 2025(r)(16).~

~(M)  Whether the vehicle is a sweeper, specialty agricultural vehicle, cab-over-engine truck tractor, or unique vehicle as defined in sections 2025(n) and 2025(p);~

(L)  Whether the vehicle has been certified as non-operational with the California Department of Motor Vehicles or equivalent documentation from the state, province, or country where the vehicle is registered and whether the vehicle will not operate in California.

~(N)~(M)  Whether the vehicle is a fuel efficient hybrid vehicle as defined in section 2025(d)~(42)~(31)~.~;

~(O)~(N)  Whether the vehicle is propelled by an alternative-fueled engine as defined in section 2025(d)~(9)~(8)~.~;

~(P)  Fuel type.;~

(O)  Whether the vehicle will use the extension or exemptions for vehicles used exclusively in NOx Exempt Areas in section 2025(p)(1);

(P)    Whether the fleet size is more tha~~n~~ three vehicles subject to the regulation with a GVWR greater than 14,000 lbs;

(Q)    Whether the vehicle is a log truck utilizing the Optional Phase in for Log Trucks provision in section 2025(m)(12);

(R)    Whether the vehicle is a low-mileage construction truck that will use the extension for low-mileage construction trucks specified in section 2025(p)(2); and

(S)    Whether the vehicle was partially paid for with public funds, and if so, the information about the funding contract specified in section 2025(r)(18).

(9)    *Engine Information Reporting*.

Except as provided in section 2025(r)(13)(A) below, T~~t~~he following information for each engine that propels a vehicle reported per section 2025(r)(8) and for each sweeper engine that operates auxiliary equipment must be reported to the Executive Officer:

(A)    Engine manufacturer~~,~~;

(B)    Engine model~~,~~;

(C)    Engine family for all 1974 model year and newer engines;~~,~~

(D)    Fuel type

~~(D)    Engine serial number, and~~

(E)    Engine model year~~,~~;

(F)    Whether the engine meets an on-road or off-road emissions standard~~,~~;

(G)    Whether the engine is used to propel the vehicle or to operate auxiliary equipment~~,~~;

(H)    The emissions standard to which the engine was certified if lower than required for the engine model year; and

(I)    Whether the engine was partially paid for with public funds, and if so, the information about the funding contract specified in section 2025(r)(18).

(10)    *Verified Diesel Emission Control Strategies Reporting*.

Except as provided in section 2025(r)(13)(A) below, F~~f~~or each VDECS that is installed on an engine listed per section 2025(r)(9), the fleet owner must report the following information to the Executive Officer~~.~~:

(A)    ~~Type~~ Description of VDECS installed~~,~~;

(B)    ~~VDECS manufacturer,~~

~~(C)~~    VDECS family name~~,~~;

(C)~~(D)~~    Serial number, or experimental part number, or aftermarket part number~~,~~;

(D)~~(E)~~    Date installed;

(E)   If claiming early PM retrofit credits of section 2025(j)(2)(A) and the VDECS is installed between July 1, 2011 and October 1, 2011, the fleet owner must attest to having records to document the purchase agreement and down payment for the VDECS by May 1, 2011;

(F)   Whether the VDECS was partially paid for with public funds and the information in 2025(r)(18) if partially paid for with public funds; and

(G)   Whether the VDECS was installed on the engine to comply with another California in-use regulation.

(11)   *Availability of* Reporting for Extension for Unavailability of *Highest Level VDECS*

If appropriate, the following information must be submitted to the Executive Officer with a request for an extension based on the unavailability of highest level VDECS:

(A)   Owner contact information, vehicle, and engine information listed in sections 2025 (r)(7), 2025(r)(8), and 2025(r)(9).;

(B)   Description of the reason for the compliance extension request for each engine or engine-vehicle combination.;

(C)   If the VDECS would void the engine warranty, provide a statement from the engine manufacturer or authorized engine or vehicle dealer.;

(D)   If a no verified VDECS is commercially available for the engine family, provide a list of manufacturers and installers that have been contacted and the manufacturers' responses to a request to purchase.; and

(E)   Documentation must be submitted with the initial request and must be reported annually on January 31 following the compliance deadline for each year that the owner is claiming non-availability of the highest VDECS.

(12)   *Low-Use Vehicles Reporting*

For vehicles that are designated as low-use, the fleet owner must report the following information to the Executive Officer annually for as long as the fleet owns or operates the vehicle:

(A)   Owner, vehicle, and engine information identified in sections 2025 (r)(5) through 2025(r)(9);

(B)   Mileage from odometer readings from a properly functioning odometer or hubodometer taken on January 1 and December 31 of the compliance year. A hubodometer may be used in lieu of the odometer.;

(C)   If the vehicle uses engine power as specified in 2025(d)(41), Hhour-meter readings from a properly functioning non-resettable hour-meter taken on January 1 and December 31 of the compliance year.;

(D)   The dates and readings of the odometer and non-resettable hour-meter readings.  In the event that the odometer meter is replaced, the original odometer reading and the new odometer reading and the date of replacement must be reported within 30 days the original odometer failed.  In the event that the odometer or hubodometer is removed, the reading and

date it is removed and the reading of the replacement and the date it is placed in service.  If hubodometers are used, the fleet owner must report the serial numbers;

(E)    Upon request of an agent or employee of the ARB, the ~~The~~owner of a vehicle operating both inside and outside of California must provide records from an electronic tracking system as defined in section 2025(d)~~(26)~~(21) that can acquire date, time, engine-on, and location data.  The owner may use other documentation of vehicle operation and location, such as IRP records;

(F)    Whether the vehicle is used as an emergency support vehicle as defined in section 2025(d)(23); and, if so, the fleet owner must report the information in section 2025(r)(15); and

(G)    Whether a planned non-operation certificate has been filed with the DMV or, an equivalent certificate has been filed with another state prior to the beginning of the compliance year, and whether the vehicle will not be operated in the compliance year.

(13)    ~~Fleets Claiming Vehicle Retirement Credit~~Credit for Fleets that have Downsized or Added Newer Vehicles Early Reporting

Fleets owners claiming credits under section 2025(j) must report the following:

(A)    Fleet owners claiming credit for downsizing must report the following:

1.    For the vehicles in the 2006 baseline fleet, vehicle information specified in section 2025(r)(8)(A) to 2025(r)(8)(G), and if the vehicle was not registered with the California Department of Motor Vehicles, identify the type of records that are being kept to document proof that the vehicles drove at least 1,000 miles in California in the year 2006.  Fleets that include street sweepers with a GVWR from 14,001 to 26,000 lbs for determining the credit, must identify that the vehicle is a street sweeper.

2.    For the compliance year, whether the fleet has drayage trucks, on-road vehicles subject to the off-road in-use vehicle regulation, and information about how many are currently in the fleet.  Fleets that include street sweepers with a GVWR from 14,001 to 26,000 lbs for determining the credit, must identify that the vehicle is a street sweeper.

(B)    For the 2006 baseline fleet, a fleet owner that claims credits for adding cleaner vehicles as specified in section 2025(j)(3) must report the vehicle information in section 2025(r)(13)(A) above and the engine model year, and engine family for all the vehicles in the fleet as of January 1, 2012.  The fleet owner has the option to report the engine information for vehicles that are no longer in the fleet if the fleet owner has records to document the engine model year and engine family.

~~(A)    By March 31, 2010, fleets requesting vehicle retirement credits must report the information required in sections 2025(r)(5) through (9) for all vehicles in the fleet that were registered on July 1, 2008.  Beginning 2011 and every year thereafter until 2014, the reporting date shall be January 31.~~

(14) *Schoolbus Fleets or Sub-Fleets*

    (A)   For schoolbus fleet or sub-fleets that comply using the PM BACT percentage limits of section 2025(g) or the PM fleet averaging of section 2025(h)(3) or any of the special provisions in section 2025(p), the schoolbus fleet owner must report the information required in section 2025(r), except for the information required under subsections 2025(r)(12)(C), (r)(12)(E) or (r)(16)(C).

(15)(14)   *Agricultural Fleet Reporting* ~~Vehicles in Agricultural Fleets.~~

Until January 1, 2023, fleet owners of all agricultural vehicles that utilize the provisions of section 2025(m), must report the following information to the Executive Officer by April 29, 2011 and every January 31 thereafter:

For all vehicles owned as of January 1, 2009, an agricultural fleet owner must report the information in this section to the Executive Officer for all vehicles (including vehicles that do not qualify as agricultural vehicles) by March 31, 2010. For subsequent years, the reporting date shall be January 31. For each vehicle in an agricultural fleet, the agricultural fleet owner must report the following information until January 1, 2023:

(A)   Information required in sections 2025(r)(5) through 2025(r)(9). for vehicles in the existing fleet and the vehicle information required in section 2025(r)(8) items (A) to (G) for the vehicles in the fleet as of January 1, 2009.;

(B)   Whether the vehicle is a specialty agricultural vehicle or a log truck;

(B)   Whether the vehicle is a low-mileage, limited-mileage, or specialty agricultural vehicle, or is none of these.

(C)   Whether the vehicle will operate as a low-mileage or limited-mileage vehicle should it not qualify as a specialty agricultural vehicle.

(D)(C)   Whether the vehicle is being added or removed from deleted to the fleet and the date of that the vehicle is added or removed addition or deletion occurred.;

(E)(D)   The vehicle body type if one of the four body types described in the definition of specialty agricultural vehicle in section 2025(d)(69)(54).;

(F)(E)   If eligible to be considered for the specialty vehicle exemption, the priority status of the vehicle in case not all specialty vehicles in the fleet can be approved.;

(G)(F)   Whether the specialty vehicle will operate exclusively outside the San Joaquin Valley Air Basin..;

(H)(G)   Whether the vehicle is operated for compensation outside a farming business owner's farm.;

(I)(H)   Except for specialty agricultural vehicles, Mmileage from a properly functioning odometer taken on January 1, 20112010 and every January 1 thereafter. In the event that the odometer is replaced, the fleet owner shall report the original odometer reading, the new odometer reading, and the date

67

the original odometer was replaced. If a hubodometer is used in lieu of the odometer, the fleet owner must also report the serial number for each hubodometer used or replaced.; and

(J)(I) For a low, limited, or specialty an agricultural vehicle being replaced, the owner, vehicle, and engine information set forth in sections 2025(r)(5) through 2025(r)(9)(10), the mileage of both the vehicle being replaced and added, and the date the mileage readings were taken.

