BROOKS ELLISON
State Bar No. 122705
PATRICK J. WHALEN
State Bar No. 173489
THE LAW OFFICES OF BROOKS ELLISON
1725 Capitol Ave.
Sacramento, CA 95811
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
California Dump Truck Owners Association

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION<br><br>　　　　　Plaintiff,<br>　　vs.<br><br>MARY D. NICHOLS, Chairperson of the California Air Resources Board; JAMES GOLDSTENE, Executive Officer of the California Air Resources Board; and DOES 1-50<br><br>　　　　　Defendants,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>　　　　　Defendant-Intervenor | Case No.  2:11-CV-00384-MCE-GGH<br><br>**PLAINTIFF CDTOA's OPPOSITION TO CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:　　　　January  26, 2012<br>Time:　　　　2:00 p.m.<br>Courtroom.:　7 |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................. 1

III. NRDC's CROSS-MOTION FOR SUMMARY JUDGMENT MUST BE DENIED ............ 2

  A.  Section 7416 Does Not Expressly Grant States Any Authority.......................................... 2

  B.  Section 7543(d) Does Not Expressly Grant States Any Authority ....................................... 3

  C.  NRDC's Legislative Intent Arguments Demonstrate Why CDTOA's Motion for Summary
Judgment Must Be Granted ....................................................................................... 4

IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.............. 6

  A.  There Is No Presumption Against Preemption Applicable to this Case ............................... 6

  B.  The Preemption Provision ........................................................................................ 8

  C.  The Two-Part Test for Evaluating Whether State Laws Fall into the Safety Exception ....... 8

  D.  The Intent of the Air Resources Board in Promulgating the Regulation ............................ 10

  E.  Health is Distinct from Safety ................................................................................. 11

  F.  The Regulation is not "Genuinely Responsive to Safety Concerns".................................. 15

CONCLUSION.............................................................................................................. 18

Opp. to Cross-Motions for Summary Judgment

# TABLE OF AUTHORITIES

**Cases**

*Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218, 224 (2nd Cir. 2008)......... 14

*American Trucking Association v. City of Los Angeles*, 559 F.3d 104.................................. 9, 12

*Automobile Club of New York, Inc. v. Dykstra,* 520 F.3d 210, 215 (2nd Cir. 2008) .................... 9

*City of Columbus v. Ours Garage and Wrecker Services, Inc.,* 536 U.S. 424, 442 (2002)...... 8, 15

*CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ............................................ 8

*Digital Equipment Corporation v. Desktop Direct Inc.*, 511 U.S. 863, 879 (1994)...................... 4

*Dilts v. Penske*, case # 08-CIV-318 JLS (BLM), ___ F.Supp.2d ___, 2011 WL 4975520 (S.D.
    Cal. 2011)........................................................................................................................... 14

*Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) ............................................................................... 7

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ...................................................................... 7

*Pacific Gas & Electric Company v. State Energy Resources Conservation and Development
    Commission*, 461 U.S. 190, 204 (1983) ............................................................................... 7

*Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 230 (1947)............................................. 7

*Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 ............................. 9, 11, 12

**Statutes**

42 U.S.C. § 7416.................................................................................................................. 2, 3, 4

42 U.S.C. § 7543 ...................................................................................................................... 3, 4

49 U.S.C. § 14501 ....................................................................................................... 4, 6, 8, 13

**Regulations**

13 CCR § 2025................................................................................................................................ 6

Opp. to Cross-Motions for Summary Judgment

## I. INTRODUCTION

Both Intervenor Natural Resources Defense Council ("NRDC") and Defendants Nichols and Goldstene ("Defendants") have filed separate cross-motions for summary judgment. In the interest of efficiency, Plaintiff CDTOA will respond to both cross-motions in this brief.

## II. STATEMENT OF FACTS

Both cross motions for summary judgment rely on the notion the diesel PM 2.5 causes several thousand premature deaths in California. Nichols et al. Ps & As at 2-3, 7; NRDC Ps and As at 3. That factual assertion is very much in dispute. Scientific evidence demonstrates that there is no relationship between diesel PM and premature mortality. Declaration of S. Stanley Young ("Young Dec.") ¶ 7, 8, 52, 53; declaration of James E Enstrom ("Enstrom Dec.") ¶ 9-11, 14. Early studies showing demonstrating causation have subsequently been undermined. Young Dec. ¶ 19, 36. In fact, there is no association of PM 2.5 with statistical deaths. Young Dec. ¶ 8, 9; Enstrom Dec. ¶ 9-11, 13, 14.

