UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DUMP TRUCK OWNERS ASSOCIATION, | No. 2:11-cv-00384-MCE-GGH |
| Plaintiff, | MEMORANDUM AND ORDER |
| v. | |
| MARY D. NICHOLS, et al., | |
| Defendants. | |

----oo0oo----

Presently before the Court is Plaintiff California Dump Truck Owners Association's ("CDTOA" or "Plaintiff") Motion for Preliminary Injunction ("Motion"). By its Motion, CDTOA seeks to preliminarily enjoin enforcement of California's "Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles," Cal. Code Regs. tit. 13, § 2025 ("the Regulation" or "the Rule"), by Mary D. Nichols, Chairperson of the California Air Resources Board, and James Goldstene, Executive Officer of the California Air Resources Board, (collectively "ARB") on the basis that the Regulation is preempted by federal law.

The ARB and Defendant-Intervenor National Resources Defense Counsel ("NRDC") opposed CDTOA's Motion, and a hearing was held before this Court on December 15, 2011.  For the following reasons, Plaintiff's Motion is DENIED.

## BACKGROUND

**A.   Procedural Background**

CDTOA initiated this action on February 11, 2011, and filed its operative First Amended Complaint ("FAC") on April 6, 2011. ECF Nos. 1 and 12.  By Memorandum and Order dated May 20, 2011, this Court granted NRDC leave to intervene as Defendant.  ECF No. 18.

Just over one month later, CDTOA filed a motion for summary judgment, which it set for hearing on this Court's September 6, 2011 calendar.  ECF No. 22, 25.  Per the subsequent stipulation of the parties and the Order of this Court, hearing on the parties' cross-motions for summary judgment was reset for January 26, 2012.[1]  ECF Nos. 29-30.  Since the effective date of the Regulation was January 1, 2012, which is prior to the time the dispositive motions will be resolved, CDTOA filed the instant Motion seeking to temporarily enjoin enforcement of the Rule until such time as those summary judgment motions can be heard and decided.  Motion, 1:17-22.

///
///

---

[1] That hearing has since been continued to February 9, 2012. ECF No. 53.

**B.   Factual Background**

The challenged Regulation was adopted in 2008 and is intended to reduce amounts of diesel particulate matter ("PM") and oxides of nitrogen ("NOx") emissions from diesel-fueled trucks and buses operating within the state. ARB Opposition, 1:6-8; 3:3-5.[2] The Regulation was adopted as part of California's plan to satisfy national air quality standards set by the federal Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq.

Over eighty-percent of California's nearly one million heavy-duty trucks are fueled by diesel, and those diesel-fueled vehicles are the largest source of PM and NOx emissions in California. Id., 2:5-9. According to the ARB, those emissions "contribute to ambient levels of PM composed of particles 2.5 microns or less in diameter," which cause a variety of health problems, up to and including death. Id., 2:12-16. NOx is also a "precursor to ozone," exposure to which carries its own health risks. Id., 2:17-19.

The Regulation combats these emissions in two ways. First, covered vehicles are required to have diesel particulate filters installed to reduce PM emissions. Id., 3:13-14. Accordingly, by the applicable regulatory deadlines, older trucks will need to either be retrofitted with filters or have their engines replaced with model year 2007 or newer engines, engines that are already equipped with updated filtering technology. Id., 3:14-17.

---

[2] Many of these relatively undisputed facts are repeated in multiple filings. Where appropriate for convenience, however, the Court limits citations to one source.

3

In addition, all engines will have to be upgraded to model year 2010 engines (or engines with equal or lower emissions) by separate regulatory deadlines. Id., 3:17-19. The NRDC provided a chart helpful in illustrating the compliance schedule:

| Engine Model Year Schedule | |
|---|---|
| Engine Year | Requirement from January 1, 2012 |
| Pre-1994 | No requirements until 2015, then 2010 engine |
| 1994-95 | No requirements until 2016, then 2010 engine |
| 1996-99 | PM filter from 2012 to 2020, then 2010 engine |
| 2000-04 | PM filter from 2013 to 2021, then 2010 engine |
| 2005-06 | PM filter from 2014 to 2022, then 2010 engine |
| 2007-09 | No requirements until 2023, then 2010 engine |
| 2010 | Meets final requirements |

NRDC Opposition, 4:3-12.

