UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA DUMP TRUCK OWNERS        No. 2:11-cv-00384-MCE-GGH
ASSOCIATION,

      Plaintiff,                 <u>MEMORANDUM AND ORDER</u>

  v.

MARY D. NICHOLS, et al.,

      Defendants.

----oo0oo----

Presently before the Court is Plaintiff California Dump Truck Owners Association's ("CDTOA" or "Plaintiff") Motion for Preliminary Injunction ("Motion").  By its Motion, CDTOA seeks to preliminarily enjoin enforcement of California's "Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles," Cal. Code Regs. tit. 13, § 2025 ("the Regulation" or "the Rule"), by Mary D. Nichols, Chairperson of the California Air Resources Board, and James Goldstene, Executive Officer of the California Air Resources Board, (collectively "ARB") on the basis that the Regulation is preempted by federal law.

1

The ARB and Defendant-Intervenor National Resources Defense
Counsel ("NRDC") opposed CDTOA's Motion, and a hearing was held
before this Court on December 15, 2011.  For the following
reasons, Plaintiff's Motion is DENIED.

**BACKGROUND**

**A.   Procedural Background**

CDTOA initiated this action on February 11, 2011, and filed
its operative First Amended Complaint ("FAC") on April 6, 2011.
ECF Nos. 1 and 12.  By Memorandum and Order dated May 20, 2011,
this Court granted NRDC leave to intervene as Defendant.  ECF
No. 18.

Just over one month later, CDTOA filed a motion for summary
judgment, which it set for hearing on this Court's September 6,
2011 calendar.  ECF No. 22, 25.  Per the subsequent stipulation
of the parties and the Order of this Court, hearing on the
parties' cross-motions for summary judgment was reset for
January 26, 2012.[1]  ECF Nos. 29-30.  Since the effective date of
the Regulation was January 1, 2012, which is prior to the time
the dispositive motions will be resolved, CDTOA filed the instant
Motion seeking to temporarily enjoin enforcement of the Rule
until such time as those summary judgment motions can be heard
and decided.  Motion, 1:17-22.

///

///

---

[1] That hearing has since been continued to February 9, 2012.
ECF No. 53.

2

1          **B.     Factual Background**

2

3          The challenged Regulation was adopted in 2008 and is

4    intended to reduce amounts of diesel particulate matter ("PM")

5    and oxides of nitrogen ("NOx") emissions from diesel-fueled

6    trucks and buses operating within the state.  ARB Opposition,

7    1:6-8; 3:3-5.[2]  The Regulation was adopted as part of

8    California's plan to satisfy national air quality standards set

9    by the federal Clean Air Act ("CAA"), 42 U.S.C. § 7401 <u>et seq.</u>

10         Over eighty-percent of California's nearly one million

11   heavy-duty trucks are fueled by diesel, and those diesel-fueled

12   vehicles are the largest source of PM and NOx emissions in

13   California.  <u>Id.</u>, 2:5-9.  According to the ARB, those emissions

14   "contribute to ambient levels of PM composed of particles 2.5

15   microns or less in diameter," which cause a variety of health

16   problems, up to and including death.  <u>Id.</u>, 2:12-16.  NOx is also

17   a "precursor to ozone," exposure to which carries its own health

18   risks.  <u>Id.</u>, 2:17-19.

19         The Regulation combats these emissions in two ways.  First,

20   covered vehicles are required to have diesel particulate filters

21   installed to reduce PM emissions.  <u>Id.</u>, 3:13-14.  Accordingly, by

22   the applicable regulatory deadlines, older trucks will need to

23   either be retrofitted with filters or have their engines replaced

24   with model year 2007 or newer engines, engines that are already

25   equipped with updated filtering technology.  <u>Id.</u>, 3:14-17.

26

27         [2] Many of these relatively undisputed facts are repeated in
     multiple filings.  Where appropriate for convenience, however,
28   the Court limits citations to one source.