(16)(15)    *Vehicles used as emergency support vehicles in emergency operations.*

A fleet owner must provide the following information to the Executive Officer to qualify a vehicle's usage as emergency operation:

(A)    Owner, vehicle, and engine information identified in sections 2025 (r)(5) through 2025(r)(9)(10);

(B)    Odometer readings from a properly functioning odometer to document use at an emergency event and to document travel to and from the emergency event.  In the event that the odometer meter is replaced, the fleet owner shall report the original odometer reading and the new odometer reading and the date of replacementthat the original odometer was replacedmust be reported.  If a hubodometer is used in lieu of an odometer, the fleet owner must also report the serial number for each hubodometer used or replaced.  Vehicles used exclusively for emergency use that are not authorized emergency vehicles do not need to have an hour meter and do not need to report hours.  Authorized emergency vehicles are exempt per section 2025(c); and

(C)    Records to document dispatch by the local, state, or federal agency or other responsible emergency management entity as approved by the Executive Officer.

(17)(16)    *Vehicles Exempt from NOx BACT.* Reporting of Vehicles Utilizing the Exemptions, Delays, and Extensions Provision

(A) *Exemption Based on Early Action.* Unless stated otherwise in section 2025(p), fleet owners utilizing the exemptions, delays, and extensions provision of section 2025(p) must provide the following information to the Executive Officer by January 31, 2012:

The owner must provide the following information to the Executive Officer by March 31, 2010.

1.    Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(9).; and

2.    Information listed in section 2025(r)(10) for the VDECS.

(B) NOx *Mileage Exempt Vehicles.*

The owner must provide the following information to the Executive Officer by January 31 of the compliance year to demonstrate compliance with the requirements of section 2025(p)(1).

> ~~1.     Owner, vehicle, and engine information listed in sections 2025(r)(5) through (11).~~
>
> ~~2.     Mileage and hours of use readings on January 1 and December 31 of the compliance year taken from a properly functioning odometer and hour-meter for vehicles meeting the definition of sections 2025(d)(58)(A) or (B) and mileage only readings for vehicles meeting the definitions of 2025(d)(58)(C) or (D).  The owner must keep on record the mileage and usage records to meet the record keeping requirements of section 2025)(s).~~

~~(C)~~(A)   *Vehicles Operating Exclusively in NOx-exempt areas~~.~~

The owner must provide the following information to the Executive Officer by January 31 of each compliance year to demonstrate compliance with the requirements of section 2025(p)(1):

1.     Owner, vehicle, engine information, and VDECS listed in sections 2025(r)(5) through ~~2025(r)(11)~~(10)~~;~~.

2.     For vehicles that are not labeled, ~~R~~records from an electronic tracking system that tracks usage and location in a monthly report format approved by ARB.  The system must at a minimum meet the requirements as defined in section 2025(d)~~(26)~~(21) and provide the information listed therein~~.~~.  ~~A fleet may use an alternative method to demonstrate compliance if approved by the Executive Officer.~~

3.     Whether the vehicle is labeled as specified in section 2025(p)(1)(C).


~~(D)~~(B)   Unique Vehicle Extension~~*Unique Vehicles*~~.

The owner must provide the following information to the Executive Officer by January 31 of each compliance year to demonstrate compliance with the requirements of section 2025(p)(3)~~:~~.

1.     Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(9)~~(11)~~.

2.     Photos and a complete description of the vehicle and its function.

3.     A complete explanation of why the vehicle qualifies as a unique vehicle.

4.     Names and phone numbers of sources contacted during the search for a replacement vehicle.

5.     Letters from contacted VDECS vendors stating that retrofit technology is unavailable for the unique vehicle.

~~(E)~~(17)   *Two~~-~~Engine Sweepers*

The owner must provide the following information for both the propulsion and auxiliary engine to the Executive Officer by March 31, 2010, April 29, 2011, and January 1 of subsequent compliance years to demonstrate compliance with the requirements of section 2025(n)~~:~~.

69

1.(A) Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(10)(11).;

2.(B) Engine tier level of the auxiliary engine, model year, and engine family number.; and

3.(C) For Tier 0 auxiliary engines, the hours of use readings taken January 1 and December 31 of each year staringstarting 2010.

(18) *Vehicles Purchased, Repowered, or Retrofitted Using Public Funds*

For owners of vehicles that were purchased, repowered or retrofitted using public funds and where funding program guidelines include criteria which limit funding projects from receiving regulatory benefit or credit, the fleet owner must provide the following information to the Executive Officer for all vehicles that were purchased or retrofitted using public funds:

(A)    Owner, vehicle, and engine information listed in sections 2025(r)(5) through 2025(r)(10);

(B)    Date the public funding contract began;

(C)    Date the contract or emissions surplus contract period ends or ended;

(D)    Program providing the funding; and

(E).    Information about the contract terms to determine eligibility.

(19)  Claiming *a Three Day Pass*

Information listed in sections 2025(r)(7) and 2025(r)(8) items (A) to (G) must be provided for the vehicle and the date for which the three day period would begin.

(18)(20)    *Compliance Certification.*  All reports submitted to ARB, must be accompanied with a certification signed by a responsible official or a designee thereof that the information reported is accurate and that the fleet is in compliance with the regulation.  If a designee signs the compliance certification, a written statement signed by the responsible official designating the designee must be attached to the compliance certification and submitted to the Executive Officer.

(19)(21)    *Changes Since Last Reporting* – The fleet owner or responsible person must report to the Executive Officer any additions, removalsdeletions, or changes to the fleet since the last annual report filed.  Such changes shall include, among other things, changes in the fleet's compliance option, vehicles removed from the fleet, vehicles added to the fleet through purchase or by bringing into California, and vehicles newly defined as low-use, or recently repowered or retrofitted.  If there are no changes, the fleet owner shall indicate there have been no changes.

(20)(22)    *New Fleet Reporting.*  New fleets that elect to utilize the phase-in options of section 2025(i) or 2025(h) BACT percent limits option of section 2025(g) or the fleet averaging option of section 2025(h) must submit the information in sections 2025(r)(5) through 2025(r)(9) to the Executive Officer within 30 days of purchasing or bringing such vehicles into the State.  Beginning the first January 1 that is more than 30 days after the date of purchase or bringing a vehicle into the State, new fleets must comply with the reporting requirements in section 2025(r).

(21)(23)    *Claiming Compliance Extension for Manufacturer Delays*

The fleet owner must report~~provide~~ the following information to the Executive Officer by January 31, each year to demonstrate compliance with the requirements of section 2025(p)(8)(10):

(A)    The date of purchase or the date the contractual agreement for purchase of VDECS, replacement engine, or vehicle was entered~~,~~;

(B)    The date the VDECS or vehicle was placed into service~~,~~;

(C)    The date the existing vehicle was removed from service~~.~~; and

(D)    Identification of the vehicle that was replaced.

(24)    *Reporting for a Compliance Extension for Fleets that Meet PM BACT per section 2025(f) or 2025(g) prior to January 1, 2014*

For fleets complying using the compliance option of section *2025(f) or* 2025(g), the fleet owner must provide the following information about the vehicles that meet PM BACT prior to January 1, 2014:

(A)    Owner, vehicle and engine information listed in sections 2025(r)(5) through 2025(r)(9).

(B)    Information listed in section 2025(r)(10) for the VDECS.

(25)    *Reporting for Small Fleets*

For fleets complying using the phase-in option for small fleets of section 2025(h), the fleet owner must provide the following information about all vehicles in the fleet;

(A)    Owner information listed in sections 2025(r)(5) through (7); and

(B)    Until January 31, 2014, the vehicle information listed in sections 2025(r)(8) items (A) through(J) and starting January 31, 2014, all the information listed in sections 2025(r)(8) through 2025(r)(10).

(26)    *Reporting for Fleets Using Excess PM VDECS Credits*

For fleets claiming Excess PM VDECS credits of section 2025(j)(2)(C), the fleet owner must provide the following information about the vehicles prior to January 1 of the compliance year in which they want to apply it:

(A)    Owner, vehicle and engine information listed in sections 2025(r)(5) through 2025(r)(9) for the vehicle that was retrofit.

(B)    Information listed in section 2025(r)(10) for the VDECS;

(C)    The fleet registration identification number for the Off-road regulation known as the diesel off-road online reporting system, or DOORS ID number.

(s)    *Record Keeping*~~.~~

(1)    The owner of a fleet shall maintain the following records specified in sections 2025(s)~~(5)~~(3) through 2025(s)(16)~~(14)~~ as applicable.  The owner shall

71

provide these records to an agent or employee of the ARB within five business days upon request. <u>If the records will be kept outside California, the owner must also comply with section 2025(t).</u>

(2)    The owner of a fleet subject to the reporting requirements of section 2025(r) shall maintain copies of the information reported under section 2025(r), as well as the records described in sections 2025(s)<u>(3)</u><s>(5)</s> through <u>2025(s)(16)</u> <s>(14)</s> below.

<s>(3)</s>    <s>*Motor Carrier or Broker*</s>

    <s>(A)</s>    <s>Bills of lading and other documentation identifying the motor carrier or broker who hired or dispatched the vehicle and the vehicle dispatched.</s>

<s>(4)</s><u>(3)</u>    <u>School Buses</u><s>*Schoolbus Fleets and Sub-Fleets*</s>

    <s>(A)</s>    <s>The owner of a schoolbus fleet or a schoolbus sub-fleet shall maintain copies of the information reported under section 2025(r)(14) and the records specified in section 2025(s) as applicable.</s>

    (A)    <u>Fleet owners of school buses shall maintain records of all the information listed in sections 2025(r)(7) through 2025(r)(10).</u>

    (B)    <u>Fleet owners using the downsize credits of section 2025(k)(2) must maintain records of all the information listed in sections 2025(r)(7) through 2025(r)(10) for all school buses in the 2006 baseline fleet and for all school buses in the fleet on January 1 of the compliance year that were registered.  Fleet owners do not have to have to keep engine and VDECS information that is required under sections 2025(r)(9) and 2025(r)(10) for school buses registered on October 1, 2006 that are no longer in the fleet.</u>

    (C)    <u>Fleet owners with low-use buses must maintain records of all the information listed in section 2025(r)(12) for each low-use bus.</u>

    (D)    <u>Fleet owners must comply with record keeping requirements for VDECS failures and maintenance as required in sections 2025(s)(10) and 2025(s)(14).</u>

(4)    *Motor Carrier or Broker*

    (A)    <u>Bills of lading and other documentation identifying the motor carrier or broker who hired or dispatched the vehicle and the vehicle dispatched.</u>

(5)    *Agricultural Fleets*

    (A)    Fleets utilizing the agricultural fleet provision must keep and make available upon request proof that all agricultural vehicles were used exclusively in agricultural operations.  This may include records used to support proof to other governmental agencies that the primary business function was agricultural.  Such documentation may include IRS or Board of Equalization tax forms or bills of lading.