The cross motions also rely on the premise that trucks and buses are the largest single mobile source of emissions in California. Nichols et al. Ps & As at 2, 7; NRDC Ps and As at 2. This is an extremely misleading statement. According to the United States EPA, dust and fuel combustion account for *three times* as much PM 2.5 emissions as *all mobile sources* in California. Young Dec. ¶ 17, Exh. 1. When looking at all emissions sources in California, mobile sources account for less than 18% of the total PM 2.5 emissions in California. Moreover, trucks and buses comprise only a subset of all mobile sources. *Id.* See Young Dec. ¶ 55, 56.

This Court need not resolve the disputes of fact. Indeed, notwithstanding the substantial disputes of fact, the cross-motions for summary judgment must be denied even assuming the factual predicates upon which they are based are true. As to NRDC, the argument for implied repeal is unsupported by statutory text notwithstanding their reliance upon the disputed facts above. As to defendants, even assuming their version of facts is true such that they have articulated a public health concern for the Truck and Bus Rule, binding precedent mandates that

Opp. to Cross-Motions for Summary Judgment

public health is distinct from safety and thus the Rule cannot fit within the "safety exception" to preemption.

## III.  NRDC's CROSS-MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

NRDC's motion is based on a false premise.  NRDC argues repeatedly that Congress has "expressly" reserved to the states the power to regulate in-use motor vehicles.  Based on that falsehood, they create a straw man argument:  the FAAAA did not repeal the express authority Congress supposedly gave the states.  The argument can quickly be dispatched.

### A.  Section 7416 Does Not Expressly Grant States Any Authority

The NRDC argument begins by purporting to cite "federal authority that expressly reserves the power of states to adopt 'operational' restrictions for 'in-use' motor vehicles." NRDC Ps & As at 9.  However, that authority is not quite as "express" as NRDC claims.  NRDC cites two federal statutes as the basis for this "express" authority.  NRDC Ps & As at 10.  First, they cite 42 U.S.C. § 7416, which provides as follows:

> Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

Interestingly, the NRDC brief does not quote section 7416.  Rather, they simply assert that under the section, "Congress generally reserved *all* State rights to control and regulate air pollution except those rights specifically preempted by the Clean Air Act."  NRDC Ps & As at 10, emphasis in original.  In fact, the plain language of the section does nothing of the sort.  Quite the opposite, section 7416 does not grant states any powers whatsoever.  Rather, the section

merely states that, to the extent states may already have power to regulate air emissions, "nothing *in this chapter*" precludes or preempts that authority.  And even that statement is subject to a number of statutory exceptions.

In other words, section 7416 is a very limited statement clarifying that "this chapter" does not preempt state authority, except to the extent it does.  Section 7416 appears in Chapter 85 of Title 42.  Title 42 is entitled "Public Health and Welfare," and Chapter 85 concerns air pollution. From its plain language, section 7416 contemplates that Congress may very well preempt state authority in *another* chapter, or even another title of the code; they simply did not do so in Chapter 85 (again, with a few exceptions).

Section 7416 does not expressly grant the states any authority whatsoever.  It is simply a statement that Chapter 85 is not intended to eliminate state authority, to the extent they have it from some other source.

**B.  Section 7543(d) Does Not Expressly Grant States Any Authority**

The other statute cited by NRDC as the source of the "express authority" is 42 U.S.C. § 7543(d).  NRDC Ps & As at 10.  That subdivision provides as follows:

> (d) Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

Similar to section 7416, this statute is not an express grant of authority, but rather a statement of the absence of preemption "in this part."  Section 7543 appears in Part A of subchapter II of Chapter 85 of Title 42.  Part A deals specifically with air quality and emissions. By its plain language, the statute contemplates that congressional action in another part of the code may very well preempt state authority in the area of regulating motor vehicles.

NRDC thus errs when it asserts that section 7416 and 7543(d) expressly authorized states to regulate motor vehicles.  The statutes simply make clear that the parts and chapters of the code in which those sections appear were not intended to preempt state authority; they say nothing about whether the states actually have any substantive authority to begin with.  Because the

3

statutes do not grant any substantive authority, the notion that the FAAAA must have repealed those statutes is a red herring.