Accordingly, most heavy-duty trucks must have filters installed by 2014. ARB Opposition, 3:20-21. Similarly, all heavy-duty truck engines must be replaced with model year 2010 engines by 2023. Id., 3:22-24. The only real requirement effective in 2012, then, is that fleets of trucks with 1996 to 1999 model year engines must install the requisite filters. Id., 4:2-4. Compliance with the Regulation even as to these trucks can nonetheless be delayed under certain provisions of the Rule. Id., 4:4-10. In addition, there are grants and loan assistance programs available to help truck owners bring their vehicles into compliance. Id., 4:11-21. In fact, in response to the national recession, the ARB amended the Regulation last year specifically to reduce compliance costs. Id., 3:5-7.

4

Accordingly, while it is estimated that the Regulation will cost $1.5 billion over the first five years of its implementation and $2.2 billion over the Rule's life, NRDC Opposition, 4:27-28, the amendments are expected to reduce compliance costs by fifty to sixty percent. Id., 3:8-10.

CDTOA is a trade association representing nearly 1,000 trucking companies "whose business constitutes over 75% of the hauling of dirt, rock, sand, and gravel operations in California." Motion, 1:10-13. CDTOA contends that "[v]irtually all of the trucks owned and operated by CDTOA members are subject to the [Regulation]" and that the Rule "imposes steep fines and penalties on anyone who operates their trucks in violation of the [R]egulation." Id., 2:16-18; 2:26-3:2. According to the CDTOA, however, retrofitting the covered trucks is prohibitively expensive for many of its members and makes the vehicles less efficient, more prone to breakdowns, and harder to resell. FAC, ¶¶ 7-11. CDTOA thus contends that if the Regulation is enforced, its members will suffer irreparable harm, "including...loss of...businesses and livelihoods, which in turn will proximately cause some members to be at risk of losing their trucks, homes, cars, and the ability to purchase the basic necessities of life." Id., ¶ 20.

Indeed, according to the CDTOA, its members' primary source of livelihood is their diesel-powered trucks. Motion, 3:3-4. Members anticipate utilizing their trucks for decades, and they purchase those trucks via conditional sales contracts typically extending five or six years. Id., 3:4-5.

///

5

1  The diesel trucks at issue here typically cost at least $130,000,
2  and can easily cost over $210,000.  Id., 3:5-7.  Finance charges
3  run around fifteen to twenty percent.  Id., 3:5-6.
4     The available technology necessary to retrofit CDTOA
5  members' trucks in compliance with the Regulation, however, costs
6  at least $18,000 per truck.  Id., 3:10-12.  CDTOA contends that
7  its members cannot afford to pay these types of compliance costs,
8  and that, especially in light of the other economic factors
9  currently affecting the construction industry, if forced to
10 either comply or cease operations, those members will likely lose
11 their businesses.  Id., 3:12-4:6.  CDTOA claims that, at the very
12 least, its members will be forced to make tough business
13 decisions prior to resolution of the parties' dispositive
14 motions.  Id., 4:9.  For example, CDTOA members allege they may
15 have to decide whether to lay off employees or to sell older
16 trucks to subsidize the cost of future compliance with the
17 Regulation.  Id., 4:9-6:21 (citing Declarations of Ernie Wipf
18 ("Wipf Decl."), Mike Parigini ("Parigini Decl."), Jed Kern ("Kern
19 Decl.") and Tom Santoro ("Santoro Decl.")).  Likewise, CDTOA
20 contends its members will have to raise prices or reduce services
21 in order to ensure compliance with the Regulation to counter the
22 increase in costs.  See, e.g., id., 4:19-20 (citing Wipf Decl.,
23 ¶ 5); 5:14-17 (citing Parigini Decl., ¶ 5); 6:3-8 (citing Kern
24 Decl., ¶ 6); 6:18-21 (citing Santoro Decl., ¶ 5); 9:2-9.
25 ///
26 ///
27 ///
28 ///

Accordingly, given the impending deadlines imposed by the Regulation and the grave consequences CDTOA alleges will befall its members if the Rule is enforced, CDTOA initiated this action alleging the Regulation is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1), pursuant to the Supremacy Clause of Article VI of the United States Constitution.  CDTOA now asks this Court to preliminarily enjoin enforcement of the Regulation while the parties' dispositive motions are pending.  For the following reasons, Plaintiff's Motion is DENIED.