In addition, all engines will have to be upgraded to model year 2010 engines (or engines with equal or lower emissions) by separate regulatory deadlines.  Id., 3:17-19.  The NRDC provided a chart helpful in illustrating the compliance schedule:

| Engine Model Year Schedule | |
| --- | --- |
| Engine Year | Requirement from January 1, 2012 |
| Pre-1994 | No requirements until 2015, then 2010 engine |
| 1994-95 | No requirements until 2016, then 2010 engine |
| 1996-99 | PM filter from 2012 to 2020, then 2010 engine |
| 2000-04 | PM filter from 2013 to 2021, then 2010 engine |
| 2005-06 | PM filter from 2014 to 2022, then 2010 engine |
| 2007-09 | No requirements until 2023, then 2010 engine |
| 2010 | Meets final requirements |

NRDC Opposition, 4:3-12.

Accordingly, most heavy-duty trucks must have filters installed by 2014.  ARB Opposition, 3:20-21.  Similarly, all heavy-duty truck engines must be replaced with model year 2010 engines by 2023.  Id., 3:22-24.  The only real requirement effective in 2012, then, is that fleets of trucks with 1996 to 1999 model year engines must install the requisite filters.  Id., 4:2-4.  Compliance with the Regulation even as to these trucks can nonetheless be delayed under certain provisions of the Rule. Id., 4:4-10.  In addition, there are grants and loan assistance programs available to help truck owners bring their vehicles into compliance.  Id., 4:11-21.  In fact, in response to the national recession, the ARB amended the Regulation last year specifically to reduce compliance costs.  Id., 3:5-7.

4

1  Accordingly, while it is estimated that the Regulation will cost
2  $1.5 billion over the first five years of its implementation and
3  $2.2 billion over the Rule's life, NRDC Opposition, 4:27-28, the
4  amendments are expected to reduce compliance costs by fifty to
5  sixty percent.  Id., 3:8-10.

6      CDTOA is a trade association representing nearly 1,000
7  trucking companies "whose business constitutes over 75% of the
8  hauling of dirt, rock, sand, and gravel operations in
9  California."  Motion, 1:10-13.  CDTOA contends that "[v]irtually
10 all of the trucks owned and operated by CDTOA members are subject
11 to the [Regulation]" and that the Rule "imposes steep fines and
12 penalties on anyone who operates their trucks in violation of the
13 [R]egulation."  Id., 2:16-18; 2:26-3:2.  According to the CDTOA,
14 however, retrofitting the covered trucks is prohibitively
15 expensive for many of its members and makes the vehicles less
16 efficient, more prone to breakdowns, and harder to resell.  FAC,
17 ¶¶ 7-11.  CDTOA thus contends that if the Regulation is enforced,
18 its members will suffer irreparable harm, "including...loss
19 of...businesses and livelihoods, which in turn will proximately
20 cause some members to be at risk of losing their trucks, homes,
21 cars, and the ability to purchase the basic necessities of life."
22 Id., ¶ 20.

23     Indeed, according to the CDTOA, its members' primary source
24 of livelihood is their diesel-powered trucks.  Motion, 3:3-4.
25 Members anticipate utilizing their trucks for decades, and they
26 purchase those trucks via conditional sales contracts typically
27 extending five or six years.  Id., 3:4-5.
28 ///

The diesel trucks at issue here typically cost at least $130,000, and can easily cost over $210,000. Id., 3:5-7.  Finance charges run around fifteen to twenty percent.  Id., 3:5-6.

The available technology necessary to retrofit CDTOA members' trucks in compliance with the Regulation, however, costs at least $18,000 per truck.  Id., 3:10-12.  CDTOA contends that its members cannot afford to pay these types of compliance costs, and that, especially in light of the other economic factors currently affecting the construction industry, if forced to either comply or cease operations, those members will likely lose their businesses.  Id., 3:12-4:6.  CDTOA claims that, at the very least, its members will be forced to make tough business decisions prior to resolution of the parties' dispositive motions.  Id., 4:9.  For example, CDTOA members allege they may have to decide whether to lay off employees or to sell older trucks to subsidize the cost of future compliance with the Regulation.  Id., 4:9-6:21 (citing Declarations of Ernie Wipf ("Wipf Decl."), Mike Parigini ("Parigini Decl."), Jed Kern ("Kern Decl.") and Tom Santoro ("Santoro Decl.")).  Likewise, CDTOA contends its members will have to raise prices or reduce services in order to ensure compliance with the Regulation to counter the increase in costs.  See, e.g., id., 4:19-20 (citing Wipf Decl., ¶ 5); 5:14-17 (citing Parigini Decl., ¶ 5); 6:3-8 (citing Kern Decl., ¶ 6); 6:18-21 (citing Santoro Decl., ¶ 5); 9:2-9.