    (B)    Records must be maintained for each agricultural vehicle demonstrating that the vehicle was operational, functional and capable of performing the duty for which it was designed.  This could include maintenance records, mileage

records, or licensing records, emissions testing records, or any other source of data approved by the Executive Officer.

(C) The agricultural fleet owner must keep bills of lading for delivery of fertilizer or crop protection products by an agricultural vehicle to a farm. Such records must demonstrate that the operation of the vehicle for the preceding calendar year was used exclusively to deliver such products to farms.

(D) Proof of transference of ownership of any ~~low or limited-mileage~~<u>qualifying</u> agricultural vehicle~~s~~ that is added to or removed from the fleet.

(E) Proof of ownership of the vehicles including title, registration, or bills of sale.

(6) *Proof of Operation* – Owners of fleets must keep records showing that any vehicle used to demonstrate compliance <u>using the phase-in options of section 2025(h) and section 2025(i) was</u>~~under section 2025(g) or section 2025(h)~~ operated in California for that applicable compliance year. Records could include IRP records, GPS tracking records, or DMV or law enforcement permits.

(7) *Fleets <u>that have Downsized or have Added Newer Engines Early</u> ~~Claiming Retirement Credit~~* – Fleets <u>utilizing the credit for fleets that have downsized of section 2025(j)(1)</u> ~~claiming retirement credit as defined in 2025(k)~~ <u>or the credit for the early addition of newer engines of section 2025(j)(3)</u> must keep the following records at the business office or terminal location identified in the reports filed with the Executive Officer:

<u>(A)</u> <u>For all vehicles in the fleet on October 1, 2006; a,</u>

~~(A)~~<u>1.</u> Copy of the ~~retired~~ vehicle's registration<u>; or</u>

~~(B)~~<u>2.</u> Copy of the vehicle's ownership documentation<u>; and</u>

<u>3.</u> <u>Copy of documentation of the engine model year and engine family (only if reported for claiming credit for the early addition of newer vehicles); and</u>

<u>4.</u> <u>If not registered with the California Department of Motor Vehicles, proof that the vehicles in the fleet drove at least 1,000 miles in California in the year 2006.</u>

~~(C) Copy of the bill of sale showing the date the transaction occurred of the retired vehicle or any form of vehicle transference approved by the Executive Officer.~~

~~(D) All documentation related to any change in business form such as a change from a sole proprietorship to partnership, partnership to corporation, etc.~~

<u>(B)</u> <u>For all vehicles in the fleet on January 1 of the compliance year:</u>

<u>1.</u> <u>A copy of the certificate of non-operation filed with the Department of Motor Vehicles or equivalent documentation from the state, province, or country where the vehicle is registered; and</u>

<u>2.</u> <u>If scrapped in the previous year, a copy of a non-repairable vehicle certificate issued from the California Department of Motor Vehicles or</u>

equivalent documentation from the state, province, or country where the vehicle is registered.

(8) *Changes Since the Last Reporting Period*

(A)   For fleets complying using any of the compliance options other than section 2025(f) or 2025(g), must keep documentation of ~~Document~~ any additions, deletions, or changes to the fleet since the last reporting.  Documentation may include bills of sale, purchase orders, maintenance records, registration information, or other documentation.

(B)   For each vehicle removed from the fleet, a copy of the bill of sale, or other documentation showing transference of ownership from the former owner and the current owner and the date of the transaction or any other form of vehicle transference approved by the Executive Officer.

(9) *Electronic Tracking* – For fleets using electronic tracking systems as defined in section 2025(d)~~(26)~~(21) summary and detailed records must be kept at the business office or terminal location for the fleet.  The records must provide;

(A)   Vehicle identification number of the vehicle being tracked;

(B)   Monthly and annual mileage accrued in California;

(C)   Monthly and annual mileage accrued in the NOx Exempt Areas if claiming the vehicle operates exclusively in NOx-exempt areas, and

(D)   Monthly and annual hours of engine operation accrued in California except for vehicles that do not use PTO to perform work in a stationary mode.

(10) *VDECS Failure* – Maintain records of any VDECS failure and replacement including:~~.~~

(A)   Date of failure;

(B)   Description of failure;

(C)   Description of resolution of failure;

(D)   Date of resolution of failure;

(E)   Past VDECS maintenance records; and

(F)   Past engine maintenance records.

(11) *Fuel-based Strategy* – Documentation of any approval from ARB Executive Officer to use a fuel strategy as in section 2025(q)(3) and the most recent two years' worth of records of purchase that demonstrate usage.

(12) *Experimental Diesel Emission Control Strategy* – For fleets using an experimental diesel PM control strategy, record of approval from the Executive Officer for use of the experimental diesel control strategy, the test plan and test data used in the experimental diesel control strategy application, and other records as specified in the approval.

(13) *Manufacturer Delay* – For any vehicle or VDECS for which the fleet owner is utilizing the equipment manufacturer delay provision in section 2025(p)(8~~10~~), proof

74

of purchase, such as a purchase order or signed contract for the sale, including engine specifications for each applicable piece of equipment or vehicle.

(14) *Maintenance of VDECS Records*

(A) VDECS Documentation. For each engine requiring a VDECS to comply with the regulation, the owner shall keep the following documentation in the vehicle and provide it upon request to an agent or employee of the ARB.~~:~~

1. A statement signed by the installer at the time of installation of the VDECS affirming that the installation was performed by an~~VDECS was installed by an~~ ~~authorized~~ installer authorized by the VDECS manufacturer; ~~and, providing the following information for each engine:~~

2. ~~a.~~ The name of the company~~person~~ installing the device.~~;~~

3. ~~b.~~ The date the device was installed.~~;~~

4. ~~c. Type~~ Description of VDECS installed.~~;~~

~~d.    Manufacturer;~~

5. ~~e.~~ VDECS family name.~~;~~

6. ~~f.~~ Serial number of installed VDECS.~~; and~~

~~8.~~7. ~~g. Its verification~~ Verification level and year of verification of the installed VDECS.

(15) Emergency Support Vehicles – Fleet owners of emergency support vehicles utilizing the provisions of section 2025(p)(1), 2025(p)(2) or 2025(p)(4) shall keep records to document dispatch by a local, state, or federal agency or other responsible emergency management entity as approved by the Executive Officer.

(16) Low-use Vehicles – Fleet owners of low-use vehicles that exceed 1,000 miles per year shall;

(A) Keep records of electronic tracking per section 2025(s)(9),

(B) Keep records of dates and the odometer readings when the vehicle leaves and returns to California to demonstrate that no more than 1,000 miles per year was driven in California.

(17) Early PM Retrofit Credits - Fleets that are claiming credit for early PM retrofits shall maintain records with the below information;

(A) The bill of sale with date of purchase or order.

(B) The total amount of the purchase and the amount of down payment if not fully paid at the time of purchase.

(C) Work Order or equivalent with the completion date.

(t)  *Audit of Records*

The vehicle owner must make records available to ARB at its request for audit to verify the accuracy of the records. In the event the records are not made available within 30 days of the request, the ARB may assess penalties for non-compliance.

(u)  *Record Retention*

The fleet owner or responsible person shall maintain the records for each vehicle subject to the reporting and record keeping requirements of sections 2025(r) and (s) for 3 years after it is retired, and for the overall fleet, for as long as the owner has a fleet, or January 1, 2025, whichever is earlier.  If fleet ownership is transferred, the seller shall transfer the fleet records to the buyer.  Dealers must maintain records of the disclosure of regulation applicability required by section 2025(w) for three years after the sale.

(v)  *Right of Entry*

For the purpose of inspecting vehicles subject to this regulation and their records to determine compliance with this regulation, an agent or employee of ARB, upon presentation of proper credentials, has the right to enter any facility (with any necessary safety clearances) where vehicles are located or vehicle records are kept.

(w)  *Disclosure of Regulation Applicability*

Any person residing in California selling a vehicle with an engine subject to this regulation must provide the following disclosure in writing to the buyer on the bill of sale, sales contract addendum, or invoice, "An on-road heavy-duty diesel or alternative-diesel vehicle operated in California may be subject to the California Air Resources Board Regulation to Reduce Particulate Matter and Criteria Pollutant Emissions from In-Use Heavy-Duty Diesel Vehicles.  It therefore could be subject to exhaust retrofit or accelerated turnover requirements to reduce emissions of air pollutants.  For more information, please visit the California Air Resources Board website at http://www.arb.ca.gov/dieseltruck."

(x)  *Compliance Requirement.*

(1)  The vehicle owner shall comply with all applicable requirements and compliance schedules set forth in this regulation.

(2)  Any in-state or out-of-state motor carrier, California broker, or any California resident who operates or directs the operation of any vehicle subject to this regulation shall verify that each hired or dispatched vehicle is in compliance with the regulation and comply with the record keeping requirements of section 2025(s)(4).

(3)  Compliance may be accomplished by keeping on site at the business location, a copy of the Certificate of Reported Compliance with the In-Use On-Road Diesel Vehicle Regulation for each fleet, or in the vehicle.

(4)  Any contract that a lessor and lessee enter into that has an effective date of January 1, 2010 or later shall clearly specify whether or not the leased vehicle is to

76

be excluded from the lessor's fleet for the duration of the lease, or the responsibility will be that of the lessee.

(y)    *ARB Certificate of Reported Compliance*

After the required reporting and compliance certification are received by ARB staff, ARB will provide the fleet with a Certificate of Reported Compliance with the In-Use On-Road Diesel Vehicle Regulation.  ARB staff will also post on the website for this regulation the name and motor carrier number for fleets that have reported compliance.