The FAAAA did indeed preempt state law, but in so doing it did not expressly or impliedly repeal sections 7416 or 7543(d). There was no need to do so. Although the preemption clause in 49 U.S.C. § 14501(c)(1) clearly prohibits states from regulating motor carriers in ways related to their prices, routes or service, that express preemption provision does not conflict at all with the two statutes cited by NRDC. Rather, it is quite consistent with sections 7416 and 7543(d). Section 14501(c)(1) appears in Title 49 of the code – a completely different part and different chapter than those referenced in sections 7416 and 7543(d). Accordingly, to the extent section 14501(c)(1) does preempt state authority, it does so without violating the proscription against such preemption set forth in section 7416 and 7543(d) because it appears outside of the designated "this chapter" (as to section 7416) and "this part" (as to section 7543(d)).

It is a bedrock principle when construing statutes that an effort should be made to harmonize them with other statutes and existing law. *Digital Equipment Corporation v. Desktop Direct Inc*., 511 U.S. 863, 879 (1994). In violence to this well-established rule, the NRDC motion for summary judgment seeks to create a conflict where there is none. There is simply no need to inquire whether section 14501(c)(1) repealed portions of the Clean Air Act – expressly or impliedly – because the two statutory schemes can so easily be read together without conflict. The Clean Air Act did not preempt states' authority to regulate motor vehicles, but the FAAAA undoubtedly did.

## C. NRDC's Legislative Intent Arguments Demonstrate Why CDTOA's Motion for Summary Judgment Must Be Granted

Because the entire premise of NRDC's cross-motion for summary judgment is premised on a false conflict between the cited statutory provisions, their motion should be denied. However, before addressing the companion cross-motion, it is worth reviewing some of the points used to support NRDC's argument as they bear on the companion cross-motion.

In purporting to identify the types of regulations that the FAAAA sought to preempt, NRDC characterizes the forbidden laws as "economic regulations." NRDC Ps & As at 11. Referring to the conference report on the FAAAA, NRDC argues that the FAAAA was intended to prevent "state regulations that required companies that wanted to change their prices to go through costly and lengthy proceedings in every state in which they operated." *Id*. NRDC also correctly notes that the FAAAA was intended to eliminate

> the inefficiency created when rates for intrastate shipments exceeded rates for comparable distances across state lines—resulting in companies inefficiently shipping goods across state lines and back to the state of origin to avoid the higher rates for purely in-state shipments.

*Id*. Interestingly, the Truck and Bus Rule creates precisely these types of costs and inefficiencies. By requiring motor carriers in California to either retrofit their trucks, replace their engines, or purchase new trucks, the rule will impose significant costs on in-state motor carriers. These costs will necessarily increase the prices in California. Motor carriers not located in California will of course have fewer costs, and thus will be able to afford lower prices. A motor carrier who operates vehicles in multiple states will have different pricing schemes, because the costs will be significantly higher to operate in California than elsewhere as a direct result of the rule.

It is important to accurately understand the costs that will be borne by the truck owners as a result of the rule. Air Resources Board staff purportedly analyzed the costs of the rule based on a survey of some segment of the trucking industry. Brasil Dec. ¶ 36. Based on an unspecified method of calculation, the staff "estimated" that the cost of compliance would be between .056% and .116% of gross annual domestic product. Brasil Dec. ¶ 36. Because the method of calculation is not defined, it is difficult to determine how this number could be remotely accurate. What is certain is that plaintiff has provided evidence that the retrofit devices cost between $18,074 per truck to $44,372 per truck.  Recupido Dec. ¶ 11; McClernon Dec. ¶ 5. Since retrofit technology is not available for all trucks, they will likely have to be replaced. Even those that can be retrofit still have to be replaced within a number of years. Replacing a truck

Opp. to Cross-Motions for Summary Judgment

entirely costs between $120,000 and $125,000 per truck.  Recupido Dec. ¶ 7; McClernon Dec. ¶ 2.  Thus, the cost for compliance will be tens of thousands of dollars *per truck.*  It is these exorbitant costs that will result in California truckers having to charge higher prices and provide fewer services.  The ARB staff calculation is disturbingly silent as to whether the estimate is based on the cost of retrofit, replacement, or both.  But disguising the cost as a small percentage of gross revenue based on a self-selected population of truckers who completed an online survey is a disingenuous way of masking the real dollar cost, which has not been disputed.