**STANDARD**

The party requesting preliminary injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009).  "To support injunctive relief, harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough." Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co., 2011 WL 5126999, *3 (9th Cir.).
///
///
///
///

1    Alternatively, under the so-called sliding scale approach, as long as the Plaintiff demonstrates the requisite likelihood of irreparable harm and shows that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in Plaintiff's favor. <u>Alliance for Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131-35 (9th Cir. 2011) (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after <u>Winter</u>).

**ANALYSIS**

**A.   Likelihood of Success on the Merits**

Through the instant action, CDTOA argues the Regulation is preempted by the FAAAA because the Rule attempts to impermissibly regulate in an area "related to a price, route, or service of a motor carrier...with respect to the transportation of property," in violation of 49 U.S.C. § 14501(c)(1). The ARB and the NRDC contend CDTOA's argument is flawed because any effect the Regulation has on CDTOA members' prices, routes or services is too attenuated to justify preemption under that section. In addition, even if the Court were to find the Regulation preempted under Section 14501(c)(1), it is the ARB's and the NRDC's position that the Rule is saved by a statutory "safety exception" codified in 49 U.S.C. § 14501(c)(2).

///
///

This Court now finds that CDTOA has failed to show a likelihood of success on the merits of its claim that the Regulation is preempted by the FAAAA, 49 U.S.C. § 14501(c)(1).  Accordingly, the Court need not reach the parties' dispute regarding the safety exception, and CDTOA's Motion is DENIED.[3]

Resolution of the preemption issue "commence[s] with the assumption that state laws dealing with matters traditionally within a state's police powers are not to be preempted unless Congress's intent to do so is clear and manifest." Californians for Safe and Competitive Dump Truck Transportation v. Mendonca ("Mendonca"), 152 F.3d 1184, 1186 (9th Cir. 1998) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  The prevention of air pollution falls within the states' traditional police powers.  Pacific Merchant Shipping Ass'n v. Goldstene, 639 F.3d 1154, 1167 (9th Cir. 2011).  "Thus, the crux of this case is whether Congress exhibited a clear and manifest intent to preempt" the Regulation.  Mendonca, 152 F.3d at 1187.

"On January 1, 1995, Section 601 of the [FAAAA] became federal law.  As a general matter, this section preempts a wide range of state regulation of intrastate motor carriage." Id.  As relevant here, the FAAAA provides:

> [A] State...may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier...with respect to the transportation of property.

---

[3] The NRDC also argues that the Regulation cannot be preempted by the FAAAA because such preemption would result in the implied repeal of the CAA.  NRDC Opposition, 6:5-11:16.  Because the Court finds CDTOA is unlikely to succeed on the merits of its statutory preemption argument, however, it need not reach this additional issue.

9

49 U.S.C. § 14501(c)(1) (emphasis added). Congress enacted this preemption provision because it "believed that across-the-board deregulation was in the public interest as well as necessary to eliminate non-uniform state regulations of motor carriers which had caused 'significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology, and curtail[ed] the expansion of markets.'" Mendonca, 152 F.3d at 1187 (quoting H.R. Conf. Rep. No. 103-677 at 86-8 (1994)). In addition, "by enacting a preemption provision identical to an existing provision deregulating air carriers (the Airline Deregulation Act ('ADA')), Congress sought to 'even the playing field' between air carriers and motor carriers." Id.[4]

The Supreme Court in Rowe v. New Hampshire Motor Transport Ass'n, 552 U.S. 364 (2008), subsequently considered the reach of the FAAAA's preemption clause. According to Rowe, "(1)...[s]tate enforcement actions having a connection with, or reference to carrier rates, routes, or services are pre-empted; (2)...such pre-emption may occur even if a state law's effect on rates, routes or services is only indirect; (3)...in respect to preemption, it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation; and

---

[4] The imbalance alluded to here "arose out of [the Ninth Circuit's] decision in Federal Express Corp. v. California Pub. Utils. Comm'n, 936 F.2d 1075 (9th Cir. 1991). By holding that Federal Express fit within the ADA's definition of 'air carrier,' [that] court concluded that California's intrastate economic regulations of the carrier's shipping activities were preempted. As a result, air-based shippers gained a sizeable advantage over their more regulated, ground-based shipping competitors. By preempting the states' authority to regulate motor carriers, Congress sought to balance the regulatory 'inequity' produced by the ADA's preemption of the states' authority to regulate air carriers." Id.