///

///

///

///

1    Accordingly, given the impending deadlines imposed by the
2    Regulation and the grave consequences CDTOA alleges will befall
3    its members if the Rule is enforced, CDTOA initiated this action
4    alleging the Regulation is preempted by the Federal Aviation
5    Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C.
6    § 14501(c)(1), pursuant to the Supremacy Clause of Article VI of
7    the United States Constitution.  CDTOA now asks this Court to
8    preliminarily enjoin enforcement of the Regulation while the
9    parties' dispositive motions are pending.  For the following
10   reasons, Plaintiff's Motion is DENIED.

11

12                              **STANDARD**

13

14   The party requesting preliminary injunctive relief must show
15   that "he is likely to succeed on the merits, that he is likely to
16   suffer irreparable harm in the absence of preliminary relief,
17   that the balance of equities tips in his favor, and that an
18   injunction is in the public interest."  Winter v. Natural
19   Resources Defense Council, 555 U.S. 7, 20 (2008); Stormans, Inc.
20   v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009).  "To support
21   injunctive relief, harm must not only be irreparable, it must be
22   imminent; establishing a threat of irreparable harm in the
23   indefinite future is not enough."  Amylin Pharmaceuticals,
24   Inc. v. Eli Lilly and Co., 2011 WL 5126999, *3 (9th Cir.).
25   ///
26   ///
27   ///
28   ///

7

Alternatively, under the so-called sliding scale approach, as long as the Plaintiff demonstrates the requisite likelihood of irreparable harm and shows that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in Plaintiff's favor. <u>Alliance for Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131-35 (9th Cir. 2011) (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after <u>Winter</u>).

**ANALYSIS**

**A.   Likelihood of Success on the Merits**

Through the instant action, CDTOA argues the Regulation is preempted by the FAAAA because the Rule attempts to impermissibly regulate in an area "related to a price, route, or service of a motor carrier...with respect to the transportation of property," in violation of 49 U.S.C. § 14501(c)(1).  The ARB and the NRDC contend CDTOA's argument is flawed because any effect the Regulation has on CDTOA members' prices, routes or services is too attenuated to justify preemption under that section.  In addition, even if the Court were to find the Regulation preempted under Section 14501(c)(1), it is the ARB's and the NRDC's position that the Rule is saved by a statutory "safety exception" codified in 49 U.S.C. § 14501(c)(2).

///

///

8

1   This Court now finds that CDTOA has failed to show a likelihood

2   of success on the merits of its claim that the Regulation is

3   preempted by the FAAAA, 49 U.S.C. § 14501(c)(1).  Accordingly,

4   the Court need not reach the parties' dispute regarding the

5   safety exception, and CDTOA's Motion is DENIED.[3]

6        Resolution of the preemption issue "commence[s] with the

7   assumption that state laws dealing with matters traditionally

8   within a state's police powers are not to be preempted unless

9   Congress's intent to do so is clear and manifest." <u>Californians</u>

10  <u>for Safe and Competitive Dump Truck Transportation v. Mendonca</u>

11  ("<u>Mendonca</u>"), 152 F.3d 1184, 1186 (9th Cir. 1998) (<u>citing</u> <u>Rice v.</u>

12  <u>Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)).  The

13  prevention of air pollution falls within the states' traditional

14  police powers.  <u>Pacific Merchant Shipping Ass'n v. Goldstene</u>,

15  639 F.3d 1154, 1167 (9th Cir. 2011).  "Thus, the crux of this

16  case is whether Congress exhibited a clear and manifest intent to

17  preempt" the Regulation.  <u>Mendonca</u>, 152 F.3d at 1187.

18       "On January 1, 1995, Section 601 of the [FAAAA] became

19  federal law.  As a general matter, this section preempts a wide

20  range of state regulation of intrastate motor carriage."  <u>Id.</u>  As

21  relevant here, the FAAAA provides:

22       [A] State...may not enact or enforce a law, regulation,
         or other provision having the force and effect of law
23       <u>related to a price, route, or service of any motor</u>
         <u>carrier</u>...with respect to the transportation of
24       property.