(z)    *Non-Compliance.*

Any person who fails to comply with the general requirements of this regulation, who fails to submit any information, report, or statement required by this regulation, or who knowingly submits any false statement or representation in any application, report, statement, or other document filed, maintained, or used for the purposes of compliance with this regulation may be subject to civil or criminal penalties under sections 39674, 39675, 42400, 42400.1, 42400.2, 42402.2, and 43016, of the Health and Safety Code. In assessing penalties, the Executive Officer will consider factors, including but not limited to the willfulness of the violation, the length of time of noncompliance, whether the fleet made an attempt to comply, and the magnitude of noncompliance.

(aa)    *Severability*

If aAny subsection, paragraph, subparagraph, sentence, clause, phrase, or portion of this regulation is, for any reason, held invalid, unconstitutional, or unenforceable by any court of competent jurisdiction, such portion shall be deemed as a separate, distinct, and independent provision, and such holding shall not affect the validity of the remaining portions of the regulation.


Note:  Authority Cited:  Sections 39600, 39601, 39650, 39658, 39659, 39666, 39667, 39674, 39675, 42400, 42400.1, 42400.2, 42402.2., 42410, 43013, 43016, 43018, 43023, 43600, California Health and Safety Code.  Reference:   Sections 39650, 39658, 39659, 39666, 39667, 39674, 39675, 42400, 42400.1, 42400.2, 42402.2, 42410, 40717.9, 43013, 43016, 43018, 43023, 43600, and 43701(b), California Health and Safety Code.

## APPENDIX A

### Table A-1

### PM Emissions Factors by Engine Model Year
### (g/mile)

| Engine Certification Standard Model Year | Medium Heavy-Duty Diesel Vehicle (MHD) | Heavy Heavy-Duty Diesel Vehicle (HHD) |
|---|---|---|
| Pre-1991 | 1.65 | 3.36 |
| 1991-1993 | 0.84 | 1.25 |
| 1994-2006 | 0.43 | 0.81 |
| 2007-2009* | 0.06 | 0.11 |
| 2010 and newer* | 0.06 | 0.11 |

\* If the engine is not equipped by the manufacturer with a diesel particulate filter, use the emission factor for the 1994-2006 model years

### Table A-2

### NOx Emissions Factors by Engine Model Year
### (g/mile)

| Engine Certification Standard Model Year | Medium Heavy-Duty Diesel Vehicle (MHD) | Heavy Heavy-Duty Diesel Vehicle (HHD) |
|---|---|---|
| 2003 and older | 14.2 | 22.0 |
| 2004-2006 | 6.7 | 12.0 |
| 2007-2009 | 4.0 | 7.0 |
| 2010 and newer | 0.8 | 1.6 |

**EXHIBIT B**



**California Environmental Protection Agency**

# AIR RESOURCES BOARD

**STAFF REPORT:  INITIAL STATEMENT OF REASONS FOR PROPOSED RULEMAKING**

**PROPOSED REGULATION FOR IN-USE ON-ROAD DIESEL VEHICLES**



Mobile Source Control Division
Heavy-Duty Diesel In-Use Strategies Branch

October 2008

## I.    OVERVIEW AND STAFF RECOMMENDATION

## A.    Overview

Staff of the Air Resources Board (ARB or Board) is proposing a regulation that would reduce emissions of diesel particulate matter (PM) and oxides of nitrogen (NOx) from over 400,000 diesel vehicles registered in the State, and another half a million out-of-state trucks that visit California each year.  The regulation would achieve these emission reductions by requiring fleet owners to modernize their fleets and install exhaust retrofits.  The regulation is projected to achieve significant emission reductions, but at a significant cost to affected fleets.

The scope of the proposed regulation is broad.  It would affect about 170,000 California businesses (including over 150,000 small businesses) in most sectors of the State's economy, and almost a million vehicles.  Some common industry sectors that operate trucks and buses subject to the regulation include: for-hire transportation, construction, manufacturing, retail and wholesale trade, vehicle leasing and rental, bus lines, and agriculture.  Within each of these broad sector categories, there is a wide variety of vehicle types.  The potential impact of this regulation on various business sectors depends on the number, type and age of the affected vehicles operated by each sector.  A copy of the regulation is provided in Appendix A, and a simplified summary is provided in Appendix A1.

The proposed new regulation would apply to any person, business, school district, school transportation provider, or federal government agency that owns or operates affected vehicles in California.  Affected vehicles include heavy-duty diesel-fueled vehicles with a gross vehicle weight rating greater than 14,000 pounds, yard trucks with off-road certified engines and certain diesel-fueled shuttle vehicles regardless of weight.  The proposed regulation would be applicable regardless of where the vehicle is registered.  However, the proposed regulation would not apply to military tactical support vehicles, authorized emergency vehicles, or private motor homes not used for commercial purposes.

In general, the regulation would require owners to reduce PM and NOx emissions from their fleets by upgrading the vehicles to meet specific performance standards for these pollutants (defined as best available control technology, or BACT).  The BACT standard for PM is generally an engine equipped with a diesel particulate filter, and the BACT standard for NOx is an engine newly manufactured in 2010 or later.  A fleet may meet these performance requirements by retrofitting a vehicle with a verified diesel emission control strategy (DECS)[1] that will achieve PM or NOx reductions or both as required, replacing an engine with a newer cleaner one, or replacing a vehicle with one having a cleaner engine.  This replacement vehicle can be either new or used.

The proposed regulation begins in 2010, and requires the installation of verified PM DECS on certain vehicles depending on their model year.  Then, beginning in 2012,

---

[1]    A retrofit device that has been verified under ARB's Verification Procedure, which ensures the effectiveness and durability of diesel engine retrofits.

**B.     Why are reductions of diesel particulate matter emission needed?**

In 1998, the Board identified diesel PM as a toxic air contaminant (TAC) and in 2001, adopted the Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles (Diesel Risk Reduction Plan or diesel RRP). The diesel RRP identified strategies, including air toxic control measures (ATCMs) and regulations, to reduce diesel emissions and associated potential cancer risks from 2000 baseline levels by 75 percent by 2010, and by 85 percent by 2020. Diesel PM is a primary contributor to adverse health impacts throughout the state, and a major contributor to ambient risk levels, including an estimated 70 percent of the average cancer risk from all TACs. The proposed regulation would provide needed progress towards achieving the emission reduction goals of the diesel RRP for on-road vehicles subject to the proposed regulation.

PM emission reductions are also needed because diesel PM contributes to ambient concentrations of fine particulate matter (PM2.5). Ambient PM2.5 is associated with premature mortality, aggravation of respiratory and cardiovascular disease, asthma exacerbation, chronic and acute bronchitis and reductions in lung function.

**Figure II-4:   Areas in California that Exceed the Federal and State Annual PM2.5 Standard**



Under the federal Clean Air Act (CAA), the U.S. Environmental Protection Agency (U.S. EPA) has established National Ambient Air Quality Standards (NAAQS) for pollutants considered harmful to public health, including PM2.5.  Set to protect public health, the NAAQS are adopted based on a review of health studies by experts and a public process.  Areas in the State that exceed the NAAQS are required by federal law to develop State Implementation Plans (SIPs) describing how they would attain the standards by certain deadlines.

In addition, the state has established its own ambient air quality standards for PM2.5.  California's ambient air quality standards for PM2.5 are more stringent than the national standards and are intended to provide protection for the most sensitive groups of citizens, including infants and children, the elderly, and persons with heart or lung disease.  Figure II-4 shows the areas of California that exceed the federal and state PM2.5 standards.

## C.    Why are oxides of nitrogen emission reductions needed?

NOx emission reductions are needed because NOx leads to formation in the atmosphere of ozone and PM2.5.  Scientific studies show that exposure to ozone can result in reduced lung function, increased respiratory symptoms, increased airway hyperreactivity, and increased airway inflammation.  Exposure to ozone is also associated with premature death, hospitalization for cardiopulmonary causes, emergency room visits for asthma, and restrictions in activity (ARB, 2005a).

In July 1997, the U.S. EPA promulgated a new 8-hour ozone national standard (replacing the previous federal 1-hour standard) effective September 1997, and in 2004 issued new area designation maps for the new standard.  The new standard was set at a lower level to address the cumulative impact of ozone exposure at lower levels for a longer period of time and is more protective of human health.  The national 1-hour ozone standard was revoked effective June 15, 2005, for all areas except the 8-hour ozone non-attainment Early Action Compact areas that have deferred effective dates for their designations under the 8-hour ozone standard.  California also established an 8-hour standard based on the results of an evaluation of the adequacy of the 1987 standard, as required by the Children's Environmental Health Protection Act (Senate Bill 25, Escutia, 1999).  Senate Bill 25 (SB25) directed the ARB, in consultation with the Office of Environmental Health Hazard Assessment (OEHHA), to "review all existing health-based ambient air quality standards to determine whether these standards protect public health, including infants and children, with an adequate margin of safety.  Figure II-5 shows that many areas in the state violate the federal 8-hour ozone standard and most of California violates the state 8-hour ozone standard.

**EXHIBIT C**



**California Environmental Protection Agency**

# AIR RESOURCES BOARD

**STAFF REPORT:  INITIAL STATEMENT OF REASONS FOR PROPOSED RULEMAKING**

**PROPOSED AMENDMENTS TO THE TRUCK AND BUS REGULATION, THE DRAYAGE TRUCK REGULATION AND THE TRACTOR-TRAILER GREENHOUSE GAS REGULATION**



Mobile Source Control Division
Heavy-Duty Diesel Implementation Branch

October 2010

**EXECUTIVE SUMMARY**

California faces many air quality challenges, whether they be meeting federal air quality standards, reducing premature mortality, addressing localized risk, or reducing greenhouse gas emissions. The Air Resources Board (ARB or Board) has put into place a series of comprehensive regulations and programs to meet these challenges. While nearly all diesel engines in the state are included in this program, trucks and buses represent the largest share of emissions and vehicles. As a result, California's program targeting emission reductions from the nearly one million existing diesel trucks and buses that operate on California roads each year is arguably the most important component of ARB's program to reduce emissions from diesel vehicles. These include the Truck and Bus regulation that reduces exhaust emissions from most heavy-duty diesel vehicles, the Drayage Truck regulation that reduces exhaust emissions from larger tractors that enter ports and intermodal rail yards and the Tractor-Trailer Greenhouse Gas regulation that reduces greenhouse gas emissions from long-haul tractor trailer combinations. This comprehensive program is intended to significantly reduce emissions from existing diesel vehicles throughout the state through a mix of exhaust and vehicle retrofits and vehicle turnover, so that by 2023, California has the cleanest, most efficient diesel fleet in the world.