Moreover, the very inefficiency identified by Congress – more expensive intrastate shipments than interstate shipments – is the inevitable result of the rule, because it allows out-of-state, noncompliant vehicles to operate in California so long as they obtain a three day pass.  13 CCR § 2025(p)(5).  Under this part of the Truck and Bus Rule, it will be less expensive to transport shipments *interstate*, because out of state motor carriers can transport property into California without complying with the rule.  However, intrastate shipments entirely within California will be vastly more expensive simply because the motor carriers in California must bear the expenses associated with the regulation.  Accordingly, while NRDC's motion must be denied, their arguments have the unintended effect of demonstrating precisely why CDTOA's motion must be granted.

## IV.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

The Cross Motion for Summary Judgment filed by defendants Nichols and Goldstene is based almost entirely on the assertion that the Truck and Bus Rule is saved from preemption by the "safety exception" in 49 U.S.C. 14501(c)(2)(A).  As will be shown, that assertion is incorrect.

### A.  There Is No Presumption Against Preemption Applicable to this Case

Before turning to the safety exception, however, Defendants Nichols and Goldstene advance a one-paragraph argument asserting that there is a presumption against preemption.  Nichols et al. Ps & As at 4.  The argument begins accurately enough by stating the

Opp. to Cross-Motions for Summary Judgment

noncontroversial rule that there is generally a presumption against preemption of state laws, unless Congress' intent to preempt is clear and manifest. *Id.* However, the argument fails to look at Congress' intent in this case. In fact, Congress' intent could not be any clearer, because in this case there is an *express* preemption provision.

Federal preemption of state law can occur where there is an actual conflict between state and federal law. See, e.g., *Pacific Gas & Electric Company v. State Energy Resources Conservation and Development Commission*, 461 U.S. 190, 204 (1983). Preemption can also occur where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Moreover, preemption may even occur when the nature of Congress's regulation is such that the federal court is convinced that "Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 230 (1947).

Traditional preemption cases begin with a comparison of the state and federal laws in question to see if there is a conflict between the two, with a presumption against preemption. In this case, however, no such presumption applies because the intent to preempt state laws is express. Specifically, the FAAAA provides:

> (1) General Rule. Except as provided in paragraphs (2) and (3), a State [or] political subdivision of a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). The assertion by Defendants Nichols and Goldstene that there is a presumption against preemption is true in the abstract, but not in this case. Here, the presumption is completely rebutted by the plain text of Congress' statutory enactment. All that remains is to determine the scope of that preemption provision, unencumbered by any presumptions. This is so because "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). When a federal law contains an express preemption clause, courts "focus on the plain

7

wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

## B.  The Preemption Provision

In this case, there is a clear and unambiguous express preemption clause in section 14501(c)(1), which expressly prohibits states from enacting or enforcing enforce any law, or regulation related to a price, route, or service of any motor carrier.  This express preemption provision is subject to a number of exceptions, set forth in 49 U.S.C. § 14501(c)(2) and (c)(3). The list of exceptions to preemption includes intrastate transportation of household goods, (§ 14501(c)(2)(B)), the price of nonconsensual towing (§ 14501(c)(2)(C)), and various antitrust provisions applicable to intrastate transportation of property (§ 14501(c)(3A)).  None of those have any applicability to the instant case, and defendants properly do not rely upon them.

Instead, defendants rely upon § 14501(c)(2)(A), which specifies that the preemption provision in § 14501(c)(1)

> shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization

Their brief properly focuses on the scope of that "safety exception."

## C.  The Two-Part Test for Evaluating Whether State Laws Fall into the Safety Exception

Unfortunately, the Defendants' brief fails to set forth the relevant standard for evaluating claims that state laws and regulations fall within the safety exception.  The United States Supreme Court has declared that "[l]ocal regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule."  *City of Columbus v. Ours Garage and Wrecker Services, Inc.,* 536 U.S. 424, 442 (2002).  Accordingly, the only state regulation of motor carriers that is permissible is regulation that is "genuinely responsive to safety concerns."

8

In defining the standard to be used for evaluating whether the safety exception to preemption applies, the Ninth Circuit has provided guidance.