10

(4)...preemption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and preemption-related objectives." 552 U.S. at 370 (internal citations and quotations omitted) (emphasis omitted).  The Rowe Court recognized "Congress' overarching goal as helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" Id. (internal citations omitted).  That Court nonetheless observed that "federal law might not pre-empt state laws that affect fares in only a 'tenuous, remote, or peripheral...manner.'" Id. (internal citations omitted).

The line at which a particular regulation crosses from impermissibly relating to carrier prices, routes, or services, and becomes "tenuous, remote, or peripheral," remains unclear, though the Ninth Circuit recently provided guidance on the issue:

> The terms "rates, routes, and services" were "used by Congress in the public utility sense; that is, service refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided....Rates indicates price; routes refers to courses of travel." Air Transport Ass'n of Am. v. City & Cnty. of San Francisco, 266 F.3d 1064, 1071 (9th Cir. 2001) (internal quotation marks, citations, and alterations omitted); see also Rowe, 552 U.S. at 372-73 (describing a motor carrier's services as its system for picking up, sorting, and carrying goods).
>
> In determining whether a provision has a connection to rates, routes, or services, we must examine the actual or likely effect of a State's action. Cf. Cal. Div. of Labor Standards Enforcement v. Dillingham Constr. NA, Inc., 519 U.S. 316, 325 (1997); Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1189 (9th Cir. 1998).

11

> If the State, for example, mandates that motor carriers provide a particular service to customers, or forbids them to serve certain potential customers, the effect is clear, and the provision is preempted if it has the force and effect of law. See Rowe, 552 U.S. at 372-73; Morales [v. Trans World Airlines, Inc., 504 U.S. 374, 388-89 (1992)] (noting that advertising guidelines expressly referenced rates and had a forbidden significant effect on the fares charged). The waters are murkier, though, when a State does not directly regulate (or even specifically reference) rates, routes, or services. We recognize that FAAA Act "preemption may occur even if a [S]tate law's effect on rates, routes, and services 'is only indirect.'" Rowe, 552 U.S. at 370 (quoting Morales, 504 U.S. at 386). At the same time, we require that the effect on rates, routes or services be more than "tenuous" or "remote." Id. at 371 (quoting Morales, 504 U.S. at 390).
>
> In such a "borderline" case, the proper inquiry is whether the provision directly or indirectly, "binds the ...carrier to a particular price, route or service and thereby interferes with competitive market forces within the...industry." Air Transport, 266 F.3d at 1072; cf. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 232-33 (1995) (holding that the Airline Deregulation Act's preemption clause "stops States from imposing their own substantive standards with respect to rates, routes, or services" but does not prevent States from enforcing dispute resolution provisions in contracts signed by airlines); Mendonca, 152 F.3d at 1189 (holding that a State minimum wage statute did not affect rates, routes or services).

American Trucking Associations, Inc. v. City of Los Angeles, 660 F.3d 384, 396-97 (9th Cir. 2011) (internal footnotes omitted).

For its part, CDTOA thus argues that the cost of compliance with the Regulation is so great that, to compensate, CDTOA members will be required to increase prices or decrease service levels. Some operators believe the cost of compliance will force them out of business, and CDTOA believes the ARB's own estimate that the Regulation will cost the industry $2.2 billion evidences the impact the rule will have on carrier prices.

///

Various truck owners also aver that reduction in fleet sizes will reduce the level of services they can provide customers. Finally, CDTOA argues that the Regulation will affect existing routes because "the available retrofit technology limits the length of time trucks can run continuously" so that CDTOA members will likely have to alter routes to accommodate for their trucks' more limited operational capacity.

The ARB and NRDC argue, to the contrary, that any relationship between the Regulation and CDTOA's members' prices, routes or services is "remote, tenuous, and peripheral" at best. More specifically, they assert that: 1) cost increases alone are insufficient to warrant a finding that the instant Rule is impermissibly "related to" carrier "prices"; 2) the Regulation does not bind motor carriers to any particular services; and 3) CDTOA has put on insufficient evidence that the technology required under the Regulation impacts trucks' functionality or, consequently, the routes on which those vehicles can travel. The ARB and the NRDC have the better argument, and, for purposes of the instant Motion, the CDTOA has not convinced this Court that the effect of the Regulation on its members' prices, services or routes is anything other than "tenuous" or "remote" or that the rule somehow "binds" carriers "to a particular price, route or service" thereby interfering with competitive market forces.