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯
    [3] The NRDC also argues that the Regulation cannot be
27  preempted by the FAAAA because such preemption would result in
    the implied repeal of the CAA.  NRDC Opposition, 6:5-11:16.
    Because the Court finds CDTOA is unlikely to succeed on the
28  merits of its statutory preemption argument, however, it need not
    reach this additional issue.

1  49 U.S.C. § 14501(c)(1) (emphasis added).  Congress enacted this

2  preemption provision because it "believed that across-the-board

3  deregulation was in the public interest as well as necessary to

4  eliminate non-uniform state regulations of motor carriers which

5  had caused 'significant inefficiencies, increased costs,

6  reduction of competition, inhibition of innovation and

7  technology, and curtail[ed] the expansion of markets.'" Mendonca,

8  152 F.3d at 1187 (quoting H.R. Conf. Rep. No. 103-677 at 86-8

9  (1994)).  In addition, "by enacting a preemption provision

10  identical to an existing provision deregulating air carriers (the

11  Airline Deregulation Act ('ADA')), Congress sought to 'even the

12  playing field' between air carriers and motor carriers." Id.[4]

13      The Supreme Court in Rowe v. New Hampshire Motor Transport

14  Ass'n, 552 U.S. 364 (2008), subsequently considered the reach of

15  the FAAAA's preemption clause.  According to Rowe, "(1)...[s]tate

16  enforcement actions having a connection with, or reference to

17  carrier rates, routes, or services are pre-empted; (2)...such

18  pre-emption may occur even if a state law's effect on rates,

19  routes or services is only indirect; (3)...in respect to

20  preemption, it makes no difference whether a state law is

21  'consistent' or 'inconsistent' with federal regulation; and

22  _____

23  [4] The imbalance alluded to here "arose out of [the Ninth
    Circuit's] decision in Federal Express Corp. v. California Pub.
24  Utils. Comm'n, 936 F.2d 1075 (9th Cir. 1991).  By holding that
    Federal Express fit within the ADA's definition of 'air carrier,'
25  [that] court concluded that California's intrastate economic
    regulations of the carrier's shipping activities were preempted.
26  As a result, air-based shippers gained a sizeable advantage over
    their more regulated, ground-based shipping competitors.  By
27  preempting the states' authority to regulate motor carriers,
    Congress sought to balance the regulatory 'inequity' produced by
28  the ADA's preemption of the states' authority to regulate air
    carriers." Id.

1   (4)...preemption occurs at least where state laws have a

2   'significant impact' related to Congress' deregulatory and

3   preemption-related objectives." 552 U.S. at 370 (internal

4   citations and quotations omitted) (emphasis omitted). The Rowe

5   Court recognized "Congress' overarching goal as helping assure

6   transportation rates, routes, and services that reflect 'maximum

7   reliance on competitive market forces,' thereby stimulating

8   'efficiency, innovation, and low prices,' as well as 'variety'

9   and 'quality.'" Id. (internal citations omitted). That Court

10  nonetheless observed that "federal law might not pre-empt state

11  laws that affect fares in only a 'tenuous, remote, or

12  peripheral...manner.'" Id. (internal citations omitted).

13       The line at which a particular regulation crosses from

14  impermissibly relating to carrier prices, routes, or services,

15  and becomes "tenuous, remote, or peripheral," remains unclear,

16  though the Ninth Circuit recently provided guidance on the issue:

17       The terms "rates, routes, and services" were "used by
         Congress in the public utility sense; that is, service
18       refers to such things as the frequency and scheduling
         of transportation, and to the selection of markets to
19       or from which transportation is provided....Rates
         indicates price; routes refers to courses of travel."
20       Air Transport Ass'n of Am. v. City & Cnty. of San
         Francisco, 266 F.3d 1064, 1071 (9th Cir. 2001)
21       (internal quotation marks, citations, and alterations
         omitted); see also Rowe, 552 U.S. at 372-73 (describing
22       a motor carrier's services as its system for picking
         up, sorting, and carrying goods).
23
         In determining whether a provision has a connection to
24       rates, routes, or services, we must examine the actual
         or likely effect of a State's action. Cf. Cal. Div. of
25       Labor Standards Enforcement v. Dillingham Constr. NA,
         Inc., 519 U.S. 316, 325 (1997); Californians for Safe &
26       Competitive Dump Truck Transp. v. Mendonca, 152 F.3d
         1184, 1189 (9th Cir. 1998).
27