The need to reduce emissions from trucks continues to be significant. These vehicles are a major source of emissions. They contribute substantially to violations of the ambient air quality standards for both fine particulate matter (PM2.5) and ozone. They also contribute to localized health risk associated with exposure to diesel particulate matter and to premature deaths associated with exposure to ambient fine particulate matter in the air.

California and the nation have been in an economic recession that was not anticipated when these diesel truck regulations were approved by the Board in 2007 and 2008. The recession has had a significant impact on companies that rely on diesel engines – whether it is trucking and transportation businesses, construction companies, or airlines. Overall, businesses' revenues and employment are down, and this has reduced many fleets' ability to make the investments needed to comply.

While the current recession has been economically devastating to businesses throughout the state, it has also caused an overall reduction in both on-road and off-road diesel vehicle activity and emissions through reductions in the number of truck trips and vehicle miles traveled as well as in reductions in the number of pieces of construction equipment working on projects. Emissions are lower today because of the recession than what we had previously assumed. Reduced emissions have provided ARB an opportunity to go back and adjust the regulations targeting diesel trucks and buses to account for reduced emissions that are occurring from less business activity.

Over the long term, the regulations are still critically important to ensuring that California meets both its short-term and long-term air quality obligations and health based goals.

Considering this, in April 2010, the Board directed staff to update the emissions inventories from trucks and off-road equipment to reflect the impact of the recession on emissions. The Board further directed staff to develop amendments to the Truck and Bus and Off-Road diesel vehicle regulations that would provide economic relief to fleets while continuing to meet the Board's air quality goals and obligations. The Board's direction included the following principles for staff to consider in proposing amendments:

- Continue progress toward cleaner air
- Maintain public health benefits
- Meet State Implementation (SIP) commitments
- Provide incentives to achieve greenhouse gas reductions
- Improve cost effectiveness
- Lower peak year costs
- Consider cumulative impact of both regulations
- Provide most economic relief to fleets hardest hit by recession
- Ensure emission reductions as economy recovers
- Support clean technologies

To support development of the proposed amendments, staff updated the emissions inventory for trucks to assess the impact of the economic recession on emissions and to integrate new information. Through staff's assessment, it was determined that the recession has had a major impact on reducing emissions. Overall, 2010 truck and bus emissions are on average more than 20 percent lower because of the recession than we had estimated in 2008.

A similar assessment was made for off-road vehicles and can be found in the Initial Statement of Reasons for Proposed Amendments to the Regulation for In-Use Off-Road Diesel-Fueled Fleets and Off-Road Large Spark Ignition Engine Fleet Requirements (ARB, 2010b). In that assessment, staff found that the recession has reduced activity and emissions in the construction sector by more than 50 percent.

Despite these changes to the emissions inventories, heavy-duty trucks and buses continue to be the largest contributor to emissions in California, both in 2010 and 2020, as shown in Figure E-1 and Figure E-2. In addition, reducing emissions is necessary to reduce premature deaths associated with exposure to fine PM (PM2.5) and near-source exposure to diesel PM.

**Figure E-1:  Truck Contribution to 2010 Statewide Mobile Source Emissions (Particulate Matter and NOx Without Regulations)**



**Figure E-2:  Truck Contribution to 2020 Statewide Mobile Source Emissions (Particulate Matter and NOx Without Regulations)**



The SIP is California's roadmap towards achieving federal clean air standards by the applicable deadlines. To assess progress towards meeting the emission reduction obligations in the SIP, staff evaluated how much lower emissions would be from the revised inventory and the recession than were anticipated at the time the regulations were adopted.  Any excess emission reductions achieved are referred to as an emission margin.  The margin defines how much economic relief could be provided under the regulations while still meeting the legal emission reduction requirements of the SIP.  To allow for a comparison of different pollutants (PM and NOx), the margin is calculated, by air basin, in NOx equivalent emissions.  Table E-1 shows the emission margin for the South Coast and San Joaquin Valley air basin for 2014, which is the attainment date for these two air basins to meet federal PM2.5 standards. Based on this analysis, it is feasible to significantly reduce the economic impact on affected fleets while meeting SIP obligations.

to have equivalent emissions.  The remaining heavier trucks with 1997 and older engines would be replaced when 20 years old or older starting in 2015.

Overall, by 2023 all trucks all trucks operating in California would need to have 2010 model year or newer engines, or equivalent emissions.  The proposed amendments also simplify the regulation while retaining flexibility for fleets to determine which vehicles to retrofit or modernize.  The regulation would continue to have provisions, such as reduced fleet size credits that would now expire in 2016 rather than in 2014 under the current regulation, which should reduce the annual compliance requirements for fleets most affected by the recession.  For example, if a fleet has 20 percent fewer trucks operating than it did in 2006, then no action would be required for 20 percent of its remaining trucks until 2016.  A fleet that has 40 percent fewer trucks would have no action required for 40 percent of its remaining trucks until 2016.  The regulation also continues to provide incentives for the early retrofit of existing trucks in order to achieve early emission reductions.

The Drayage Truck regulation would eliminate the 2014 requirement to modernize all trucks visiting ports or intermodal rail yards to 2007 model year engines or newer, and would instead align this requirement with the Truck and Bus regulation.  Drayage trucks with PM filters would now comply until 2020 rather than having to upgrade the truck again by 2014.  The proposed amendments would also include changes to prevent trucks from circumventing the regulation by exchanging drayage cargo with dirty trucks outside the port or rail facilities, a practice commonly known as "dray-off."

The proposed amendments to the Tractor-Trailer GHG regulation would provide fleets a new option to begin the phase-in of the trailer retrofit requirements by extending the reporting period another year, extend the deadline for using low rolling resistance tires for existing trucks and trailers and would make other changes that provide more flexibility for fleets to comply.  The Tractor-Trailer GHG regulation currently allows owners of large fleets of 2010 and previous model year trailers to phase-in compliance from 2010 through 2015.  In order to participate in this large fleet compliance schedule, an owner was required to submit to ARB a compliance plan by July 1, 2010.  The proposed amendment would establish a second large fleet compliance schedule allowing owners of these trailers to phase-in compliance from 2011 through 2015.  To participate in this second phase-in schedule an owner would be required to submit a compliance plan by July 1, 2011.  The proposed amendments would delay the low rolling resistance tires requirements for 2010 and previous model year trailers from January 1, 2011 to January 1, 2017.  In addition, the compliance date for retrofitting 2010 and previous model year tractors with low rolling resistance tires would be extended from January 1, 2012 to January 1, 2013.

The proposed amendments to the Truck and Bus regulation would provide substantial economic relief to all affected fleets.  The proposed amendments would eliminate the PM filter requirements for lighter trucks and, for the next decade, would only require modernization of engines that are 20 years old or older.

Overall, the estimated compliance costs of the Truck and Bus regulation over the next five years would be reduced by 50 percent and would be reduced by about 60 percent over the life of the regulation.  Figure E-3 shows how the average costs of the regulation would decline compared to the original estimates for the current regulation.

**Figure E-3:  Cost of Proposed Truck and Bus Regulation Down Substantially**



Similarly, aligning the requirements of the Drayage Truck regulation with the proposed amendments to the Truck and Bus regulation would lower costs for drayage truck operators by extending the useful life of their already retrofitted trucks an additional six years and by eliminating the requirement to modernize to a truck with a 2007 model year engine or newer by 2014.

Parallel amendments to the Tractor-Trailer GHG regulation would improve compliance flexibility and would not result in significant changes in compliance costs.

Overall, the regulations would continue to provide significant emissions reductions that are necessary to meet California's air quality obligations and goals.  The proposed amendments would reduce the emissions margin to zero in the San Joaquin Valley and to 5 tons/day in the South Coast.  Because the combined margin for trucks and buses and off-road equipment is minimized, maximum relief is provided while still meeting SIP legal obligations.

In addition, the truck regulations would continue to provide significant health benefits by reducing premature mortality from PM2.5 exposure and localized risk from diesel PM. Staff estimates that 3,500 premature deaths (2,700 to 4,400 with a 95 percent

confidence interval) would be avoided by implementation of the amended truck regulations from 2010 to 2025.  This estimate is based on United States Environmental Protection Agency's (U.S. EPA) new risk assessment methodology (U.S. EPA, 2010), and includes the most recent air quality data available (2006 to 2008) and the latest emissions inventory estimates.  Staff also expects localized risk to be reduced commensurate with the expected diesel particulate matter (PM) emission reductions.

## I.    INTRODUCTION

This Staff Report: Initial Statement of Reasons (Staff Report) supports the proposed amendments to the following regulations:

- Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles. (Truck and Bus regulation), title 13, California Code of Regulations (Cal. Code Regs.), section 2025;

- Regulation for In-Use On-Road Diesel-Fueled Heavy-Duty Drayage Trucks (Drayage Truck regulation), title 13, Cal. Code Regs., section 2027; and

- The Heavy-Duty Vehicle Greenhouse Gas (GHG) Emission Reduction Measure, (Tractor-Trailer GHG regulation), title 17, Cal. Code Regs., sections 95301 to 95307, 95309, and 95311.

The Staff Report describes the proposed amendments and the rationale for each amendment.  It also presents staff's analysis of impacts associated with the implementation of the proposed amendments, including costs, and economic and environmental impacts.  The proposed text of each regulation and appendices with supplementary information are addenda to the staff report.  The text of the regulations is set forth in the proposed regulation orders in Appendix A for the Truck and Bus regulation, Appendix B for the Drayage Truck regulation, and Appendix C for the Tractor-Trailer GHG regulation.