> This standard requires that we consider intent. We must ask if the regulator "was acting out of safety concerns."  [Citation.]  That is, we must consider whether the purpose and intent was "truly safety." But that does not mean that we are required to take the regulator at its word; we need to go further with the analysis. [Citation.]  We must still decide whether the regulation is genuinely responsive to safety concerns.

*American Trucking Association v. City of Los Angeles*, 559 F.3d 1046, 1053-1054 (9th Cir. 2009.).  Thus, there is a two part test, each part of which must be satisfied:

      1) Is the regulatory scheme in question intended to address safety concerns?

      2) Regardless of intent, does the regulatory scheme actually address safety concerns, i.e. is it "genuinely responsive to safety concerns?"

      Other courts employ the same two-part test in determining whether a particular law is "genuinely responsive to safety concerns."

> First, a court must consider any specific expressions of legislative intent in the statute itself as well as the legislative history.  Then, it must assess those "purported safety justifications ... in light of the existing record evidence.

*Automobile Club of New York, Inc. v. Dykstra,* 520 F.3d 210, 215 (2nd Cir. 2008).

      The Ninth Circuit also made clear that care must be taken not to read the safety exception too broadly, and generic public health concerns were insufficient to invoke the exception:

> Moreover, even if some kind of general public health concerns are (or may be) involved in a statute or regulation-for example control of cigarette usage-that alone does not bring the regulation within the ambit of the motor vehicle safety exception.  Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it.

*American Trucking Association v. City of Los Angeles*, *supra*, 559 F.3d at 1054, citing *Rowe v. New Hampshire Motor Transport Association*, *supra*, 552 U.S. 364 at, 374.  Thus, the Ninth

Opp. to Cross-Motions for Summary Judgment

Circuit has made it clear that the preemption provision itself is clear, and that the safety exception to preemption must be read narrowly.

### D.  The Intent of the Air Resources Board in Promulgating the Regulation

In their brief, Defendants purport to identify the Board's purposes in adopting the Truck and Bus Regulation as follows:

> to reduce the amount of air pollution emitted from trucks and buses and to help California attain national ambient air quality standards in order to protect the health of Californians and comply with the Clean Air Act.

Nichols et al. Ps & As at 6.  At the outset, it is difficult to discern whether this statement of purpose is an accurate paraphrasing of the Board's true purposes.  The statement of purpose set forth above is supported in the brief with a citation to paragraph 12 of Mary Nichols and James Goldstene's Statement of Undisputed Material Facts In Support Of Cross-Motion for Summary Judgment.  Reviewing that document, paragraph 12 does indeed recite a statement of purpose that is slightly more specific, but generally consistent with the passage quoted in the brief.  However, that statement is supported by citation to the Declaration of Tony Brasil, ¶3, as well as some pages in an exhibit to that declaration.  Unfortunately, perhaps through a typographical error, the cited paragraph in Mr. Brasil's declaration says nothing about purpose, but rather concerns his educational background.  Nevertheless, a thorough review of the material provided in support of Defendant's Cross Motion is adequate to determine the Boards' purposes, and they are not safety but health.

For example, later in Mr. Brasil's declaration, he states that he and his staff "designed the Truck and Bus Regulation to protect public health and safety."  Brasil decl. at ¶ 11.  This statement is illuminating because it evinces recognition of the fact that "health" and "safety" are two distinct concepts, such that they were stated separately in the conjunctive.  But notwithstanding the "safety" gloss attributed to the regulation by Mr. Brasil in his declaration – undoubtedly prepared for litigation – the better indicia of the Board's intent, and the one sanctioned by the case law, is the regulatory history of the regulation at issue.

To that end, Exhibit 1 attached to Mr. Brasil's declaration is a resolution by the Air Resources Board which sets forth, inter alia, the Board's findings and purposes.  See Brasil decl. at ¶ 12.  The resolution contains a series of "whereas" clauses, and on page 1 of that resolution, the Board notes "the public policy of the state that emissions of toxic air contaminants should be controlled to levels that prevent harm to the *public health*."  Emphasis added.  Later in the resolution, the Board acknowledges the California Legislature's determination that there could be "serious *public health* impacts" from air contaminants.  Brasil Decl. Exh. 1, pp. 3-4.  Still later, the Board specifically states its intent "to reduce the *health risks* associated with such pollutants."  Brasil Decl. Exh. 1, p. 11, emphasis added.  Moreover, the Board found that the regulation would reduce cancer, premature deaths, "and other *adverse health effects*."  *Id*. at pp. 11-12, emphasis added.