First, in <u>Mendonca</u>, the Ninth Circuit rejected an FAAAA preemption challenge to California's Prevailing Wage Law, California Labor Code §§ 1770-80 ("CPWL"), that is similar in principle to CDTOA's instant challenge. 152 F.3d 1184.
///

13

In that case, the plaintiffs, public works contractors providing transportation-related services, filed suit against several California agencies alleging that the CPWL, which required contractors and subcontractors awarded public works contracts to pay "not less than the general prevailing rate...for work of a similar character in the locality in which the public work is performed," was preempted by the FAAAA. Id. at 1186. The Ninth Circuit affirmed the district court's decision granting the defendants' subsequent motion to dismiss and holding that the CPWL was not preempted. Id. at 1186, 1190.

As pertinent here, the Mendonca plaintiffs argued that their prices were dependent, in part, on wage rates and that the CPWL wage requirements there had both increased plaintiffs' prices by 25% and forced plaintiffs to "re-direct and re-route equipment" to compensate for losses in revenue. Id. at 1189. The Ninth Circuit acknowledged that, "[w]hile CPWL in a certain sense [was] 'related to' [plaintiffs'] prices, routes and services,...the effect [was] no more than indirect, remote, and tenuous." Id. The CPWL was thus not "related to" the plaintiffs' prices, routes, and services as intended by the FAAAA, and, despite plaintiffs' allegations that the CPWL increased their wage costs and thus forced plaintiffs to dramatically increase their prices, the Ninth Circuit found the effect on "prices" too attenuated to hold the CPWL preempted. Id.

///
///
///
///

14

Plaintiff's action before this Court is on par with Mendonca. Indeed, Plaintiff's primary basis for claiming the Regulation is related to prices is that the costs of compliance are so exorbitant Plaintiff will have no viable alternative other than to raise prices.  Pursuant to Mendonca, however, while the Regulation may be "in a certain sense" related to CDTOA members' prices, that relationship is likely insufficient to warrant a preemption finding here.

In light of Mendonca, Plaintiff has likewise failed to convince the Court it can show any more than a tenuous relationship between the Regulation and any of its members' "services."  According to Plaintiff, "[c]ompliance with the rule will force trucking companies to...lower the level of service they provide."  Motion, 13:9-10.  Plaintiff's argument is, generally stated, that because costs of compliance are high, its members will have to reduce the size of their fleets, thus limiting the level of future service those members will be able to provide.  Motion, 14:5-4.  In fact, CDTOA contends that some of its members have already either dropped or anticipate dropping their service levels "to nothing, by essentially going out of business."  Motion, 14:12-14.  Plaintiff's argument, however, is insufficient to justify a preemption finding because nothing in the Regulation actually "binds" Plaintiff's members to make any changes to their services.

///
///
///
///

15

1    To the contrary, at its most basic, Plaintiff's service-
2 related argument is simply an incarnation of its above cost-based
3 "price" argument.  Plaintiff is essentially arguing that the cost
4 to comply with the Regulation is so high that business owners
5 will choose to reduce fleet sizes and, thus, to reduce services.
6 That is no different from CDTOA's prior argument in which
7 Plaintiff claimed the cost to comply with the Regulation is so
8 high that business owners will choose to raise prices.
9 Accordingly, for the reasons already stated, and again pursuant
10 to Mendonca, this argument is rejected.
11    CDTOA disagrees and asks this Court to instead rely on the
12 district court decision in Dilts v. Penske, 2011 WL 4975520 (S.D.
13 Cal. 2011), to find the Regulation preempted.  That case,
14 however, is not only not binding on this Court, it is
15 distinguishable on its facts.
16    In Dilts, employees engaged in delivery services filed suit
17 against their employer alleging violation of California's meal
18 and rest break laws.  Id. at *2.  According to the employees,
19 they had not been provided the appropriate duty-free breaks.  The
20 Dilts court determined that "the length and timing of meal and
21 rest breaks seems directly and significantly related to such
22 things as the frequency and scheduling of transportation" because
23 the "laws impact the number of routes each [employee] may go on
24 each day," "the types of roads ...[employees] may take and the
25 amount of time it takes them to reach their destination."  Id.
26 at *9.  Accordingly, in very simple terms, the applicable laws in
27 that case mandated that drivers stop at particular intervals
28 throughout the day.