28

                                    11

If the State, for example, mandates that motor carriers provide a particular service to customers, or forbids them to serve certain potential customers, the effect is clear, and the provision is preempted if it has the force and effect of law.  See Rowe, 552 U.S. at 372-73; Morales [v. Trans World Airlines, Inc., 504 U.S. 374, 388-89 (1992)] (noting that advertising guidelines expressly referenced rates and had a forbidden significant effect on the fares charged).  The waters are murkier, though, when a State does not directly regulate (or even specifically reference) rates, routes, or services.  We recognize that FAAA Act "pre-emption may occur even if a [S]tate law's effect on rates, routes, and services 'is only indirect.'" Rowe, 552 U.S. at 370 (quoting Morales, 504 U.S. at 386).  At the same time, we require that the effect on rates, routes or services be more than "tenuous" or "remote." Id. at 371 (quoting Morales, 504 U.S. at 390).

In such a "borderline" case, the proper inquiry is whether the provision directly or indirectly, "binds the ...carrier to a particular price, route or service and thereby interferes with competitive market forces within the...industry." Air Transport, 266 F.3d at 1072; cf. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 232-33 (1995) (holding that the Airline Deregulation Act's preemption clause "stops States from imposing their own substantive standards with respect to rates, routes, or services" but does not prevent States from enforcing dispute resolution provisions in contracts signed by airlines); Mendonca, 152 F.3d at 1189 (holding that a State minimum wage statute did not affect rates, routes or services).

American Trucking Associations, Inc. v. City of Los Angeles, 660 F.3d 384, 396-97 (9th Cir. 2011) (internal footnotes omitted).

For its part, CDTOA thus argues that the cost of compliance with the Regulation is so great that, to compensate, CDTOA members will be required to increase prices or decrease service levels.  Some operators believe the cost of compliance will force them out of business, and CDTOA believes the ARB's own estimate that the Regulation will cost the industry $2.2 billion evidences the impact the rule will have on carrier prices.

///

12

Various truck owners also aver that reduction in fleet sizes will reduce the level of services they can provide customers. Finally, CDTOA argues that the Regulation will affect existing routes because "the available retrofit technology limits the length of time trucks can run continuously" so that CDTOA members will likely have to alter routes to accommodate for their trucks' more limited operational capacity.

The ARB and NRDC argue, to the contrary, that any relationship between the Regulation and CDTOA's members' prices, routes or services is "remote, tenuous, and peripheral" at best. More specifically, they assert that: 1) cost increases alone are insufficient to warrant a finding that the instant Rule is impermissibly "related to" carrier "prices"; 2) the Regulation does not bind motor carriers to any particular services; and 3) CDTOA has put on insufficient evidence that the technology required under the Regulation impacts trucks' functionality or, consequently, the routes on which those vehicles can travel.  The ARB and the NRDC have the better argument, and, for purposes of the instant Motion, the CDTOA has not convinced this Court that the effect of the Regulation on its members' prices, services or routes is anything other than "tenuous" or "remote" or that the rule somehow "binds" carriers "to a particular price, route or service" thereby interfering with competitive market forces.

First, in Mendonca, the Ninth Circuit rejected an FAAAA preemption challenge to California's Prevailing Wage Law, California Labor Code §§ 1770-80 ("CPWL"), that is similar in principle to CDTOA's instant challenge.  152 F.3d 1184.
///

In that case, the plaintiffs, public works contractors providing transportation-related services, filed suit against several California agencies alleging that the CPWL, which required contractors and subcontractors awarded public works contracts to pay "not less than the general prevailing rate...for work of a similar character in the locality in which the public work is performed," was preempted by the FAAAA.  Id. at 1186.  The Ninth Circuit affirmed the district court's decision granting the defendants' subsequent motion to dismiss and holding that the CPWL was not preempted.  Id. at 1186, 1190.

As pertinent here, the Mendonca plaintiffs argued that their prices were dependent, in part, on wage rates and that the CPWL wage requirements there had both increased plaintiffs' prices by 25% and forced plaintiffs to "re-direct and re-route equipment" to compensate for losses in revenue.  Id. at 1189.  The Ninth Circuit acknowledged that, "[w]hile CPWL in a certain sense [was] 'related to' [plaintiffs'] prices, routes and services,...the effect [was] no more than indirect, remote, and tenuous."  Id. The CPWL was thus not "related to" the plaintiffs' prices, routes, and services as intended by the FAAAA, and, despite plaintiffs' allegations that the CPWL increased their wage costs and thus forced plaintiffs to dramatically increase their prices, the Ninth Circuit found the effect on "prices" too attenuated to hold the CPWL preempted.  Id.

///

///

///

///

14

1    Plaintiff's action before this Court is on par with

2  Mendonca. Indeed, Plaintiff's primary basis for claiming the

3  Regulation is related to prices is that the costs of compliance

4  are so exorbitant Plaintiff will have no viable alternative other

5  than to raise prices.  Pursuant to Mendonca, however, while the

6  Regulation may be "in a certain sense" related to CDTOA members'

7  prices, that relationship is likely insufficient to warrant a

8  preemption finding here.

9    In light of Mendonca, Plaintiff has likewise failed to

10 convince the Court it can show any more than a tenuous

11 relationship between the Regulation and any of its members'

12 "services."  According to Plaintiff, "[c]ompliance with the rule

13 will force trucking companies to...lower the level of service

14 they provide."  Motion, 13:9-10.  Plaintiff's argument is,

15 generally stated, that because costs of compliance are high, its

16 members will have to reduce the size of their fleets, thus

17 limiting the level of future service those members will be able

18 to provide.  Motion, 14:5-4.  In fact, CDTOA contends that some

19 of its members have already either dropped or anticipate dropping

20 their service levels "to nothing, by essentially going out of

21 business."  Motion, 14:12-14.  Plaintiff's argument, however, is

22 insufficient to justify a preemption finding because nothing in

23 the Regulation actually "binds" Plaintiff's members to make any

24 changes to their services.

25 ///

26 ///

27 ///

28 ///

15

1    To the contrary, at its most basic, Plaintiff's service-
2    related argument is simply an incarnation of its above cost-based
3    "price" argument.  Plaintiff is essentially arguing that the cost
4    to comply with the Regulation is so high that business owners
5    will choose to reduce fleet sizes and, thus, to reduce services.
6    That is no different from CDTOA's prior argument in which
7    Plaintiff claimed the cost to comply with the Regulation is so
8    high that business owners will choose to raise prices.
9    Accordingly, for the reasons already stated, and again pursuant
10   to Mendonca, this argument is rejected.

11       CDTOA disagrees and asks this Court to instead rely on the
12   district court decision in Dilts v. Penske, 2011 WL 4975520 (S.D.
13   Cal. 2011), to find the Regulation preempted.  That case,
14   however, is not only not binding on this Court, it is
15   distinguishable on its facts.

16       In Dilts, employees engaged in delivery services filed suit
17   against their employer alleging violation of California's meal
18   and rest break laws.  Id. at *2.  According to the employees,
19   they had not been provided the appropriate duty-free breaks.  The
20   Dilts court determined that "the length and timing of meal and
21   rest breaks seems directly and significantly related to such
22   things as the frequency and scheduling of transportation" because
23   the "laws impact the number of routes each [employee] may go on
24   each day," "the types of roads ...[employees] may take and the
25   amount of time it takes them to reach their destination."  Id.
26   at *9.  Accordingly, in very simple terms, the applicable laws in
27   that case mandated that drivers stop at particular intervals
28   throughout the day.

16

1    During those intervals no services could be provided.  Such is

2    not the case here where the challenged rule instead simply

3    mandates the technology that must be utilized on the trucks.  The

4    choice to forego any service for any period of time is thus not

5    dictated by the Regulation; it is dictated by the owner or

6    operator of the vehicle.  The Regulation in the instant case is

7    therefore much more analogous to Mendonca's prevailing wage laws,

8    which required an across the board wage increase, than to the

9    meal and rest break laws in Dilts.

10       Plaintiff's final contention, that the Regulation will

11   affect routes, is also rejected.  According to Plaintiff, the

12   technology required by the Regulation is unreliable, causing

13   breakdowns and fuel inefficiency, which will force carriers to

14   choose to employ different routes.  Plaintiff's evidence,

15   however, is speculative at best.  See Declaration of Lee Brown,

16   ¶ 9 (indicating that "[a]nectdotal stories now abound within the

17   industry" regarding engine reliability and efficiency);

18   Declaration of Jay Pocock, ¶¶ 5-6 (recounting declarant's

19   negative experience with one filter on one truck).  Accordingly,

20   even assuming Plaintiff's argument could justify a finding that

21   the Regulation more than tenuously or remotely affects its

22   members' routes, which this Court doubts for the reasons already

23   stated, the Court is simply not willing to preliminarily enjoin a

24   state regulation on the basis of such scant evidence.

25   ///

26   ///

27   ///

28   ///

17

Accordingly, CDTOA has not shown for purposes of the instant Motion that it is likely to succeed on the merits, nor has it raised substantial questions going to the merits, of its claim.[5]

**B.   Likelihood of Irreparable Harm**

Plaintiff has failed to carry its burden of showing that, absent an injunction, its members will likely suffer the requisite irreparable harm.  CDTOA alleges its members will be required to spend thousands of dollars to bring their trucks or fleets of trucks into compliance with the Regulation.  However, it is not seriously contested that only certain motor carriers with model year 1996 to 1999 engines are required to employ retrofit technology by January 1, 2012.  Moreover, the ARB and the NRDC point out that these carriers can utilize compliance credits and delay provisions to reduce their immediate compliance costs, in some cases to zero.  Accordingly, CDTOA has failed to show its members will be irreparably injured or that any injury is in any way "imminent."  Moreover, the injunctive relief CDTOA seeks is much too broad because, despite the fact that only limited regulatory requirements go into effect in 2012, the CDTOA asks this Court to enjoin enforcement of the Regulation in its entirety.  Motion, 20:3-4.

---

[5] Plaintiff's remaining authority, American Trucking Associations v. City of Los Angeles,559 F.3d 1046 (9th Cir. 2009) ("ATA"), does not persuade this Court otherwise, primarily because Plaintiff misconstrued its facts.  When read properly, that case has no real relevance to the decision facing this Court now.  Accordingly, this Court rejects CDTOA's invitation to rely on ATA.

Accordingly, CDTOA has failed to show that its various doomsday predictions are imminently likely to come to fruition or that injunctive relief, especially of the magnitude sought here, is warranted.

## C.    Balance of Hardships and the Public Interest

Given this Court's above findings, the Court also now holds that the public interest and the balance of hardships weigh in favor of denying injunctive relief.  As just stated, the hardships likely to befall CDTOA's members in the immediate future are speculative, appear somewhat exaggerated, and in no sense do they outweigh the interest of the State of California in enforcing its own rules or the interest of the public in reducing emissions.  Moreover, CDTOA assumes this case will be resolved short of trial and that any injunction entered will consequently be of short duration.  This assumption, however, is itself speculative; if it proves incorrect, any injunction could extend much longer.  See Motion, 10:16-18 (seeking an injunction "until [the Court] can rule on whether the Regulation is preempted by federal law").  Finally, CDTOA had ample time to challenge the Regulation prior to the January 1, 2012, effective date and chose not to do so until the relative last minute.  To permit CDTOA to capitalize on that delay by awarding an injunction now would be inequitable.  Likewise, awarding injunctive relief at this late date would be unfair to those motor carriers who have already undertaken compliance measures in advance of the Regulation's effective date.

1  Accordingly, the balance of hardships and the public interest
2  weigh against granting CDTOA's requested relief.

3

4                              **CONCLUSION**

5

6      Accordingly, for the reasons just stated, CDTOA's Motion is
7  DENIED.

8
 Dated: January 27, 2012
9

10

11                              _____
                                MORRISON C. ENGLAND, JR.
12                              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      20