## A.    Background

The Truck and Bus regulation was approved by the Air Resources Board (ARB or Board) on December 12, 2008, to reduce emissions of diesel particulate matter (PM), oxides of nitrogen (NOx), and other criteria pollutants from about one million in-use diesel trucks and buses that operate in California.  The regulation became effective in January 2010 and requires trucks and buses to meet PM filter requirements starting January 1, 2011, and NOx reduction requirements starting January 1, 2013.  The emissions reductions will be achieved through the installation of verified diesel emission control strategies (VDECS[1] or PM filter) on existing engines, by replacing vehicles with newer ones having cleaner engines or repowering vehicles with newer, cleaner engines. The reductions are necessary to meet State and federal air quality standards, to reduce premature deaths attributable to exposure to fine particulate matter (PM2.5) emissions and to reduce exposure to diesel PM in support of the Diesel Risk Reduction Plan adopted by the Board on September 30, 2000 (ARB, 2000).

The Drayage Truck regulation, approved by the Board In December 2007, reduces emissions from diesel-fueled drayage trucks, which are used to transport containers,

---

[1]  A retrofit device that has been verified under ARB's Verification Procedure, Warranty and In-Use Compliance Requirements for In-Use Strategies to Control Emissions from Diesel Engines, title 13, CCR, sections 2700 et seq.

out-of-state truck vehicles miles traveled (VMT) in California by 28 percent from previous estimates.

### 4.    Addition of New Vehicle Categories

In order to reflect the impact of the recession and selected regulatory provisions, staff developed new inventory categories reflecting construction trucks, motorcoaches, and divided the medium-heavy duty diesel truck and bus categories into two categories – one each above and below 26,000 pounds gross vehicle weight rating (GVWR).

### 5.    Modification of Lifetime Mileage Assumptions

Truck emission rates are a function of cumulative mileage on the vehicle - an emissions process called deterioration.  The cumulative mileage estimated on the vehicle can be measured with the vehicle odometer.  Our previous analyses assumed that the odometer reading is the sum of estimated year by year mileage accrual.  However, staff evaluated this assumption using several data sources and found that older vehicles did not have nearly as high an odometer reading as would be predicted by that assumption.  Staff evaluated several different data sources and found that medium-heavy duty diesel truck odometer readings tended, on average, to not increase with age above 400,000 miles.  Staff found that heavy heavy-duty diesel truck odometer readings tended not to increase with age above 800,000 miles.  As a result, staff capped modeled odometer values at those levels, which reduced emission rates for older vehicles.  This change reduced baseline emissions by a few percent, and had a minimal impact on the inventory after the regulation was applied.

Changes to emissions inputs independent of the recession, including out-of-state VMT estimates and lifetime mileage assumptions reduced baseline emissions by about 10 percent from what was assumed in 2008.  The recession has reduced emissions by an additional 25 percent in 2009 and 2010, an additional 7 percent in 2014, and 10 percent in 2020 from what was assumed in 2008.  Overall, emissions are 35 percent lower in 2010, 17 percent lower in 2014, and 20 percent lower in 2020 than was anticipated in the 2008 Rulemaking.

## B.    Current and Future Emissions

As can be seen below in Figure II-1, in 2010, even after considering the impacts of the recession, emissions from trucks that are subject to both the Truck and Bus regulation and Drayage Truck regulation are the single largest statewide contributor to mobile source emissions, representing 40 percent of PM emissions, and also contribute over 30 percent of NOx emitted from all mobile sources in California, including cars.  Both NOx and PM contribute to ambient PM2.5 concentration, and NOx is also a precursor to ozone.  In Figure II-1 and Figure II-2, the vehicles within the scope of the Truck and Bus regulation and Drayage Truck regulations are labeled "Truck Rules Scope."

to the localized health risk associated with exposure to diesel PM and to premature deaths associated with exposure to ambient PM2.5.

## C.    Meeting Air Quality Standards

### 1.    National Ambient Air Quality Standards

The U.S. EPA has established health protective National Ambient Air Quality Standards (NAAQS) for a number of criteria pollutants, including PM2.5 and ozone.  States with areas that do not meet these standards must develop SIPs and adopt regulations to meet the standards by certain deadlines.  Figure II-3 and Figure II-4 below show the nonattainment areas in California for PM and Ozone, respectively.  Two air basins in California in particular – the South Coast Air Basin and the San Joaquin Valley Air Basin – are in nonattainment for both PM2.5 and the 8-hour ozone standard.

**Figure II-3:   California Nonattainment Areas for PM2.5**



**Figure II-4:   California Nonattainment Areas for Ozone**



☐ Nonattainment          ☐ Unclassified/Attainment

In September 2007, ARB approved a SIP committing the State to develop measures to achieve emission reductions from sources under State regulatory authority and attain the NAAQS in these areas.[2]  These air basins are both required to attain the PM2.5 standard by 2014, and the 8-hour ozone standard by 2023.  A, key strategy towards meeting these standards is significantly reducing emissions from existing trucks and buses operating in California.

Overall, to meet the PM2.5 standard in the South Coast and the San Joaquin Valley Air Basins, NOx emissions must be reduced by approximately 50 percent.  Even greater reductions of NOx, on the order of 75 to 88 percent, will be needed to achieve the 8-hour ozone standard in the by 2023.  Despite the fact that emissions in future years are expected to be lower than originally anticipated when the regulations were adopted, substantial emissions reductions from trucks and buses are still needed by 2014 to meet the PM2.5 attainment deadline and by 2023 to meet the 8-hour ozone attainment deadline.

### 2.    Meeting SIP Targets

In directing staff to propose changes to the Truck and Bus and Off-Road regulations together, the Board directed staff to also consider the impact of the recession and inventory changes on fleets affected by these regulations in deciding how to provide appropriate economic relief.  This was intended to ensure emissions reductions could

---

[2] Additional discussion of the SIP is addressed in the 2008 Technical Support Document (ARB, 2008).

nation.  This report was also peer reviewed through a public process by the Clean Air Scientific Advisory Committee Particulate Matter Review Panel.  The relationship between premature death and PM2.5 relies on a new comprehensive study of about 500,000 participants in 116 U.S. cities (Krewski et al., 2009).  Besides the large representative study population, the U.S. EPA concluded this study has significant advantages over other epidemiological studies of the relationship between PM2.5 and premature death.  These include the use of more recent measured PM2.5 air quality data, more individual lifestyle information to allow for consideration of potential confounding (compared to other cohort studies), and rigorous statistical methods.  Using this relationship, the U.S. EPA conducted a national-scale analysis and a more limited risk assessment, which was focused on 15 urban study areas, including Fresno and Los Angeles (U.S. EPA, 2010).

Based on this work, the U.S. EPA estimates that about 63,000 to 80,000 premature deaths each year in the United States are related to PM2.5.  Using the same methodology, ARB staff estimated that 9,200 (7,300 to 11,000, 95 percent confidence interval) of these deaths occur annually in California and that reducing emissions to meet the Federal standard would result in 2,700 fewer premature deaths annually.  Reducing PM emissions further would provide an additional reduction in the number of premature deaths.

## E.    Exposure to Localized Diesel PM Emissions

Diesel PM as a component of ambient PM2.5 is a significant public health concern throughout the state.  Additionally, in August 1998, the ARB identified particulate emissions from diesel-fueled engines as toxic air contaminants.  It is, by far, the largest contributor of known ambient air toxics cancer risk in California (ARB, 2009b).

Following the identification process, the ARB developed the Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles (Diesel Risk Reduction Plan) in September 2000, paving the way for the development of control measures designed to reduce toxic diesel PM emissions.  Through this plan, staff identified strategies; including air toxics control measures and other regulations, to reduce diesel emissions by 75 percent by 2010, and by 85 percent by 2020.  The goal of each regulation is to make diesel engines as clean as possible to reduce emissions and their associated cancer risk.  The Truck and Bus and Drayage Truck regulations are critical pieces of the Diesel Risk Reduction Plan, as is evidenced by the significant emissions of diesel PM from the vehicles subject to those regulations.  Failure to obtain substantial reductions in diesel PM from trucks and buses will likely mean the overall goals of the Diesel Risk Reduction Plan will not be met.

## VI.   ENVIRONMENTAL IMPACTS

This chapter describes how the proposed amendments continue to achieve needed emissions reductions, reduce localized risk from exposure to diesel PM, reduce impacts of diesel engine emissions on mortality and other health effects and meet SIP commitments to meet federal air quality standards.

### A.   Legal Requirements

The California Environmental Quality Act (CEQA) and ARB policy require an analysis to determine the potential environmental impacts of proposed regulations.  The legal requirements applicable to the environmental impact analysis are the same as those presented in Chapter XII, Section A of the Technical Support Document for the original regulation (ARB, 2008a).

The results of the analysis of the environmental impacts of the proposed amendments are presented below.  Alternatives to the proposed amendments are discussed in Chapter VIII of this report.  ARB staff has concluded that there are no alternative means of compliance that would achieve similar diesel PM and NOx emission reductions at a lower cost, while addressing the serious economic recession and its impact on industry and residents of the State.

### B.   Emission Impacts from Proposed Amendments

#### 1.   Emissions Benefits of the Proposed Amendments

Staff anticipates the proposed amendments to the Truck and Bus regulation and the Drayage Truck regulation would reduce diesel PM emissions by 50 percent from baseline levels in 2014 and ensure that by 2020 practically all trucks operating in California will be equipped with a diesel PM filter.  The revised baseline truck emissions inventory and the impact of the regulation on emissions in years relevant to attainment of federal clean air quality standards are shown below in Table VI-1

**Table VI-1:   Impact on Statewide NOx and PM Emissions**

| Year | NOx Emissions | | | PM Emissions | | |
|------|----------------------|----------------------|----------|----------------------|----------------------|----------|
|      | Without Regulation | Proposed Regulation | Benefits | Without Regulation | Proposed Regulation | Benefits |
| 2014 | 422 | 421 | 0 | 15.5 | 8.6 | 6.9 |
| 2017 | 339 | 305 | 34 | 11.8 | 5.6 | 6.2 |
| 2020 | 276 | 231 | 44 | 9.4 | 5.3 | 4.0 |
| 2023 | 245 | 157 | 88 | 7.8 | 5.2 | 2.6 |

Figure VI-1 compares anticipated emissions without the regulation to emissions with the amended regulation, as currently proposed.  Both lines in the graph include the effect of the recession.

**Figure VI-1:  Statewide Truck and Bus PM Emissions***



**\* Vehicles subject to either the Truck and Bus or Drayage Truck regulation**

Staff also anticipates the amended regulations would achieve a 36 percent reduction in statewide NOx emissions in 2023, and an overall 15 percent reduction in statewide NOx emissions from baseline levels between 2015 and 2023.  Figure VI-2 compares anticipated emissions without the regulations to emissions with the proposed amendments.

- Delaying truck replacements substantially
- Extending credits for early retirement and alternative-fueled and hybrid trucks.

Table VII-1 provides a comparison of what actions would be required with the existing regulation for all in-state registered trucks with a GVWR greater than 14,000 pounds in comparison to the proposed amendments without any compliance credits.

**Table VII-1:  Comparison of 2014 Actions Required (Percentage of Trucks)**

| Action | Proposed Amendments | Existing Regulation |
|--------|--------------------|--------------------|
| Early Replacements | 0% | 28% |
| PM Retrofit Filters | 28% | 30% |
| Business as Usual | 72% | 42% |
| Total | 100% | 100% |

As is shown in Table VII-1, prior to 2015, the existing regulation would require 28 percent of the vehicles to be replaced early, compared to the proposed amendments that would not require any vehicle to be replaced early.  Both the existing regulation and proposed amendments would require retrofit PM filters on about 30 percent of all trucks with a GVWR greater than 14,000 pounds.  However, the proposed amendments would exempt lighter trucks (less that 26,001 pounds GVWR), representing about 30 percent of the total population, from meeting the PM filter requirements.  Cumulatively, nearly 75 percent of the trucks would be replaced as normal and would remain compliant with the proposed amendments, as compared to just over 40 percent with the current regulation.

Overall, the estimated costs of the Truck and Bus regulation would be reduced substantially.  The net investments required in the first five years would be reduced from $3.3 billion to about $1.5 billion, a reduction of more than 50 percent.  For the life of the regulation the overall cost would be reduced by about 60 percent - from $5.5 billion to about $2.2 billion.  Average costs for businesses such as local contractors, retailers and local moving companies, would be reduced by 70 percent, with nearly all of the costs being eliminated entirely for thousands of small businesses with lighter trucks.  Figure VII-1 shows how the average statewide costs of the regulation would decline compared to the original estimates for the current regulation.

While businesses in the transportation sector would experience substantial cost savings, the amount of savings could vary significantly.  For example, a long haul truckload carrier that replaces its fleet within a 7-year cycle would continue to have no costs attributable to the regulation.  A less than truckload carrier that replaces the fleet within an 8 year cycle would have no costs other than one year of reporting with the proposed amendments instead of having to install PM filters on 10 percent of the fleet with the existing regulation.  This would be a greater than 90 percent cost savings.  Fleets that replace their trucks within a 10-year cycle would need to install PM filters on 10 percent of their trucks with the proposed amendments instead of 20 percent of their

engines.  The inclusion of class 7 tractors would keep the PM requirements in place, but would eliminate the requirement to modernize to a truck with a cleaner engine.

While trucks serving the Ports of Long Beach and the Port of Los Angeles already have 2007 model year engines or newer through the Clean Ports Program, only about 23 percent of the 4,200 drayage trucks outside the South Coast are expected to have 2007 and newer engines by 2014.  Staff estimates that the proposed amendment eliminating the requirement to upgrade to the 2007 engine by 2014 would save the owners of the remaining 77 percent of pre-2007 model year trucks about $29 million in replacement costs by reducing the reporting and record keeping period for drayage trucks from 10 years to seven years and would result in approximately $13 million in savings for the 18,000 truck owners ($270 yearly saving per truck) and the 1,800 motor carriers ($4,700 yearly savings per motor carrier) subject to the regulation.

## C.  Effects of Amendments to the Tractor-Trailer GHG regulation

Most of the proposed amendments to the Tractor-Trailer GHG regulation are intended to provide additional flexibility to fleets, but are not expected to have a major impact in the average cost of the regulation.  However, fleets that elect to utilize the proposed provision to delay compliance with the low rolling resistance tire requirements would not realize the cost savings benefits resulting from the existing regulation.  Nevertheless, most of the fleets are expected to utilize fuel efficient tires prior to the proposed compliance date as the existing tire casings reach their natural end of retread life cycle and the tires get replaced with new ones.  Thus, the proposed compliance delay with the low rolling resistance tires is expected to not have a significant impact on the overall cost savings and estimated costs of the existing program.

## D.  Impacts on Incentive Funding

### 1.  Impact of Proposed Amendments on Funding Opportunities

State incentive funding programs play a complementary role to the state's regulatory emission reduction programs to help meet the state's SIP requirements and achieve California's air quality goals.  ARB's portfolio of incentive funding and loan assistance programs includes the Carl Moyer Program, the Goods Movement Emission Reduction Program, Lower Emission School Bus Program, and the AB118 Air Quality Improvement Program.

Funding is currently available for truck and bus replacement, retrofits, and repowering that provide early or extra reductions to the regulatory requirements.  Eligibility depends on several factors, including fleet size, vocation, and the type of vehicle and reduced emission technology.  The regulation compliance deadlines affect eligibility by defining the end of the surplus emission reduction period.  In addition, each funding program must be consistent with statutory requirements that vary by program.

In general, the proposed regulatory changes should enable greater funding opportunities by allowing more time for applicants to apply for funding before compliance dates.  Staff will present a summary of potential incentive impacts when the

Board considers regulatory changes in December.  Staff plans to propose incentive program revisions that reflect the Board's action and direction with other funding program changes at a later date, with revisions to funding opportunities for the Carl Moyer Program already planed for next year.

Many federal and state programs are administered by local agencies, so vehicle owners should check with their local air quality management district for funding opportunities. Some vehicles may have their own specially funded programs based on type and use. In addition, funding may be available for technologies such as zero-emission and hybrid vehicles that achieve emission reductions beyond those required by regulation.

## 2.    Access to Funding for Vehicle Owners

Interested vehicle owners can obtain more information on funding and compliance by using any of ARB's outreach tools including the Truck Stop website at www.arb.ca.gov/truckstop, the phone hotline at 866-6DIESEL (866-634-3735), or the email address at 8666diesel@arb.ca.gov.

**EXHIBIT D**

FACTS ABOUT

# Truck and Bus Regulation Compliance Requirements Summary

*Fleets have flexibility to comply*

On December 12, 2008, the California Air Resources Board approved the Truck and Bus regulation to significantly reduce particulate matter, or PM, and oxides of nitrogen emissions from existing diesel vehicles operating in California. This fact sheet describes the regulatory requirements consistent with the amendments considered by the Board in December 2010.

### What vehicles are affected by the truck and bus regulation?

The regulation applies to nearly all diesel fueled trucks and buses with a gross vehicle weight rating (GVWR) greater than 14,000 pounds that are privately or federally owned and for privately and publicly owned school buses. Other public fleets, solid waste collection trucks and transit buses are already subject to other regulations and are not part of the truck and bus regulation. Trucks that transport marine containers must comply with the drayage truck regulation.

### What are the compliance requirements for heavier trucks and buses?

| Engine Model Year Schedule for Heavier Trucks | |
| --- | --- |
| Engine Year | Requirement from January 1 |
| Pre-1994 | No requirements until 2015, then 2010 engine |
| 1994-1995 | No requirements until 2016, then 2010 engine |
| 1996-1999 | PM filter from 2012 to 2020, then 2010 engine |
| 2000-2004 | PM filter from 2013 to 2021, then 2010 engine |
| 2005-2006 | PM filter from 2014 to 2022, then 2010 engine |
| 2007-2009 | No requirements until 2023, then 2010 engine |
| 2010 | Meets final requirements |

Heavier trucks and buses with a GVWR greater than 26,000 pounds would have two primary ways to comply. Fleets could comply with the compliance schedule by engine model year or could use a phase-in option that is more flexible.

Starting January 1, 2012, heavier trucks would be required to meet the engine model year schedule shown to the left. Fleets that comply with the schedule would install the best available PM filter on 1996 model year and newer engines and would replace the vehicle 8 years later. Trucks with 1995 model year and older engines would be replaced starting 2015. Replacements with a 2010 model year or newer engines meet the final requirements, but fleets could also replace with used trucks that would have a future compliance date on the schedule. For example, a replacement with a 2007 model year engine complies until 2023. By 2023 all trucks and buses must have 2010 model year engines with few exceptions. No reporting would be required if complying with this schedule.

| Phase-In Option for Heavier Trucks | |
| --- | --- |
| Compliance Date | Vehicles with PM Filters |
| January 1, 2012 | 30% |
| January 1, 2013 | 60% |
| January 1, 2014 | 90% |
| January 1, 2015 | 90% |
| January 1, 2016 | 100% |

In addition, there would be a phase-in option that allows fleets to decide which vehicles to retrofit or replace, regardless of engine model year. Fleets must report information about all of their heavier trucks starting January 31, 2012, to use this option.

Fleets could comply by demonstrating they have met the percentage requirement each year as shown in the table. For example, by 2012 the fleet would need to have PM filters on 30 percent of the heavier trucks and buses in the fleet. This option counts 2007 model year and newer engines originally equipped with PM filters toward compliance and would reduce the overall number of retrofit PM filters needed. Any engine with a PM filter regardless of model year would be compliant until at least 2020. Beginning January 1, 2020, all heavier trucks and buses would need to meet the requirements specified in the Compliance Schedule for Heavier Trucks.

### Are there any credits or exemptions fleets can use?

Starting January 1, 2012, fleets that report and use the phase-in option for heavier trucks, could take advantage of credits to delay requirements for other heavier trucks in the fleet until 2017 for the following:

- PM filters installed before July 2011
- Early purchase of cleaner engines before 2012 (originally equipped with PM filters)
- Reducing the number of trucks since 2006
- Adding fuel-efficient hybrids or alternative fueled engines to the fleet

All fleets could make any vehicle equipped with a PM filter prior to 2014 compliant until 2020, or could make all heavier vehicles in the fleet exempt from meeting the replacement requirements until 2023 if all heavier trucks in the fleet are equipped with PM filters prior to 2014. Fleets would need to report by January 31, 2014 to take advantage. Vehicles operated less than 1000 miles per year can also be exempt from the general requirements but must be reported in the compliance year.

### What are the requirements for lighter trucks and buses?

Lighter trucks and buses with a GVWR of 14,001 to 26,000 pounds would not have compliance requirements until 2015. The Engine Model Year Schedule for Lighter Trucks table lists the compliance dates that would apply by engine model year for lighter trucks. Starting January 1, 2015, lighter trucks with engines that are 20 years or older would need to be replaced with newer trucks. Starting January 1, 2020, all remaining trucks and buses would need to be replaced so that they would all have 2010 model year engines or equivalent emissions by 2023. No reporting would be required.

| Engine Model Year Schedule for Lighter Trucks | |
| --- | --- |
| Engine Year | Replacement Date |
| 1995 and older | January 1, 2015 |
| 1996 | January 1, 2016 |
| 1997 | January 1, 2017 |
| 1998 | January 1, 2018 |
| 1999 | January 1, 2019 |
| 2003 and older | January 1, 2020 |
| 2004-2006 | January 1, 2021 |
| 2007-2009 | January 1, 2023 |

Fleets would also have the option to install a PM filter retrofit on a lighter truck by 2014 to make the truck exempt from replacement until January 1, 2020, and any lighter truck equipped with a PM filter retrofit prior to July 2011 would receive credit toward the compliance requirements for a heavier truck or bus in the same fleet.

### Are there any other provisions for exemptions or delays?

The regulation has special provisions that delay some or all of the compliance requirements, but fleets must report to take advantage of them. By April 29, 2011, fleets would need to report to qualify for lower use and specialty agricultural truck exemptions until 2017 or 2023 and must report hour meter readings for sweepers with auxiliary Tier 0 engines. Fleets would need to report by January 31, 2012 to take advantage of delays until 2014 for small fleets with one to three vehicles, log trucks, lower use construction trucks, and vehicles operating in parts of the state with less polluted air.

### What are the requirements for school buses?

School buses with a GVWR more than 14,000 pounds would need to meet PM filter requirements from 2012 to 2014. School bus fleets would need to demonstrate that 33 percent of their buses have PM filters by 2012, 66 percent by 2013 and 100 percent by 2014. If an engine cannot be equipped with a PM filter it will need to be replaced by January 1, 2018. Pre-1977 model year school buses must be replaced by 2012. No reporting is required, but fleets must keep records.

### If I decide to sell my vehicle, do I have to notify the buyer of the requirements of this regulation?

Yes. Any person selling a vehicle subject to the Truck and Bus Regulation must provide a specific disclosure statement in writing to the buyer on the bill of sale, sales contract addendum, or invoice. See Regulatory Advisory 416 at *www.arb.ca.gov/enf/advs/advs416.pdf*.

### For more information

Other fact sheets and additional information are available at: *www.arb.ca.gov/dieseltruck* or by calling ARB's diesel hotline at (866) 6DIESEL (866-634-3735). To obtain this document in an alternative format or language, please contact (866) 634-3735. TTY/TDD/ Speech to Speech users may dial 711 for the California Relay Service.

**EXHIBIT E**

State of California
AIR RESOURCES BOARD

**EXECUTIVE ORDER R-11-009**

Adoption of Amendments to the Regulation to Reduce Emissions
of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria
Pollutants from In-Use Heavy-Duty Diesel-Fueled Vehicles

WHEREAS, on December 17, 2010, the Air Resources Board (the Board or ARB) conducted public hearing after issuance of a Notice of Public Hearing (45-Day Notice) to consider the adoption of amendments to the "Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants from In-Use Heavy-Duty Diesel-Fueled Vehicles (Truck and Bus regulation), title 13, California Code of Regulations (Cal. Code Regs.), section 2025; the Heavy-Duty Vehicle Greenhouse Gas (GHG) Emission Reduction Measure (Tractor-Trailer GHG regulation), title 17, Cal. Code Regs., sections 95301 to 95307, 95309, and 95311; and the regulation for In-Use On-Road Heavy-Duty Diesel-Fueled Drayage Trucks at Ports and Intermodal Rail Yard Facilities (Drayage Truck regulation), title 13, Cal. Code Regs., section 2027;

WHEREAS, the California Environmental Quality Act (CEQA) requires that no project which may have significant adverse environmental impacts may be adopted as originally proposed if feasible alternatives or mitigation measures are available to reduce or eliminate such impacts, unless specific overriding considerations are identified which outweigh the potential adverse consequences of any unmitigated impacts;

WHEREAS, CEQA allows public agencies to prepare a plan or other written documentation in lieu of an environmental impact report or negative declaration (i.e., a functional equivalent environmental document), once the Secretary of the Resources Agency has certified an agency's regulatory program pursuant to section 21080.5 of the Public Resources Code;

WHEREAS, pursuant to section 21080.5 of the Public Resources Code, the Secretary of the Resources Agency has certified that portion of the ARB's regulatory program that involves the adoption, approval, amendment, or repeal of standards, rules, regulations, or plans;

WHEREAS, ARB's certified regulatory program provides that when an action contemplated by the Board may have a significant effect on the environment, ARB staff shall prepare a staff report that shall contain a description of the proposed action, an assessment of anticipated significant long or short-term adverse and beneficial environmental impacts associated with the proposed action and a succinct analysis of those impacts, which shall include a discussion of feasible mitigation measures and alternatives to the proposed action;

WHEREAS, concurrent with publication of the 45-Day Notice, ARB issued an Initial Statement of Reasons (Staff Report) that included an environmental analysis that addressed potential long and short-term environmental impacts related to the proposed amendments given California's severe recession and its impact on operation of heavy-duty vehicle emission sources;

WHEREAS, at the December 17, 2010 public hearing, the Board adopted Resolution 10-44 (copy of which is attached hereto as Attachment 1), which directed the staff to modify the initially proposed amendments that were part of the 45-Day Notice, consistent with the resolution and the suggested modifications presented by staff in Attachment B to the resolution;

WHEREAS, Resolution 10-44 further directed the Executive Officer to make the modifications to the initially proposed amendments to the regulation available for public comment for a period of 15 days, that he consider written comments submitted during the 15-day comment period, make such further modifications as may be appropriate in light of the comments received, and that he should return to the Board for further consideration if he determines that this is warranted;

WHEREAS, Resolution 10-44 also directed the Executive Officer to prepare and approve written responses to comments received, including comments raising significant environmental issues, as required by Government Code section 11346.9, Public Resource Code section 21080.5(d)(2)(D), and Cal. Code Regs., title 17, section 60007, determine whether there are feasible alternatives or mitigation measures that could be implemented to reduce or eliminate any potential adverse environmental impacts, while at the same time addressing the serious economic recession and its impact on industry and residents of the State, make findings as required by Public Resources Code section 21081 if the proposed amendments would result in one or more significant adverse environmental effects, and take final action to adopt the proposed amendments to the Truck and Bus regulation, as modified in the publicly noticed 15-day changes;

WHEREAS, on May 19, 2011, ARB issued the modified regulation, reflecting the amendments considered by the Board and other conforming modifications, which were made available for public comment for a period of 15-days, with the changes to the originally proposed text clearly indicated, in accordance with the provisions of title 1, California Code of Regulations, section 44 (15-Day Notice);

WHEREAS, written comments were received during the initial 45-day comment period and after issuance of 15-day comment period and oral comments were received as part of the testimony taken at the December 17, 2010 Board hearing, and among the comments received were comments that raised potentially significant environmental issues;

WHEREAS, pursuant to the Board's direction in Resolution 10-44, ARB staff has summarized and prepared written responses to comments raising significant environmental issues, (a copy of which is attached hereto as Attachment 2); and

WHEREAS, the Executive Officer has deemed it is necessary to bifurcate the amendments to sections 2025, title 13, Cal. Code Regs., and 95301 to 95307, 95309, and 95311, title 17, Cal. Code Regs. from the proposed amendments to sections 2027, title 13, Cal. Code Regs. to ensure that the amendments to the three regulations covered by the 45-Day Notice are handled expeditiously and become operative as soon as possible.

NOW, THEREFORE, IT IS ORDERED that the recitals and findings contained in Resolution 10-44 are incorporated by reference herein.

IT IS FURTHER ORDERED that I hereby certify that the environmental analysis prepared for the amendments to the Truck and Bus regulation was prepared in accordance with the requirements of ARB's certified regulatory program under CEQA.

IT IS FURTHER ORDERED that I hereby approve each of the written responses to comments raising significant environmental issues as set forth in Attachment 2.

IT IS FURTHER ORDERED that after fully considering the amendments as modified by the 15-Day Notice, the environmental analysis, and the full record before me, I find:

The amendments to the Truck and Bus regulation will not result in any adverse impacts to the environment, and therefore, no mitigation measures, findings or statement of overriding considerations are required;

ARB adopted the Truck and Bus regulation in 2008/2009 to, among other things, reduce the public's health risk exposure to diesel particulate matter (PM), an identified toxic air contaminant, and meet the national ambient air quality standards (NAAQS) established by U.S. EPA for PM 2.5 and ozone by 2014 and 2023 respectively;

The severe, long-lasting recession experienced in the United States and California, specifically, has impacted the number of on-road heavy-duty vehicles operating and total vehicle miles travelled by these vehicles in California, and the consequent emissions from these vehicles is less than ARB forecasted when the Truck and Bus regulation was first considered for adoption in 2008;

The revised inventories for on-road heavy-duty vehicles, combined with the effects of the recession and the emission reductions forecasted to be achieved from the Truck and Bus regulation, as initially adopted in 2008/2009, achieve emission reductions greater than the emission

reductions that California needs to meet its NAAQS emission reduction obligations under the State Implementation Plan (SIP);

Although in the short term, the amendments will result in some foregone emission reduction benefits that would have been achieved absent the amendments to the regulation, the effects of the recession and amendments long-term will result in environmental benefits at least equal to the initially adopted regulation;

Given the revised inventory and the lower emissions caused by the recession, the amendments to the Truck and Bus regulation will not cause emissions to exceed the emission reduction targets of the SIP or the forecasted emission levels that were anticipated by the regulation as initially adopted in 2008/2009, therefore, the amendments will not have a significant adverse environmental effect on air quality.

IT IS FURTHER ORDERED, the amendments to Cal. Code Regs., title 13, section 2025, as set forth in the Final Regulation Order, which is attached hereto as Attachment 3, are adopted.

Executed this 19th day of September 2011, at Sacramento, California.


James N. Goldstene
Executive Officer



Attachments