Thus, regardless of the "health and safety" gloss now attributed to the rule, it is apparent from the plain text of the Board's resolution that the concern was not safety, nor even "health and safety," but simply health.  References to the alleged public health impacts abound throughout the resolution, but there is nary a word referring to safety.[1]  The concern for public health at the heart of the regulation is not subject to reasonable dispute.  In their motion, Defendants attempt to shoehorn public health concerns into the safety exception, and it simply does not fit.

**E.  Health is Distinct from Safety**

The Supreme Court has specifically held that public health is not an exception to preemption, holding that public health is different than public safety.  *Rowe v. New Hampshire Motor Transport Association, supra*, 552 U.S. 364 at 374.  In *Rowe*, the issue was whether the state could regulate tobacco shipments by requiring shippers to utilize only carriers with a specific recipient-verification service to ensure that only persons with a Maine tobacco license

---

[1] Not including, of course, the many references to California Health and Safety Code.

Opp. to Cross-Motions for Summary Judgment

1   received tobacco, and by imputing upon persons knowledge that a package contains tobacco

2   under specific circumstances.  *Id.* at 369.  The purpose of the law was to prevent minors from

3   obtaining cigarettes, but the Court determined that notwithstanding that laudable goal, the

4   method chosen by Maine ran afoul of federal law.  *Id.* at 373-374.  The decision in Rowe

5   completely forecloses any notion that the public health concerns arising out of pollution fall

6   within the safety exception to the FAAAA.

7          To begin with, the Supreme Court in *Rowe* made clear that the safety exception to the

8   FAAAA was limited to "motor vehicle safety" and not safety in general.  *Id.* at 373.  On this

9   point, the court noted that "[m]any products create "public health" risks of differing kind and

10  degree."  *Id.* at 375.  By expressly refusing to find that the health risks associated with tobacco

11  smoke could be deemed to fall within the exception for "*motor vehicle* safety" the Court has

12  already rejected an expansive interpretation of the exception to preemption.  The public health

13  risks from tobacco smoke is analogous in kind to the risks associated with diesel pollution.  Both

14  tobacco smoke and diesel pollution are potentially damaging to lungs, and prolonged exposure

15  can result in health consequences and perhaps even premature death.  While public health may

16  be a laudable goal, Congress has already determined that states cannot regulate public health by

17  regulating motor carriers.

18         Subsequent to *Rowe*, the Ninth Circuit picked up on the Supreme Court's narrow

19  interpretation of the safety exception, including the language from *Rowe* that requires the focus

20  be on "motor vehicle safety," rather than simply safety in general.  Specifically, in explaining

21  how to assess the breadth of the safety exception, the Ninth Circuit noted, "While there is no

22  bright line test for what is related to vehicle safety, cases to date do give some guidance in that

23  regard."  *American Trucking Association v. City of Los Angeles*, *supra*, 559 F.3d at 1054.  It is

24  therefore clear that what is important is "vehicle safety," not a generalized concern with public

25  safety, and certainly not public health.

26         Faced with the wealth of evidence that the Board was concerned with health and not

27  safety, and in light of binding Supreme Court precedent that distinguishes public health from

28  safety, the sole authority offered by Defendants to support their view that the safety exception

Opp. to Cross-Motions for Summary Judgment

includes public health is the Webster's Dictionary definition of "safety."  Nichols et al. Ps & As
at 8.  Presumably, the edition of Webster's chosen by Defendants is the one most helpful to their
argument, but even their chosen definition does not refer at all to public health, but rather
freedom from exposure to danger, hurt, or injury.  *Id.*  Interestingly, another edition of Webster's
contains a simpler definition of safety:  "being safe; security."  Webster's New World Dictionary
and Thesaurus (Second ed., 2002), p. 564.  Plaintiff concedes that the definition of "safety" can
vary and depends on context.  However, the context of the FAAAA in no way suggests that the
term "safety," as used in the exception to preemption provision, is broad enough to include
public health.

Section 14501(c)(2)(A) creates three general categories of laws that are not preempted:
(1) "the safety regulatory authority of a State with respect to motor vehicles"; (2) highway route
controls based on weight or hazardous cargo; (3) minimum insurance requirements. Only the
first category is invoked by defendants Nichols and Goldstene.  At the outset, it is worthwhile to
note that the very fact that the provision includes three separate categories is indicative of the
fact that the safety exception is to be read narrowly.  It obviously does not include highway
controls based on the weight of the vehicle or the hazardous nature of the cargo, as that exception
to preemption is spelled out as a separate category.  One might argue that restricting the types of
vehicles that could travel on a state highway based on their weight might be generally related to
safety, since the state authorities would likely be in the best position to determine what size and
weight of vehicle could safely travel on their roads.  But Congress thought otherwise, and
expressly included a separate exception to preemption on that basis.  Similarly, controlling the
types of hazardous material that can be transported on state roadways might generally thought to
be related to safety, but Congress did not believe that the general "safety exception" included
that idea, and took pains to make it its own exception.  (Indeed, one of the principal dangers from
hazardous materials is that they pose a *public health* risk if they leak or are not transported
properly.  As such, it is understandable that Congress did not believe such regulations fell into
the "safety" exception.)  Likewise, the notion that states could require certain minimum levels of
insurance might be thought to be generally related to safety, inasmuch as it directly relates to

Opp. to Cross-Motions for Summary Judgment

compensating the victims of unsafe driving. But again, Congress has rejected the notion that the safety exception is broad enough to permit states to legislate in the area of insurance, and instead has carved out a specific exception for that purpose.

From the plain text of the provision, it is clear that "the safety regulatory authority of a State with respect to motor vehicles" must be read narrowly, so as not to include weight controls, hazardous materials regulations, or insurance laws. From the case law, it is clear that the provision cannot include public health. Since the decision in *Rowe,* other circuits have recognized that the safety exception is not broad enough to include rules related to public health. "Additionally, we note that *Rowe* declined to read into § 14501(c)(1)'s preemption provision an exception that preserves state laws protecting the public health." *Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218, 224 (2nd Cir. 2008). In *Cuomo*, the court was evaluating the New York "Passenger Bill of Rights" which required airplane passengers to be given access to food, water, fresh air, and sanitation facilities while delayed on the ground for more than three hours. The court found that the state law was preempted and did *not* fall within the safety exception. *Id*. at 224.

Even other federal courts in California have a narrow view of the "safety exception." In *Dilts v. Penske*, case # 08-CIV-318 JLS (BLM), ___ F.Supp.2d ___, 2011 WL 4975520 (S.D. Cal. 2011), plaintiffs alleged that the defendants had failed to provide rest breaks, overtime, and other wages to its delivery drivers. On October 19, 2011, the district court granted the defendant's motion for partial summary judgment, finding that the California meal and rest break laws codified in California Labor Code §§ 226.6 and 512 were indeed preempted as to the defendants, because it was a motor carrier under the FAAAA. *Id*. at *1. The district court rejected the argument that the meal and rest break laws fell within the safety exception. Id. at *12.

In so doing, the district court characterized the safety exception in the same manner as did the United States Supreme Court and the Ninth Circuit: "the kinds of general public health concerns that are (or may be) involved in the California M & RB laws are not within the scope of the motor vehicle safety exception." By characterizing it as a "motor vehicle safety exception"

Opp. to Cross-Motions for Summary Judgment

the court was following the high Court's earlier lead in *Rowe* and limiting the scope of the exception to matters that truly involve motor vehicle safety.

In its analysis, the district court noted that employees denied meal and rest breaks "face greater risk of work-related accidents and increased stress." *Id*. at *12. Nevertheless, the court found that "although the public health concerns addressed by the M & RB laws are certainly serious, they are not directly connected to motor vehicle safety." *Id*. at *12. In an insightful passage, the court warned about the dangers of an overly broad view of the safety exception. "If the Court were to hold them directly connected, then any law impacting the health and safety of an employee would fall within the motor vehicle safety exception simply because the employee is the driver of a potentially dangerous motor vehicle." *Id*. at *12. The Truck and Bus Regulation is even further removed than the rules at issue in *Dilts*. Whereas the rule in *Dilts* at least had an impact on the health of the drivers, the Truck and Bus Regulation seeks to impact the health of the public in general. In other words, rather than focusing on the drivers themselves, or perhaps all motorists on the roadways, the Truck and Bus Regulation is focused on people who have no connection to the motor carrier industry whatsoever. Thus, it is a general public health law, which, as the court in *Dilts* pointed out, would completely eviscerate the preemption provision if it was allowed to fit within the safety exception.

## F.  The Regulation is not "Genuinely Responsive to Safety Concerns"

Because it is apparent that purpose of the Truck and Bus Regulation was to protect public health, rather than safety, there is little need to inquire into the second prong of the relevant test. Under Supreme Court precedent, a state or local law cannot be saved from preemption via the safety exception unless it is "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage and Wrecker Services, Inc., supra*, 536 U.S. 424, 442. However, as discussed above during the analysis of the first prong – the purpose of the regulation – it is clear that the rule deals with public health, not safety. It should come as no surprise then that the regulation responds to those health concerns, but does not respond to any legitimate safety concerns. For all the same reasons that public health is distinct from safety in analyzing the intent of the regulation, health is also distinct from safety when analyzing the effect.

Opp. to Cross-Motions for Summary Judgment

1   If matters of public health are not included within the safety exception, as the Supreme
2   Court has held, then the Defendants' motion must be denied, because by definition the regulation
3   cannot be deemed genuinely responsive to safety concerns when there are in fact no true safety
4   concerns at all.  Near the end of the Defendants' brief is a plea that sums up the dispute in this
5   case:  "the safety exception should be construed to include state laws intended to protect the
6   public from the harmful air pollution effects of motor carriers."  Nichols et al. Ps & As at 8.
7   However, it is plain that Congress did not include air pollution regulations in the exceptions to
8   preemption.  Rather, they carved out a narrow band of motor vehicle safety regulations, which
9   would fairly include such topics as speed limits, proper safety equipment likes brakes and lights,
10  etc.  The problem with Defendant's view of the safety exception is that it would simply swallow
11  the rule.  If air pollution is related a generalized concern for "safety" and as such is within the
12  exception, then virtually any law or regulation intended to benefit or protect the public could be
13  shielded from Congress' express desire for preemption.  After all, what law does not purport to
14  protect the public in some way by making them "safer"?

15  In plaintiff's view, "safety" must be defined with reference to the statutory text, and in
16  the context of the legal landscape in which Congress legislated.  In defining what constitutes
17  "safety," plaintiff believes courts should consider both the immediacy of the threat, as well as the
18  nature of the threatened injury.  Unlike health impacts, which typically manifest themselves over
19  time after repeated exposure to a toxin, "safety" tends to connote an immediate threat of bodily
20  injury.  Thus, under the safety exception, states can require that motor carriers have sufficient
21  equipment on their trucks to ensure they will operate safely on the roadways, and not expose the
22  motor public to any risk of dangerous motor vehicle accidents.  States can act to prevent motor
23  carriers from travelling down the highway while emitting clouds of opaque smoke that inhibits
24  the ability of other drivers to see clearly and drive safely.  But they cannot legislate in areas
25  aimed only at incrementally making the public "healthier."

26  The emissions that the Truck and Bus Regulation is designed to reduce do not present an
27  immediate physical threat.  Quite the opposite, the very rationale for the regulation in this case is
28  that prolonged exposure to PM 2.5 may cause "premature deaths."  In other words, those

16

individuals who are susceptible to the adverse health impacts of PM 2.5 may die in 25 years rather than 30 years.  While that is certainly a public health concern, it does not qualify as the narrow type of "safety" concern that Congress expressly excepted from the express preemption provision.  Accordingly, the Defendants' motion for summary judgment must be denied.

17

## CONCLUSION

The FAAAA does not conflict with the Clean Air Act, and thus there is no need to inquire whether the FAAAA intended to repeal provisions of the Clean Air Act. Moreover, the Truck and Bus Regulation cannot be characterized as a "safety" regulation such that it is saved from preemption. For the foregoing reasons, the cross-motions for summary judgment must be denied.

THE LAW OFFICES OF BROOKS ELLISON

Dated: January 12, 2012

/s/ Patrick J. Whalen

PATRICK J. WHALEN

Attorneys for Plaintiff
CALIFORNIA DUMP TRUCK OWNERS
ASSOCIATION

Opp. to Cross-Motions for Summary Judgment