16

1  During those intervals no services could be provided.  Such is
2  not the case here where the challenged rule instead simply
3  mandates the technology that must be utilized on the trucks.  The
4  choice to forego any service for any period of time is thus not
5  dictated by the Regulation; it is dictated by the owner or
6  operator of the vehicle.  The Regulation in the instant case is
7  therefore much more analogous to Mendonca's prevailing wage laws,
8  which required an across the board wage increase, than to the
9  meal and rest break laws in Dilts.
10      Plaintiff's final contention, that the Regulation will
11 affect routes, is also rejected.  According to Plaintiff, the
12 technology required by the Regulation is unreliable, causing
13 breakdowns and fuel inefficiency, which will force carriers to
14 choose to employ different routes.  Plaintiff's evidence,
15 however, is speculative at best.  See Declaration of Lee Brown,
16 ¶ 9 (indicating that "[a]nectdotal stories now abound within the
17 industry" regarding engine reliability and efficiency);
18 Declaration of Jay Pocock, ¶¶ 5-6 (recounting declarant's
19 negative experience with one filter on one truck).  Accordingly,
20 even assuming Plaintiff's argument could justify a finding that
21 the Regulation more than tenuously or remotely affects its
22 members' routes, which this Court doubts for the reasons already
23 stated, the Court is simply not willing to preliminarily enjoin a
24 state regulation on the basis of such scant evidence.
25 ///
26 ///
27 ///
28 ///

Accordingly, CDTOA has not shown for purposes of the instant Motion that it is likely to succeed on the merits, nor has it raised substantial questions going to the merits, of its claim.[5]

**B.  Likelihood of Irreparable Harm**

Plaintiff has failed to carry its burden of showing that, absent an injunction, its members will likely suffer the requisite irreparable harm. CDTOA alleges its members will be required to spend thousands of dollars to bring their trucks or fleets of trucks into compliance with the Regulation. However, it is not seriously contested that only certain motor carriers with model year 1996 to 1999 engines are required to employ retrofit technology by January 1, 2012. Moreover, the ARB and the NRDC point out that these carriers can utilize compliance credits and delay provisions to reduce their immediate compliance costs, in some cases to zero. Accordingly, CDTOA has failed to show its members will be irreparably injured or that any injury is in any way "imminent." Moreover, the injunctive relief CDTOA seeks is much too broad because, despite the fact that only limited regulatory requirements go into effect in 2012, the CDTOA asks this Court to enjoin enforcement of the Regulation in its entirety. Motion, 20:3-4.

---

[5] Plaintiff's remaining authority, American Trucking Associations v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009) ("ATA"), does not persuade this Court otherwise, primarily because Plaintiff misconstrued its facts. When read properly, that case has no real relevance to the decision facing this Court now. Accordingly, this Court rejects CDTOA's invitation to rely on ATA.

Accordingly, CDTOA has failed to show that its various doomsday predictions are imminently likely to come to fruition or that injunctive relief, especially of the magnitude sought here, is warranted.

### C.  **Balance of Hardships and the Public Interest**

Given this Court's above findings, the Court also now holds that the public interest and the balance of hardships weigh in favor of denying injunctive relief.  As just stated, the hardships likely to befall CDTOA's members in the immediate future are speculative, appear somewhat exaggerated, and in no sense do they outweigh the interest of the State of California in enforcing its own rules or the interest of the public in reducing emissions.  Moreover, CDTOA assumes this case will be resolved short of trial and that any injunction entered will consequently be of short duration.  This assumption, however, is itself speculative; if it proves incorrect, any injunction could extend much longer.  See Motion, 10:16-18 (seeking an injunction "until [the Court] can rule on whether the Regulation is preempted by federal law").  Finally, CDTOA had ample time to challenge the Regulation prior to the January 1, 2012, effective date and chose not to do so until the relative last minute.  To permit CDTOA to capitalize on that delay by awarding an injunction now would be inequitable.  Likewise, awarding injunctive relief at this late date would be unfair to those motor carriers who have already undertaken compliance measures in advance of the Regulation's effective date.

19

Accordingly, the balance of hardships and the public interest weigh against granting CDTOA's requested relief.

**CONCLUSION**

Accordingly, for the reasons just stated, CDTOA's Motion is DENIED.

Dated: January 27, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE